## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JAMAAL CAMERON; RICHARD
BRIGGS; RAJ LEE; MICHAEL
CAMERON; MATTHEW
SAUNDERS, individually and on
behalf of all others similarly situated,

      Plaintiffs,

      v.

MICHAEL BOUCHARD, in his
official capacity as Sheriff of Oakland
County; CURTIS D. CHILDS, in his
official capacity as Commander of
Corrective Services; OAKLAND
COUNTY, MICHIGAN,

      Defendants.

Case No.

**Petition for Writ of Habeas Corpus
and Complaint for Injunctive and
Declaratory Relief**

Class Action

**IMMEDIATE RELIEF SOUGHT**

## CLASS ACTION COMPLAINT

1.    The rate at which the novel coronavirus and its resulting disease,

COVID-19, is ravaging the globe is unprecedented in modern society. The situation

is especially grave in the state of Michigan, which currently ranks third in the country

for coronavirus-related deaths.[1]   Hospitals in Southeast Michigan are already suffering and struggling to keep up with the rush of COVID-19 related patients.[2] The state's chief medical officer, Dr. Joneigh Khaldun, declared during a press conference on April 6, 2020 that state hospitals are overwhelmed because there are no signs that the rate of infection is slowing down.[3]

2.     A mass outbreak of COVID-19 inside Michigan's jails and prisons is a major threat to the state's already fragile healthcare system.   An outbreak in the Oakland County Jail ("Jail") will undoubtedly cause death and devastation to countless lives, including the people jailed, the people who work in the jail, and their families.   Its impact will be felt across the state as valuable medical resources— already in short supply—are completely depleted.   Medical experts have stressed that urgent action in the jails is an essential public health priority given that any

---

[1] Bobby Allyn, *After Surge In Cases, Michigan Now 3rd In Country For Coronavirus Deaths*, NPR (Mar. 31, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/31/824738996/ after-surge-in-cases-michigan-now-3rd-in-country-for-coronavirus-deaths.

[2] *See, e.g.,* Kristen Jordan Shamus and Darcie Moran, *Nurses Protest Conditions at Detroit's Sinai-Grace, Said They Were Told to Leave*, Detroit Free Press (Apr. 6, 2020), https://www.freep.com/story/news/health/2020/04/06/detroit-dmc-sinai-grace-nurses/2953385001/?utm_source=oembed&utm_medium=onsite&utm _campaign=storylines&utm_content=news&utm_term=4566614002.

[3] Courtney Vinopal, *WATCH: Michigan Gov. Gretchen Whitmer gives coronavirus update*, PBS (Apr. 6, 2020), https://www.pbs.org/newshour/health/watch-live-michigan-gov-gretchen-whitmer-gives-coronavirus-update.

outbreak will place incredible strain on regional hospitals and health centers.  These institutions would bear the brunt of having to treat all infected people and would have fewer resources available to treat anyone who required medical attention, which will be disastrous when medical needs overwhelm the institutions' resources.[4] Dr. Marc Stern, an expert in public health in jails and prisons, has emphasized the need to "reduce the number of persons incarcerated" in order to accomplish "critical public health aims" of protecting both incarcerated people and the public at large.[5]

3.    Understanding the dire need for immediate action, medical and public health experts have urged sweeping precautionary measures in everyday life to slow the spread of this virus.  Yet the very steps they deem necessary—such as regular handwashing, sanitizing one's environment, access to testing, prompt medical attention, and wearing protective gear—have been made impossible for the people confined in the Jail by the very officials responsible for their well-being.

4.     Social distancing, the practice of maintaining at least six feet between you and others, is the single most important precaution anyone can take to prevent

---

[4] Ex. 1, Decl. of Dr. Marc Stern ¶ 11; *see also* Ex. 2, Expert Decl. of Dr. Jaimie Meyer ¶¶  16, 22, , *Velesaca v. Wolf*, Case No. 1:20-cv-01803-AKH, ECF Doc. 42 (S.D.N.Y. Mar. 16, 2020); Ex. 3, Expert Decl. of Elizabeth Y. Chiao ¶ 28, *Russell, et al. v. Harris County, Texas*, No. 4:19-cv-00226, ECF Doc. 32-2 (S.D. Tex. Mar. 27, 2020).

[5] Stern  Decl. ¶¶ 10-11.

the spread of Covid-19.[6]   Governors, mayors, and local city and county officials

have all urged the public to practice social distancing.[7]   Gatherings where it is

[6] *Coronavirus 2019*, Centers for Disease Control, https://www.cdc.gov/
coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html; Ryan Miller,
*Coronavirus: What is social distancing? When should I quarantine versus isolate?*,
USA Today (Mar. 12, 2020), https://www.usatoday.com/story/news/health/2020
/03/11/coronavirus-pandemic-quarantine-social-distancing-covid-19-
defined/5020755002/ ("The CDC defines social distancing as 'remaining out of
congregate settings, avoiding mass gatherings and maintaining distance
(approximately 6 feet) from others when possible.'"); Bruce Lee, *What Is Social
Distancing? Here Are 10 Ways To Keep The Coronavirus Away*, Forbes (Mar. 14,
2020), https://www.forbes.com/sites/brucelee/2020/03/14/with-covid-19-
coronavirus-here-are-10-ways-to-social-distance-yourself/#1f51f86f606c; *On Apr
5, 9 pm, light candles, diya for 9 min to dispel darkness of Coronavirus: PM Modi
to nation*, MSN (Apr. 4, 2020) https://www.msn.com/en-in/news/other/on-apr-5-9-
pm-light-candles-diya-for-9-min-to-dispel-darkness-of-coronavirus-pm-modi-to-
nation/ar-BB126Jzj; Al Dothan, *Coffee County has first case of COVID-19*,
WTVY (Apr. 2, 2020), https://www.wtvy.com/content/news/Coffee-County-has-
first-case-of-COVID-19-569327441.html; Taj Simmons, *As Roanoke County
reports second case of COVID-19, 'It's upended every aspect of our normal lives'*
WSLS (Mar. 27, 2020), https://www.wsls.com/news/local/2020/03/28/as-roanoke-
county-reports-second-case-of-covid-19-its-upended-every-aspect-of-our-normal-
lives/; Suzannah Lyons, Olivia Willis, *Is coronavirus airborne, and how does it
spread?*, ABC (Mar. 29, 2020) https://www.abc.net.au/news/health/2020-03-28/is-
coronavirus-airborne-covid19-australia/12090974

[7] *Michigan closes bars, stops restaurant dine-in, further limits gatherings*,
WOODTV (Mar. 16, 2020), https://www.woodtv.com/health/coronavirus
/whitmer-orders-bars-restaurants-to-close-due-to-virus-concerns/; Doug
Mainwaring, *Governor urges 'social distancing' even among families at home*,
LifeSite (Apr. 3, 2020), https://www.lifesitenews.com/news/governor-urges-social-
distancing-even-among-families-at-home; Christian Berthelsen, Elise Young, *N.J.,
N.Y. Urge Residents to Stay Put With Peak Approaching*, Bloomberg (Apr. 9,
2020), https://www.bloomberg.com/news/articles/2020-04-09/murphy-says-social-
distancing-is-slowing-virus-spread-in-n-j; Laura Ziegler, *Act Like You Have The
Virus, Kansas City Officials Urge As They Step Up Social Distance Enforcement*,
KCUR (Mar. 30, 2020), https://www.kcur.org/post/act-you-have-virus-kansas-city-

impossible to maintain social distancing have been cancelled across the country and world.[8]   The police in several states are arresting or ticketing people who fail to maintain six feet of separation between themselves and others.[9]   But social distancing is impossible in the Jail as it is currently operated and at its current population levels.

---

officials-urge-they-step-social-distance-enforcement#stream/0; Kendall Downing, *City, county officials urge social distancing over Easter holiday weekend; City braces for COVID-19 budget impact*, WMC5 (Apr. 8, 2020), https://www.wmcactionnews5.com/2020/04/08/city-county-officials-urge-social-distancing-over-easter-holiday-weekend-city-braces-covid-budget-impact/; *Many People Will Get COVID-19' Says Mayor Garcetti As He Urges LA To Practice Social Distancing, Self-Quarantine*, CBSN Los Angeles (Mar. 14, 2020), https://losangeles.cbslocal.com/2020/03/14/many-people-will-get-covid-19-says-mayor-garcetti-as-he-urges-la-to-practice-social-distancing-self-quarantine/.

[8] *A List of What's Been Canceled Because of the Coronavirus*, N.Y. Times (Apr. 1, 2020), https://www.nytimes.com/article/cancelled-events-coronavirus.html.

[9] Hannah Fry, *Manhattan Beach issues 129 citations for coronavirus social-distancing*, Los Angeles Times (Apr. 7, 2020), https://www.latimes.com/california/story/2020-04-07/manhattan-beach-citations-coronavirus-social-distancing-violations; *Detroit police: Property owners will get social distancing violation ticket if crowd gathers*, Fox 2 (Apr. 6, 2020), https://www.fox2detroit.com/news/detroit-police-property-owners-will-get-social-distancing-violation-ticket-if-crowd-gathers; Katie Canales, *Police in California have started ticketing people having picnics and congregating in beach areas as law enforcement cracks down on violators of the statewide stay-at-home order*, Business Insider (Apr. 6, 2020), https://www.businessinsider.com/california-giving-people-tickets-stay-at-home-coronavirus-2020-4; Amanda Jackson, *Police are arresting and fining people for violating social distancing orders*, CNN (Apr. 1, 2020), https://www.cnn.com/2020/03/31/us/violating-coronavirus-orders-trnd/index.html. Alice Speria, *NYPD'S AGGRESSIVE POLICING RISKS SPREADING THE CORONAVIRUS*, The Intercept (Apr. 3, 2020), https://theintercept.com/2020/04/03/nypd-social-distancing-arrests-coronavirus/.

5.     Given reports of at least 23 confirmed cases of COVID-19,[10] an outbreak in the Jail is imminent and will cause death and devastation to countless lives, including the people jailed, the people who work in the jail, their families, and the public at large.  The County and the people responsible for operating the Jail, however, have failed to adequately respond to the obvious and urgent threats posed by this growing pandemic.  The over-800 people confined in the Jail are forced to suffer unconstitutional conditions that blatantly deny them the precautions and protections necessary to mitigate against the risks of COVID-19.

6.     Human beings confined inside the Jail sleep within one to three feet of each other, are denied medical treatment or must wait several days to receive it, do not have adequate soap, and share multiple common areas without adequate supplies to clean them.  They are shuffled from cell to cell with no regard for which people are symptomatic and which are not.  They cannot protect themselves, including by practicing social distancing, and they do not have access to the necessary hygiene services and facilities to avoid infection, which puts them at imminent risk of substantial bodily harm and death.

7.     People confined in jails and prisons must "be furnished with the basic

---

[10] Aileen Wingblad, *23 Oakland County Jail inmates have confirmed COVID-19*, Oakland Press (Apr. 10, 2020), https://www.theoaklandpress.com/news /coronavirus/23-oakland-county-jail-inmates-have-confirmed-covid-19/article_9cb8f138-7b69-11ea-ab69-0f769f8495c1.html.

human needs, one of which is 'reasonable safety.'" *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993) (citations omitted). Yet Plaintiffs, as well as the class and subclasses they represent, all face imminent risk of serious injury or death once they are exposed to COVID-19 in the Jail. Starkly, in the midst of a public health crisis, the people currently confined at the Jail have no adequate safeguards against the severe threat of this novel coronavirus—all they ask is to be treated humanely while they are in Oakland County's custody during this perilous time.

8. Because of the ongoing, systemic violations of Petitioners/Plaintiffs' constitutional rights, Petitioners/Plaintiffs seek class-wide relief requiring Defendants to take basic and necessary steps to safeguard the health of people who, due to the nature of their confinement, are not only at heightened risk of infection and death but are also rendered unable to take the simple steps to protect themselves that have become a necessary part of everyday life for people not in jail. Petitioners/Plaintiffs further request a writ of habeas corpus for all those who are medically vulnerable and at particularly grave risk of infection and death from COVID-19 or, in the alternative, request an injunction requiring that they be transferred to home confinement for the duration of the COVID-19 pandemic.

## JURISDICTION AND VENUE

9. This is a civil rights action arising under 42 U.S.C. § 1983, 28 U.S.C. § 2241, and 28 U.S.C. § 2201, *et seq*., as well as the Eighth and Fourteenth

Amendments to the United States Constitution.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, 28 U.S.C. § 2241, and 28 U.S.C. § 1651.

