# **<u>Exhibit 13</u>**



**State Headquarters**
2966 Woodward Avenue
Detroit, MI 48201
Phone 313.578.6800
Fax 313.578.6811
E-mail aclu@aclumich.org
www.aclumich.org



**Detroit Office**
645 Griswold Suite 3300
Penobscot Building
Detroit, MI 48226
Phone 313.256.9833
Fax 313.965.0372
www.sado.org

March 31, 2020                                                                                      <u>Sent via email</u>

Re:     Reducing Your Jail Population Pursuant to Executive Order 2020-29

Dear Sheriff:

The ACLU of Michigan ("ACLU") and the State Appellate Defender Office ("SADO") appreciate the efforts that many courts and law enforcement officials around the state have already taken to try to reduce jail populations in order to mitigate the probability of a disastrous COVID-19 outbreak in our jails and to reduce the impact when one inevitably occurs despite everyone's best efforts.  On March 29, 2020, Governor Whitmer signed Executive Order 2020-29, attached here for your convenience.  The Order underscores the life-or-death threat that the COVID-19 pandemic poses to people incarcerated in county jails throughout Michigan, as well as to jail staff and the community at large.  The Order suspends the capacity and procedural requirements of Michigan's County Jail Overcrowding Act ("JOA"), thus empowering sheriffs and courts to swiftly but safely take bold and urgent steps to dramatically reduce jail populations to alleviate these risks.

We write to highlight the specific measures that sheriffs and courts can now take to further reduce jail populations under the JOA, as modified by EO 2020-29, while maintaining public safety.  We note that Chief Justice Bridget McCormack and Sheriff Matt Saxton of the Michigan Sheriffs' Association recently issued a press release urging courts and sheriffs to take similar measures, emphasizing that "[f]ollowing this advice WILL SAVE LIVES."  The ACLU and SADO agree.

It is important to note that all of the powers conferred by the JOA allow courts and sheriffs to act promptly and efficiently without conducting separate hearings in each individual case.  And, as expressly authorized by EO 2020-29, you may immediately implement any or all of the JOA's population reduction measures without regard to the capacity, procedural, and waiting-period requirements that strict compliance with the statute would otherwise entail.  Accordingly, the following critical measures can now be taken immediately by judges and sheriffs working together—and as a matter of public health, *must* be taken without any delay—in order to reduce the risks of fatal COVID-19 outbreaks in our jails:

- <u>Release of pre-trial detainees</u>.  The JOA permits the chief district judge, chief circuit judge, the sheriff (and in some jurisdictions a few additional judges) to vote to establish a "maximum value" for convertible cash bonds.  The sheriff is then authorized to convert the bond of any person in jail because of inability to pay a bond up to the "maximum value" into a personal bond and to release that individual upon approval from the chief circuit judge.  MCL 801.51a(1)(a), (2).  Courts and sheriffs should immediately use this

power by establishing high "maximum values." Then sheriffs should promptly provide lists of individuals who qualify for release because of their bond amount, and chief circuit judges should promptly and summarily approve such lists.

The JOA also provides ways to promptly and safely release most individuals whose cash bail exceeds the "maximum value." The JOA allows chief judges to modify bond to facilitate the release of any pre-trial detainee, except for individuals accused of crimes against their romantic partner or children, who does not pose "a high risk to public safety." MCL 801.56(2)(b), (3), (4)(b). Sheriffs should promptly provide lists of all individuals who are still in jail in a format that complies with MCL 801.56(2)(b). Chief judges should then make determinations about whether to modify bond as rapidly as possible and in recognition that an individual accused of a crime should not be presumed guilty and should not be presumed to be likely to re-offend in the absence of extraordinary facts suggesting a recurring pattern of violent activity.

- Release of prisoners who have served 85% of their sentence. The JOA permits sheriffs to release people who were convicted of most crimes immediately if they have already served 85% or more of their sentence, unless the chief circuit judge concludes that immediate release will present a threat to public safety. MCL 801.51a(1)(b). This option exists for all criminal convictions except "assaultive offense, sex offense, prison or jail escape offense, weapons offense, drunk driving offense, or a controlled substance offense except possession of less than 25 grams of a controlled substance." Accordingly, sheriffs should immediately provide lists of eligible individuals who have served 85% of their sentence to chief circuit judges. Chief circuit judges should promptly order the release of all such people absent persuasive evidence that the individuals will be a danger to the public, evidence of which should be very rare given the offenses that are eligible for release.

