# **Exhibit 14**

## DECLARATION OF DR. ADAM LAURING

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

### I.    Background and Qualification

1.  My name is Adam Lauring, M.D., Ph.D.

2.  I am a board-certified medical doctor in Infectious Diseases

3.  I have been a physician for more than 18 years, and I have worked in Infectious Diseases for 14 years.

4.  My bio, attached as Exhibit A, includes a brief description of my education and relevant experience

5.  My Curriculum Vitae, attached as Exhibit B, includes a full list of my honors, experience, and publications.

6.  I am donating my time reviewing materials and preparing this Declaration. Any live testimony I provide will also be *pro bono*.

### II.    Heightened Risk of Epidemics in Jails and Prisons

7.  As I will discuss below, the risk posed by infectious diseases in jails and prisons is significantly higher than in the community, both in terms of multiple risks of transmission and exposure to individuals who become infected.

8.  Globally, outbreaks of contagious diseases are all too common in closed detention settings and are more common than in the community at large. Prisons and jails, however, are closely connected to communities. Staff, visitors, contractors, and vendors pass between communities and these facilities and, if infected, these individuals can carry with them and transmit infectious diseases. Moreover, rapid turnover of jail and prison populations means that people often cycle between facilities and communities, posing the same risk. People often need to be transported to

and from facilities to attend court and move between facilities. Prison health is public health.

9. Reduced prevention opportunities: Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. When people share dining halls, bathrooms, showers, telephones, and other common areas, the opportunities for transmission are greater. Where infectious diseases are transmitted from person to person by droplets, and no vaccine exists, the best initial strategy is to practice social distancing – maintaining a physical distance of at least six feet from any other person. When jailed or imprisoned, people have much less of an opportunity to protect themselves by social distancing than they would in the community.

10. Spaces within jails and prisons are often also poorly ventilated, which promotes highly efficient spread of diseases through droplets. Placing someone in such a setting, therefore, dramatically reduces their ability to protect themselves from being exposed to and acquiring infectious diseases, and significantly increases the likelihood of the spread of infection. For example, in mid-March, the jail at Rikers Island in New York City had not had a single confirmed COVID-19 case. By March 30, 167 inmates, 114 correction staff and 20 health workers at Rikers tested positive for COVID-19; two correction staff members have died and multiple inmates have been hospitalized.[1] As of April 8, Rikers had a rate of infection that is far higher than the infection rates of the most infected regions of the world. More than 700 people have tested positive for COVID-19, including more than 400 staff.[2] The Chief Medical Officer of Rikers has described a "public health disaster unfolding before our eyes." In his view, following CDC guidelines has not been enough to stem the crisis: "infections in our jails are growing quickly despite these efforts."[3]

---

[1] Jan Ransom, *We're Left for Dead: Fears of Virus Catastrophe at Rikers Jail*, NY Times, Mar. 30, 2020.

[2] Asher Stockler, *More Than 700 People Have Tested Positive for Coronavirus on Rikers Island, Including Over 440 Staff*, Newsweek (April 8, 2020), https://www.newsweek.com/rikers-island-covid-19-new-york-city-1496872.

[3] Ross MacDonald (@RossMacDonaldMD), Twitter (Mar. 30, 2020, 8:03 PM), https://twitter.com/rossmacdonaldmd/status/1244822686280437765?s=12 ("I can assure you we were following the CDC guidelines before they were issued. We could

Like the explosive growth at Rikers, the Cook County Jail went from two confirmed COVID-19 cases on March 23 to more than 350 confirmed cases, 238 inmates and 115 staff members, two weeks later.[4] As of April 13, the number of confirmed cases totaled 500, of which two-thirds are inmates.[5]

11. Disciplinary segregation or solitary confinement is not an effective disease containment strategy. Beyond the known detrimental mental health effects of solitary confinement, isolation of people who are ill in solitary confinement results in decreased medical attention and increased risk of death. Isolation of people who are ill using solitary confinement also is an ineffective way to prevent transmission of the virus through droplets to others because, except in specialized negative pressure rooms (rarely in medical units if available at all), air continues to flow outward from rooms to the rest of the facility. Risk of exposure is thus increased to other jail or prison inmates, staff, and visitors.

