# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

JAMAAL CAMERON; RICHARD
BRIGGS; RAJ LEE; MICHAEL
CAMERON; MATTHEW
SAUNDERS, individually and on
behalf of all others similarly situated,

     Plaintiffs,

     v.

MICHAEL BOUCHARD, in his
official capacity as Sheriff of Oakland
County; CURTIS D. CHILDS, in his
official capacity as Commander of
Corrective Services; OAKLAND
COUNTY, MICHIGAN,

     Defendants.

Case No. 20-cv-10949-LVP-MJH
Hon. Linda V. Parker

## PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs Jamaal Cameron, Richard Briggs, Raj Lee, Michael Cameron, and Mathew Saunders, hereby move this Court, pursuant to Fed. R. Civ. P. 65, for a temporary restraining order. The grounds for this motion are set forth in the Brief in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, filed herewith and the accompanying Declarations and Exhibits in support.

Because of the grave risk to health and life at stake, Plaintiffs request that this Court consider this motion on an emergency basis and that the Court grant a temporary restraining order requiring the release of members of the Medically Vulnerable Subclass pending briefing and argument.

Plaintiffs further request that the court issue a temporary restraining order requiring Defendants to immediately undertake the following minimum measures to improve the hygiene and safety at the Oakland County Jail:

1) Ensure that each incarcerated person receives, free of charge: (1) an individual supply of liquid hand soap and paper towels sufficient to allow frequent hand washing and drying each day, and (2) an adequate supply of disinfectant hand wipes or disinfectant products effective against the virus that causes COVID-19 for daily cleanings;

2) Ensure that all incarcerated people have access to hand sanitizer containing at least 60% alcohol;

3) Provide access to daily showers and daily access to clean laundry, including clean personal towels and washrags after each shower;

4) Require that all Jail staff wear personal protective equipment, including masks, when interacting with any person or when touching surfaces in cells or common areas;

5) Require that all Jail staff wash their hands with soap and water or use hand sanitizer containing at least 60% alcohol both before and after touching any person or any surface in cells or common areas;

6) Take each incarcerated person's temperature daily (with a functioning and properly operated thermometer) to identify potential COVID-19 infections;

7) Assess (through questioning) each incarcerated person daily to identify potential COVID-19 infections;

8) Conduct immediate testing for anyone displaying known symptoms of COVID-19;

9) Provide adequate spacing of six feet or more between people incarcerated, to the maximum extent possible at the Jail's current population level, so that social distancing can be accomplished;

10) Ensure that individuals identified as having COVID-19 or having been exposed to COVID-19 receive adequate medical care and are properly quarantined in a non-punitive setting, with continued access to showers, recreation, mental health services, reading materials, phone and video calling with loved ones, communications with counsel, and personal property; Respond to all emergency (as defined by the medical community) requests for medical attention within an hour;

11) Provide sufficient disinfecting supplies, free of charge, so incarcerated people can clean high-touch areas or items (including, but not limited to, phones and headphones) between each use;

12) Effectively communicate to all people incarcerated, including low-literacy and non-English-speaking people, sufficient information about COVID-19, measures taken to reduce the risk of transmission, and any changes in policies or practices to reasonably ensure that individuals are able to take precautions to prevent infection;

13) Waive all medical co-pays for those experiencing COVID-19-related symptoms;

14) Waive all charges for medical grievances during this health crisis;

15) Cease and desist (a) all use of punitive transfers or threats of transfers to areas of the jail that have higher infection rates (or any other form of threat involving increased exposure to infection) for any infraction whatsoever; (b) all retaliation in any form, against class members who raise concerns either formally or informally about the health and safety conditions in the Jail; (c) all punitive measures taken against class members who decline to engage in labor on the grounds that such labor represents a threat to their health and safety or the health and safety of other class members.

In addition, Plaintiffs request that the court immediately order Defendants to take the following measures in preparation for a TRO hearing, assuming the court orders such a hearing:

1) Require Defendants to promptly provide Plaintiffs and the Court with a list of all individuals who are members of the Medically Vulnerable Subclass as defined in paragraph 94 of Plaintiffs' Complaint, that includes their location, charge and bond status;

2) Require Defendants to promptly thereafter provide Plaintiffs and the Court with a list of any individuals in the Medically Vulnerable Subclass who Defendants object to releasing and the basis for that objection.

Lastly, Plaintiffs request that the court 1) set an evidentiary hearing to examine allegations in Plaintiffs' emergency motion for a Temporary Restraining Order and Preliminary Injunction; 2) set a time and date for a hearing in which the Court will resolve any disputes about whether certain listed individuals are entitled to relief; 3) order an inspection of the jail facilities by a medical expert in infectious disease who can report to the court at the hearing on allegations and answer critical questions; and 4) grant leave to conduct expedited narrow limited discovery, which the parties can confer about.

Local Rule 7.1(a) requires Plaintiffs to ascertain whether this motion will be opposed. Because this motion is being filed contemporaneously with the complaint,

there is not yet an attorney of record for Defendants in this case. Plaintiffs' counsel did place a telephone call to the Oakland County Corporation Counsel's office to explain the nature of this motion and its legal basis. Plaintiffs' counsel did not obtain concurrence in the relief sought.

Plaintiffs' counsel has emailed Corporation Counsel Joellen Shortley contemporaneously with this filing to alert her that this emergency filing is forthcoming and to provide her with copies of this motion, the supporting brief, Plaintiffs' complaint, and Plaintiffs' motion for class certification. Plaintiffs' counsel is prepared to appear by telephone immediately. Each day that passes risks Plaintiffs' lives. This case cannot wait.

Respectfully submitted,

/s/ Krithika Santhanam
Krithika Santhanam (DC Bar No. 1632807)*
Thomas B. Harvey (MBE #61734MO)*
Advancement Project National Office
1220 L Street, N.W., Suite 850
Washington, DC 20005
Tel: (202) 728-9557
Ksanthanam@advancementproject.org
Tharvey@advancementproject.org

/s/ Philip Mayor
Philip Mayor (P81691)
Daniel S. Korobkin (P72842)
American Civil Liberties Union
   Fund of Michigan
2966 Woodward Ave.