10.    Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to these claims occurred and continue to occur in this judicial district.

## PARTIES

11.    Petitioner/Plaintiff Jamaal Cameron currently resides in Oakland County, Michigan.  At all times relevant to this Complaint, Mr. J. Cameron was in the custody of Defendant Bouchard, in his capacity as Oakland County Sheriff, at the Jail.  He suffers from bronchitis and hypertension.  He also has sleep apnea, which he has not received treatment for since entering the Jail.  He is housed in "the Tank," a dank and crowded holding cell with no bunks, where he sleeps on the concrete floor in extremely close proximity to people who have symptoms of COVID-19.  He was moved to the Tank, from another jail building with far fewer suspected cases of COVID-19, as punishment for raising concerns about the safety conditions in the jail. Mr. J. Cameron is in the Jail following conviction. He represents the Class, as well as the Post-conviction Subclass and Medically Vulnerable Subclass.

12.    Petitioner/Plaintiff Richard Briggs currently resides in Oakland

County, Michigan.  At all times relevant to this Complaint, Mr. Briggs was in the custody of Defendant Bouchard, in his capacity as Oakland County Sheriff, at the Jail.  He is confined to the Jail because he cannot afford to pay his bond.  He is awaiting trial and is presumptively innocent. He represents the Class, as well as the Pre-trial Subclass.

13.     Petitioner/Plaintiff Raj Lee currently resides in Oakland County, Michigan.  At all times relevant to this Complaint, Mr. Lee was in the custody of Defendant Bouchard, in his capacity as Oakland County Sheriff, at the Jail.  He is housed in "the Tank," a dank and crowded holding cell with no bunks, where he sleeps on the concrete floor in extremely close proximity to people who have symptoms of COVID-19.  He was moved to the Tank, from another jail building with far fewer suspected cases of COVID-19, as punishment for raising concerns about the safety conditions in the Jail. He represents the Class, as well as the Post-conviction Subclass.

14.     Petitioner/Plaintiff Michael Cameron currently resides in Oakland County, Michigan.  At all times relevant to this Complaint, Mr. M. Cameron was in the custody of Defendant Bouchard, in his capacity as Oakland County Sheriff, at the Oakland County Jail.  He suffers from cardiac disease, hypertension, and obesity. He is not able to get medical attention. He represents the Class, as well as the Post-conviction Subclass and Medically Vulnerable Subclass.

15.    Petitioner/Plaintiff Matthew Saunders currently resides in Oakland County, Michigan.  At all times relevant to this Complaint, Mr. Saunders was in the custody of Defendant Bouchard, in his capacity as Oakland County Sheriff, at the Jail.  He cannot get medical attention and has not had access to soap for over a week. He is awaiting trial and is presumptively innocent. He represents the Class, as well as the Pre-trial Subclass.

16.    Defendant Oakland County is a political subdivision of the State of Michigan that can be sued in its own name.  Oakland County is responsible for all acts of the Oakland County Sheriff's Office.  The Oakland County Sheriff's Office oversees and administers the Jail and is responsible for the custody and care of all persons detained or incarcerated in the Jail, and it currently has immediate custody over Petitioners/Plaintiffs and other putative class members.

17.    Defendant Michael Bouchard is the Sheriff of Oakland County and is responsible for operating the Jail and maintaining the care and custody of people confined at the Jail.  He is being sued in his official capacity.

18.    Defendant Curtis Childs is the Commander of Corrective Services for the Oakland County Sheriff's Office and is responsible for operating the Jail.  He is being sued in his official capacity.

## THE GRAVE RISK OF HARM POSED BY THE COVID-19 PANDEMIC REQUIRES AN EMERGENCY RESPONSE

19.     We are in the midst of an unprecedented global health emergency.[11] On March 11, 2020, the World Health Organization declared that the outbreak of COVID-19 constituted a global pandemic.[12] Citing "deep[] concern[] both by the alarming levels of spread and severity, and by the alarming levels of inaction," it called for countries to take "urgent and aggressive action."[13]

20.     The number of people infected by COVID-19 is growing exponentially.[14] On January 1, 2020, the first confirmed COVID-19 case was diagnosed in the United States.[15] As of April 15, 2020, over half a million people

---

[11] *See* World Health Organization, Director-General Opening Remarks (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-mediabriefing-on-covid-19---11-march-2020.

[12] *Id.*

[13] *Id.*; *see also Coronavirus: COVID-19 Is Now Officially A Pandemic*, *WHO Says*, NPR (March 11, 2020), https://www.npr.org/sections/goatsandsoda/2020/03/11/814474930/coronavirus-covid-19-is-now-officially-a-pandemic-who-says.

[14] The death toll in Italy, which began experiencing this epidemic about a week earlier than the first diagnosed American case, saw a rise of 30% overnight in the 24 hours between March 5, 2020, and March 6, 2020 and a rise of 25% on March 15 alone—a day that killed 368 people in Italy. Crispian Balmer & Angelo Amante, *Italy coronavirus deaths near 200 after biggest daily jump*, Reuters (Mar. 6, 2020), https://www.reuters.com/article/us-health-coronavirus-italy/italy-coronavirus-deaths-near-200-after-biggest-daily-jump-idUSKBN20T2ML.

[15] Derrick Bryson Taylor, *A Timeline of the Coronavirus*, New York Times (Mar. 2020), https://www.nytimes.com/article/coronavirus-timeline.html (last visited March 24, 2020).

have been diagnosed with COVID-19 in the United States, with 22,252 deaths confirmed.[16] Nationally, CDC projections indicate that over 200 million individuals in the United States could be infected with COVID-19 over the course of the epidemic without effective public health intervention,[17] with as many as 2.2 million deaths in the worst projections.[18]

21.    COVID-19 is highly contagious.  The virus is thought to spread through respiratory droplets or by touching a surface or object that has the virus on it.[19] COVID-19 is thought to survive for three hours in the air in droplet form, up to twenty-four hours on cardboard, up to two days on plastic, and up to three days on steel.[20]

22.    Infected people—who may be asymptomatic and not even know they

---

[16] *Coronavirus 2019*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/cases-in-us.html.

[17] James Glanz et al., *Coronavirus Could Overwhelm U.S. without Urgent Action, Estimates Say*, N.Y. Times (Mar. 20, 2020), https://www.nytimes.com/interactive /2020/03/20/us/coronavirus-model-us-outbreak.html.

[18] Holly Yan, More than 3,000 people in the US have died from coronavirus, CNN (Mar. 31, 2020), https://www.cnn.com/2020/03/30/health/us-coronavirus-updatesmonday/index.html.

[19] Coronavirus Factsheet, Centers for Disease Control (Mar. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf.

[20] Neeltje van Doremalen et al., *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, NEW ENGLAND J. MEDICINE (March 17, 2020), https://www.nejm.org/doi/full/10.1056/NEJMc2004973.

are infected—can spread the disease even through indirect contact with others.[21]

Given that many people are asymptomatic transmitters and very few people have

been tested,[22] the number of people diagnosed with COVID-19 reflects only a small

portion of those infected.[23]

    23.    Everyone is at risk of contracting the novel coronavirus disease, but

certain populations are at higher risk for severe illness from COVID-19. People of

any age with lung disease or other conditions like asthma, chronic liver or kidney

disease, diabetes, epilepsy, hypertension, compromised immune systems, blood

disorders, inherited metabolic disorders, stroke, and pregnancy face increased risk

---

[21] *See, e.g.,* Marilynn Marchione/AP, *Novel Coronavirus Can Live on Some Surfaces for Up to 3 Days, New Tests Show* TIME, (Mar. 11, 2020), https://time.com/5801278/coronavirus-stays-on-surfaces-days-tests/; Cai J et al., *Indirect virus transmission in cluster of COVID-19 cases, Wenzhou, China, 2020* Emerg Infect Dis. 6, 26 (2020), https://doi.org/10.3201/eid2606.200412.

[22] Roni Caryn Rabin, *They Were Infected with the Coronavirus. They Never Showed Signs*, N.Y. Times (Feb. 26, 2020, updated Mar. 6, 2020), https://www.nytimes.com/2020/02/26/health/coronavirus-asymptomatic.html; Aria Bendix, *A Person Can Carry And Transmit COVID-19 Without Showing Symptoms, Scientists Confirm*, Bus. Insider (Feb. 24, 2020), https://www.sciencealert.com/researchers-confirmed-patients-can-transmit-the-coronavirus-without-showing-symptoms.

[23] Melissa Healy, *True Number of US Coronavirus Cases is Far Above Official Tally, Scientists Say*, L.A. Times (Mar. 10, 2020), https://www.msn.com/en-us/health/medical/true-number-of-us-coronavirus-cases-is-far-above-official-tally-scientists-say/ar-BB110qoA.

of serious COVID-19 disease.[24]   Older individuals also face greater chances of serious illness or death from COVID-19.[25]   For people over the age of 50 or with medical conditions that increase the risk of serious COVID-19 infection, symptoms such as fever, coughing, and shortness of breath can be especially severe.[26]

24.    COVID-19 can severely damage lung tissue (sometimes leading to a permanent loss of respiratory capacity), lead to acute respiratory distress syndrome, affect cardiac functions (including the possibility of heart failure), and cause widespread damage to other organs.[27]   Emerging evidence also suggests that COVID-19 can trigger an over-response in the immune system and further damage the body's tissues or organs, including permanent harm to the kidneys or neurologic injury.[28]

25.    The experiences of those infected with COVID-19 are "a lot more

---

[24] Ex. 4, Expert Decl. of Dr. Jonathan Golob ¶ 4, *Dawson v. Asher*, Case No. 2:20-cv-00409-JLR-MAT, ECF Doc. 5 (D. Or. Mar. 16, 2020).

[25]  Golob Decl. ¶ 3; Xianxian Zhao et al., *Incidence, clinical characteristics and prognostic factor of patients with COVID-19: a systematic review and meta-analysis* (Mar. 20, 2020), https://cutt.ly/etRAkmt.

[26] Golob Decl. ¶ 5; *see also* Ex. 5, Decl. of Dr. Carlos Franco Paredes, *Fraihat v. U.S. Immigration and Customs Enforcement*, 5:19-cv-01546-JGB-SHK, ECF Doc. 81-12 (E.D. Cal., Mar. 24, 2020) (outlining the heightened risk of severe harm or death for those populations deemed medically vulnerable to COVID-19, including higher fatality rates, severe damage to organs and other capacities, and the need for advanced support).

[27] Golob Decl. ¶ 7.

[28] *Id*.

frightening" than the flu.[29]  The sensation of acute respiratory distress syndrome has been compared to "essentially drowning in [one's] own blood."[30]  Even relatively young people with minimal health history can be "wiped out" by the virus, "like they've been hit by a truck," and people who are infected by the virus can "all of a sudden" go into complete respiratory failure.[31]

26.     These complications can manifest at an alarming pace, and the required levels of support can quickly exceed local health care resources.[32]  Patients with serious cases of COVID-19 will need advanced medical support requiring highly specialized equipment that is in limited supply, such as ventilator or oxygenation assistance, as well as an entire team of care providers that can include 1:1 nurse to patient ratios, respiratory therapists, and intensive care physicians.[33]

27.     The current estimated incubation period is between 2 and 14 days.[34] Approximately 20% of people infected experience life-threatening complications,

---

[29] Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19 — Even in His Young Patients*, Propublica (Mar. 21, 2020), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients.

[30] *Id*.

[31] *Id*.

[32] Golob Decl. ¶ 6; Stern Decl. ¶ 11.

[33] Golob Decl. ¶¶ 5-6.

[34] *Coronavirus Disease COVID-19 Symptoms*, Centers for Disease Control (Feb. 29, 2020), https://www.cdc.gov/coronavirus/2019-ncov/about/symptoms.html.

and, of those infected, between 1% and 3.4% die.[35]  According to recent estimates, the fatality of people infected with the coronavirus is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems.[36]  Patients who do not die from serious cases of COVID-19 may face prolonged recovery periods, including extensive rehabilitation from neurologic damage and loss of respiratory capacity.[37]

28.    There is no vaccine, nor is there any known medication to prevent or cure infection from the virus.[38]  Development of a vaccine is likely at least 12 months away.[39]

29.    The only known effective measure to reduce the risk of severe illness or death to individuals is to prevent them from being infected with the coronavirus in the first place.[40]  Accordingly, officials and experts urge "social distancing"—

---

[35] *Why Covid-19 is worse than the flu, in one chart*, Vox (Mar. 18, 2020), https://www.vox.com/science-and-health/2020/3/18/21184992/coronavirus-covid-19-flu-comparison-chart.