- Reduction of sentences for other prisoners. The JOA provides three ways to reduce the sentences of people housed in county jails. First, section 56 states that sheriffs should provide a list of all individuals currently serving sentences in the jails to the chief circuit judges. MCL 800.56(2)(a). Chief circuit judges must then classify the list into two categories: individuals who present a "high risk to public safety" if released and those who do not. The chief judge can then set a minimum and maximum percentage amount by which sentences of the non-high risk individuals may be reduced, and the sheriff may immediately reduce the sentences of all such people by any amount within the range set by the chief judge. MCL 801.56(4)(a).

Second, sheriffs can *unilaterally* reduce the sentences of all people in a county jail by up to 30% without approval from a circuit judge. MCL 801.57.

Third, any sentencing judge "may suspend or reduce any validly imposed jail sentence imposed by that judge." MCL 800.59b(1). Judges can delegate these powers to their chief judge. All judges should be encouraged to exercise this power (or delegate it to their chief judges) to reduce or suspend sentences of all people who do not pose an immediate high risk to public safety. In particular, judges should suspend sentences in

situations where the defendant has not yet begun to serve their sentence, so as to avoid introducing new individuals and risks into the carceral environment.

- <u>Refuse to detain new people in the jails</u>.  The JOA authorizes sheriffs to defer admitting new detainees to the jail except for individuals convicted of certain, more serious, crimes, until the crisis has abated.  Specifically, sheriffs may decline to admit new individuals to their jails unless such individuals have been convicted of "violent or assaultive crimes, sex offenses, escape from prison or jail, drunk driving offenses, controlled substance offenses except possession of less than 25 grams of a controlled substance, or weapons offenses." MCL 801.58(1).  Sheriffs are now able to exercise these powers to refuse to admit all new pre-trial detainees, people convicted of most offenses, as well as anyone charged with technical probation violations or failure to appear, unless the chief circuit judge affirmatively determines that detention is necessary because of a "threat to public safety."  Significantly, sheriffs can decline to admit new detainees under this section without first obtaining approval from the circuit court.

- <u>Review and termination of agreements to house other detainees, especially ICE detainees</u>.  Section 55(f) of the JOA allows sheriffs to review agreements to house detainees from other governmental actors and authorizes termination of such arrangements.  MCL 801.55(f).  This allows sheriffs to revisit contracts to hold federal detainees, including ICE detainees.  In our experience, most such contracts allow for immediate termination in the event of an "emergency."  Accordingly, sheriffs should consider immediately terminating such contracts and releasing ICE detainees as an efficient way to significantly reduce jail populations without imperiling public safety.[1]

    In addition, local jails should not hold people on detainers for Immigrations and Customs Enforcement (ICE), which are <u>not</u> judicially issued warrants, but are merely requests to hold individuals for ICE. See *Lopez-Lopez v. County of Allegan*, 321 F Supp 3d 794, 799 (WD Mich., 2018) ("[C]ooperation with ICE detainers is discretionary rather than mandatory").

In addition to the specific powers enumerated above, the JOA includes several other measures that courts and jails have at their disposal to reduce jail populations.  For example, MCL 801.55(a)–(q) sets forth a panoply of alternatives to incarceration that can be utilized.  A full copy of the relevant provisions of the JOA are attached to this letter for your convenience.

EO 2020-29 also offers additional categories of people for special consideration of release.  These include older people, people who have chronic conditions or are otherwise medically frail, people who are pregnant, people nearing their release date, people incarcerated for traffic violations or for failure to appear or failure to pay, and people with behavioral health problems who can safely be diverted for treatment.

---

[1] The standard Intergovernmental Service Agreement (IGSA) between county jails and ICE specifically provides that you can bring medically vulnerable individuals to ICE's attention for release within 48 hours, and that limitations on releasing ICE detainees do not apply in "medical or emergency situations."

3

Finally, EO 2020-29 complements the tools already in place to reduce jail populations. MCL 771.2(5) provides for modification of probation, where jail is a condition of the probation, and MCL 801.257 permits reductions of jail sentences by one quarter.