12. Reduced prevention opportunities: During an infectious disease outbreak, people can curb their risk of infection by washing hands. Jails and prisons often do not provide adequate opportunities to exercise necessary hygiene measures, such as frequent handwashing or use of alcohol-based sanitizers. When handwashing is unavailable, then the risk of infection and rate of infection spread is much greater. Jails and prisons are often under-resourced and ill-equipped with sufficient hand soap and alcohol-based sanitizers for people detained in and working in these settings. High-touch surfaces (doorknobs, light switches, telephones, etc.) should also be cleaned and disinfected regularly with bleach to prevent virus spread, but this is often not done in jails and prisons because of a lack of cleaning supplies and lack of people available to perform necessary cleaning procedures.

---

have written them ourselves. . . [I]infections in our jails are growing despite these efforts.").

[4] Timothy Williams and Danielle Ivory, Chicago's Jail Is Top U.S. Hot Spot as Virus Spreads Behind Bars, NY Times (April 8, 2020), https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html.

[5] Cheryl Corley, *The Covid-19 struggle in the Cook County Jail*, NPR (April 13, 2020), https://www.npr.org/2020/04/13/833440047/the-covid-19-struggle-in-chicagos-cook-county-jail

13. Additional reduced prevention opportunities: During an infectious disease outbreak, a containment strategy requires people who are ill with symptoms to be isolated and that caregivers have access to personal protective equipment, including gloves, masks, gowns, and eye shields. Jails and prisons are often under-resourced and ill-equipped to provide sufficient personal protective equipment for people who are incarcerated and caregiving staff, increasing the risk to everyone in the facility of a widespread outbreak.

14. Increased susceptibility: People incarcerated in jails and prisons are more susceptible to acquiring and experiencing complications from infectious diseases than the population in the community.[6] This is because people in jails and prisons are more likely than people in the community to have chronic underlying health conditions, including diabetes, heart disease, chronic lung disease, chronic liver disease, and lower immune systems from HIV.

15. Jails and prisons are often poorly equipped to diagnose and manage infectious disease outbreaks. Some jails and prisons lack onsite medical facilities or 24-hour medical care. The medical facilities at jails and prisons are almost never sufficiently equipped to handle large outbreaks of infectious diseases. To prevent transmission of droplet-borne infectious diseases, people who are infected and ill need to be isolated in specialized airborne negative pressure rooms. Most jails and prisons have few negative pressure rooms, if any, and these may be already in use by people with other conditions (including tuberculosis or influenza). Resources will become exhausted rapidly and any beds available will soon be at capacity. This makes containing the illness and caring for those who have become infected nearly impossible.

16. Jails and prisons lack access to vital community resources to diagnose and manage infectious diseases. Jails and prisons do not have access to community health resources that can be crucial in identifying and managing widespread outbreaks of infectious diseases. This includes

---

[6] Active case finding for communicable diseases in prison, 391 The Lancet 2186 (2018), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(18)31251-0/fulltext.

access to testing equipment, laboratories, medications, and specialized equipment, such as ventilators.

17. Jails and prisons often need to rely on outside facilities (hospitals, emergency departments) to provide intensive medical care given that the level of care they can provide in the facility itself is typically relatively limited. During a pandemic, this will not be possible, as those outside facilities will likely be at or over capacity themselves. To help ease the collective burden on Southeastern Michigan hospitals, the state is constructing make-shift field hospitals.[7] The patient volume at Detroit's Sinai-Grace Hospital is so overwhelming that patients are lining the hallways, and patient care is suffering from staff, supplies, and equipment shortages.[8] In some cases, patients have died waiting for medical attention.[9]

18. Health safety: As an outbreak spreads through jails, prisons, and communities, medical personnel become sick and do not show up to work. Absenteeism means that facilities can become dangerously understaffed with healthcare providers. This increases a number of risks and can dramatically reduce the level of care provided. As health systems inside facilities are taxed, people with chronic underlying physical and mental health conditions and serious medical needs may not be able to receive the care they need for these conditions. As supply chains become disrupted during a global pandemic, the availability of medicines may be limited. Locally, for example, two Wayne County Jail physicians, including the Jail's medical director, have died from COVID-19.[10]

---

[7] *TCF Center makeshift hospital in Detroit ready to accept first patients*, WXYZ Detroit, Channel 7 (April 9, 2020) https://www.wxyz.com/news/coronavirus/4-local-health-systems-will-help-staff-tcf-center-temporary-hospitals-first-patients-arriving-friday

[8] Paul P. Murphy, *Detroit hospital workers say people are dying in the ER hallways before help can arrive* (April 9, 2020), https://www.cnn.com/2020/04/09/us/detroit-hospital-workers-sinai-grace-coronavirus/index.html