/s/ Cary S. McGehee
Cary S. McGehee (P42318)
Kevin M. Carlson (P67704)
Pitt, McGehee, Palmer,
   Bonanni & Rivers, PC
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067
(248) 398-9800
cmcgehee@pittlawpc.com
kcarlson@pittlawpc.com

/s/ Allison L. Kriger
Allison L. Kriger (P76364)
LaRene & Kriger, PLC
645 Griswold, Suite 1717
Detroit, MI 48226

Detroit, MI 48201                        (313) 967-0100
(313) 578-6803                           Allison.kriger@gmail.com
pmayor@aclumich.org
dkorobkin@aclumich.org

/s/  Alexandria Twinem
Alexandria Twinem
   (D.C. Bar No. 1644851)*
Civil Rights Corps
1601 Connecticut Ave NW, Suite 800
Washington, DC 20009
(202) 894-6126
alexandria@civilrightscorps.org

Attorneys for Plaintiffs/Petitioners
   *Applications for admission forthcoming

Dated: April 17, 2020

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMAAL CAMERON; RICHARD BRIGGS;
RAJ LEE; MICHAEL CAMERON; MATTHEW
SAUNDERS, individually and on behalf of all
others similarly situated,

      Plaintiffs,

                v.

MICHAEL BOUCHARD, in his official capacity
as Sheriff of Oakland County; CURTIS D.
CHILDS, in his official capacity as Commander of
Corrective Services; OAKLAND COUNTY,
MICHIGAN,

      Defendants.

Case No. 20-cv-10949-LVP-
MJH
Hon. Linda V. Parker

**Emergency Motion**

## BRIEF IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR
## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES .........................................................................................ii

INTRODUCTION .........................................................................................................1

BACKGROUND AND FACTS .....................................................................................2

I.   The COVID-19 Crisis Is a Health Crisis Unmatched in Living Memory ............................2

II.  The COVID-19 Jail Outbreak Is An Extreme Threat to Public Health .................................4

III. The Oakland County Jail's Woefully Insufficient Hygienic Conditions.............................6

    1. Detained people cannot practice social distancing. ...................................6
    2. Defendants do not properly screen or quarantine. ....................................6
    3. Defendants do not provide adequate or timely health care.......................8
    4. Defendants maintain dangerous conditions and fail to provide
       even basic hygiene supplies to the people confined at the Jail. .................9
    5. Defendants fail to provide information about COVID-19 and its spread..................11

ARGUMENT .................................................................................................................12

    A. Plaintiffs are likely to succeed on the merits because Defendants are violating their
       Eighth and Fourteenth Amendment rights.................................................................13

       1. Objective Risk of Harm ........................................................................15
       2. Subjective Indifference .........................................................................17

    B. Plaintiffs Will Suffer Irreparable Harm. ....................................................................20
    C. The Public Interest and Balance of Equities Weigh Heavily in Plaintiffs' Favor. ..........22

CONCLUSION..............................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

<small>CASES</small>

*ACLU of Ky. v. McCreary Cty., Ky.*, 354 F.3d 438, 445 (6th Cir. 2003) ................................... 22

*Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) ................................................................ 16

*City of Dearborn v. Comcast of Mich.*, 558 F. Supp. 2d 750,
    754 (E.D. Mich. 2008) ............................................................................................................ 14

*City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) ................................................ 15

*Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 222 (6th Cir. 2016) ............................................. 26

*Elrod v. Burns*, 427 U.S. 347, 373 (1976) ................................................................................. 23

*Estelle v. Gamble*, 429 U.S. 97, 104 (1976) .............................................................................. 15

*Farmer v. Brennan*, 511 U.S. 825, 834 (1994) .......................................................................... 15

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071,
    1079 (6th Cir. 1994) ............................................................................................................... 25

*Helling v. McKinney*, 509 U.S. 25, 33 (1993) ..................................................................... 17, 23

*In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985) ............................................. 14

*Malam v. Adducci*, __ F. Supp. 3d __, No. 20-cv-10829, 2020
    WL 1672662 (E.D. Mich. Apr. 6, 2020) ................................................................................ 22

*Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008) .................................... 13

*Richko v. Wayne Cty., Mich.,* 819 F.3d 907, 915 (6th Cir. 2016) ............................................. 15

*Thakker v. Doll*, __ F. Supp. 3d __, No. 20-cv-480, 2020 WL 1671563
    (M.D. Pa. Mar. 31, 2020) ....................................................................................................... 20

*United States v. Stephens*, __ F. Supp. 3d __, No. 15-CR-95, 2020
    WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) ....................................................................... 6

*Wilson v. Gordon*, 822 F.3d 934, 958 (6th Cir. 2016) .............................................................. 23

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) .................................................. 13

**Statutes**

28 U.S.C. § 2241 ................................................................................................................. 2, 13

42 U.S.C. § 1983 ................................................................................................................. 2, 13

# INTRODUCTION

An outbreak of the novel coronavirus is occurring in the Oakland County Jail ("Jail"), where Defendants confine over 800 human beings in life-threatening conditions. Plaintiffs sleep as close as one foot from each other, have limited or no access to hygiene products and cleaning supplies, are not properly quarantined when sick, and—because medical staff have stopped conducting rounds—must wait days to seek medical attention. Many people confined at the Jail are medically vulnerable to the COVID-19 disease, and their lives are at risk. As of the filing of this motion, more than 23 inmates as well as jail staff members have tested positive for the virus. Based on the virus's spread in other jails, this number will be in the hundreds in less than a week. *See* [Ex. A, Cook County Jail Population and COVID Tracker].