[36] Betsy McKay, *Coronavirus vs. Flu Which Virus is Deadlier*, WALL ST. J. (Mar. 10, 2020), https://www.wsj.com/articles/coronavirus-vs-flu-which-virus-is-deadlier-11583856879.

[37] Golob Decl. ¶ 4.

[38] Golob Decl. ¶ 8.

[39] Saralyn Cruickshank, *Experts Discuss Covid-19 and Ways to Prevent Spread of Disease*, John Hopkins Mag. (Mar. 17, 2020), https://hub.jhu.edu/2020/03/17/coronavirus-virology-vaccinesocial-distancing-update.

[40] Golob Decl. ¶ 8.

isolating oneself from other people at a minimum distance of six feet as much as possible.[41]  Dozens of the world's experts on fighting epidemics agree that extreme social distancing approximates the type of "total freeze"[42] to transmission that is vital to halting and reversing the spread of COVID-19.  Epidemiologists say that "[i]f it were possible to wave a magic wand and make all Americans freeze in place for 14 days while sitting six feet apart . . . the whole epidemic would sputter to a halt."[43]

30.    For this reason, governors and mayors across the country are ordering entire cities and states to "shelter in place" and "stay at home."[44]  Other federally recommended precautions include frequent hand-washing, alcohol-based hand sanitizers, and frequent cleaning *and* disinfecting of any surfaces touched by any

---

[41] Michigan Executive Order 2020-21, (Mar. 24, 2020) https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-522626--,00.html; *See* Saralyn Cruickshank, *Experts Discuss Covid-19 and Ways to Prevent Spread of Disease*, John Hopkins Mag. (Mar. 17, 2020), https://hub.jhu.edu/2020/03/17 /coronavirus-virology-vaccine-social-distancing-update.

[42] Donald G. McNeil Jr., *The Virus Can Be Stopped, but Only With Harsh Steps, Experts Say*, N.Y. Times (Mar. 22, 2020), https://www.nytimes.com/2020/03/22/health/coronavirus-restrictions-us.html.

[43] *Id*.

[44] The governors of 42 states, as well as local officials of numerous counties in most remaining states, have all ordered residents to "shelter in place" or stay at home.  *See Which States and Cities Have Told Residents to Stay at Home*, N.Y. Times (April 7, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html.

person.[45]

## INCARCERATED PEOPLE AND CORRECTIONAL STAFF ARE AT HEIGHTENED RISK DURING THE COVID-19 PANDEMIC

31.    Substantial epidemiological research "shows that mass incarceration raises contagion rates for infectious disease—both for people in jails, and for the community at large."[46]   During pandemics, jail facilities become "ticking time bombs" as "[m]any people crowded together, often suffering from diseases that weaken their immune systems, form a potential breeding ground and reservoir for diseases."[47]

32.    Indeed, Dr. Meyer has explained that "the risk posed by COVID-19 in jails and prisons is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected."[48]   This is

---

[45] *Steps to Prevent Illness*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/about/prevention.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fabout%2Fprevention-treatment.html; *see also* Saralyn Cruickshank, *Experts Discuss Covid-19 and Ways to Prevent Spread of Disease*, John Hopkins Mag. (Mar. 17, 2020), https://hub.jhu.edu/2020/03/17/coronavirus-virology-vaccine-social-distancing-update.

[46] Sandhya Kajeepeta & Seth J. Prins, Why Coronavirus in Jails Should Concern All of Us, The Appeal (Mar. 24, 2020), https://theappeal.org/coronavirus-jails-public-health/.

[47] *See* St. Louis Univ., *Prisons Unprepared For Flu Pandemic*, ScienceDaily (2006), https://www.sciencedaily.com/releases/2006/09/060915012301.htm.

[48] Meyer Decl. ¶ 7.

due to a number of factors, including:

a.  The close proximity of individuals in those facilities;

b.  Their reduced ability to protect themselves through social distancing;

c.  The lack of necessary medical and hygiene supplies ranging from hot water, soap or hand sanitizer, to protective equipment;

d.  Ventilation systems that encourage the spread of airborne diseases;

e.  Difficulties quarantining individuals who become ill;

f.  The enhanced susceptibility of the population in jails and prisons due to chronic health conditions;

g.  The fact that incarcerated people, rather than professional cleaners, are often responsible for cleaning the facilities and are not given appropriate supplies;

h.  The fact that jails and prisons normally have to rely heavily on outside hospitals that will become unavailable during a pandemic, as well as the loss of both medical and correctional staff to illness.[49]

---

[49] *See* Meyer Decl. ¶¶ 7-19. "The pathway for transmission of pandemic influenza between jails and the community is a two-way street. Jails process millions of bookings per year.  Infected individuals coming from the community may be housed with healthy inmates and will come into contact with correctional officers, which can spread infection throughout a facility." *Pandemic Influenza & Jail Facilities & Populations*, Am. J. of Pub. Health, October 2009; *see also* Dr. Anne

33.     Additional reasons for the increased risk of transmission and infection include the constant cycling of people in and out of the jail (including staff)[50] and insufficient access to medical care within the jail itself.

34.     And jail screening procedures are ineffective.   COVID-19 poses a particular threat to public health because a person can be asymptomatic yet spread the disease to others.  Most people do not show symptoms for two to fourteen days while being contagious.  Others never exhibit any symptoms at all.  Thus, while screening for fevers and other symptoms associated with COVID-19 may stop some infected people from entering, it cannot catch many of those actively spreading the virus.  The drastic social distancing measures that have been imposed across the country are designed exactly to combat this problem—staying at home, we are able to limit our contact with other persons, even the asymptomatic.  But every day, numerous jail employees, working on multiple different shifts, travel into and out of the jail.   Any one of those employees can be asymptomatically carrying and transmitting COVID-19, and the jail has no means of stopping this disease vector.

35.     In Michigan, more than 40 state department of corrections staff have

---

Spaulding, *Coronavirus and the Correctional Facility: for Correctional Staff Leadership* (Mar. 9, 2020), https://www.ncchc.org/filebin/news/COVID_for_CF _Administrators_3.9.2020.pdf.

[50] *See* Peter Wagner & Emily Widra, *No need to wait for pandemics: The public health case for criminal justice reform*, Prison Policy Initiative (Mar. 6, 2020), https://www.prisonpolicy.org/blog/2020/03/06/pandemic.

contracted COVID-19, and an additional 150 staff have self-quarantined due to possible exposure.[51]   On April 2, 2020, Andy Potter, executive director of the Michigan Corrections Organization, and Brian Dawe, executive director of the American Correctional Officer Intelligence Network, sent a letter to the National Governors Association, describing the dire impact of COVID-19 on correctional officers and staff[52]:  "[O]fficers in Michigan, New York and New Jersey have died from COVID-19. They will not be the last. Hundreds more across the nation have tested positive and thousands face quarantine. Inmates in our custody are dying as a result of this virus."  The letter also referenced a survey of over 750 correctional officers and staff about the ways in which the COVID-19 virus is impacting prisons, jails, and juvenile detention facilities, in which almost 60% of respondents said that COVID-19-related hazards inside their facility remain unaddressed.[53]  Correctional officials around the country agree that particular care must be taken to stop the spread of COVID-19 within the nation's jails. Leann Bertsch, the Director of the

---

[51] Jameson Cook, *Michigan prison guards concerned about dangers of COVID-19*, Macomb Daily (Apr. 5, 2020), https://www.macombdaily.com/news/coronavirus /michigan-prison-guards-concerned-about-dangers-of-covid-19/article_1e6c27f6-7604-11ea-a444-43bddcfab230.html.

[52] Letter from One Voice and ACOIN to National Governors Association (Apr. 2, 2020), https://drive.google.com/file/d/13euHXAPbSyVo1vkG9k1x7ymJCl _UJhTc/view.

[53] *Id.*

North Dakota Department of Corrections and Rehabilitation, concluded that "ignoring the health of those living and working inside the walls of our nation's correctional facilities poses a grave threat to us all" and that "putting public health first is the best, and only, way to effectively achieve [a department of correction's] public safety mission during the COVID-19 pandemic." [54]

36.    The guidance from the Centers for Disease Control and Prevention (CDC) for correctional and detention facilities, including local jails, was published on March 30, 2020.[55] The guidance acknowledges that incarcerated people are forced to exist "within congregate environments" that "heighten[] the potential for COVID-19 to spread once introduced," especially given the impossibility of social distancing within correctional facilities. It recognizes the "many opportunities for COVID-19 to be introduced into a correctional or detention facility" including "daily staff ingress and egress" as well as "high turnover" of "admit[ted] new entrants."[56] In light of these concerns, the guidance recommends that the correctional facility:

---

[54] Brie Williams and Leanne Bertsch, *A public health doctor and head of corrections agree: we must immediately release people from jails and prisons*, The Appeal (Mar. 27, 2020), https://theappeal.org/a-public-health-doctor-and-head-of-corrections-agree-we-mustimmediately-release-people-from-jails-and-prisons/.

[55] Ex. 6, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, Centers for Disease Control and Prevention (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidancecorrectional-detention.html.

[56] *Id.*

a. Post signage throughout the facility communicating COVID-19 symptoms and hand hygiene instructions, ensure such signage is understandable for non-English speaking people as well as those with low literacy, and provide clear information about the presence of COVID-19 cases within a facility and the need to increase social distancing and maintain hygiene precautions;

b. Ensure sufficient stocks of hygiene and cleaning supplies, including tissues; liquid soap where possible; hand drying supplies; alcohol-based hand sanitizer; cleaning supplies effective against the coronavirus; and recommended personal protective equipment like face masks, disposable medical gloves, and N95 respirators;

c. Provide incarcerated people no-cost access to soap (providing liquid soap where possible), running water, hand drying machines or disposable paper towels for hand washing, and tissues (providing no-touch trash receptacles for disposal);

d. Consider relaxing restrictions on allowing alcohol-based hand sanitizer where security concerns allow;

e. Provide a no-cost supply of soap sufficient to allow frequent hand washing, providing liquid soap where possible;

f. Suspend co-pays for incarcerated people seeking medical evaluation for respiratory symptoms;

g. Even if COVID-19 cases have not been identified locally or inside, implement "intensified cleaning and disinfecting procedures" that clean and disinfect high-touch surfaces and objects "[s]everal times per day," and ensure adequate supplies to support intensified cleaning and disinfection practices";

h. Perform pre-intake screening and temperature checks for all new entrants

i. If an individual has symptoms of COVID-19 (fever, cough, shortness of breath), require the individual to wear a face mask and place her under medical isolation;

j.  Implement social distancing strategies to increase the physical space between incarcerated people, ideally a distance of six feet "regardless of the presence of symptoms"; and

k.  Implement daily temperature checks in housing units where COVID-19 cases have been identified.

37.    According to correctional health expert Dr. Marc Stern, this guidance sets out only minimum standards and fails to address the need for downsizing when necessary to ensure that social distancing can be maintained in the jail environment.[57]

38.    The global path of the virus confirms that jails and prisons are epicenters for transmission.  Approximately one month into the pandemic in the province of Hubei, China, over half of reported COVID-19 cases were from jails.[58] In South Korea, which has had tremendous success in slowing and stopping the spread of the virus, "the single largest COVID-19 outbreak and mortality cluster was from the Daenam Prison Hospital, where 101 inmates were infected and seven died."[59]

---

[57] Stern Decl. ¶¶ 9–10.

[58] Zi Yang, *Cracks in the System: COVID-19 in Chinese Prisons*, Diplomat (Mar. 9, 2020), https://thediplomat.com/2020/03/cracks-in-the-system-covid-19-in-chinese-prisons/.

[59] Nancy Gertner & John Reinstein, *Compassionate Release Now for Prisoners Vulnerable to the Coronavirus*, Boston Globe (Mar. 23, 2020), https://www.bostonglobe.com/2020/03/23/opinion/compassionate-release-now-prisoners-vulnerable-coronavirus/.