SADO and the ACLU of Michigan appreciate that sheriffs and courts have already been working around the clock in many jurisdictions to improve public safety. EO 2020-29 provides a powerful new tool to accelerate those efforts, and rapidly deploying these new powers is urgent to protect both people in jails, and jail staff and their loved ones, as well as the health of the public at large. Our organizations would be eager to speak with you about ways to facilitate the swift and safe release of people in jails pursuant to the Governor's order. Thank you for your consideration of these matters in a challenging time.

    Sincerely,

    Dan Korobkin, Legal Director
    Phil Mayor, Senior Staff Attorney
    ACLU of Michigan
    dkorobkin@aclumich.org
    pmayor@aclumich.org

    Jonathan Sacks, Director
    State Appellate Defender Office
    JSacks@sado.org

Cc:    Chief Justice Bridget Mary McCormack (via email)
        Matt Saxton, Executive Director, Michigan Sheriffs' Association

GRETCHEN WHITMER
GOVERNOR

STATE OF MICHIGAN
OFFICE OF THE GOVERNOR
LANSING

GARLIN GILCHRIST II
LT. GOVERNOR

# EXECUTIVE ORDER

No. 2020-29

**Temporary COVID-19 protocols for entry into Michigan Department of Corrections facilities and transfers to and from Department custody; temporary recommended COVID-19 protocols and enhanced early-release authorization for county jails, local lockups, and juvenile detention centers**

The novel coronavirus (COVID-19) is a respiratory disease that can result in serious illness or death. It is caused by a new strain of coronavirus not previously identified in humans and easily spread from person to person. There is currently no approved vaccine or antiviral treatment for this disease.

On March 10, 2020, the Michigan Department of Health and Human Services identified the first two presumptive-positive cases of COVID-19 in Michigan. On that same day, I issued Executive Order 2020-4. This order declared a state of emergency across the state of Michigan under section 1 of article 5 of the Michigan Constitution of 1963, the Emergency Management Act, 1976 PA 390, as amended, MCL 30.401-.421, and the Emergency Powers of the Governor Act of 1945, 1945 PA 302, as amended, MCL 10.31-.33.

The Emergency Management Act vests the governor with broad powers and duties to "cop[e] with dangers to this state or the people of this state presented by a disaster or emergency," which the governor may implement through "executive orders, proclamations, and directives having the force and effect of law." MCL 30.403(1)-(2). Similarly, the Emergency Powers of the Governor Act of 1945 provides that, after declaring a state of emergency, "the governor may promulgate reasonable orders, rules, and regulations as he or she considers necessary to protect life and property or to bring the emergency situation within the affected area under control." MCL 10.31(1).

To mitigate the spread of COVID-19, protect the public health, and provide essential protections to vulnerable Michiganders who work at or are incarcerated in prisons, county jails, local lockups, and juvenile detention centers across the state, it is reasonable and necessary to implement limited and temporary COVID-19-related protocols and procedures regarding entry into facilities operated by the Michigan Department of Corrections and transfers to and from the Department's custody; to recommend limited and temporary COVID-19-related protocols and measures for county jails, local lockups, and juvenile detention centers; and to temporarily suspend certain rules and procedures to facilitate the implementation of those recommendations.

Acting under the Michigan Constitution of 1963 and Michigan law, I order the following:

1. The Michigan Department of Corrections (the "Department") must continue to implement risk reduction protocols to address COVID-19 ("risk reduction protocols"), which the Department has already developed and implemented at the facilities it operates and which include the following:

    (a) Screening all persons arriving at or departing from a facility, including staff, incarcerated persons, vendors, and any other person entering the facility, in a manner consistent with guidelines issued by the Centers for Disease Control and Prevention ("CDC"). Such screening includes a temperature reading and obtaining information about travel and any contact with persons under investigation for COVID-19 infection.

    (b) Restricting all visits, except for attorney-related visits, and conducting those visits without physical contact to the extent feasible.

    (c) Limiting off-site appointments for incarcerated persons to only appointments for urgent or emergency medical treatment.

    (d) Developing and implementing protocols for incarcerated persons who display symptoms of COVID-19, including methods for evaluation and processes for testing, notification of the Department of Health and Human Services ("DHHS"), and isolation during testing, while awaiting test results, and in the event of positive test results. These protocols should be developed in consultation with local public health departments.

    (e) Notifying DHHS of any suspected case that meets the criteria for COVID-19 through communication with the applicable local public health department.

    (f) Providing, to the fullest extent possible, appropriate personal protective equipment to all staff as recommended by the CDC.