[9] *Id.*

[10] Charlie LeDuff, *LeDuff: Covid Has Killed 2 Wayne County Jail Doctors, A Commander, And Still: Silence*, Deadline Detroit (April 13, 2020), https://www.deadlinedetroit.com/articles/24965/leduff_covid_has_killed_2_wayne_county_jail_doctors_a_commander_and_still_silence

19. Safety and security: As an outbreak spreads through jails, prisons, and communities, correctional officers and other security personnel become sick and do not show up to work. Absenteeism poses substantial safety and security risk to both the people inside the facilities and the public. Furthermore, rapid spread of infectious diseases among the inmates can often worsen the epidemic outside of the incarcerated population because staff are more likely to be infected and spread the disease to their families and the wider population.

20. These risks have all been borne out during past epidemics of influenza in jails and prisons. For example, in 2012, the CDC reported an outbreak of influenza in 2 facilities in Maine, resulting in two inmate deaths.[11] Subsequent CDC investigation of 995 inmates and 235 staff members across the 2 facilities discovered insufficient supplies of influenza vaccine and antiviral drugs for treatment of people who were ill and prophylaxis for people who were exposed. During the H1N1-strain flu outbreak in 2009 (known as the "swine flu"), jails and prisons experienced a disproportionately high number of cases.[12] Even facilities on "quarantine" continued to accept new cases" of influenza, a viral infection for which there was an effective and available vaccine and antiviral medications, unlike COVID-19, for which there is currently neither.

### III.   Profile of COVID-19 as an Infectious Disease[13]

---

[11] *Influenza Outbreaks at Two Correctional Facilities—Maine, March 2011,* Centers for Disease Control and Prevention (2012), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6113a3.htm.

[12] David. M. Reutter, *Swine Flu Widespread in Prisons and Jails, but Deaths are Few*, Prison Legal News (Feb. 15, 2010), https://www.prisonlegalnews.org/news/2010/feb/15/swine-flu-widespread-in-prisons-and-jails-but-deathsare-few/.

[13] This whole section draws from Broks J. Global Epidemiology and Prevention of COVID19, COVID-10 Symposium, Conference on Retroviruses and Opportunistic Infections (CROI), virual (March 10, 2020); Coronavirus (COVID-19), Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/index.html; Brent Gibson, COVID-19 (Coronavirus): What You Need to Know in Corrections, National Commission on Correctional Health Care (February 28, 2020), https://www.ncchc.org/blog/covid-19-coronavirus-what-you-need-toknow-in-corrections.

21. The novel coronavirus, officially known as SARS-CoV-2, causes a disease known as COVID-19. The virus is thought to pass from person to person primarily through respiratory droplets (by coughing or sneezing) but may also survive on inanimate surfaces. People seem to be most able to transmit the virus to others when they are sickest but recent data from China has demonstrated that almost 13% of transmission occurs from asymptomatic individuals before they start to show symptoms, and it is possible that transmission can occur for weeks after their symptoms resolve.[14]  In China, where COVID-19 originated, the average infected person passed the virus on to 2-3 other people; transmission occurred at a distance of 3-6 feet. A recent study out of Singapore found 10% of new infections could be caused by asymptomatic patients.[15] Not only is the virus very efficient at being transmitted through droplets, everyone is at risk of infection because our immune systems have never been exposed to or developed protective responses against this virus. A vaccine is currently in development but will likely not be able for over a year to the general public. Antiviral medications are currently in testing but not yet FDA-approved. People in prison and jail will likely have even less access to these novel health strategies as they become available.

22. Most people (80%) who become infected with COVID-19 will develop a mild upper respiratory infection but emerging data from China suggests serious illness occurs in up to 16% of cases, including death.[16] Serious illness and death is most common among people with underlying chronic health conditions, like heart disease, lung disease, liver disease,

---

[14] Du Z, Xu X, Wu Y, Wang L, Cowling BJ, Ancel Meyers L. Serial interval of COVID-19 mong publicly reported confirmed cases. Emerg Infect Dis. 2020 Jun [*date cited*]. https://doi.org/10.3201/eid2606.200357

[15] Linda Givetash, *New Chinese data on asymptomatic coronavirus cases could help world response*, NBC News (April 9, 2020), https://www.nbcnews.com/news/world/new-chinese-data-asymptomatic-coronavirus-cases-could-help-world-response-n1173896.