As COVID-19 spreads inside and outside the Jail, time is running out to save Plaintiffs' lives and to prevent the Jail from becoming an epicenter of community infection. Absent immediate intervention from this Court, people will die because of Defendants' deliberate indifference.

Plaintiffs seek two forms of immediate relief. First, they seek class-wide relief requiring Defendants to take critical steps inside the Jail to safeguard people who, due to the nature of their confinement, are at serious risk of infection and death in a global pandemic. Second, they seek immediate release from confinement for a subclass of people who, because of age or preexisting medical conditions, are at

particularly grave risk of death from COVID-19, a risk that cannot be sufficiently mitigated by safeguards or preventive measures in the Jail. This relief is appropriate either through 28 U.S.C. § 2241 or, in the alternative, through 42 U.S.C. § 1983.

This extraordinary moment requires the Court's immediate intervention. The "horizon of risk for COVID-19 in this facility is a matter of days, not weeks." Compl. Ex. 14 ("Lauring Decl.") ¶ 39. Immediate relief is also in the public interest. A rapid outbreak amongst the Jail population would drain the Southeast Michigan metropolitan area of limited resources, including ventilators. For these reasons, and for the reasons explained further below, the Court should grant Plaintiffs' motion.

## BACKGROUND AND FACTS

## I. The COVID-19 Crisis Is a Health Crisis Unmatched in Living Memory.

We are in the midst of an unprecedented public health emergency. *See* Compl. ¶ 19 (citing sources). The number of people infected by COVID-19 has grown exponentially in this country since the first case was identified in January. *Id*. ¶ 20. By March 11, 2020, the World Health Organization defined the outbreak as a global pandemic. *Id*. ¶ 19. As of April 15, over 600,000 people have been diagnosed with COVID-19 in the United States, with over 24,000 deaths confirmed.[1] Without

---

[1] Coronavirus 2019, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Apr. 15, 2020).

effective public health intervention, the Centers for Disease Control and Prevention ("CDC") project that as many as 2.2 million American people will die. *Id*. ¶ 20.

The experience of severe illness caused by COVID-19 has been compared to "drowning in your own blood." *Id*. ¶ 25. COVID-19 is a highly contagious virus that can severely damage lung tissue, impede cardiac functions (causing heart failure), and permanently harm other organs. *Id*. ¶ 24. Complications manifest at an alarming pace, and the required levels of medical support—which include highly specialized equipment like ventilators as well as an entire team of care providers— already exceeds local health care resources in Southeast Michigan.[2] Approximately 20% of people infected experience life-threatening complications; between 1% and 3.4% die. *Id*. ¶ 27. The fatality rate is about ten times higher than a severe seasonal influenza, even in countries with highly effective health care systems. *Id*.

Although everyone is at risk of contracting COVID-19, some populations are at higher risk for severe health results. Certain underlying medical conditions including lung disease, asthma, chronic obstructive pulmonary disease, chronic liver or kidney disease, diabetes, epilepsy, hypertension, compromised immune systems, blood disorders, inherited metabolic disorders, strokes, and pregnancy increase the

---

[2] *See*, *e.g.*, Kristen Jordan Shamus & Darcie Moran, *Nurses Protest Conditions at Detroit's Sinai-Grace, Said They Were Told to Leave*, Detroit Free Press (Apr. 6, 2020), https://www.freep.com/story/news/health/2020/04/06/detroit-dmc-sinai-grace-nurses/2953385001/.

risk for individuals of any age. *Id.* ¶ 23. People over the age of fifty also face greater chances of serious illness or death. *Id.* The only known effective measure to mitigate the risk is to prevent infection in the first instance. *Id.* ¶ 29.

Accordingly, medical experts, officials, and the CDC urge "social distancing"—isolating oneself from other people at a minimum distance of six feet—as well as frequent hand-washing, use of hand sanitizer, and frequent cleaning and disinfecting of high touch surfaces and objects. *Id.* ¶ 30. These measures are particularly important in jails; congregate settings that can rapidly become a "public health disaster unfolding before our eyes." Lauring Decl. ¶ 10.

## II. The COVID-19 Jail Outbreak Is An Extreme Threat to Public Health.

People incarcerated in the Jail are at heightened risk of infection and death from COVID-19. According to experts in public health in jails and prisons, "the risk posed by COVID-19 in jails and prisons is significantly higher than in the community, . . . in terms of risk of transmission, exposure, and harm to individuals who become infected." Compl. ¶ 32; *see also* Lauring Decl. ¶¶ 9-10. This is due to a number of factors, including forced proximity of detained individuals, their inability to protect themselves through social distancing, lack of medical and hygiene supplies, heavy reliance on outside hospitals for serious medical care, forced labor of incarcerated people in cleaning their own facilities with insufficient supplies, constant cycling of people through the jails, and inadequate medical care

within the jail itself.  Compl. ¶ 32; Lauring Decl. ¶¶ 12-16.

The CDC's guidance for detention facilities acknowledges that incarcerated people live in conditions "heightening the potential for COVID-19 to spread." Compl. ¶ 36.  The growing devastation in other jails around the country is a harbinger for what awaits Oakland County.  The first case of COVID-19 in the Jail was first reported two weeks ago.[3]  In New York City, less than a month from the detection of the first case at Riker's Island, 334 incarcerated people and 627 jail staff have tested positive; two jail officers have died; and more than 800 incarcerated people are in quarantine.  *Id*. ¶ 40.  The COVID-19 infection rate in the city's jails is presently eight times higher than the rest of the city.  *Id*.