39.     The coronavirus has already started to spread inside other prisons, jails, and detention centers in the United States.  Experts predict that a mass contagion is only a matter of time and that "[a]ll prisons and jails should anticipate that the coronavirus will enter their facility."[60]

40.     Once the virus enters a jail or prison, the infection rate has been known to be much higher than in the broader community.  In New York City, for example, the COVID-19 infection rate in the city's jails is eight times higher than the rest of the city, which already sits at one of the highest rates in the world.[61]  The first case of COVID-19 on Rikers Island, New York City's largest jail complex, was confirmed on March 18, 2020.[62]  In New York City, less than a month from the detection of the first case at Riker's Island, 334 incarcerated people and 627 jail staff

---

[60] Evelyn Cheng & Huileng Tan, *China Says More than 500 Cases of the New Coronavirus Stemmed from Prisons*, CNBC, (Feb. 20, 2020), https://www.cnbc.com/2020/02/21/coronavirus-china-says-twoprisons-reported-nearly-250-cases.html (quoting Tyler Winkelman, co-director of the Health, Homelessness, and Criminal Justice Lab at the Hennepin Healthcare Research Institute in Minneapolis).

[61] *COVID-19 Infection Tracking in NYC Jails, The Legal Aid Society NYC (last visited Mar. 28, 2020), https://www.legalaidnyc.org/covid-19-infection-tracking-in-nyc-jails/.*

[62] *21 Inmates, 17 Employees Test Positive for COVID-19 on Rikers Island: Officials*, NBC New York (Mar. 22, 2020), https://www.nbcnewyork.com/news/coronavirus/21-inmates17-employees-test-positive-for-covid-19-on-rikers-island-officials/2338242/.

have tested positive[63]; two jail officers have died; and more than 800 incarcerated people were held in isolation or quarantine.[64]  The dramatic outbreak of COVID-19 in the Cook County Jail is also illustrative—126 staff and 298 detainees have tested positive for COVID-19 and nurses at Cook County's Stroger Hospital have warned that the virus is a "growing beast" that threatens not only staff and people behind bars but all of Cook County.[65]  An entire unit at Stroger Hospital has been converted into a space for treating COVID-19 cases from the Cook County jail, and the unit is rapidly reaching maximum capacity.[66]

41.     An equally gruesome pattern is already devastating Michigan's carceral system.[67]  In one Michigan prison alone, 10% of all incarcerated people have tested

---

[63] Jennifer Bisram, *Exclusive: NYC DOC commissioner addresses COVID-19 concerns on Rikers Island*, PIX 11 (Apr. 14, 2020), https://www.pix11.com/news/coronavirus/exclusive-nyc-doc-commissioner-addresses-covid-19-concerns-on-rikers-island

[64] Jay Ransom and Alan Feuer, 'We're Left for Dead': Fears of Virus Catastrophe at Rikers Jail, N.Y. Times (Last updated: Mar. 31, 2020), https://www.nytimes.com/2020/03/30/nyregion/coronavirus-rikers-nyc-jail.html.

[65] Shannon Heffernan, *Nurses Warn COVID-19 Cases At Cook County Jail Aren't Just Staying Behind Bars*, WBEZ, Chicago's NPR (Apr. 11, 2020), https://www.wbez.org/stories/nurses-warn-covid-19-cases-at-cook-county-jail-arent-just-staying-behind-bars/44cc1e46-693b-44cc-8a5a-347737966185.

[66] *Id*.

[67] *See* Angie Jackson & Kristi Tanner, *Infection Rate at Michigan Prison Exceeds New York, Chicago Hot Spots*, Detroit Free Press (Apr. 15, 2020), https://www.freep.com/story/news/local/michigan/2020/04/16/infection-rate-michigan-prison-exceeds-new-york-chicago-jail-hotspots/2987935001/.

positive for COVID-19, and 9 prisoners have already died statewide.[68] As of April 15, there were 454 confirmed cases among people detained in Michigan's prisons, an increase of almost 200 cases from a week prior.[69] And 175 prison staff also had confirmed cases on April 15. There have also been numerous outbreaks in Michigan's jails, including in all three counties in the Detroit metropolitan area.[70]

42. For this reason, medical and public health experts have urged emergency action to fight the spread of COVID-19 in jails and other carceral facilities, including decarceration, improved access to medical care, and compliance with CDC guidelines.[71] And the World Health Organization has declared that no

---

[68] *Id.*

[69] *See* Mich. Dep't of Corrections, *Total Confirmed Prisoner and Staff Cases to Date* (last checked Apr. 15, 2020), https://medium.com/@MichiganDOC/mdoc-takes-steps-to-prevent-spread-of-coronavirus-covid-19-250f43144337; *see also* Egan & Jackson, *Coronavirus Spreads to 4 More Michigan Prisons As Concerns Mount*, Detroit Free Press (April 10, 2020), https://www.freep.com/story/news/local/michigan/2020/04/10/coronavirus-covid-19-spreads-michigan-prisons/5133558002/.

[70] *See* Ross Jones, *Michigan Prisons and Jails See COVID-19 Cases Rise*, WXYZ Channel 7 News (Apr. 3, 2007), https://www.wxyz.com/news/local-news/investigations/michigan-prisons-and-jails-see-covid-19-cases-rise.

[71] *See, e.g.,* Ex. 7, Brad Lander, *Doctors in NYC Hospitals, Jails, and Shelters Call on the City to Take More Aggressive Action to Combat the Spread of Coronavirus*, Medium (Mar. 12, 2020), https://medium.com/@bradlander/doctors-in-nyc-hospitals-jails-and-shelters-call-on-the-city-totake-more-aggressive-action-to-fb75f0b131c2; Ex. 8, Letter from Johns Hopkins faculty to Governor Hogan, Mar. 25, 2020, https://bioethics.jhu.edu/wp-content/uploads/2019/10/JohnsHopkins-faculty-letter-on-COVID-19-jails-and-prisons.pdf; Stern Decl. ¶ 11; Ex. 9, Decl. of Dr. Ranit Mishori ¶ 46, *Coreas v. Bounds*, et al., No. 8:20-cv-00780, ECF Doc. 2-3

government should end a "shelter in place" or lockdown procedure until "hot spot risks are minimized in vulnerable places," which includes jails and prisons.[72] Medical experts explain that the need for action is urgent given that "[t]he window of opportunity is rapidly narrowing for mitigation of COVID-19"—outbreaks are measured "in a matter of days, not weeks," with this type of novel virus.[73]

43.    Numerous public health experts, including Plaintiffs' expert Dr. Marc Stern,[74] Dr. Gregg Gonsalves,[75] Ross MacDonald,[76] Dr. Oluwadamilola T. Oladeru

---

(D. Md. Mar. 24, 2020); Ex. 10, Decl. of Robert B. Greifinger ¶ 13, *Dawson v. Asher*, Case No. 2:20-cv-00409-JLR-MAT, ECF Doc. 4 (D. Or., Mar. 16, 2020).

[72] Bill Chappell, *WHO Sets 6 Conditions For Ending a Lockdown*, NPR (Apr. 15, 2020), https://www.npr.org/sections/goatsandsoda/2020/04/15/834021103/who-sets-6-conditions-for-ending-a-coronavirus-lockdown?utm_source=facebook.com&utm_campaign=npr&utm_medium=social&utm_term=nprnews&fbclid=IwAR34AVrfEfUkggt7aI2W_apYjtIK8XKObFnQkFNfAtsn9iWFLPj7VMnAfWU.

[73] Mishori Decl. ¶ 46.

[74] Stern Decl. ¶ 11.

[75] Kelan Lyons, *Elderly Prison Population Vulnerable to Potential Coronavirus Outbreak*, Connecticut Mirror (March 11, 2020), https://cutt.ly/BtRSxCF.

[76] Craig McCarthy and Natalie Musumeci, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* N.Y. Post (Mar. 19, 2020), https://cutt.ly/ptRSnVo.

and Adam Beckman,[77] Dr. Anne Spaulding,[78] Homer Venters,[79] and Josiah Rich[80] have all strongly cautioned that people booked into and held in jails are likely to face serious, even grave, harm due to the outbreak of COVID-19.

44.    According to Dr. Stern, "taking immediate and concerted efforts to implement preventive steps, as well as reducing the population to the lowest number possible prioritizing those who are elderly or have underlying medical conditions defined by the CDC, will increase public safety via reducing public health risk."[81]

45.    Given this urgency, jails and prisons nationwide have released people with the aim of preventing community outbreaks of severe illness and death from COVID-19.   States and counties that have released people from incarceration in response to the COVID-19 crisis include, but are not limited to: Los Angeles County,

---

[77] Oluwadamilola T. Oladeru et al., *What COVID-19 Means for America's Incarcerated Population – and How to Ensure It's Not Left Behind* (Mar. 10, 2020), https://cutt.ly/QtRSYNA.

[78] Anne C. Spaulding, MD MPDH, *Coronavirus COVID-19 and the Correctional Jail*, Emory Center for the Health of Incarcerated Persons (Mar. 9, 2020).

[79] Madison Pauly, *To Arrest the Spread of Coronavirus, Arrest Fewer People*, Mother Jones (March 12, 2020), https://cutt.ly/jtRSPnk.

[80] Amanda Holpuch, *Calls Mount to Free Low-risk US Inmates to Curb Coronavirus Impact on Prisons*, The Guardian (Mar. 13, 2020), https://cutt.ly/itRSDNH.

[81] Stern Decl. ¶ 13.

California (1,700 people);[82] New York (more than 1,100 people);[83] New Jersey (1,000 people);[84] and Cuyahoga County, Ohio (approx. 600 people),[85] among others.

46. Internationally, governments have also responded to the threat posed by COVID-19 by releasing people from incarceration. In Iran, more than 80,000 people were temporarily released from prison to protect them and to protect the community from propagation of an outbreak.[86] In Ethiopia, more than 4,000 people were pardoned and released from incarceration to help prevent the spread of

---

[82] *LA County Releases 1,700 Inmates to Reduce Jail Population Due to Coronavirus*, NBC Los Angeles (Mar. 24, 2020), https://www.nbclosangeles.com/news/local/la-county-releases-1700inmates-to-reduce-jail-population-due-to-coronavirus/2334809/.

[83] Brendan Lyons, *NY to release 1,100 parole violators as coronavirus spreads*, Times Union (Mar. 27, 2020), https://www.timesunion.com/news/article/Deaths-surge-again-in-New-Yorkfrom-coronavirus-15160973.php.

[84] *1,000 Inmates Will Be Released From N.J. Jails to Curb Coronavirus Risk*, N.Y. Times (Mar. 23, 2020), https://www.nytimes.com/2020/03/23/nyregion /coronavirus-nj-inmates-release.html.

[85] Scott Noll, *Cuyahoga County Jail releases hundreds of low-level offenders to prepare for coronavirus pandemic*, News 5 Cleveland (Mar. 20, 2020), https://www.news5cleveland.com/news/local-news/oh-cuyahoga/cuyahoga-county-jail-releaseshundreds-of-low-level-offenders-to-prepare-for-coronavirus-pandemic.

[86] Parisa Hafezi, *Iran Temporarily Frees 85,000 From Jail Including Political Prisoners*, Reuters (Mar. 17, 2020), https://www.reuters.com/article/us-health-coronavirus-iran-prisoners/iran-temporarily-frees-85000-from-jail-including-political-prisoners-amid-coronavirus-idUSKBN21410M.

COVID-19.[87]

47.    States and other local jurisdictions have also made changes to existing carceral policies in response to the COVID-19 pandemic, including eliminating medical co-pays for incarcerated people and waiving fees for phone calls and video communication.[88]  Others have required facilities to distribute and make available sanitation supplies and hand sanitizer to everyone who is incarcerated, arranged for the immediate evaluation and treatment of anyone with symptoms, and enacted screening procedures for everyone who enters the jail or prison.[89]

48.    Over the past two weeks, multiple courts have also acknowledged the severe and urgent threats posed by COVID-19 and have accordingly ordered the release of detained and incarcerated persons.[90]

---

[87] Bukola Adebayo, *Ethiopia pardons more than 4,000 prisoners to help prevent coronavirus spread*, CNN (Mar. 26, 2020), https://www.cnn.com/2020/03/26/africa/ethiopia-pardons-4000-prisoners-over-coronavirus/index.html.

[88] *Responses to the COVID-19 Pandemic*, Prison Policy (Mar. 27, 2020), https://www.prisonpolicy.org/virus/virusresponse.html.

[89] *See, e.g.*, *Preparedness and Response Plan 5-8*, Indiana Dep't of Correction (2020), https://www.in.gov/idoc/files/IDOC%20Pandemic%20Response%20Plan%203-3-2020.pdf#response%20plan.