    (g) Conducting stringent cleaning of all areas and surfaces, including frequently touched surfaces (such as doorknobs, handles, light switches, keyboards, etc.), on a regular and ongoing basis.

    (h) Ensuring access to personal hygiene products for incarcerated persons and correctional staff, including soap and water sufficient for regular handwashing.

    (i) Ensuring that protective laundering protocols are in place.

    (j) Posting signage and continually educating on the importance of social distancing, handwashing, and personal hygiene.

    (k) Practicing social distancing in all programs and classrooms—meaning a distance of at least six feet between people in any meeting, classroom, or other group.

    (l) Minimizing crowding, including interactions of groups of 10 or more people, which may include scheduling more times for meal and recreation to reduce person-to-person contact.

2. To mitigate the risk of COVID-19 spreading in county jails, strict compliance with the capacity and procedural requirements regarding county jail overcrowding states of emergency in the County Jail Overcrowding Act ("CJOA"), 1982 PA 325, MCL 801.51 et seq., is temporarily suspended. While this order is in effect, all actions that would be authorized under the CJOA in the event of a declaration of a county jail overcrowding state of emergency are authorized and shall remain authorized without regard to any reduction in jail population or any other such limitations on the duration of authorization imposed by the CJOA.

3. Anyone authorized to act under section 2 of this order is strongly encouraged to consider early release for all of the following, so long as they do not pose a public safety risk:

    (a) Older people, people who have chronic conditions or are otherwise medically frail, people who are pregnant, and people nearing their release date.

    (b) Anyone who is incarcerated for a traffic violation.

    (c) Anyone who is incarcerated for failure to appear or failure to pay.

    (d) Anyone with behavioral health problems who can safely be diverted for treatment.

4. Effective immediately, all transfers into the Department's custody are temporarily suspended. Beginning seven (7) days from the effective date of this order, and no more than once every seven (7) days, a county jail or local lockup may request that the director of the Department determine that the jail or lockup has satisfactorily implemented risk reduction protocols as described in section 1 of this order. Upon inspection, if the director of the Department determines that a county jail or local lockup has satisfactorily implemented risk reduction protocols, transfers from that jail or lockup will resume in accordance with the Department's risk reduction protocols. The director of the Department may reject transfers that do not pass the screening protocol for entry into a facility operated by the Department.

5. Parole violators in the Department's custody must not be transported to or lodged in a county jail or local lockup unless the director of the Department has determined that such county jail or local lockup has satisfactorily implemented risk reduction protocols as described in section 1 of this order.

6. The State Budget Office must immediately seek a legislative transfer so that counties may be reimbursed for lodging incarcerated persons that would have been transferred into the Department's custody if not for the suspension of transfers described in section 4 of this order.

7. Juvenile detention centers are strongly encouraged to reduce the risk that those at their facilities will be exposed to COVID-19 by implementing as feasible the following measures:

    (a) Removing from the general population any juveniles who have COVID-19 symptoms.

    (b) Eliminating any form of juvenile detention or residential facility placement for juveniles unless a determination is made that a juvenile is a substantial and immediate safety risk to others.

    (c) Providing written and verbal communications to all juveniles at such facilities regarding COVID-19, access to medical care, and community-based support.

    (d) To the extent feasible, facilitating access to family, education, and legal counsel through electronic means (such as telephone calls or video conferencing) at no cost, rather than through in-person meetings.

8. Unless otherwise directed by court order, for juveniles on court-ordered probation, the use of out-of-home confinement for technical violations of probation and any requirements for in-person meetings with probation officers are temporarily suspended.

9. This order is effective immediately and continues through April 26, 2020 at 11:59 pm.

Given under my hand and the Great Seal of the State of Michigan.

Date: March 29, 2020

Time: 7:23 pm

GRETCHEN WHITMER
GOVERNOR

By the Governor:

_____
SECRETARY OF STATE

4

**COUNTY JAIL OVERCROWDING STATE OF EMERGENCY (EXCERPT)**
Act 325 of 1982

**801.51a County jail population exceeding 95% of jail's rated design capacity; actions by county sheriff; maximum value of outstanding bonds; duration; applicability of subsections (1) to (3).**

Sec. 1a. (1) In a county other than a county described in subsection (4), the sheriff of that county shall take the following actions on the fifth consecutive day on which the general population of the county jail exceeds 95% of the jail's rated design capacity:

(a) The sheriff shall review the outstanding bonds for each prisoner. If the total of a prisoner's outstanding bonds does not exceed a maximum value determined as provided in subsection (2), the sheriff, subject to the approval of the chief circuit judge in that county, shall modify each outstanding bond for that prisoner to a personal recognizance bond in that same amount, issue to the prisoner a receipt similar to an interim bond receipt, and send a copy of the receipt to the court that set the bond.