[16] *Coronavirus Disease 2019 (COVID-19): Situation Summary*, Centers for Disease and Prevention (March 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/casesupdates/summary.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fsummary.html.

and diabetes, and older age.[17] 74% of cases requiring hospitalization are people over the age of 50.[18] Among those individuals, the risk of poor outcomes, included the need for mechanical intervention is over 20%. Death in COVID-19 infection is usually due to pneumonia, and sepsis, and would occur between approximately 1-4% of the population. The emergence of COVID-19 during influenza season means that people are also at risk from serious illness and death due to influenza, especially when they have not received the influenza vaccine or the pneumonia vaccine

23. The care of people who are infected with COVID-19 depends on how seriously they are ill.[19] People with mild symptoms may not require hospitalization but may continue to be closely monitored at home. People with moderate symptoms may require hospitalization for supportive care, including intravenous fluids and supplemental oxygen. People with severe symptoms may require ventilation and intravenous antibiotics. As discussed earlier, Southeastern Michigan hospitals are already overwhelmed and beyond capacity to provide this type of intensive care. This will worsen as COVID-19 becomes more widespread in communities.

24. In order to reduce the burden on the local health systems, aggressive containment and COVID-19 prevention is of utmost importance. To this end, State of Michigan and the City of Detroit have mandated COVID-19 prevention strategies, such as "shelter in place" or "stay at home" orders, which have gone beyond containment and mitigation. Jails and prisons already have difficulty with containment because it requires

---

[17] *Clinical course and risk factors for mortality of adult inpatients with COVID-19 in Wuhan, China: a retrospective cohort study*, The Lancel (published online March 11, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext.

[18] Center for Disease Control, Morbidity and Mortality Weekly Report – Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Cases (April 8, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm

[19] *Coronavirus Disease 2019 (COVID-19): Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease*, Centers for Disease Control and Prevention (March 7, 2002), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.

intensive hand washing practices, decontamination and aggressive cleaning of surfaces, and identifying and isolating people who are ill or who have had contact with people who are ill, including the use of personal protective equipment. However, even with these efforts, it is nearly impossible for jails and prisons to provide the atmosphere of "shelter in place" or "stay at home" social distancing, given the number of individuals that work in and are housed in these facilities in the current system.

25. The time to act is now. Data from other settings demonstrates what happens when jails and prisons are unprepared for COVID-19. To date, few state or federal prison systems have adequate (or any) pandemic preparedness plans in place.[20] Systems are just beginning to screen and isolate people on entry and perhaps place visitor restrictions, but this is wholly inadequate when staff and vendors can still come to work sick and potentially transmit the virus to others.

## IV.   Risk of COVID-19 in the Oakland County Jail

26. In preparing this report I have reviewed the declarations of Oakland County Jail Inmates Arsineau, Bates, Briggs, J. Cameron, M. Cameron, Kucharski, Lee, and Saunders.

27. Based on my expertise in virology, review of the relevant literature, and my review of the declarations referred to paragraph 25, it is my professional judgment that immediate action is necessary to stem the spread of COVID-19 in the Oakland County Jail and prevent an even worse  outbreak, which will result in severe harm to detained individuals, jail staff, and the broader community. The Oakland County Jail is not only obviously under-equipped and ill-prepared to prevent and manage a COVID-19 outbreak assuming what is described in the declarations is true, but in some cases, according to declarants, it is intentionally exposing inmates to COVID-19 as retribution for raising concerns about safety. The reasons for this conclusion are detailed as follows.

---

[20] Luke Barr & Christina Carrega, *State prisons prepare for coronavirus but federal prisons not providing significant guidance, sources say*, ABC News (March 11, 2020),      https://abcnews.go.com/US/state-prisons-preparecoronavirus-federal-prisons-providing- significant/story?id=69433690.

28. According to the declarants, people confined in the jail sleep on bunks spaced one to three feet apart and in some cases are sleeping on the floor right next to cellmates. They further stated that inmates share showers, toilets, and sinks in small common areas, and some toilets are close to their beds. Declarants also state that much of the time, whether they are sitting, standing, walking, eating, or sleeping, they are within six feet of at least one other person. Notwithstanding their close proximity to one another, the declarants stated that there have been shortages in personal protective equipment, such as masks and gloves, for all people incarcerated and some working in the jail. Declarants further attested to the fact that staff inconsistently wears personal protective equipment when they interact with inmates. If these statements are true, the jail is not following basic CDC protection and prevention. And, given this layout and crowded environment in which individuals are held, largely without protection, it is impossible to provide an environment where social distancing can occur, and, in turn, impossible to prevent the risk or spread of infection.