Nor can an outbreak be contained inside the Jail.  What happens to the people trapped inside this ticking time bomb affects others who cycle through, including correctional and medical staff.  Compl. Ex. 1 ("Stern Decl.") ¶11.  The outbreak then spreads to staff's families and the community.  *Id*.  And jail outbreaks can quickly overwhelm regional hospitals, making resources unavailable to treat others suffering from COVID-19 or life-threatening conditions like heart attacks.  Compl. ¶ 40; Stern Decl. ¶ 11.  As courts have noted, "[t]he more people we crowd into [a] facility, the

---

[3] James Dickson, *First Oakland County Jail inmate tests positive for coronavirus*, Detroit News (Mar. 30, 2020), https://www.detroitnews.com/story/news/local/oakland-county/2020/03/30/first-oakland-county-jail-inmate-tests-positive-coronavirus/5088382002/.

more we're increasing the risk to the community." *United States v. Stephens*, __ F. Supp. 3d __, No. 15-CR-95, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020).

## III.    The Oakland County Jail's Woefully Insufficient Hygienic Conditions

### 1.  Detained people cannot practice social distancing.

Social distancing is impossible at the Jail.  In some areas, people sleep a foot apart or less.  Ex. G ("Saunders Decl.") ¶ 2; Ex. B ("J. Cameron Decl.") ¶ 9.  At most, arrangements allow three feet of distance at night. Ex. H ("Arsineau Decl.") ¶ 2.  Inmates share showers, toilets, and sinks. Ex. I ("Bates Decl.") ¶ 9.  Some bunks adjoin toilets.  Ex. C ("Briggs Decl.") ¶ 9.

When people are allowed to leave their cells or are in common space, they are often within one or two feet of others.  Arsineau Decl. ¶ 3. Bates Decl. ¶ 9; J. Cameron Decl. ¶ 16.  In the main building, there are holding cells—referred to as "the tanks"—with no bunks at all.  Ex. D ("Lee Decl.") ¶¶ 18-19; J. Cameron Decl. ¶ 9.  Inmates sleep on the concrete floor in close proximity, "essentially [being] forced to cuddle."  J. Cameron Decl. ¶ 9.  People in the tanks can reach through the bars in front of their cell and into the next cell, where COVID-19 patients are housed in similarly dungeon-like circumstances.  Lee Decl. ¶ 21; J. Cameron Decl. ¶9.

### 2.  Defendants do not properly screen or quarantine.

In the tanks, people are shuffled from cell to cell with no consideration for who is symptomatic and who is not.  Cells with people in quarantine for COVID-19

are next to cells with presumptively healthy individuals. Lee Decl. ¶ 23. One cell under quarantine was emptied, and the healthy people in the next cell were immediately moved into it without it having been cleaned first. Lee Decl. ¶ 23. Hair was still on the floor, and the toilet had not been cleaned. Lee Decl. ¶ 23.

Defendants are not properly monitoring or testing inmates for COVID-19. Jason Arsineau, a detainee and a paramedic, watched officers incorrectly performing basic tasks, such as taking people's temperatures by testing right after meals and by contaminating the thermometer without cleaning it. Arsineau Decl. ¶ 6. Some officers do not even read the thermometer. Lee Decl. ¶ 5. And, because COVID-19 carriers can be asymptomatic for 2 to 14 days, Compl. ¶ 27, screening for symptoms alone is woefully insufficient to prevent spread within the Jail.

And symptomatic people are not properly isolated. Inmates who work as kitchen trustees[4] have been required to prepare and serve communal food, despite exhibiting symptoms of COVID-19, risking spread to everyone who received food from them. Ex. F ("Kucharski Decl.") ¶ 5. For example, around the end of March 2020, Arsineau had most of the symptoms of COVID-19 and told a deputy he was feeling sick and should not be serving food. Arsineau Decl. ¶5. The deputy responded, "Motherfucker, you do what I tell you to do, and you are going to serve

---

[4] Trustees are detained people who are tasked with responsibilities like food service, laundry, and cleaning. Saunders Decl. ¶ 6; Arsineau Decl. ¶ 5.

food." Arsineau continued to serve food to others while sick for four days until he could not get out of bed, leading a deputy to physically assault him. *Id*. And when Matthew Saunders became sick with suspected COVID-19 and a fever of 103 degrees, he was quarantined in the medical ward for only four days, and then returned to his dorm without being tested for COVID-19. Saunders Decl. ¶¶ 3, 5.

People who are sniffling and coughing are in the same cells as asymptomatic people, and the Jail is not testing any of them. Lee Decl. ¶ 20; Ex. E ("M. Cameron Decl.") ¶ 6. On April 11, 2020, one person in a quarantined cell died from suspected COVID-19. Lee Decl. ¶ 23. Two of the deceased's cellmates were then moved to a cell with presumptively healthy prisoners. *Id*.

### 3. Defendants do not provide adequate or timely health care.

Those who have been exposed to the virus or exhibit symptoms are not properly treated. David Kucharski, who also suffers from asthma, told a nurse about his symptoms on April 4, 2020. Kucharski Decl. ¶ 8. The nurse told him to let her know if his symptoms got worse, and gave everyone in his cell some Tamiflu, with instructions to take it if they had COVID-19 symptoms. *Id*.; Saunders Decl. ¶ 9. The nurses have not been back since. Kucharski Decl. ¶ 8; Saunders Decl. ¶ 9. Kucharski tried to ask a guard for medical attention, but was told that he would have to wait for a nurse. When Kucharski told the guard that the nurses were not coming, the guard said he could not help. Kucharski Decl. ¶ 10.

When Richard Briggs began to feel shortness of breath and loss of smell and taste, two nurses told him that he did not have COVID-19 and would not be tested. Briggs Decl. ¶ 8. One of the nurses suggested that he could not have shortness of breath, since he was able to speak to her. *Id*. After this, many of the others in his cell became sick with the same symptoms. Briggs Decl. ¶ 9.

During the four days that Saunders was quarantined in the medical unit, he would go hours without anyone coming to check on him. Saunders Decl. ¶ 4. His meals were placed just inside his door, but he was too sick to retrieve them, and guards removed the meals without him eating. *Id*.