[90] *See, e.g.*, *Castillo et al. v. Barr*, 5:20-cv-00605, ECF Doc. 32 (C.D. Cal. Mar. 27, 2020) (ordering petitioners be released from immigration detention in light of COVID-19 and noting "the risk of infection in immigration detention facilities – and jails – is particularly high"); *USA v. Garlock*., No. 18 Cr 00418, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (ordering, sua sponte, extension of convicted defendant's surrender date and noting "[b]y now it almost goes without

## THE COVID-19 PANDEMIC HAS REACHED OAKLAND COUNTY AND SWIFT ACTION IS NEEDED TO PREVENT A MASS OUTBREAK IN THE JAIL

49.    With over 27,000 confirmed cases of COVID-19,[91] the state of Michigan now ranks third in the country for COVID-19 related deaths trailing behind New York and New Jersey.[92]   Oakland County has the second highest number of COVID-19 cases in the state. As of April 16, 2020, over 5,000 people have been diagnosed with COVID-19 in Oakland County, with 392 deaths

---

saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *Xochihua-Jaimes v. Barr*, No. 18-71460 (9th Cir. Mar. 24, 2020) (ordering, sua sponte, that petitioner be immediately released from immigration detention "[i]n light of the rapidly escalating public health crisis" related to COVID-19 that"public health authorities predict will especially impact immigration detention centers"); *U.S. v. Stephens,* 15 Cr. 95 (AJN), 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) (granting motion for reconsideration of defendant's bail conditions and releasing him from jail to home confinement, explaining that "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic has become apparent" and that "inmates may be at a heightened risk of contracting COVID-19 should an outbreak develop"); *In re. Extradition of Alejandro Toledo Manrique*, 2020 WL 1307109, (N.D. Cal. March 19, 2020) (ordering release on bond despite government assertions that facility has preparedness plan in place and no cases have been confirmed).

[91] *Coronavirus Daily Counts*, Michigan.Gov (Apr. 15, 2020), https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173_99207---,00.html.

[92] Bobby Allyn, *After Surge In Cases, Michigan Now 3rd In Country For Coronavirus Deaths*, NPR (Mar. 31, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/31/824738996/after-surge-in-cases-michigan-now-3rd-in-country-for-coronavirus-deaths.

confirmed.[93]

50.     The Governor of Michigan declared a state of emergency on March 10, 2020, after two positive cases of COVID-19 were confirmed in Michigan—one in Oakland County and the other in Wayne County.[94]  On March 13, 2020, Oakland County Executive David Coulter declared a local state of emergency as a response to the threat posed by COVID-19.  In the emergency order, county health officer Leigh-Anne Stafford cautioned that the "best way to prevent infection is to avoid being exposed to the virus."[95]

51.     On March 15, 2020, the Michigan Supreme Court issued Administrative Order 2020-1 instructing all trial courts in Michigan to take all "reasonable measures to avoid exposing participants in court proceedings, court employees, and the general public to the COVID-19 virus."  The order further instructs courts to reduce jail populations by "tak[ing] into careful consideration

---

[93] *Coronavirus*, Michigan.Gov, https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173---,00.html.

[94] *Michigan Executive Order No. 2020-04 Declaration of State of Emergency*, (Mar. 10, 2020), https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-521576--,00.html.

[95] *County Executive Coulter Continues Public Health Preparedness and Activates Emergency Operations Center for Coronavirus Efforts*, Oakland County News Release (Mar. 11, 2020), https://www.oakgov.com/health/news/Documents/Press%20Releases/031020%20DRAFT%20COVID-19%20partial%20EOC%20HC%20+%20OCHD%20team.pdf.

public health factors arising out of the present state of emergency" in making bond determinations and determining conditions or probation.

52.    On March 16, 2020, Oakland County issued another order to reduce the occupancy load at county establishments, entertainment venues, and fitness centers by 50%, and county health officer Stafford reemphasized that "social distancing is vital" to keep residents healthy and "stop the spread of illness."[96]

53.    On March 23, 2020, Governor Whitmer issued a statewide stay-at-home order and ordered all non-essential businesses to close to bolster efforts to fight the ongoing COVID-19 outbreak.[97]

54.    On March 26, 2020, Michigan Supreme Court Chief Justice Bridget M. McCormack and Sheriff Matt Saxton, Executive Director of the Michigan Sheriffs' Association, issued a joint statement urging Judges and Sheriffs "to reduce and suspend jail sentences for people who do not pose a public safety risk" and "release far more people on their own recognizance as they await their day in court," emphasizing that "[f]ollowing this advice WILL SAVE LIVES" during this global

---

[96] *Emergency Order For Control Of Pandemic*, Oakland County News Release (Mar. 14, 2020), https://www.oakgov.com/Documents/News/Emergency%20Order%20for%20Coronavirus%20Pandemic%20food%20service%20establishments%20%203.14.20.pdf

[97] Michigan Executive Order No. 2020-21 Temporary requirement to suspend activities that are not necessary to sustain or protect life (Mar. 23, 2020), https://content.govdelivery.com/attachments/MIEOG/2020/03/23/file_attachments/1408152/EO%202020-21%20Stay%20Home,%20Stay%20Safe.pdf

pandemic.[98]

55.     On March 29, 2020, Governor Whitmer issued Executive Order 2020-29[99], underscoring the life-or-death threat that the COVID-19 pandemic poses to people incarcerated in county jails throughout Michigan, as well as to jail staff and the community at large.  The order detailed necessary protocols that the Michigan Department of Corrections, county jails, local lockups, and juvenile detention centers must implement to reduce exposure risks to the virus.   These protocols include:

> a. "Screening all persons arriving at or departing from a facility, including staff, incarcerated persons, vendors, and any other person entering the facility, in a manner consistent with guidelines issued by the Centers for Disease Control and Prevention ('CDC'). Such screening includes a temperature reading and obtaining information about travel and any contact with persons under investigation for

---

[98] *Michigan Court News Release* (Mar. 26, 2020), https://courts.michigan.gov/News-Events/press_releases/Documents/CJ%20and%20MSA%20Joint%20Statement%20draft%202%20(003).pdf.

[99] Ex. 11, Michigan Executive Order No. 2020-29 Temporary COVID-19 protocols for entry into Michigan Department of Corrections facilities and transfers to and from Department custody; temporary recommended COVID-19 protocols and enhanced early-release authorization for county jails, local lockups, and juvenile detention centers Declaration of State of Emergency (Mar. 29, 2020), https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-523422--,00.html.

COVID-19 infection.";

b.  "Restricting all visits, except for attorney-related visits, and conducting those visits without physical contact to the extent feasible.";

c.  "Limiting off-site appointments except for urgent or emergency medical treatment";

d.  "Developing and implementing protocols for incarcerated persons who display symptoms of COVID-19, including methods for evaluation and processes for testing, notification of the Department of Health and Human Services ("DHHS"), and isolation during testing, while awaiting test results, and in the event of positive test results. These protocols should be developed in consultation with local public health departments.";

e.  "Notifying DHHS of any suspected case that meets the criteria for COVID-19 through communication with the applicable local public health department.";

f.   "Providing, to the fullest extent possible, appropriate personal protective equipment to all staff as recommended by the CDC.";

g.   "Conducting stringent cleaning of all areas and surfaces, including frequently touched surfaces (such as doorknobs, handles, light

switches, keyboards, etc.), on a regular and ongoing basis.";

h.   "Ensuring access to personal hygiene products for incarcerated persons and correctional staff, including soap and water sufficient for regular handwashing.";

i.   "Ensuring that protective laundering protocols are in place.";

j.   "Posting signage and continually educating on the importance of social distancing, handwashing, and personal hygiene.";

k.   "Practicing social distancing in all programs and classrooms— meaning a distance of at least six feet between people in any meeting, classroom, or other group."; and

l.   "Minimizing crowding, including interactions of groups of 10 or more people, which may include scheduling more times for meal and recreation to reduce person-to-person contact."

56.   Many of the measures listed in the Governor's Executive Order have not been implemented at the Jail.[100]

57.   Indeed, the Jail has failed to cooperate with courts and attorneys on common-sense measures to reduce incarceration rates.  In particular, the Jail has refused to facilitate providing attorneys to newly arrested arrestees at their

---

[100] https://www.oakgov.com/sheriff/Corrections-Courts/jail/Pages/default.aspx.

arraignment.   The standards promulgated by the Michigan Indigent Defense Commission (MIDC), as well as the Sixth Amendment, require that defendants be represented at their arraignments.   Since the crisis, Defendants have refused to cooperate with the MIDC and with Oakland County courts to facilitate appearances of defense attorneys at arraignments.   As a result, new arrestees face a heightened risk of being unjustly detained in the Jail under the conditions described herein because of being denied access to counsel at their arraignment.   No other Jail in Michigan has exhibited similar unwillingness to provide counsel at arraignments during the crisis.

58.   Executive Order 2020-29 also suspends the capacity and procedural requirements of Michigan's County Jail Overcrowding Act ("JOA"), thus empowering sheriffs and courts to swiftly but safely take bold and urgent steps to dramatically reduce jail populations to alleviate these risks.   On March 31, 2020, the ACLU of Michigan and the State Appellate Defender Office sent letters to every chief judge and sheriff in the state, including Defendant Bouchard, outlining the specific measures that sheriffs and courts can now take to further reduce jail populations under the JOA, as modified by Executive Order 2020-29, while maintaining public safety.[101]   The letter called, *inter alia*, for 1) the release of pre-

---

[101] Ex 12, Letter from ACLU to Chief Judges, Mar. 31, 2020,
https://www.aclumich.org/sites/default/files/field_documents/aclu_letter_to_judges

trial detainees on a personal bond; 2) the release of prisoners who have served 85% of their sentences; 3) the reduction or suspension of sentences for other prisoners; and 4) a moratorium on detaining new people in the jails in order to reduce the risk of fatal COVID-19 outbreaks in the jails.  Neither Defendant Bouchard nor the Oakland County Circuit Court have taken full advantage of the powers now available to them to reduce the jail population under the JOA.

59.    On April 1, 2020, the Michigan Joint Task Force on Jail and Pretrial Incarceration issued a press release highlighting the gravity of a potential outbreak in county jails:  "As high traffic institutions characterized by relatively confined spaces, the threat of COVID-19 is particularly acute in our county jails.  Individuals in jail, including law enforcement and correctional officers, are at an elevated risk of being exposed to the virus and spreading it to others through inadequate social distancing."  The Task Force urged "justice system decision makers to continue taking all necessary actions to keep our communities safe through arrest alternatives, de-incarceration as appropriate, and social distancing."[102]

_re_gov_executive_order.pdf; Ex 13, Letter from ACLU to Sheriffs, Mar. 31, 2020 https://www.aclumich.org/sites/default/files/field_documents/aclu_letter_to_mi_sheriffs_re_gov_executive_order.pdf

[102] *Michigan Joint Task Force on Jail and Pretrial Incarceration*, *Jail Population Reduction to Curb the Spread of COVID-19* (Apr. 1, 2020), https://courts.michigan.gov/News-Events/press_releases/Documents/Jails%20Task%20Force%20press%20release%20on%20COVID-19_FINAL.pdf

60.    Yet, despite the urgent calls to reduce jail populations, Defendants have failed to take sufficient steps to reduce the population at the Jail to a safe number. To the contrary, as of April 3, 2020, public reports stated that only 60 people had been approved for early release from the Jail and that the only people even being considered for release were people with an underlying health condition or a bond of less than $1,000.[103]  Further, Defendants remain woefully unprepared and incapable of taking necessary precautions to protect the people currently confined in the Jail against this unprecedented, life-threatening public health crisis

61.    Alarmingly, Michigan's coronavirus case count is doubling every three days,[104] and Governor Whitmer confirmed during a press conference on April 6, 2020, that the state is nowhere close to hitting the apex of the COVID-19 pandemic.[105]  Hospitals in Southeast Michigan are already suffering and struggling

---

[103] Aileen Wingblad, *6 inmates at Oakland County Jail have COVID-19*, Oakland Press (Apr. 3, 2020), https://www.theoaklandpress.com/news/coronavirus/6-inmates-at-oakland-county-jail-have-covid-19/article_a1fe7b48-75df-11ea-ae6b-233d4bf6a9fe.html.

[104] Kristen Jordan Shamus and Kristi Tanner, *'Southeast Michigan is burning': Michigan's coronavirus case count doubles every 3 days*, Detroit Free Press (Mar. 29, 2020), https://www.freep.com/in-depth/news/local/michigan/2020/03/28/michigan-coronavirus-surge-covid-19-case-count/2898574001/.