(b) The following prisoners, except for any prisoner that the chief circuit judge in that county believes would present a threat to the public safety if released, shall be released immediately:

(*i*) Any sentenced prisoner who has served 85% or more of his or her sentence, unless he or she is serving a sentence for a violent or assaultive offense, sex offense, prison or jail escape offense, weapons offense, drunk driving offense, or a controlled substance offense except possession of less than 25 grams of a controlled substance.

(*ii*) Any prisoner detained in the county jail for a civil contempt adjudication for failure to pay child support who has no other charges pending against him or her.

(2) The maximum value of outstanding bonds, for purposes of subsection (1)(a), shall be determined by a majority vote of the following individuals, as applicable:

(a) In a single-county or multicounty judicial district, the chief circuit judge for the judicial circuit that includes that county, the chief district judge for that district, and the sheriff of the county.

(b) In a county containing 2 or more judicial districts, the chief circuit judge for the judicial circuit that includes that county, the chief probate judge for that county, the sheriff of the county, and 2 district judges chosen by the chief district judges sitting in that county.

(3) A determination made under subsection (2) remains in effect for 1 year after the date on which that determination was made.

(4) Subsections (1) to (3) do not apply to either of the following:

(a) A county for which a county jail management plan has been approved under section 9a.

(b) A county having a population greater than 650,000 as of the most recent federal decennial census that, on the effective date of this section, has implemented a written jail management plan in which the basis of the plan is jail bed allocation. The exception provided by this subsection applies only as long as that plan remains in effect.

**History:** Add. 2007, Act 140, Eff. Feb. 11, 2008.

**Popular name:** Jail Overcrowding Emergency Powers Act

# COUNTY JAIL OVERCROWDING STATE OF EMERGENCY (EXCERPT)
## Act 325 of 1982

**801.55 Reduction of prisoner population by sheriff, notified persons, and other judges; means.**

Sec. 5. The sheriff, the persons notified pursuant to section 4, and other circuit, district, and municipal judges may attempt to reduce the prisoner population of the county jail through any available means which are already within the scope of their individual and collective legal authority, including, but not limited to, the following:

(a) Accelerated review and rescheduling of court dates.

(b) Judicial review of bail for possible bail reduction, release on recognizance, or conditional release of prisoners in the county jail.

(c) Prosecutorial pre-trial diversion.

(d) Judicial use of probation, fines, community service orders, restitution, and delayed sentencing as alternatives to commitment to jail.

(e) Use of work-release, community programs, and other alternative housing arrangements by the sheriff, if the programs and alternative housing arrangements are authorized by law.

(f) Review of agreements which allow other units of government to house their prisoners in the overcrowded county jail to determine whether the agreements may be terminated.

(g) Entering into agreements which allow the sheriff for the county in which the overcrowded county jail is located to house prisoners in facilities operated by other units of government.

(h) Refusal by the sheriff to house persons who are not required by law to be housed in the county jail.

(i) Acceleration of the transfer of prisoners sentenced to the state prison system, and prisoners otherwise under the jurisdiction of the department of corrections, to the department of corrections.

(j) Judicial acceleration of pending court proceedings for prisoners under the jurisdiction of the department of corrections who will be returned to the department of corrections regardless of the outcome of the pending proceedings.

(k) Reduction of waiting time for prisoners awaiting examination by the center for forensic psychiatry.

(*l*) Alternative booking, processing, and housing arrangements, including the use of appearance tickets instead of booking at the county jail and the use of weekend arraignment, for categories of cases considered appropriate by the persons notified pursuant to section 4.

(m) Acceptance by the courts of credit cards for payments of bonds, fines, and court costs.

(n) Use of community mental health and private mental health resources in the county as alternatives to housing prisoners in the county jail for those prisoners who qualify for placement in the programs and for whom placement in the programs is appropriate.

(o) Use of community and private substance abuse programs and other therapeutic programs as alternatives to housing prisoners in the county jail for those prisoners who qualify for placement in the programs and for whom placement in the programs is appropriate.