29. According to the declarants, some inmates are not provided with regular access to soap, and, in some cases, have been without soap for more than one week. Declarants also state that they do not have access to any hand sanitizer or other personal sanitation supplies, even for purchase. The jail's failure to provide adequate hygiene supplies deprives individuals of the most important CDC-recommended measures to protect themselves from infection.

30. Declarants attested to the fact that individuals confined at the jail have limited access to disinfectant, if at all, or basic cleaning supplies with which to clean their shared cells, shared living quarters, common areas, or high-touch surfaces. High-touch surfaces, such as light switches, door and sink knobs, telephones, tables, etc., should be sanitized after each use. Failure to properly sanitize shared spaces, common areas, and high-touch surfaces that detained individuals heavily use, seriously increases the risk of the spread of COVID-19 and demonstrates the Jail's failure to take the most fundamental precautions for preventing the spread of the disease.

31. The declarations attest to significant neglect of inmates' medical needs and the ability to provide the care necessary to prevent serious illness or

death. The declarants stated that, although they were initially able to make requests for medical attention, those requests were ignored for days or dismissed. Presently, according to declarants, inmates are essentially unable to request medical attention because nurses and doctors are unavailable and jail guards tell the inmates that they cannot assist with to those requests. This is true, according to declarants, even for inmates who are particularly vulnerable to risk of severe illness or death, as a result of underlying health conditions.

32. The Jail's failure to provide inmates with adequate medical care for their underlying chronic health conditions, as described by the declarants, results in increased risk of COVID-19 infection and increased risk of infection-related morbidity and mortality if they do become infected. According to their declarations, some Plaintiffs, and others held in the jail have serious medical vulnerabilities. A worsening outbreak in the jail would prove disastrous, and potentially fatal, for these medically vulnerable individuals. Based upon the declarations, it is apparent that the Jail is not providing adequate medical treatment to infected inmates. This is also worrisome because it will surely cause unnecessary risk of severe illness or death, and because patients from the Jail will further strain already-burdened Southeastern Michigan medical facilities who will have to absorb patients from the jail.

33. The declarants further attested to the fact that inmates who exhibit COVID-like symptoms, such as cough, shortness of breath, or a fever are not immediately tested or quarantined, if at all. Failure to adequately test for infection results in dramatic undercounting of persons infected, and, in turn, makes it impossible to protect against an outbreak.

34. The quarantine procedures described by declarants will not in any way mitigate or prevent the spread of infection. The declarants stated that the jail is "quarantining" presumably infected inmates in cells immediately adjacent to and within arms-reach of cells with inmates who are not presumed to be infected.

## V.   Conclusion and Recommendations

35. For the reasons above, it is my professional judgment that individuals placed in the Oakland County Jail are at a significantly higher risk of infection with COVID-19 as compared to the population in the

community, given the procedural and housing conditions in the facility, and that they are at a significantly higher risk of harm if they do become infected. These harms include serious illness (pneumonia and sepsis) and even death.

36. Indeed, based on the circumstances described in the declarations, my expertise in virology, and based upon my knowledge and understanding of the ways in which the novel coronavirus is transmitted, drastically reducing the jail's population is the *only* way to protect the health and safety of people detained in the facility and the public at large..

37. For the medically vulnerable – individuals with preexisting conditions (e.g., heart disease, chronic lung disease, chronic liver disease, suppressed immune systems, cancer, and diabetes) or who are over the age of 50[21] – immediate release is the only option because the Jail's widespread neglect of medical needs and failure to both identify and quarantine infection, coupled with the inmates' limited access to lifesaving protections, if any, and inability to practice physical distancing creates a meaningfully higher risk of death.

38. From a public health perspective, it is my strong opinion that individuals who can **safely and appropriately** remain in the community must not be placed in the Oakland County Jail facilities at this time. I am also strongly of the opinion that individuals who are already in these facilities should be evaluated for release, and that a careful evaluation of procedural and housing guidance is created for those who remain in the facility during the "stay at home" mandate, and possibly until the epidemic is contained.

39. It is my professional opinion that these steps are both necessary and urgent. The horizon of risk for COVID-19 in this facility is a matter of days, not weeks.

---

[21] Center for Disease Control, Morbidity and Mortality Weekly Report – Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Cases (April 8, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm

40. Health in jails and prisons is community health. Protecting the health of individuals who are detained in and work in these facilities is vital to protecting the health of the wider community.

41. I declare under penalty of perjury, that the foregoing is true and correct.

Executed on this 15th day of April 2020.

_____
ADAM LAURING, M.D., Ph.D