The medical staff do not make rounds at all in certain parts of the jail. In fact, many people who take prescription drugs were dispensed a thirty-day supply, with instruction to take it on their own. J. Cameron Decl. ¶ 16; Lee Decl. ¶ 4. People have been advised that doctors will not return until May. J. Cameron Decl. ¶ 16.

### 4. Defendants maintain dangerous conditions and fail to provide even basic hygiene supplies to the people confined at the Jail.

The Jail does not supply enough soap for people to regularly wash their hands. Briggs Decl. ¶6; Kucharski Decl. ¶15. Some have not received soap in over a week. Kucharski Decl. ¶15; Saunders Decl. ¶11. The commissary has been closed for two weeks, so there is no way to purchase more soap or any other hygiene products. Arsineau Decl. ¶ 11; Briggs Decl. ¶ 6. No one in the Jail has access to hand sanitizer or tissues. *E.g.*, Arsineau Decl. ¶ 13–14. Jail residents are given inadequate amounts

of toilet paper, sometimes sharing one roll among six toilets, spreading germs to each person who touches the role. J. Cameron Decl. ¶ 18. There is no sanitary way for inmates to dry their hands after they have been washed. J. Cameron Decl. ¶ 20.

Most people get a change of uniform and linens only once a week. Kucharski Decl. ¶ 19. Some cells have a dirty communal bucket that is never replaced in which to wash their clothes and underwear during the week. Briggs Decl. ¶ 3. Recently, laundry service stopped entirely for over two weeks. Briggs Decl. ¶ 15.

Although there is access to showers, the showers are filthy with scum, mold, clumps of hair, and insects; there is no way to clean them. J. Cameron Decl. ¶17; Briggs Decl. ¶ 5; Kucharski Decl. ¶ 17. In some areas of the Jail, bottles of highly diluted DMQ (a floor cleaner) is the only disinfectant available. J. Cameron Decl. ¶ 13. But, lacking any cleaning equipment they have no way to clean their bunks and other commonly touched surfaces in the quarter. *Id*. In other parts of the Jail, inmates do not have access to adequate cleaning supplies to clean the communal showers in the bathrooms. Kucharski Decl. ¶17. They rely on an unidentified pink liquid meant to clean toilets, to clean everything. *Id*.

Common surfaces and items that are touched frequently are not cleaned regularly. M. Cameron Decl. ¶ 8. There are no rags or cleaning supplies to clean shared surfaces. Briggs Decl. ¶ 4. The rails on the staircase are cleaned every other day and a shared water cooler is not sanitized between uses. M. Cameron Decl. ¶ 8.

Trustees tasked with cleaning receive one pair of gloves that they must reuse every time they clean.  M. Cameron Decl. ¶ 7.  Some are not given masks.  M. Cameron Decl. ¶ 7.  Some were made to clean a van that transported an inmate with suspected COVID-19 to the hospital with only cloth face masks as protection. Saunders Decl. ¶ 6.  Food service trustees were made to work for days with COVID-19 symptoms. Arsineau Decl. ¶ 5; Kucharski Decl. ¶ 5.  Kitchen trustees must handle the same carts and plastic trays that ungloved jail workers do.  J. Cameron Decl. ¶ 4.  Some food trustees are only given a pair of gloves and no mask when distributing food to others. J. Cameron Decl. ¶¶ 4-7.  Laundry trustees are afraid to work with some of the laundry, which comes in biohazard bags.  Bates Decl. ¶ 11-12.  Several laundry trustees quit because they felt the job was unsafe.  J. Cameron Decl. ¶ 25.

### 5. Defendants fail to provide information about COVID-19 and its spread.

While the Jail has done little to educate those detained about COVID-19, Bates Decl. ¶ 10; Briggs Decl. ¶ 7; M. Cameron Decl. ¶ 4,  the guards are well aware of its spread in the jail and use it as a threat with which to terrorize inmates.  J. Cameron Decl. ¶¶ 8–10.  They threaten and punish people who do not want to perform dangerous work with further exposure.  *Id*.  One officer threatened Raj Lee with relocation from the jail annex building to the main building as a punishment, telling Lee that he would not want to go to the main building because there was an outbreak there.  Lee Decl. ¶ 9.  Lee wrote a grievance about the threat, which a guard

handed to the officer, who promptly transferred Lee to the Tank where social distancing is least possible and quarantined people are kept. Lee Decl. ¶¶10-16. Jamaal Cameron was similarly punished for raising health concerns about food distribution. J. Cameron Decl. ¶¶ 8–9. Laundry trustees are similarly threatened. Bates Decl. ¶ 12.

## ARGUMENT

### PLAINTIFFS ARE ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION.

Plaintiffs and class members are at imminent risk of death or serious injury. If this litigation is decided in the ordinary course, many class members will become seriously ill and die before final judgment. Numerous others will suffer severe pain or organ damage. Plaintiffs seek two forms of immediate relief.

First, on behalf of the class as a whole, Plaintiffs seek an order requiring Defendants to follow procedures, recommended by medical professionals and the CDC Guidance on the management of COVID-19 in jails and correctional settings, that ensure those detained at the Jail: 1) have access to adequate and timely medical treatment to screen, test, and treat symptoms; 2) can practice social distancing; 3) can maintain necessary hygiene; and 4) are educated about COVID-19.

Second, medically vulnerable Plaintiffs, on behalf of a subclass composed of similarly vulnerable detainees, seek immediate release from the chaotic, infectious jail environment, because there are no measures that Defendants can take within the

facility to protect them from a high risk of death or serious bodily harm. Their lives literally depend on how quickly they are released. This relief is appropriate either through 28 U.S.C. § 2241 or, in the alternative, through 42 U.S.C. § 1983.