[105] Courtney Vinopal, *WATCH: Michigan Gov. Gretchen Whitmer gives coronavirus update*, PBS (Apr. 6, 2020), https://www.pbs.org/newshour/health/watch-live-michigan-gov-gretchen-whitmer-gives-coronavirus-update.

to keep up with the rush of COVID-19 related patients.[106]  The state's chief medical officer, Dr. Joneigh Khaldun, declared during the conference that state hospitals are overwhelmed because there are no signs that the rate of infection is slowing down.[107] A mass outbreak at the Jail would further cripple the already fragile healthcare system in Michigan.  As early as March 23, Oakland County Executive David Coulter was already warning that he was hearing from all of Oakland County's hospitals that they were "already at a critical point" and that "this is going to get worse before it gets better."[108]  And, just yesterday, the grisly news was reported that the County is scouting out ice rinks to store the bodies of the dead because of the potentially excessive number of fatalities that could occur in the upcoming weeks in the county's hospitals.[109]

---

[106] *See, e.g.,* Kristen Jordan Shamus & Darcie Moran, *Nurses Protest Conditions at Detroit's Sinai-Grace, Said They Were Told to Leave*, Detroit Free Press (Apr. 6, 2020), https://www.freep.com/story/news/health/2020/04/06/detroit-dmc-sinai-grace-nurses/2953385001/?utm_source=oembed&utm_medium=onsite &utm_campaign=storylines&utm_content=news&utm_term=4566614002.

[107] *Id*.

[108] Robin Erb, *Alarm Grows as Michigan Hospitals Begin to Fill with Coronavirus Cases*, Bridge (Mar. 23, 2020), https://www.bridgemi.com/michigan-health-watch/alarm-grows-michigan-hospitals-begin-fill-coronavirus-cases.

[109] Jennifer Dixon, *Oakland County Scouts Ice Rinks to Potentially Store Bodies in 'Last Resort' Scenario*, Detroit Free Press (Apr. 14, 2020), https://www.freep.com/story/news/local/2020/04/15/coronavirus-oakland-ice-rinks-bodies/5137771002/.

## DEFENDANTS' RESPONSES TO THE COVID-19 PANDEMIC ARE CONSTITUTIONALLY DEFICIENT AND PLACE THE PEOPLE IN ITS CUSTODY AT HEIGHTENED RISK

62.     All people incarcerated in the Jail face a significant risk of exposure to COVID-19.  Defendants are well aware of the heightened threat of COVID-19 in the jails—the CDC, the Governor, medical experts, and various advocates have already alerted them of this risk as well as the preventive measures needed to protect against the further spread of COVID-19.

63.     Currently in the Jail, people are forced to sleep in bunks that are one to three feet apart, and sometimes on a concrete floor right next to others, as in the case of Plaintiffs Lee and J. Cameron.  People are also forced to share communal showers, toilets, and sinks in small common areas.  Some bunks, like Plaintiff Briggs' are right next to the shared toilets.

64.     People confined in the Jail are not given the opportunity to practice safe social distancing, and they are forced to sit, stand, walk, eat, and sleep within six feet of other people throughout the day.

65.     People confined in the Jail are not provided with soap on a regular basis, and some people like Plaintiff Saunders have been without soap for over a week. Other personal sanitation supplies are not provided at all, and the commissary is closed, so there is no way to purchase them.

66.     Defendants have also not provided access to hand sanitizer to

incarcerated people, but have provided it to their employees..

67.     Staff do not consistently wear protective personal equipment like gloves or masks when interacting with people confined in the Jail, and there have been shortages in protective personal equipment for all people incarcerated and for people working in the Jail.

68.     People confined in the Jail are not provided adequate cleaning supplies in the proper concentrations of strength to prevent transmission of the virus at no cost to them.   Even basic cleaning supplies are difficult to come by.   People incarcerated in the Jail have attempted to clean toilets with heavily diluted cleaning solution and toilet paper.   There is no access to Kleenex.

69.     The people tasked with cleaning cells or communal areas are not provided the protective personal equipment they need, such as masks or gloves, which would allow them to protect themselves from the virus.   When gloves are provided, they are in scarce supply and people are forced to reuse them for multiple days, practically eliminating any protective benefit in slowing virus transmission.

70.     Nor are people confined in the Jail provided adequate cleaning supplies to clean their own cells or living spaces, ensuring that the dozens of people who share the same cell will quickly transmit the illness to each other.

71.     Defendants have provided neither paper towels nor other means for inmates to dry their hands after washing them. As a result,  people who are detained

must shake their hands dry or wipe them on their jail-issued uniforms, which are exposed to contaminated surfaces and laundered infrequently (due to lack of access or cost).

72.     Prior to the COVID-19 pandemic, nurses made rounds in the mornings and distributed "kites"[110] so that people could request medical attention. When the pandemic began, the nurses ignored the requests for days at a time.  As the pandemic progresses, the nurses do not even make rounds to distribute kites so that people can request medical attention if necessary.  When people finally meet with a medical professional, proper care is not provided.  For example, Plaintiff Saunders went to the medical ward with COVID-19 symptoms about a month ago.  While there, he went eight to twelve hours with nobody coming to check on him at all.  He could not move to get his meals, which were placed just inside the door.  The  meals were then simply removed with no attempt to bring them to him.  Other people who have been exposed to those with presumed COVID-19, have been given a 7-day supply of Tamiflu with instructions to take it if they develop symptoms.  Plaintiff Briggs attempted to get medical treatment by telling a nurse that he was experiencing shortness of breath.  The nurse responded that he could not be speaking if he had shortness of breath and refused to treat or test him.

---

[110] People incarcerated at the Jail request medical attention by completing "kites," which are written requests to see a doctor or nurse.

73.     People confined in the Jail are generally required to pay a $12 co-pay for each visit to the doctor, when the visit finally occurs.  The people in the Jail are not provided with access to their account statements, so they do not know if these co-pays are waived for COVID-19 treatment.

74.     When people begin to show symptoms of COVID-19, such as a dry cough, shortness of breath, or a fever, they are not immediately tested or quarantined, if they are tested or quarantined at all.

75.     While some people who are incarcerated in the Jail have been "quarantined" for presumed COVID-19, the quarantined cells are immediately next to cells that are not quarantined.  People are so close to the "quarantined" cells that they can reach into these neighboring cells through the bars on the front of their own cells.  People are also shuffled from quarantined cells into non-quarantined cells at random.

76.     All the people incarcerated in the Jail use shared phones when calling family members, loved ones, or lawyers.  The phones are not cleaned between each use, nor are people provided with disinfectant supplies, which means that each person must risk COVID-19 infection when touching and speaking through the phone.

77.     The nurses are not consistently making rounds, and Plaintiff J. Cameron was told that no doctor would be available until May.  When people express to

guards that they need medical treatment, the guards tell them that they must wait for a nurse. When the people remind the guards that the nurses are not coming, the guards tell them that there is nothing that they can do to help.

78.    Not only are Defendants aware of the conditions in the Jail, but jail staff are actively using exposure to COVID-19 as a punitive measure to control incarcerated people.  It is well known by both guards and incarcerated people at the Jail that the COVID-19 outbreak is centered in the main building.  Guards in the annex have repeatedly threatened to move people in the annex who raise concerns about the hygienic conditions there into the main building where they will be exposed to COVID-19.  In fact, both Plaintiff J. Cameron and Plaintiff Lee were punished in exactly this manner and were moved from the annex into the Tank as retaliation for raising concerns about their health.  In the crowded Tank, they are required to sleep on the concrete floor right next to other incarcerated people in a cell that is within arm's reach of a similarly dungeon-like cell where quarantined COVID-19 patients are being warehoused.

79.    The danger posed by Plaintiffs' incarceration during the COVID-19 pandemic is "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk" and violates their constitutional right to safety in government custody.  *See Helling v. McKinney*, 509 U.S. 25, 36 (1993).

80.    To expose people to the unmitigated risk of contracting COVID-19 is

constitutionally impermissible. Failure to act in accordance with speed and urgency will constitute a wholesale violation of the constitutional rights of those confined in the jail.

## IMMEDIATE RELEASE OF THE MEDICALLY VULNERABLE IS THE ONLY RESPONSE THAT SERVES PUBLIC HEALTH, COMMUNITY SAFETY, AND THE INDIVIDUAL SAFETY OF EACH SUBCLASS MEMBER

81. Immediate release of medically vulnerable Plaintiffs, as well as the subclass of medically vulnerable people they represent, remains a necessary public health intervention.[111]

82. Release is needed to prevent irreparable harm to members of the medically vulnerable subclass. Because of the rapidity with which COVID-19 spreads and the danger it poses, immediate release is both necessary and the least intrusive intervention to ensure Medically Vulnerable Class Members are provided medically and constitutionally sufficient treatment.

83. If immediate action is not taken to dramatically reduce the population

---

[111] Stern Decl. ¶¶ 10-11 (noting that "[d]ownsizing jail populations by releasing high risk individuals and others the court system deems eligible for release will help to "flatten the curve" overall—both within the jail setting and without); Ex 14, Declaration of Dr. Adam Lauring ¶ 37 (explaining that "drastically reducing the jail's population is the only way to protect the health and safety of people detained in the facility and the public at large"); *see also* Meyer Decl. ¶¶ 37–38 (noting that population reduction in jails will be "crucially important to reducing the level of risk both for those within [jail] facilities and for the community at large," and that stemming the flow of intakes is a part of the necessary intervention).

of the Jail, all people who remain incarcerated will be at grave and unacceptable risk of contracting COVID-19—a serious and potentially life-threatening illness.  People confined in prisons and jails must "be furnished with the basic human needs, one of which is 'reasonable safety,'" *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993) (citations omitted), which is virtually impossible given the realities of the COVID-19 pandemic and the limitations inherent to the Jail.

84.     The Jail is ill-equipped to manage or handle a COVID-19 outbreak—which is already occurring.  The Jail lacks the ability to provide ICU-level care or access to ventilator equipment necessary to properly treat people who become infected.  It does not have COVID-19 tests available for incarcerated people, and it has routinely refused offering such tests to people who exhibit known symptoms of the coronavirus.  Over ten (and sometimes nearly 30) people are packed into the same cells, where people are forced into conditions where they sleep one to two feet away from another person, must share a limited supply of communal toilets, sinks, showers, furniture, and phones, and are not provided the hygiene and sanitation supplies necessary to adequately disinfect or clean their immediate surroundings, including all the high-touch surfaces and objects they are constantly forced to come into contact with.

85.     Given the size of the Jail, the configuration of its cells, and staffing, the jail population must be significantly decreased to ensure adequate social distancing.

86.    As Plaintiffs' expert declarant Dr. Marc Stern, a correction health expert who advises the National Sheriffs' Association and the U.S. Department of Justice, and who has served as Assistant Secretary of Healthcare for the Washington Department of Corrections has concluded:  In this unique moment, release *enhances* the safety of other people and the community and is necessary to protect the Plaintiff's own health and safety.[112]   And those Petitioners/Plaintiffs who remain incarcerated must be able to exercise self-protective measures in a sanitary, disinfected space, and to maintain social distance from other community members to flatten the curve of the virus's spread and protect themselves from infection.

87.    Other medical experts specializing in correctional health similarly shared urgent recommendations to dramatically reduce the population of detention centers, jails, and prisons.  Dr. Ranit Mishori, Senior Medical Consultant for Physicians for Human Rights and an expert in correctional health issues, has concluded that "[r]eleasing people from incarceration is the best and safest way to prevent the spread of disease and reduce the threat to the most vulnerable incarcerated people," and that "[i]mmediate release is crucial for individuals with chronic illnesses or other preexisting conditions."[113]   Release is "both necessary and urgent" given that "[t]he window of opportunity is rapidly narrowing for mitigation

---

[112] Stern Decl. ¶¶10–12, 14.

[113] Mishori Decl. ¶ 46.

of COVID-19."[114]

88.    Dr. Jonathan Giftos, the former Medical Director for Correctional Health Services at Riker's Island, concluded that "the only way to really mitigate the harm of rapid spread of coronavirus in the jail system is through depopulation, releasing as many people as possible with a focus on those at highest risk of complication."[115]

89.    Other correctional medical and public health experts have also urged the release of people from incarceration given the heightened risk of transmission and infection, including a group of doctors who work in New York City's jails, hospitals and shelters,[116] as well as a group of more than 200 Johns Hopkins faculty in public health, bioethics, medicine, and nursing.[117]

90.    The unprecedented coronavirus pandemic unquestionably requires individuals' release, as multiple health experts have opined that no other measures would be a sufficient or appropriate response to protect public and individual health.