(p) Preparation of a long-range plan for addressing the county jail overcrowding problem, including recommendations to the county board of commissioners on construction of new jail facilities and funding for construction or other options designed to alleviate the overcrowding problem.

(q) Review of sentencing procedures, including the elimination of delays in preparing presentence reports for prisoners awaiting sentence, and staggering the dates on which prisoners will start serving a jail sentence to minimize fluctuating demands on jail capacity.

**History:** 1982, Act 325, Eff. Feb. 8, 1983;—Am. 2007, Act 140, Eff. Feb. 11, 2008.

**Popular name:** Jail Overcrowding Emergency Powers Act

## COUNTY JAIL OVERCROWDING STATE OF EMERGENCY (EXCERPT)
### Act 325 of 1982

**801.56 Requirement of further actions; failure of certain actions to reduce population to level prescribed in subsection (1); presenting prisoner information to chief circuit judge; applicability of subsection (2)(b) to certain prisoners; review; classification of prisoners; reduction of sentences; duration; report.**

Sec. 6. (1) The further actions prescribed in subsections (2) to (5) and in sections 7 and 8 shall be required unless the actions taken pursuant to section 5 reduce the county's jail population to the higher of the following:

(a) 90% of rated design capacity or a percentage of rated design capacity less than 90% as set by a court prior to February 8, 1983.

(b) A prisoner population such that the jail has the following number of empty beds:

(*i*) For a jail with a rated design capacity of less than 500 beds, at least 10 empty beds.

(*ii*) For a jail with a rated design capacity of 500 beds or more, at least 25 empty beds.

(2) If the actions taken pursuant to section 5 do not reduce the county jail's population to the level prescribed in subsection (1) within 14 days after the declaration of the county jail overcrowding state of emergency, the sheriff shall present to the chief circuit judge for the county in which the jail is located the following information for each prisoner housed in the county jail on that date:

(a) For prisoners who are serving a sentence of imprisonment for conviction of 1 or more crimes:

(*i*) The name of each prisoner.

(*ii*) The offense for which the prisoner was convicted.

(*iii*) The length of sentence imposed for the prisoner.

(*iv*) The date on which the prisoner began serving his or her sentence.

(*v*) The date on which the prisoner will be released from the jail according to the terms of his or her sentence, including computations for good time.

(*vi*) The name of the judge who imposed the sentence.

(b) For prisoners housed in the county jail, other than a prisoner described in subsection (3), who are not serving a sentence of imprisonment for conviction of a crime:

(*i*) The name of the prisoner.

(*ii*) The offense for which the prisoner is being detained in the county jail.

(*iii*) The amount of the prisoner's bond.

(*iv*) The date on which the prisoner began his or her period of detention.

(*v*) The name of the judge who ordered the prisoner to be detained.

(3) Subsection (2)(b) does not apply to a prisoner who is detained in the county jail in connection with a crime or an allegation of a crime in which the victim was a spouse, a former spouse, an individual with whom he or she has had a child in common, an individual residing or having resided in the same household, or an individual with whom he or she has or has had a dating relationship as that term is defined in section 2950 of the revised judicature act of 1961, 1961 PA 236, MCL 600.2950.

(4) After the chief circuit judge for the county in which the jail is located reviews the information presented by the sheriff pursuant to subsection (2), the chief circuit judge shall, for purposes of county jail population reduction, do both of the following:

(a) Classify prisoners who are serving sentences of imprisonment for conviction of crimes into 2 groups: those prisoners who, if released, would present a high risk to the public safety, and those who, if released, would not present a high risk to the public safety. The chief circuit judge shall also determine a minimum and a maximum percentage by which the sentences can be reduced. The sheriff shall reduce the sentences of all prisoners who, if released, would not present a high risk to the public safety by an equal percentage which is within the minimum and maximum percentages determined by the chief circuit judge.

(b) Review the list of prisoners housed in the county jail who are not serving a sentence for conviction of crimes and determine for each prisoner whether the release of that prisoner would or would not present a high risk to public safety. The chief circuit judge may do either or both of the following with regard to a prisoner whose release would not present a high risk to the public safety:

(*i*) Modify the bond of the prisoner, subject to any conditions reasonably necessary to ensure the appearance of the individual in court.

(*ii*) Release the prisoner subject to the condition that he or she be placed on electronic monitoring.