Plaintiffs easily meet the legal requirements for the Court to grant them a temporary restraining order and preliminary injunction requiring Defendants to change their practices at the Jail to conform to medically accepted means of preventing and mitigating the spread of COVID-19 in the Jail and release members of the medically vulnerable subclass. As explained below, (1) they are likely to succeed on the merits of their claims; (2) they are likely to suffer irreparable harm in the absence of relief; (3) the balance of equities weighs in their favor; and (4) an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008). The court must balance each of the four factors and "no single factor is dispositive." *City of Dearborn v. Comcast of Mich.*, 558 F. Supp. 2d 750, 754 (E.D. Mich. 2008). Where, as here, plaintiffs demonstrate "irreparable harm which decidedly outweighs any potential harm to the defendant," the "degree of likelihood of success required" is less, and a plaintiff need only show "serious questions going to the merits." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

**A.**     **Plaintiffs are likely to succeed on the merits because Defendants are violating their Eighth and Fourteenth Amendment rights.**

Plaintiffs and class members are highly likely to succeed on their claims because Defendants are deliberately disregarding the risk that Plaintiffs will contract COVID-19 within the current conditions at the Jail, in violation of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment. Defendants' failure to implement the basic steps recommended by health experts, the CDC, and Governor Gretchen Whitmer[5]—including access to basic medical screening and treatment protocols for infectious disease, providing soap and water so that those detained can wash their hands after touching objects or other people, giving people sufficient space to stay at least six feet away from others at all times, the ability to clean and disinfect all surfaces touched by multiple people at least once per day, and access to information about COVID-19—constitutes deliberate indifference.

The government has a constitutional duty to protect those it detains from "a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). This right arises under the Eighth Amendment for after conviction, *see id.*; *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), and under the Fourteenth Amendment's Due Process Clause pre-conviction, *see City of Revere v. Mass. Gen. Hosp*., 463 U.S. 239, 244 (1983); *Richko v. Wayne Cty., Mich.,* 819 F.3d 907, 915 (6th Cir. 2016).

---

[5] Compl. Exhibit 11, Executive Order 2020-29 (March 29, 2020).

To demonstrate a violation of the Eighth Amendment, convicted prisoners must show both an objectively substantial risk of serious harm and that prison officials subjectively "acted with 'deliberate indifference'" towards the hazardous condition in question. *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000). While the Sixth Circuit traditionally analyzed Fourteenth Amendment pretrial detainee claims and Eighth Amendment prisoner claims "under the same rubric," *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018), the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), "calls into serious doubt" whether pre-trial detainees need to satisfy the subjective prong of the inquiry. *Richmond*, 885 F.3d at 938 n.3.[6] Accordingly, the Pre-Trial Subclass can prove a Fourteenth Amendment claim by demonstrating solely that they face a substantial risk of serious harm. In any event, both the Eighth and Fourteenth Amendment standards are satisfied here.

### 1. Objective Risk of Harm

Plaintiffs confined at the Jail are at a substantial risk of serious harm from COVID-19. The risk of exposure to a deadly infectious disease constitutes a serious risk to health. A "condition of confinement that is sure or very likely to cause serious illness and needless suffering" to someone detained, which includes "exposure of

---

[6] *See also, e.g.*, *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018), *cert. denied sub nom. Cty. of Orange, Cal. v. Gordon*, 139 S. Ct. 794, 202 L. Ed. 2d 571 (2019); *Darnell v. Pineiro*, 849 F.3d 17, 34–35 (2d Cir. 2017); *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018).

inmates to a serious, communicable disease" is precisely the type of serious harm that the Constitution protects against. *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

COVID-19 is exactly that. It is a disease with no vaccine, effective treatment, or cure. It can cause severe pain in even mild and moderate cases, can feel like "having glass in your lungs" or "drowning in your own blood," and leaves patients choking and struggling to breathe. Compl. ¶ 25. And it can cause permanent lung damage. Compl. ¶ 24. In critical cases, patients may need to spend weeks attached to a ventilator and blood oxygenation machine. Compl. ¶ 26. Finally, COVID-19 has a fatality rate ten times higher than influenza. Compl. ¶ 27.

The risk of contracting COVID-19 in the Jail is extreme and unreasonable. Lauring Decl. ¶ 27. Across the country, governments have issued "shelter in place" orders closing public schools and non-essential businesses, banning people from eating in restaurants or even congregating in small groups, and requiring individuals to stay in their homes unless it is absolutely necessary to leave. Even when they leave, people are advised to stay at least six feet from others, wear masks, avoid touching their faces, and wash their hands immediately upon returning home. The message is clear and unprecedented: the risk of contracting COVID-19 is objectively unacceptable. So too for Plaintiffs who are detained, where the risk of contracting the virus is even greater than in the general population. Lauring Decl. ¶¶ 28-30.

This risk is even more extreme and unreasonable for the medically vulnerable subclass. They all have conditions rendering them exceptionally vulnerable to death or serious harm if exposed to COVID-19. Because of their medical vulnerability, there is no practicable way to ensure that they can avoid infection and no practicable way to ensure that, if infected, they receive prompt and reasonable medical treatment within the Jail. Serious illness is substantially likely, and older people and those with underlying medical conditions, such as lung disease, heart disease, or diabetes, are more likely to develop serious illness. Lauring Decl. ¶ 22. Therefore, their continued detention is a grave risk to their lives and violates the Constitution.

### 2. Subjective Indifference

This Court need not consider the subjective prong of the deliberate indifference standard with respect to members of the Pre-Trial Subclass. Yet even under the Eighth Amendment's more exacting standard, immediate injunctive relief is clearly appropriate. That is because Defendants have certainly known of and disregarded an excessive risk to inmate health or safety. *Richmond*, 885 F.3d at 939.

Here, in the midst of this global pandemic, it cannot be seriously disputed that any government officials, including Defendants, are subjectively aware of the risks posed by the coronavirus. Through government orders,[7] CDC guidance aimed at

---

[7] Michigan Executive Order 2020-42, Whitehouse.gov (Apr. 9, 2020), https://www.michigan.gov/whitmer/0,9309,7-387-90499_90640-525173--,00.html.

jails, *see* Compl. Ex. 6, letters sent to Defendants,[8] and nationwide publications,[9] Defendants have been made well aware of the risks to incarcerated people. The County's and Jail's own communications and announcements emphasize this awareness.[10] Similarly, the widespread public discussion and CDC guidance regarding the heightened risk to medically vulnerable people leaves no question that Defendants are aware of the mortal peril that Jail conditions pose to such individuals.