91.    Releasing people from the jails would also reduce the burden on

---

[114] *Id.*

[115] *Recipe for disaster:  The spread of corona virus among detained populations*, MSNBC (Mar. 18, 2020), https://www.msnbc.com/all-in/watch/-recipe-for-disaster-the-spread-of-coronavirus-among-detained-populations-80947781758.

[116] Ex. 7.

[117] Ex. 8.

regional hospitals and health centers.

92.    This Court has jurisdiction to release the medically vulnerable subclass immediately.  It further has authority to convene a three-judge panel to determine whether to issue a Prisoner Release Order once this Court concludes that social distancing is impossible unless the population at the Jail is significantly reduced.

## CLASS ACTION ALLEGATIONS

93.    The named Petitioners/Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action under Federal Rule of Civil Procedure 23(b)(2).

94.    The class that Petitioners/Plaintiffs seek to represent is defined as all current and future persons held at the Jail during the course of the COVID-19 pandemic ("Jail Class"), including three subclasses:

>   a.  The "Pre-trial Subclass" is defined as "All current and future persons detained at the Oakland County Jail during the course of the COVID-19 pandemic who have not yet been convicted of the offense for which they are currently held in the Jail."

>   b.  The "Post-conviction Subclass" is defined as "All current and future persons detained at the Oakland County Jail during the course of the COVID-19 pandemic who are have been sentenced to serve time in the Jail or who are otherwise in the

Jail as the result of an offense for which they have already been convicted."

c. The "Medically-Vulnerable Subclass" is defined as: "All members of the Jail Class who are also over the age of fifty, or who, regardless of age, experience an underlying medical condition that places them at particular risk of serious illness or death from COVID-19, including but not limited to (a) lung disease, including asthma, chronic obstructive pulmonary disease (e.g. bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure and coronary artery disease; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) epilepsy; (f) hypertension; (g) compromised immune systems (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (h) blood disorders (including sickle cell disease); (i) inherited metabolic disorders; (j) history of stroke; (k) a developmental disability; and/or (l) a

current or recent (last two weeks) pregnancy."

95.     This action is brought and may properly be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the requirements of numerosity, commonality, typicality, and adequacy.  Fed. R. Civ. P. 23(a).

96.     On April 15, 2020, the Jail confined over 800 people, all of whom are eligible members of this class.  Therefore, the class and subclass meet the numerosity requirement of Federal Rule of Civil Procedure 23(a).

97.     The subclasses are also too numerous for joinder of all members to be practicable.  In Michigan, pre-trial detainees constitute approximately 50% of all people in jails,[118] so the Pre-trial and Post-conviction subclasses likely each include approximately half of the class.  And demographic data regarding the health of correctional populations indicates that well over 30% of detained people suffer from at least one condition rendering them medically vulnerable.[119]  Thus, the medically vulnerable subclass likely contains hundreds of people as well.

---

[118] *See* Michigan Joint Task Force on Jail and Pretrial Incarceration, *Report and Recommendations* 7 (Jan. 10, 2020), https://courts.michigan.gov/News-Events/ Documents/final/Jails%20Task%20Force%20Final%20Report%20and%20 Recommendations.pdf.

[119] Peter Wagner & Emily Widra, *No need to wait for pandemics: The public health case for criminal justice reform*, Prison Policy Initiative (Mar. 6, 2020), www.prisonpolicy.org/blog/2020/03/06/pandemic/.

| | Prevalence of health condition by population | | | |
|---|---|---|---|---|
| Health condition | Jails | State prisons | Federal prisons | United States |
| Ever tested positive for Tuberculosis | 2.5% | 6.0% | | 0.5% |
| Asthma | 20.1% | 14.9% | | 10.2% |
| Cigarette smoking | n/a | 64.7% | 45.2% | 21.2% |
| HIV positive | 1.3% | 1.3% | | 0.4% |
| High blood pressure/hypertension | 30.2% | 26.3% | | 18.1% |
| Diabetes/high blood sugar | 7.2% | 9.0% | | 6.5% |
| Heart-related problems | 10.4% | 9.8% | | 2.9% |
| Pregnancy | 5.0% | 4.0% | 3.0% | 3.9% |

*Health conditions that make respiratory diseases like COVID-19 more dangerous are far more common in the incarcerated population than in the general U.S. population. Pregnancy data come from our report, Prisons neglect pregnant women in their healthcare policies, the CDC's 2010 Pregnancy Rates Among U.S. Women, and data from the 2010 Census. Cigarette smoking data are from a 2016 study, Cigarette smoking among inmates by race/ethnicity, and all other data are from the 2015 BJS report, Medical problems of state and federal prisoners and jail inmates, 2011-12, which does not offer separate data for the federal and state prison populations. Cigarette smoking may be part of the explanation of the higher fatality rate in China among men, who are far more likely to smoke than women.*

98.     Joinder is impracticable because the class members are numerous; the class is fluid due to the inherently transitory nature of pretrial incarceration; and the class members are incarcerated and impoverished, which limits their ability to institute individual lawsuits.  Certifying this class supports judicial economy.

99.     Common questions of law and fact exist as to all members of the class. The named Petitioners/Plaintiffs seek common declaratory and injunctive relief concerning whether Defendants' policies, practices, and procedures violate the constitutional rights of the class members.  These common questions of fact and law include, but are not limited to:

1)  Whether the conditions of confinement at the Jail since the beginning of the COVID-19 pandemic amount to constitutional violations;

2)  What measures Defendants implemented in the Jail in response to the COVID-19 crisis;

54

3) Whether Defendants' practices during the COVID-19 pandemic exposed people confined at the Jail to a substantial risk of serious harm; and

4) Whether Defendants knew of and disregarded a substantial risk of serious harm to the safety and health of the class.

100.   Plaintiffs' claims are typical of the class members' claims.  The injuries that Petitioners/Plaintiffs have suffered due to Defendants' unconstitutional course of conduct are typical of the injuries suffered by the class.  All class members seek the same declaratory and injunctive relief.

101.   The Petitioners/Plaintiffs are adequate representatives of the class because their interests in the vindication of the legal claims they raise are entirely aligned with the interests of the other class members, each of whom has the same constitutional claims.  There are no known conflicts of interest among members of the proposed class, and the interests of the named Petitioners/Plaintiffs do not conflict with those of the other class members.

102.   Petitioners/Plaintiffs are represented by counsel with experience and success in litigating complex civil rights matters in federal court.  The interests of the members of the class will be fairly and adequately protected by the named Petitioners/Plaintiffs and their attorneys.

103.   Because the putative class challenges Defendants' system as

unconstitutional through declaratory and injunctive relief that would apply the same relief to every member of the class, certification under Rule 23(b)(2) is appropriate and necessary.

104. A class action is the only practicable means, by which the named Petitioners/Plaintiffs and class members can challenge the Defendants' unconstitutional actions and obtain the necessary immediate declaratory and injunctive relief sought for themselves and all other members of the class.

## DEFENDANTS' FAILURE TO ADEQUATELY MITIGATE AGAINST THE SPREAD OF COVID-19 IS OBJECTIVELY UNREASONABLE AND VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENT RIGHTS OF PETITIONERS/PLAINTIFFS AND CLASS MEMBERS

105. Defendants violate Plaintiffs' Eighth and Fourteenth Amendment rights by incarcerating them in conditions that fail to adequately mitigate against the spread of a potentially fatal virus in the midst of a growing pandemic and in spite of their knowledge and ability to do so.

106. All people held in the Jail, whether detained pretrial or incarcerated post-conviction, are entitled to be protected from conditions of confinement that create a substantial risk of serious harm. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (correctional officer violated Eighth Amendment by consciously failing to prevent "a substantial risk of serious harm"); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ("deliberate indifference" to serious medical needs violates the Eighth

Amendment).  Corrections officials have a constitutional obligation to provide for detainees' reasonable safety and to address their serious medical needs.  *See DeShaney v. Winnebago County Dept. of Soc. Services*, 489 U.S. 189, 200 (1989) ("[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." );  *Youngberg v. Romeo*, 457 U.S. 307, 315–16, 324 (1982) (the state has an "unquestioned duty to provide adequate . . . medical care" for detained persons);  *Wilson v. Seiter*, 501 U.S. 294, 300 (1991);  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Brown v. Plata*, 563 U.S. 493, 531-32 (2011).

107.   It is well established that, under the Fourteenth Amendment, pretrial detainees are entitled to at least the same level of protection as convicted detainees. *See Richko v. Wayne Cty., Mich.,* 819 F.3d 907, 915 (6th Cir. 2016);  *see also City of Revere v. Mass. Gen. Hosp*., 463 U.S. 239, 244 (1983) ("[T]he due process rights of a [pretrial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner.").  Indeed, as explained in paragraph 112, *infra*, a pre-trial detainee's burden of proving that the conditions of their confinement are unconstitutional are lower than for convicted persons.

108.   Exposure to an infectious disease like COVID-19 without adequate preventive measures is objectively unreasonable under the Fourteenth Amendment and constitutes deliberate indifference to a serious risk to health and safety, in direct violation of the Eighth Amendment.  *Helling*, 509 U.S. at 33-34 ("Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease"); *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) ("[C]orrectional officials have an affirmative obligation to protect [forcibly confined] inmates from infectious disease."); *Flanory v. Bonn*, 604 F.3d 249 (6th Cir. 2010) (recognizing that a complete denial of dental hygiene products can constitute deliberate indifference); *see also Farmer v. Brennan*, 511 U.S. 825, 833 (1994) ("[H]aving stripped [prisoners] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course."); *Johnson v. Operation Get Down, Inc.*, No. 11-15487, 2014 WL 3752481, at *5 (E.D. Mich. 2014) (finding that even a "short period" of exposures to an infectious antibiotic resistant staph infection could constitute deliberate indifference); *Lee v. Birkett*, No. 09–cv–10723, 2010 WL 1131485, at *5 (E.D. Mich. Feb.18, 2010) (holding that allegations that prisoners were forced to use common razors and be exposed to other unsanitary conditions for two months could constitute deliberate indifference).

109.   Jail officials violate this affirmative obligation towards convicted

prisoners by showing "deliberate indifference" to the substantial risk of serious harm. *Wilson*, 501 U.S. at 303. With respect to an impending infectious disease like COVID-19, deliberate indifference is satisfied when corrections officials "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," even when "the complaining inmate shows no serious current symptoms." *Helling*, 509 U.S. at 33 (holding that a prisoner "*states a cause of action* . . . by alleging that [corrections officials] have, with deliberate indifference, exposed him to conditions that pose an unreasonable risk of serious damage to future health") (emphasis added); *see also Hope v. Pelzer,* 536 U.S. 730, 738 (2002) (citing *Farmer,* 511 U.S. at 842) (court "may infer the existence of [deliberate indifference] from the fact that the risk of harm is obvious").

110.   This Court need not "await a tragic event" to find that Defendants are maintaining unconstitutional conditions of confinement in the midst of a global pandemic. *See Helling*, 509 U.S. at 33. So long as the risk of serious harm is "likely," as it is here, the Eighth Amendment is violated even if "the complaining inmate shows no serious current symptoms," it is "not alleged that the likely harm would occur immediately," and "the possible infection might not affect all of those exposed." *Id*.

111.   As established above, Petitioners/Plaintiffs face a significant risk of exposure to the novel coronavirus, which poses a serious threat of severe illness or

death to all class members, and to the Medically Vulnerable subclass in particular given the subclass members' known vulnerable health conditions.  Defendants are well aware of these serious risks to their health and safety, and their failure to provide constitutionally adequate conditions of confinement during this growing global pandemic constitutes deliberate indifference.

112.    Defendants' deliberate indifference to the health and safety of people incarcerated in the Jail satisfies both objective and subjective standards.  However, following the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the Sixth Circuit has recognized the "shift in Fourteenth Amendment deliberate indifference jurisprudence [that] calls into serious doubt whether [pretrial detainees] need even show that the individual defendant-officials were subjectively aware of [their] serious medical conditions." *Richmond v. Huq*, 885 F.3d 928, 938 n.3 (6th Cir. 2018).   As alleged in detail above, the heightened risk of COVID-19 transmission in jails and other carceral facilities have been widely reported, and the need for risk mitigation—including testing, physical distancing, and sanitation— has been well established locally and nationwide.  Yet the Jail has failed to implement the types of changes required to its conditions to adequately protect against COVID-19 transmission and infection within its walls.