(5) The sentences of prisoners sentenced to and housed in the county jail after the fourteenth day of the county jail overcrowding state of emergency may continue to be reduced in the same manner as prescribed in subsections (2)(a) and (4)(a), but shall not be reduced after the county jail overcrowding state of emergency is

ended or after the sheriff orders a sentence reduction pursuant to section 7, whichever occurs first.

(6) The department of corrections, in cooperation with the Michigan sheriffs' association, shall annually report to the chairpersons of the senate and house standing committees responsible for legislation concerning corrections. The report shall evaluate the effect on the overcrowding state of emergency procedures under this section.

**History:** 1982, Act 325, Eff. Feb. 8, 1983;—Am. 1988, Act 399, Imd. Eff. Dec. 27, 1988;—Am. 2008, Act 542, Imd. Eff. Jan. 13, 2009.

**Popular name:** Jail Overcrowding Emergency Powers Act

## COUNTY JAIL OVERCROWDING STATE OF EMERGENCY (EXCERPT)
### Act 325 of 1982

**801.57 Failure of certain actions to reduce population to level prescribed in MCL 801.56(1); equal reduction of original sentences.**

Sec. 7. If the actions taken pursuant to sections 5 and 6 do not reduce the county jail's population to the level prescribed in section 6(1) within 28 days of the declaration of the county jail overcrowding state of emergency, the original sentences, not including good time, of all prisoners sentenced to and housed in the county jail on that date shall be equally reduced by the sheriff by the least possible percentage reduction necessary, not to exceed 30%, to reduce the county jail's prisoner population to the level prescribed in section 6(1).

**History:** 1982, Act 325, Eff. Feb. 8, 1983;—Am. 1988, Act 399, Imd. Eff. Dec. 27, 1988.

**Popular name:** Jail Overcrowding Emergency Powers Act

## COUNTY JAIL OVERCROWDING STATE OF EMERGENCY (EXCERPT)
### Act 325 of 1982

**801.58 Failure of certain actions to reduce population to level prescribed in MCL 801.56(1); deferring acceptance for incarceration of certain persons.**

Sec. 8. (1) Except as otherwise provided in this subsection and subsection (2), if the actions taken pursuant to sections 5, 6, and 7 do not reduce the county jail's population to the level prescribed in section 6(1) within 42 days of the declaration of the county jail overcrowding state of emergency, the sheriff shall defer acceptance for incarceration in the general population of the county jail persons sentenced to or otherwise committed to the county jail for incarceration until the county jail overcrowding state of emergency is ended pursuant to section 9, except that the sheriff shall not defer acceptance for incarceration all persons under sentence for or charged with violent or assaultive crimes, sex offenses, escape from prison or jail, drunk driving offenses, controlled substance offenses except possession of less than 25 grams of a controlled substance, or weapons offenses.

(2) The sheriff shall not defer acceptance of a prisoner for incarceration into the general population of the county jail if both of the following occur:

(a) The sheriff or the sentencing judge presents to the chief circuit judge for the county in which the county jail is located information alleging that deferring acceptance of the prisoner for incarceration would constitute a threat to public safety.

(b) The chief circuit judge, based upon the presence of a threat to public safety, approves of accepting the prisoner for incarceration.

**History:** 1982, Act 325, Eff. Feb. 8, 1983;—Am. 1988, Act 399, Imd. Eff. Dec. 27, 1988;—Am. 2007, Act 140, Eff. Feb. 11, 2008.

**Popular name:** Jail Overcrowding Emergency Powers Act

**COUNTY JAIL OVERCROWDING STATE OF EMERGENCY (EXCERPT)**
**Act 325 of 1982**

**801.59b Suspension or reduction of jail sentence by sentencing judge; delegation of authority to chief judge; modification of bond.**

Sec. 9b. (1) For purposes of this act, a sentencing judge may suspend or reduce any validly imposed jail sentence imposed by that judge. A sentencing judge may delegate the authority conferred under this subsection to the chief judge of the judicial district or circuit in which the sentencing judge serves or his or her designee.

(2) For purposes of this act, a judge may modify bond set by the court for unsentenced prisoners. A judge may delegate the authority conferred under this subsection to the chief judge of the judicial district or circuit in which the judge serves, or his or her designee.

**History:** Add. 2007, Act 139, Imd. Eff. Nov. 13, 2007.

**Popular name:** Jail Overcrowding Emergency Powers Act