Defendants are disregarding the grave risk posed by the coronoavirus by failing to implement the steps urged by health experts, including the CDC, to stop the spread of the virus. An official demonstrates disregard of a risk by "failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Here, the list of reasonable measures to prevent the spread of COVID-19 is well delineated and publicized: "[s]ocial distancing and proper hygiene are the only effective means by which we can stop the spread of COVID-19." *Thakker v. Doll*, __ F. Supp. 3d __,

[8] Compl. Exs 12, 13, ACLU Letters to Chief Judges and Sheriffs.

[9] David Mills & Emily Galvin-Almanza, *As many as 100,000 incarcerated people in our prisons will die from the coronavirus, unless the US acts now*, Bus. Insider (Apr. 2, 2020), https://www.businessinsider.com/failure-to-release-prisoners-is-condemning-thousands-to-death-2020-4; Anna Flagg & Joseph Neff, *Why Jails Are So Important in the Fight Against Coronavirus*, N.Y. Times (Mar. 31, 2020), https://nyti.ms/3aIBHjv; Timothy Williams et al., *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, N.Y. Times (Mar. 30, 2020), https://nyti.ms/2Jmnf4z.

[10] Oakland County Jail, Visitation, https://www.oakgov.com/sheriff/Corrections-Courts/jail/Pages/visitation.aspx (last visited Apr. 15, 2020).

No. 20-cv-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020). The CDC has also recommended similar measures within jails and prisons, calling social distancing of at least six feet at all times the "cornerstone of reducing transmission" of COVID-19 within detention facilities, pushing facilities to "[p]rovide a no-cost supply of soap to incarcerated/detained persons, sufficient to allow frequent hand washing," and advising that facilities must, "[s]everal times a day, clean and disinfect surfaces and objects that are frequently touched, especially in common areas." Compl. ¶ 36.

Despite these clear directives, Defendants have not provided Plaintiffs with the space, antibacterial soap, sanitizer, and cleaning supplies necessary to allow staff and inmates to remain safe. Nor have they provided timely and adequate medical care to identify, isolate, and treat people who develop symptoms. As a result, the entire class has a substantial risk of contracting COVID-19, and the medically vulnerable subclass faces a very realistic threat of death and/or permanent organ damage. Defendants' failure to act puts them out of step with many other jails and prisons around the country, who are implementing medical guidance.

Although courts give some latitude to jail and prison officials to decide what actions are "reasonable" to deal with safety within facilities, COVID-19 is a threat to inmates' health and safety of a magnitude unseen in recent history. At this moment, there is only one way to minimize the risk of COVID-19: prevent its spread. By failing to take the necessary steps to do so in the Jail, Defendants are knowingly

exposing Plaintiffs, guards and staff, and the public at large, to a risk of a painful and lethal disease. That risk is unacceptable and unconstitutional.

Officials' indifference to the significant risk of permanent damage and death to the medically vulnerable subclass is even more culpable. It is well-documented that these individuals face a risk of death or permanent organ damage far in excess of the rest of the population. Stern Decl. ¶ 11; Lauring Decl. ¶ 14. This risk is well-evident in the COVID-19 death toll to date—for instance, in New York state, just over 86% of reported COVID-19 deaths involved at least one comorbidity, according to the state's department of health.[11] Defendants' refusal or inability to provide circumstances that would limit the subclass's exposure to the virus constitutes deliberate indifference. At this point, only release will sufficiently protect the medically vulnerable from risk of death. *Malam v. Adducci*, __ F. Supp. 3d __, No. 20-cv-10829, 2020 WL 1672662 (E.D. Mich. Apr. 6, 2020).

Plaintiffs have shown that they are likely to succeed on their claims' merits.

## B. Plaintiffs Will Suffer Irreparable Harm.

Plaintiffs allege injuries that are irreparable and, therefore, are not suitable for resolution in the ordinary course of litigation. Nor can these injuries be redressed through money damages. There is no injury that is more irreparable than death, and

---

[11] COVID-19 tracker New York State Department of Health, https://covid19tracker.health.ny.gov/ (last visited Apr. 15, 2020).

Plaintiffs face a heightened risk of contracting a deadly virus. This risk is not speculative: in one Louisiana prison where COVID-19 has been allowed to spread, five people have died in less than a week.[12]

Moreover, Plaintiffs seek relief from violations of their constitutional rights. "[W]hen reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *ACLU of Ky. v. McCreary Cty.*, *Ky.*, 354 F.3d 438, 445 (6th Cir. 2003) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). An injunction is appropriate to prevent a substantial risk of deprivation of constitutional rights, as well as death or permanent, debilitating injury. Being compelled to endure a substantially increased risk of serious illness and death will always constitute irreparable injury. *See, e.g.*, *Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.").

The risk of permanent harm to Plaintiffs applies with greater force to the medically vulnerable subclass, for whom continued detention is even more likely to cause injury and death. *See Wilson v. Gordon*, 822 F.3d 934, 958 (6th Cir. 2016) (upholding preliminary injunction "where the alleged irreparable harm involves

---

[12] *ACLU Sues Louisiana Prison After 5 COVID-19 Deaths Reported*, Democracy Now (Apr. 7, 2020) https://www.democracynow.org/2020/4/7/headlines/aclu_sues_louisiana_prison_after_5_covid_19_deaths_reported.

delay in or inability to obtain medical services"). With 23 confirmed COVID-19 cases in the Jail, the risk of death and devastation to subclass members is an absolute certainty that cannot be ignored.