## CLAIMS FOR RELIEF

## COUNT I: Declaratory and Injunctive Relief for Violation of the Eighth Amendment

**(42 U.S.C. § 1983)**

*Jail Class and Post-conviction Subclass versus All Defendants*

113.   Petitioners/Plaintiffs incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

114.   Under the Eighth Amendment, as applicable to States and their political subdivisions through the Fourteenth Amendment, post-convicted persons in carceral custody have a right to be free from cruel and unusual punishment.  As part of the right, the government must provide incarcerated persons with reasonable safety and address serious medical needs that arise in jail.  *See, e.g., Estelle*, 429 U.S. at 104; *DeShaney*, 489 U.S. at 200.

115.   As part of this right, the government must provide incarcerated persons with reasonable safety and address serious medical needs that arise in jail. Deliberate indifference to the serious risk COVID-19 poses to members of the Jail Class, and particularly members of the Medically-Vulnerable Subclass, violates this right.

116.   Plaintiffs, and the class they represent, suffer a substantial risk of serious harm to their health and safety due to the presence of, and spread of, COVID-19.

117.   Defendants know of and are failing to abate the serious risks that COVID-19 poses to Plaintiffs, including severe illness, permanent physical damage, and death.  These risks are well-established and obvious to Defendants.

118.   Defendants are subjecting Petitioners/Plaintiffs to conditions of confinement that increase their risk of contracting COVID-19, for which there is no known vaccine, treatment, or care. Due to the conditions at the Jail, Petitioners/Plaintiffs are unable to take steps to protect themselves—such as social distancing, accessing medical attention or testing, or washing their hands regularly— and Defendants have failed to provide adequate protections or mitigation measures. Defendants act with deliberate indifference towards Petitioners/Plaintiffs by failing to adequately safeguard their health and safety in the midst of a potential outbreak of a contagious, infectious disease.

119.   As a result of Defendants' unconstitutional actions, Petitioners/Plaintiffs are suffering irreparable injury.

120.   Accordingly, Defendants, as supervisors, direct participants, and policy makers for Oakland County, have violated and are violating the rights of the Post-trial Subclasses under the Eighth Amendment.

**COUNT II: Declaratory and Injunctive Relief for Violation of the Fourteenth Amendment (42 U.S.C. § 1983))**
*Pretrial Subclass versus All Defendants*

121.   Petitioners/Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

122.   Under the Fourteenth Amendment, corrections officials are required to provide for the reasonable health and safety of persons in pretrial custody.

*Youngberg v. Romeo*, 457 U.S. 307, 315–16, 324 (1982) (the state has an "unquestioned duty to provide adequate . . . medical care" for detained persons); *see also City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) ("[T]he due process rights of a [pretrial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner.")

123.   Due process claims brought by pretrial detainees under the Fourteenth Amendment are evaluated under an objective standard.  *See Richmond*, 885 F.3d at 938 n.3; *Castro v. Cty. of Los Angeles,* 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc); *Darnell v. Pineiro*, 849 F.3d 17, 34–35 (2d Cir. 2017); *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018).  Members of the Pre-Trial subclass are not required to show that Defendants are subjectively aware of a substantial risk of serious harm due to COVID-19, although if such a showing is required that standard is met under the circumstances presented here.

124.   The Jail has neither the capacity nor the ability to comply with public health guidelines to prevent an outbreak of COVID-19 and cannot provide for the safety of the Jail Class.  Defendants' actions and inactions result in the confinement of members of the Jail class in a facility where they do not have the capacity to test for, treat, or prevent COVID-19 outbreaks, which violates Plaintiffs' rights to treatment and adequate medical care.

125.   Defendants violate  Petitioners/Plaintiffs' due process rights by failing

to adequately safeguard their health and safety in the midst of a potential outbreak of a contagious, infectious disease.  Petitioners/Plaintiffs face a serious risk of intense pain, illness, lasting bodily damage, and ultimately, death in the Jail due to the Defendants' insufficient measures to prevent the spread of infection.

126.   Accordingly, Defendants, as supervisors, direct participants, and policy makers for Oakland County, have violated and are violating the rights of the Pre-trial Subclass under the Fourteenth Amendment.

## Count III: Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241
### *Medically-Vulnerable Subclass versus all Defendants*

127.   Petitioners/Plaintiffs repeat and re-allege paragraphs 1 through 113 as if fully set forth in this Count.

128.   Because the Medically Vulnerable Plaintiffs/Petitioners and subclass seek release in light of the immediate and urgent risks to their health and lives, there is no other available remedy that could protect their rights.

129.   Respondents/Defendants are holding Petitioners/Plaintiffs in custody in violation of the Due Process Clause of the Eighth and/or Fourteenth Amendment to the Constitution of the United States. Both amendments forbid exposing Petitioners/Plaintiffs to a severe risk of death, pain, or permanent severe injury, and at this time, with respect to the Medically-Vulnerable Subclass, no options available to Respondents/Defendants will adequately mitigate that risk other than release from

custody.

130.   Section 2241(c)(3) allows this court to order the release of people like Plaintiffs who are held "in violation of the Constitution." 28 U.S.C. 2241(c)(3); *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("It is clear, not only from the language of §§ 2241(c)(3) and 2254(a), but also from the common-law history of the writ, that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody."). Such relief is appropriate where, as here, there are no set of conditions under which an individual can be constitutionally detained, and the petitioner is thus "challenging the fact, not conditions, of her confinement."[120]

**COUNT IV: Declaratory and Injunctive Relief for Violation of the Fourteenth Amendment (42 U.S.C. § 1983))**
*Medically Vulnerable Subclass versus All Defendants*

131.   Petitioners/Plaintiffs repeat and re-allege paragraphs 1 through 113 as if fully set forth in this Count.

132.   The Medically Vulnerable Plaintiffs/Petitioners and subclass seek release in light of the immediate and urgent risks to their health and lives. There is no other available remedy that could protect their rights.

---

[120] Ex. 15, Order at 8, *Malam v. Adducci,* No. 20 cv-10829 (E.D. Mich. Apr. 6, 2020), DE 23.

133.   Respondents/Defendants are holding Petitioners/Plaintiffs in custody in violation of the Due Process Clause of the Eighth and/or Fourteenth Amendment to the Constitution of the United States. Both amendments forbid exposing Petitioners/Plaintiffs to a severe risk of death, pain, or permanent severe injury. At this time, with respect to the Medically Vulnerable Subclass, no options are available to Respondents/Defendants that will adequately mitigate that risk other than removing the Petitioners/Plaintiffs from custody at the Jail.

134.   Accordingly, Petitioners/Plaintiffs are entitled to be transferred out of the Jail to a facility that does not expose them to an unconstitutional risk of substantial harm, including a transfer to home confinement.

## PRAYER FOR RELIEF

WHEREFORE, Petitioners/Plaintiffs and the Class Members respectfully request that the Court:

A. Certify the proposed class and subclasses;

B. Enter a declaratory judgment that Defendants are violating Named Plaintiffs' and Class Members' constitutional rights by failing to adequately safeguard their health and safety in the midst of a potential outbreak of a contagious, infectious disease;

C. Enter a temporary restraining order, preliminary injunction, and permanent injunction, and/or writ of habeas corpus requiring Defendants to immediately

release all Medically Vulnerable Petitioners/Plaintiffs and Subclass Members or transferring them to home confinement;

D. Enter a temporary restraining order, preliminary injunction, and permanent injunction requiring, during the COVID-19 pandemic, for Defendants to:

a. Frequently communicate to all incarcerated people information about COVID-19, measures taken to reduce the risk of transmission, and any changes in policies or practices;

b. Provide adequate spacing of six feet or more between incarcerated people so that social distancing can be accomplished in accordance with CDC guidelines;

c. Ensure that each incarcerated person receives, free of charge, an individual supply of hand soap and paper towels sufficient to allow frequent hand washing and drying each day; an adequate supply of clean implements for cleaning such as sponges and brushes and disinfectant hand wipes or disinfectant products effective against the virus that causes COVID-19 for daily cleanings;

d. Ensure that all incarcerated people have access to hand sanitizer containing at least 60% alcohol;

e. Provide access to daily showers and daily access to clean laundry, including clean personal towels and washrags after each shower;

f.  Require that all Jail staff wear personal protective equipment, including CDC-recommended surgical masks, when interacting with any person or when touching surfaces in cells or common areas;

g.  Require that all Jail staff wash their hands, apply hand sanitizer containing at least 60% alcohol, or change their gloves both before and after interacting with any person or touching surfaces in cells or common areas;

h.  Take each incarcerated person's temperature daily (with a functioning and properly operated and sanitized thermometer) to identify potential COVID-19 infections;

i.  Assess (through questioning) each incarcerated person daily to identify potential COVID-19 infections;

j.  Conduct immediate testing for anyone displaying known symptoms of COVID-19;

k.  Ensure that individuals identified as having COVID-19 or having been exposed to COVID-19 receive adequate medical care and are properly quarantined in a non-punitive setting, with continued access to showers, recreation, mental health services, reading materials, phone and video visitation with loved ones, communications with counsel, and personal property;

l.  Respond to all emergency (as defined by the medical community) requests for medical attention within an hour;

m. Provide sufficient disinfecting supplies, free of charge, so incarcerated people can clean high-touch areas or items (including, but not limited to, phones and headphones) between each use;

n.  Waive all medical co-pays for those experiencing COVID-19-related symptoms;

o.  Waive all charges for medical grievances during this health crisis;

p.  Cease and desist relocating or threatening to relocate incarcerated people into infected areas of the jail as punishment or sanction for any kind of conduct.

E.  If immediate release is not granted on the basis of this Petition alone, expedite review of the Petition, including oral argument, via telephonic or videoconference if necessary;

F.  Enter an order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

G.  Order such other and further relief as this Court deems just, proper, and equitable.

Respectfully submitted,

/s/ Krithika Santhanam
Krithika Santhanam (DC Bar No. 1632807)*
Thomas B. Harvey (MBE #61734MO)*
Advancement Project National Office
1220 L Street, N.W., Suite 850
Washington, DC 20005
Tel: (202) 728-9557
Ksanthanam@advancementproject.org
Tharvey@advancementproject.org

/s/ Philip Mayor
Philip Mayor (P81691)
Daniel S. Korobkin (P72842)
American Civil Liberties Union
Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6803
pmayor@aclumich.org
dkorobkin@aclumich.org

/s/ Alexandria Twinem
Alexandria Twinem (D.C. Bar No. 1644851)*
Civil Rights Corps
1601 Connecticut Ave NW, Suite 800
Washington, DC 20009
Tel: 202-894-6126  Fax: 202-609-8030
alexandria@civilrightscorps.org

/s/ Cary S. McGehee
Cary S. McGehee (P42318)
Kevin M. Carlson (P67704)
Pitt, McGehee, Palmer,
Bonanni & Rivers, PC
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067
248-398-9800
cmcgehee@pittlawpc.com
kcarlson@pittlawpc.com

/s/ Allison L. Kriger
Allison L. Kriger (P76364)
LaRene & Kriger, PLC
645 Griswold, Suite 1717
Detroit, MI 48226
(313) 967-0100
Allison.kriger@gmail.com

Attorneys for Plaintiffs/Petitioners

*Applications for admission forthcoming

Dated: April 17, 2020

JS 44 (Rev. 11/15)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Richard Briggs, Jamaal Cameron, David Kucharski, Raj Lee, Michael Cameron, Matthew Saunders

**(b)** County of Residence of First Listed Plaintiff    Oakland
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Cary S. McGehee (P42318)
Pitt McGehee Palmer Bonanni & Rivers
117 W. 4th Street, Suite 200
Royal Oak, MI 48067  (248) 398-9800

### DEFENDANTS
Oakland County Michigan, Michael Bouchard, Curtis D. Childs

County of Residence of First Listed Defendant    Oakland
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury  - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 840 Trademark | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | **LABOR** | **SOCIAL SECURITY** | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | Relations | ☐ 864 SSID Title XVI | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | Leave Act | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☒ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 1983

Brief description of cause:
8th & 14th Amendment violations

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**    ☐ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

DATE
April 17, 2020

SIGNATURE OF ATTORNEY OF RECORD
/s/ Cary S. McGehee

**FOR OFFICE USE ONLY**

RECEIPT #_____    AMOUNT_____    APPLYING IFP_____    JUDGE_____    MAG. JUDGE_____