Courts across the country have recognized that risk of exposure to the coronavirus constitutes an irreparable harm and in turn granted immediate release to people who are exposed to coronavirus.[13] This groundswell reflects the emerging judicial consensus that people cannot be safely detained when they are exposed to a serious risk of contracting COVID-19. Here, COVID-19 is already in the Jail. Every possible step must be taken to ameliorate the risk to those who remain detained. Plaintiffs have shown irreparable harm.

### C. The Public Interest and Balance of Equities Weigh Heavily in Plaintiffs' Favor.

The substantial risk to Plaintiffs of contracting a deadly disease considerably outweighs any potential harm to Defendants. As discussed above, Plaintiffs will

---

[13] *See* Ex. H (providing decisions from seven district courts); *see also Zhang v. Barr*, 20 Civ. 331, 2020 WL 1502607 (C.D. Cal. Mar. 27, 2020) (granting an immediate bond hearing in light of the "global pandemic by which delay in determining Petitioner's release exposes him to unnecessary risk"); *United States v. Garlock*, No. 18 Cr. 00418, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (ordering, sua sponte, extension of convicted defendant's surrender date and noting "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *Castillo v. Barr*, __ F. Supp. 3d __, 20 Civ. 605, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020) (noting "the risk of infection in immigration detention facilities – and jails – is particularly high").

suffer significant harm if forced to endure the conditions currently prevailing in the Jail. The only potential harm Defendants face if ordered to bring their Jail into compliance with CDC guidelines is economic: Jail staff may have to expend additional time, and the County may have to expend additional money, to provide the information, hygiene products, cleaning agents, and medical treatment necessary to kill the virus. But the possibility that Defendants will have to spend money to reduce the substantial risk that Plaintiffs will be exposed to a deadly disease does not tip the balance in their favor because "it is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). Immediately implementing CDC's medically advised hygiene, social distancing, screening and testing measures for the whole Class is the only way to make the Jail safer for those who remain and will also promote Defendants' interests in ensuring the safety of the staff at the Jail, and the community at large. Accordingly, the public interest would be served by issuance of a preliminary injunction requiring Defendants to implement constitutionally adequate measures to prevent the spread of COVID-19 in the Jail.

Additionally, the balance of equities and public interest favor release of the medically vulnerable subclass members who, as a practical matter, cannot be constitutionally held in the Jail. Release of these individuals will save the Jail money and reduce the demands on jail staff, including guards and nurses. And releasing

medically vulnerable individuals is the only way to eliminate the unacceptable risk to their health and the concomitant demand on public health resources that will result when they become infected in jail. The constitution, and the public interest, demands no less. *See Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 222 (6th Cir. 2016) (protection of constitutional rights is "always in the public interest").

A worsened outbreak at the Jail would create a "tinderbox scenario" with dire consequences for detainees and workers at the Jail as well as the Southeast Michigan metropolitan area, which would be drained of limited medical resources, including intensive care unit beds and ventilators. In Michigan, the COVID-19 outbreak has already resulted in unprecedented public health measures and has strained the local health care system. Further, COVID-19 is already devastating Michigan's carceral system. In one Michigan prison alone, 10% of all incarcerated people have tested positive for COVID-19, and 9 prisoners have already died statewide.[14] Releasing vulnerable individuals is the only way to save lives and reduce the burden on the community and health infrastructure and is clearly in the public interest.

## CONCLUSION

For these reasons, Plaintiffs ask this Court to issue a temporary restraining order and preliminary injunction ordering the relief requested in their motion.

---

[14] *See* Compl. ¶ 41 (and source cited therein).

Respectfully submitted,

/s/ Krithika Santhanam
Krithika Santhanam (DC Bar No. 1632807)*
Thomas B. Harvey (MBE #61734MO)*
Advancement Project National Office
1220 L Street, N.W., Suite 850
Washington, DC 20005
Tel: (202) 728-9557
Ksanthanam@advancementproject.org
Tharvey@advancementproject.org

/s/ Philip Mayor
Philip Mayor (P81691)
Daniel S. Korobkin (P72842)
American Civil Liberties Union
Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6803
pmayor@aclumich.org
dkorobkin@aclumich.org

/s/ Alexandria Twinem
Alexandria Twinem (D.C. Bar No. 1644851)*
Civil Rights Corps
1601 Connecticut Ave NW, Suite 800
Washington, DC 20009
Tel: 202-894-6126  Fax: 202-609-8030
alexandria@civilrightscorps.org

/s/ Cary S. McGehee
Cary S. McGehee (P42318)
Kevin M. Carlson (P67704)
Pitt, McGehee, Palmer,
Bonanni & Rivers, PC
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067
248-398-9800
cmcgehee@pittlawpc.com
kcarlson@pittlawpc.com

/s/ Allison L. Kriger
Allison L. Kriger (P76364)
LaRene & Kriger, PLC
645 Griswold, Suite 1717
Detroit, MI 48226
(313) 967-0100
Allison.kriger@gmail.com

Attorneys for Plaintiffs/Petitioners

*Applications for admission forthcoming

Dated: April 17, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel of record. I further certify that I emailed the foregoing document to: Oakland County Corporation Counsel Joellen Shortley at shortleyj@oakgov.com, the Oakland County Clerk at clerk@oakgov.com, and the Oakland County Sheriff's Office at ocso@oakgov.com. The foregoing document will also be served on Defendants by a process server along with the complaint and summons at the following addresses:

Sheriff Michael Bouchard
Oakland County Sheriff's Office
1200 N. Telegraph Road
Pontiac, MI 48341

Joellen Shortley
Oakland County Corporation Counsel's Office
1200 N. Telegraph Road
Pontiac, MI 48341

Lisa Brown
Oakland County Clerk/Register of Deeds
1200 N. Telegraph Road
Pontiac, MI 48341

Curtis D. Childs
Oakland County Sheriff's Office
1200 N. Telegraph Road
Pontiac, MI 48341

/s/ Cary S. McGehee
Cary S. McGehee (P42318)