JAMAAL CAMERON; RICHARD
BRIGGS; RAJ LEE; MICHAEL
CAMERON; MATTHEW
SAUNDERS, individually and on
behalf of all others similarly situated,

                                                 Case 2:20-cv-10949-LVP-MJH

    Plaintiffs,

v.

MICHAEL BOUCHARD, in his
official capacity as Sheriff of Oakland
County; CURTIS D. CHILDS, in his
official capacity as Commander of
Corrective Services; OAKLAND
COUNTY, MICHIGAN,

    Defendants.

_____

# **DEFENDANTS' MOTION TO DISMISS PETITION FOR HABEAS CORPUS, CLAIMS AGAINST BOUCHARD AND CHILDS (IN LIEU OF ANSWER TO COMPLAINT) AND RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER**

NOW COME Defendants, MICHAEL BOUCHARD, CURTIS D. CHILDS and OAKLAND COUNTY, by and through their attorneys, POTTER DeAGOSTINO O'DEA & CLARK, and pursuant to Fed. R. Civ. P. 12(b)(6), hereby request the Court to dismiss Plaintiff's Petition for Habeas Corpus and claims against Bouchard and Childs, and pursuant to Fed. R. Civ. P. 65 and deny Plaintiff's Motion for Temporary Restraining Order for the reasons set forth in the brief accompanying this Motion.

POTTER, DeAGOSTINO, O'DEA & CLARK

s/ STEVEN M. POTTER (P33344)
s/ ROBERT C. CLARK (P76359)
Attorneys for Defendants
2701 Cambridge Court, Suite 223
Auburn Hills, Michigan 48326
(248) 377-1700
Dated:          April 23, 2020     spotter@potterlaw.com


## BRIEF IN SUPPORT OF MOTION AND RESPONSE

### I.     Factual Background

#### A.     Procedural History

Plaintiffs, all convicted felons, filed the instant action on April 17, 2020. Plaintiffs' Petition, titled "Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief" seeks class certification for potentially all inmates incarcerated at Oakland County Jail and (without legal basis) requests their release

from jail. Since the filing of Plaintiffs' Petition and other related filings, this Court has held several status conferences and is well familiar with the procedural history of this case. Important to the instant motion, Plaintiffs have only asserted claims against Defendants Bouchard and Childs in their official capacity which are to be treated as claims against Oakland County. As discussed extensively below, the fact that Plaintiffs have only asserted claims against Oakland County provides the legal framework for the analysis of the validity (or lack thereof) of Plaintiffs' claims.

B.    Oakland County Jail's Pro-activity and Response to COVID-19

Prior to the first confirmed COVID-19 case in the jail, Defendants took an immediate and proactive response to the COVID-19 pandemic to curb an outbreak or spread at the Oakland County Jail. The Oakland County Jail has a capacity of 1,664 inmates. (Exhibit I, Population Report). On March 17, 2020 the inmate population was 1,223. (Exhibit B,  Affidavit of Captain Childs, ¶ 31; Exhibit O, March 17 OCJ Population Report). Beginning in March, an initiative for compassionate releases occurred wherein OCSO advised Oakland County judges of 166 inmates who were incarcerated due to misdemeanor convictions and/or were potentially medically vulnerable. (Exhibit A, Sample correspondence[1] dated March

---

[1]

Defendants have attached one (1) sample letter sent directly to an Oakland County judge and other correspondence to court administrators. There are numerous additional letters not attached to Defendants' Motion.

17, correspondence with court administrators and redacted spreadsheet identifying inmates; Exhibit B, ¶¶ 26-27). As a result of this initiative, 101 inmates were released by the state court judges who sentenced same. (Exhibit B, ¶ 28).

Additionally, approximately three (3) weeks prior to the first confirmed case at the jail on March 28, signs were posted throughout the jail advising inmates of the steps being taken to attempt to prevent the virus from entering the facility. (Exhibit B, Affidavit of Captain Curtis Childs, ¶17). These were posted throughout the jail as early as March 11, 2020. (Exhibit B, ¶17; Exhibit C, Sign). The posts advised inmates that extra cleaning was being performed throughout the facility including ultraviolet cleaning. (Exhibit B).

Part of the jail's attempts to prevent and/or eliminate the spread of COVID-19 from entering and/or spreading throughout the jail has included various hygiene and cleanliness practices inside the jail. The following represent practices incorporated by the jail:

1. Inmates in the main jail receiving area are given showers three times a week and are given whatever soap is needed when they shower. Additionally, two bars of soap are also provided to inmates in receiving area two times per week. In the main jail, the inmates receive two bars of soap two times per week. In the Annex, inmates are allowed to shower daily and soap is provided when they shower. In addition, inmates in the Annex receive two bars of soap twice per week.

Furthermore, the desk deputy in each housing area has extra boxes of soap that is available upon request. (Exhibit B, ¶ 5).

2.  The jail uses a product called DMQ. The jail only dilutes this product pursuant to the manufacturer's instruction. The product is machine mixed at the jail. DMQ is available to all inmates when requested and no less than three times per day. It is provided to the inmates with food delivery. Inmates are provided sponges and rags in order to use the DMQ. When inmates are transferred between cells, the cells are always disinfected before use by the transferring inmates. (Exhibit B, ¶ 6).

3.  Food preparation inmates are provided masks and gloves. Food delivery inmates are also provided masks and gloves. These requirements existed before COVID 19. (Exhibit B, ¶ 7).

4.  All inmates are provided fresh, clean laundry once per week. (Exhibit B, ¶ 8).

5.  Inmates performing laundry services are provided with gloves and masks and multiple clothing changes per day if requested. COVID 19 laundry is separated from laundry not suspected of COVID 19 contamination. (Exhibit B, ¶ 9).

6.  With regard to sinks and toilets contained within cells, cleaning is performed by inmates with DMQ that is provided to them at a minimum of three times per day. (Exhibit B, ¶ 11). Inmates have been advised that "cleaning supplies are readily available" and have been asked to "use them as often as possible." (Exhibit H).

7.  With regard to PPE for correctional staff, all correctional staff have been issued masks and gloves. Additionally, N95 masks and face shields have been issued to correctional staff who have contact with inmates who have tested positive for COVID 19. (Exhibit B, ¶ 12)

8.  With regard to common areas within the jail, all common areas are disinfected by custodial staff daily. (Exhibit B, ¶ 13).

9.  With regard to shower cleanliness, showers in main jail are in cells and are cleaned by the inmates using DMQ. Showers in Annex are cleaned by the trustees and are to be cleaned after each use by the inmates. The receiving showers are cleaned by trustees immediately after each use. (Exhibit B, ¶ 19).

10. With regard to the holding cells, inmates in the holding cells are not in the same vicinity as the positive and symptomatic inmates who are housed in separate pods.  (Exhibit B, ¶ 20).

Hand sanitizer is not given to inmates due to an incident that occurred in October 2019 when inmates attempted to mix the hand sanitizer with other substances in an effort to create drinkable alcohol which resulted in several inmates becoming ill. (Exhibit B, ¶ 18; Exhibit D, Incident Report).

With regard to inmates' communication with the medical staff, sick call slips are distributed to the inmates daily and picked up every morning by medical staff. (Exhibit F, Affidavit of Vicki-Lyn Warren, ¶ 3). Sick call slips are the protocol for inmates to self-report COVID-19 symptoms. (Exhibit F, ¶ 3). Individuals who are displaying COVID-19 symptoms are seen daily by the medical staff and assessed accordingly. (Exhibit F, ¶ 3). A full set of vitals is taken once per day. (Exhibit F, ¶ 3). Temperature is taken by the day, afternoon and midnight medical shifts and therapeutics are administered as needed. (Exhibit F, ¶ 3). On Monday-Friday, each housing area is visited by a doctor or nurse practioner at which time the doctor or nurse practioner are constantly interacting with the inmate population and providing

lengthy verbal education regarding the importance of self-reporting COVID-19 symptoms. (Exhibit F, ¶ 4).

Unfortunately, despite the jail's best efforts to prevent COVID-19 from entering the jail, the first inmate tested positive for COVID-19 on March 28, 2020. (Exhibit B, ¶ 25). Subsequent to the first positive case, Oakland County Jail personnel were extremely aggressive in preventing further outbreak. If an inmate tests positive, that inmate is transferred into a pod designated for COVID 19 individuals. If an inmate has significant symptoms of COVID 19, that inmate is transferred from their cell and put into an area designated as symptomatic pod. (Exhibit B, ¶ 4). All inmates who had contact with someone who tests positive or has significant symptoms of COVID 19 are then placed into quarantine for 14 days. (Exhibit B, ¶ 4).

All inmates who have shown symptoms of COVID-19 are tested. (Exhibit F, ¶ 15). In accord with CDC guidelines, the OCSO has implemented a new "pre-intake screening" practice which includes identifying new inmates with COVID-19 complaints and taking all new inmates' temperature. (Exhibit B, ¶ 32). As of April 18, 2020, 242 inmates had received testing in the form of a swab. (Exhibit F, ¶ 15 ). Of the 242 tests, only 36 inmates have tested positive. (Exhibit F, ¶ 15). Five (5) of the 36 inmates who have tested positive have been released from custody. (Exhibit F, ¶ 15). Seven (7) of the 36 inmates who have tested positive have recovered and are no

longer quarantined. (Exhibit F, ¶ 15). Thus, 24 inmates remain in quarantine with positive results at the jail. (Exhibit F, ¶ 15). The total jail population as of April 17, 2020 was 742 inmates. (Exhibit I, Daily Inmate Population Report).

The jail has also taken measures to encourage reporting of COVID-19 symptoms by including the waiver of any cost for treatment related to COVID-19 or filing a grievance. (Exhibit F, ¶ 15). Additional signs (including in multiple languages) have been posted as the pandemic has progressed. (Exhibit S, Signs).

C.    Plaintiffs' Credibility (or lack thereof)

In support of Plaintiffs' Motion for TRO, Plaintiffs attach declarations containing allegations regarding the conditions of the jail. Because Defendants did not have an opportunity to respond to Plaintiffs' Motion (or allegations set forth in the affidavits), the Court admittedly took the affiants and the allegations contained in the affidavits at face value. (See R. 21, Amended Opinion and Order, p. 3). Interestingly, the affiants' criminal histories are replete with convictions related to crimes involving theft or dishonesty.

Raj Lee's criminal history includes convictions of felony home invasion, felony receiving and concealing stolen property, and most recently felony uttering and publishing countefeit bills or notes. (Exhibit E, Summary of Criminal Histories).

David Kucharski's criminal history includes convictions of felony receiving

and concealing stolen property, felony attempted home invasion, misdemeanor operating a vehicle with a forgery/alteration/false ID, felony larceny in a building, felony home invasion (multiple convictions), felony attempted breaking and entering, felony tampering with electronic monitoring device and misdemeanor retail fraud. (Exhibit E).

Jamaal Cameron's criminal history includes four convictions of felony uttering and publishing. (Exhibit E).

Matthew Saunders' criminal history includes convictions of felony armed robbery, felony home invasion (1st degree), felony unlawful driving away of a motor vehicle, felony receiving/concealing stolen property, felony breaking and entering a vehicle (multiple convictions).

Richard Briggs' criminal history includes convictions of felony receiving and concealing stolen property (multiple convictions), felony attempted unlawful driving away of a motor vehicle (multiple convictions). (Exhibit E).

Michael Bates' criminal history includes convictions of misdemeanor larceny, felony larceny from a motor vehicle and felony receiving/concealing stolen property. (Exhibit E).

Michael Cameron's criminal history includes convictions of felony receiving and concealing stolen property (multiple convictions) and felony unlawful driving

away of a motor vehicle (multiple convictions). (Exhibit E).

Attached as Exhibit E is summary of affiants' criminal histories demonstrating their lack of credibility and corresponding issues with the Court relying on statements made by these individuals who have shown their propensity to repeatedly engage in dishonest acts.

Certainly, one could wonder if these career criminals are not simply looking for a "get-out-of- jail-free" card.

## **ARGUMENT**

Defendants seek dismissal of the claims against them set forth in Plaintiffs' habeas petition because they fail to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). *Gavitt v Born*, 835 F.3d 623, 639-640 (6th Cir. 2016) set forth the applicable standard of review as follows:

> The complaint is viewed in the light most favorable to [plaintiff]; the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in his favor. *Jelovsek v. Bredesen*, 545 F.3d 431, 434 (6th Cir. 2008)... The complaint must state a claim that is plausible on its face, i.e., the court must be able to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

**I.    Plaintiff's Habeas Petition Should Be Dismissed**

A.    Plaintiffs' Have Failed to Exhaust Required Available State Remedies

Plaintiffs have failed to exhaust the requisite available state remedies prior to

filing the instant action. Pursuant to 28 U.S.C. § 2254(b)(1):

> An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that - (A) the applicant has exhausted the remedies available in the courts of the State; or (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

See also, *O'Sullivan v Boerckel*, 526 US 838, 845 (1999). The exhaustion requirement "serves to minimize friction between our federal and state systems of justice by allowing the State an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights. *Duckworth v Serrano*, 454 US 1, 3 (1981). Moreover, the Sixth Circuit has held, " [A] federal habeas petitioner "must first exhaust the remedies available in state court by fairly presenting his federal claims before the state court; the federal court will not review unexhausted claims." *Irick v Bell*, 565 F3d 315, 323 (6th Cir.2009)(citations and quotations omitted). " A federal court will not review claims that were not entertained by the state court due to ... the petitioner's failure to raise those claims in the state courts while state remedies were available...." *Id* at 323-324 (citations and quotations omitted). This includes presentation of the claims to the state appellate courts where review is discretionary and part of the ordinary appellate procedure in the state. *O'Sullivan*, 526 US at 847. "Where state remedies remain available to the habeas petitioner who has not fairly

presented his constitutional claim(s) to the state courts, the exhaustion doctrine precludes a federal court from granting him relief on that claim,.." *Perruquet v Briley*, 390 F3d 505, 514 (7th Cir. 2004).

In *Money v Pritzker*, - - - F. Supp. 3d - - - , 2020 WL 1820660 (N.D. Ill, April 10, 2020)(attached as Exhibit P), plaintiffs filed a habeas petition in federal court seeking their release from incarceration alleging the prison setting made them (and other purported class members) vulnerable to COVID-19 and the only way to solve the problem was for release. *Id* at *2. The court dismissed plaintiffs' habeas petition holding that plaintiffs' failed to raise their claims in the state courts prior to filing suit in federal court. *Id* at *21-22. The court noted that the state courts were available for emergency matters. *Id* at *21. Notably, the court held, "[T]o be sure, exhaustion requirements can (and should) be waived when relief is truly unavailable. But waiving them here - when state courts clearly were available...would turn the habeas system upside down." *Id* at *22.

Just as in *Money*, Plaintiffs in the instant action attempt to "turn the habeas system upside down" through their blatant disregard of available state remedies. *Id.* Plaintiffs have not and cannot show that they pursued their claims in any state court prior to filing the instant action. This alone is fatal to Plaintiffs' habeas petition. 28 U.S.C. § 2254(b)(1); *Irick, supra*. While it is anticipated Plaintiffs may argue that the

state courts in Michigan are not available, this argument is without merit. The Oakland County Circuit Court has entered multiple orders indicating it remains available to handle "emergency matters." (See Exhibit K, Oakland County Court Administrative Order, "[T]his Order is amended to continue emergency procedures..."). The Oakland County Circuit Court's Order is consistent with the Michigan Supreme Court's Administrative Order dated March 15, 2020 which states, "Trial Courts may adjourn...any criminal maters where the defendant is not in custody; where a criminal defendant is in custody, trial courts should expand the use of videoconferencing when the defendant consents." (Exhibit L, Order). Indeed, Oakland County Circuit Court remains available to handle non-emergency matters as well. (See Exhibit K, "[N]on-emergency matters may be heard by audio or video conferencing..."). Simply put, Oakland County Circuit Court, and the available appeals court in Michigan remain available to hear emergency and non-emergency related issues. Despite the availability of the state courts, Plaintiffs failed to raise their claims in state court prior to filing the instant action. Therefore, Plaintiffs habeas petition is procedurally defective and barred. Consequently, it should be dismissed.

B.    PLRA Precludes the Release of Plaintiffs/Inmates at OCJ

Even if Plaintiffs could show they have exhausted the required state remedies, their habeas petition still fails because this Court does not have authority to order the

13

release of inmates at Oakland County Jail. In regard to a prisoner's claims regarding

conditions and confinement while incarcerated, the United Stated District Court for

the Western District of Michigan recently noted:

> The United States Supreme Court has explained that "[f]ederal law opens two main avenues to relief on complaints related to imprisonment: a petition for habeas corpus, 28 U.S.C. § 2254, and a complaint under the Civil Rights Act of 1987, Rev. Stat. § 1979, as amended, 42 U.S.C. § 1983." *Muhammad v. Close*, 540 U.S. 749, 750 (2004) (per curiam). Causes of action arising from the conditions and circumstances of confinement are brought through claims under § 1983 and are subject to various procedures and consequences set forth in the Prison Litigation Reform Act (PLRA). See *id.*; *Moran v. Sondalle*, 218 F.3d 647, 649 (7th Cir. 2000) (per curiam). Challenges to the validity and duration of a conviction are brought through habeas applications and are subject to different procedures and consequences set forth in the Antiterroism and Effective Death Penalty Act (AEDPA). See *Muhammad*, 540 U.S. at 750; *Moran*, 218 F.3d at 649. Because the requirements for the two types of lawsuits are different, the Seventh Circuit explained that it was "important to classify [the] cases correctly." *Moran*, 218 F.3d at 649.
>
> The Seventh Circuit also noted that prisoners "may be tempted to choose one route rather than another to avoid" the various procedures and consequences set forth in the two statutes. *Moran*, 218 F.3d at 649. A "hybrid" action involving both types of claims "presents significant problems and courts must be on guard for attempts to use § 1983" to avoid the restrictions contained in the AEDPA. *Spencer v. Barret*, No. 14-10823, 2015 WL 4528052, at *4 (E.D. Mich. July 27, 2015). Where prisoner have sought to bring a hybrid habeas and civil rights claims, courts have directed the prisoners to file separate actions. See, e.g., *Kirk v. Jablonski*, No. 18-cv-288, 2019 WL 1283009, at *1 (D.N.M. Mar. 20, 2019).

*Dunbar v. Rozen*, No. 1:18-CV-617, 2019 WL 3213757, at *2 (W.D. Mich. July 17,

2019) (attached as Exhibit J).

1.    The Conditions of the PLRA Are Not Satisfied

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, incorporates the provisions of 18 U.S.C. § 3626, titled "appropriate remedies with respect to prison conditions." Pursuant to this section, "prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1). Courts are instructed "to give substantial weight to any adverse impact on public safety or the operation of the criminal justice system caused by the relief." *Id.* "Civil action with respect to prison conditions" is defined as "any civil proceeding arising under Federal law with respect to the conditions of confinement and the effects of actions by government officials on the lives of persons confined in prison" but explicitly "does not include habeas corpus proceedings challenging the fact or duration of confinement in prison." 18 U.S.C. § 3626(a)(2).

Importantly, the PLRA sets forth procedures for consideration of a "prisoner release order." 18 U.S.C. § 3626(a)(3). A "prisoner release order" includes "any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison." 18 U.S.C. § 3626(g)(4). **A**

**court may not enter a "prisoner release order" unless it "has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied" and "the defendant has had a reasonable amount of time to comply with the previous court orders."** 18 U.S.C. § 3626(a)(3)(i)-(ii). Once these conditions have been satisfied, only a three-judge panel can consider and issue a "prisoner release order" once it has determined by clear and convincing evidence that "crowding is the primary cause of the violation of a Federal right" and "no other relief will remedy the violation." 18 U.S.C. § 3626(a)(3)(E)(i)-(ii); *Brown v Plata*, 563 US 493, 512 (2011); *Money, supra.*

Courts have routinely denied plaintiffs request for a prison release order due to concerns related to COVID-19 in accordance with the conditions set forth in the PLRA. In *Money*, *supra*, the court denied plaintiffs' request to be released from the Illinois Department of Corrections due to alleged concerns regarding the inmates' safety and wellbeing during the COVID-19 pandemic. *Id* at *1. In its Opinion and Order denying plaintiffs' requested relief, the court held:

> The upshot is that the PLRA prevents this Court from granting the temporary restraining order on the Section 1983 claim, for a number of reasons. First, the statute provides that "no court shall enter a prisoner release order unless * * * a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right," and the defendants have "had a reasonable amount of time to comply with the previous court orders." 18 U.S.C. § 3626(a)(3)(A)(i),

(ii). Here, there is no such "previous court order[ ]." Id. Second, the statute provides that "only" a "three-judge court" can enter a prisoner release order. 18 U.S.C. § 3626(a)(3)(B). **So, this Court, standing alone, lacks the authority to issue any order that has the "purpose or effect of reducing or limiting the prison population**." Id.; 18 U.S.C. § 3626(g)(4). *Id* at *14 (emphasis supplied).

Similarly, in *Coleman & Plata v Newsom*, 2020 WL 1675775 (E.D. Cal April 4, 2020)(Exhibit R), plaintiffs sought an order directing the Governor of California and other state officials to release categories of inmates who were low-risk, non-violent and/or close to their release dates and to "release or relocate inmates who, because of their age or other medical conditions, are at a high risk of developing a severe form of COVID-19." *Id* at *3. In denying plaintiffs' request, the court noted plaintiffs could not satisfy the PLRA's "prior order requirement because there have not yet been any orders requiring Defendants to take measures short of release to address the threat of the virus; nor have Defendants had a reasonable time to comply." *Id* at *4.

Just as in *Money* and *Coleman*, *supra*, the PLRA is implicated in the instant case because Plaintiffs' Petition for Habeas Corpus seeks a "prisoner release order." Specifically, Plaintiffs' Petition for Habeas Corpus requests an order to "release all Medically Vulnerable Petitioners/Plaintiffs and Subclass Members of transferring them to home confinement." (Plaintiff's Petition, p. 67). Also similar to *Money* and

*Coleman*, Plaintiffs' request has no legal support and similarly has no likelihood of success. Prior to Plaintiffs' habeas petition, no court has ever entered an order for "less intrusive relief." 18 U.S.C. 3626(a)(3)(A)(i); *Gillette v Prosper*, 858 F3d 833, 837 (3d Cir. 2017). Just as the *Money* court held when facing concerns related to COVID-19, "there is no such 'previous court order." *Money*, at *14. This includes the Stipulation involved in the instant case which expressly indicates it is not an "order" for purposes of the PLRA. Because no prior order has been entered, it is impossible for Plaintiffs to show that Defendants had a "reasonable amount of time to comply with the prior court orders." *Id*; 18 U.S.C. 3626(a)(3)(A)(ii). Thus, Plaintiffs cannot show that either requirement of the PLRA is satisfied. Moreover, even if Plaintiffs could show the requirements were satisfied, this Court alone would not have the authority to order release of Plaintiffs or any other inmates of Oakland County Jail. Instead, a three judge panel would need to consider the requested "prisoner release order" after making a determination that there is clear and convincing evidence that "crowding" is the primary cause of constitutional violation and no other relief is sufficient. 18 U.S.C. § 3626(a)(3)(E)(i)-(ii). Simply put, just as the *Money* court held, "this Court, standing alone, lacks the authority to issue any order that has the 'purpose or effect of reducing or limiting the prison population.'" Therefore, to the extent the Court's Opinion and Order contemplated possible release of Plaintiffs and/or other

inmates at Oakland County Jail (see Opinion and Order p. 7), it contained a palpable defect and was inconsistent with established authority. Consequently, the Order should be reconsidered and set aside.

C.    Habeas Is Not Available For Eighth and Fourteenth Amendment Claims

The *Rooker-Feldman* doctrine prohibits "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp v Saudi Basic Indus Corp*, 544 US 280, 284 (2005). Additionally, the Full-Faith and Credit Act, 28 U.S.C. § 1783 requires a federal court to "give the same preclusive effect to a state-court judgment as another court of that state would give." *Migra v Warren City School Dist Bd of Ed*, 465 US 75, 80-82 (1984).

In *Glaus v Anderson*, 408 F3d 382, 387-88 (7th Cir. 2005), plaintiff alleged defendant prison officials violated his Eighth Amendment rights. Specifically, plaintiff alleged defendants were deliberately indifferent to his serious medical needs which presented a potentially fatal situation. *Id* at 384. The district court denied plaintiff's habeas petition and the Seventh Circuit affirmed the district court holding:

> Glaus's habeas corpus petition would be proper if release were among
> the possible remedies for an Eighth amendment deliberate indifference
> claim. Unfortunately for Glaus, it is not. If an inmate established that his

medical treatment amounts to cruel and unusual punishment, the appropriate remedy would be to call for proper treatment, or to award him damages; release from custody is not an option...

[Glaus's claim] must be brought as either a civil rights claim or possibly a Federal Tort Claims Act claim against the United States or an Administrative Procedures Act challenge[.]

The Sixth Circuit has also held that an inmate may not challenge the conditions of confinement in a habeas petition. *In re Owens*, 525 Fed. App'x 287, 290 (6th Cir.2013). Similarly, in *Burton v McGlasson*, No. 2:14-CV-10693, 2014 WL 700503 (E.D. Mich. Feb. 24, 2014), this Court dismissed plaintiff's habeas petition when plaintiff's petition challenged the conditions of confinement. This Court noted:

Where a prisoner is challenging the very fact or duration of his physical imprisonment and the relief that he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a petition for writ of habeas corpus. *Preiser v. Rodriguez*, 411 U.S. 475, 500, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). **However, habeas corpus is not available to prisoners who are complaining only of mistreatment during their legal incarceration**. See *Lutz v. Hemingway*, 476 F.Supp.2d 715, 718 (E.D.Mich.2007). Complaints like the ones raised by petitioner which involve conditions of confinement "do not relate to the legality of the petitioner's confinement, nor do they relate to the legal sufficiency of the criminal court proceedings which resulted in the incarceration of the petitioner." *Id.* (quoting *Maddux v. Rose*, 483 F.Supp. 661, 672 (E.D.Tenn.1980)). **A petition for writ of habeas corpus is not the proper vehicle for a prisoner's claim that prison officials have been deliberately indifferent to his medical needs, because release from custody is not an available remedy for a deliberate indifference claim**. See *In re Owens*, 525 Fed. App'x 287, 290 (6th Cir.2013); *Glaus v. Anderson*, 408 F.3d 382, 387 (7th Cir.2005); *Hamilton v. Gansheimer*,

536 F.Supp.2d 825, 841–42 (N.D.Ohio 2008). An inmate like petitioner should therefore bring his medical indifference claim as a civil rights complaint. *Glaus*, 408 F.3d at 386–87. Because petitioner challenges only the conditions of his confinement, his claims "fall outside of the cognizable core of habeas corpus relief." See *Hodges v. Bell*, 170 Fed. App'x 389, 393 (6th Cir.2006).

*Id* at *1 (emphasis supplied). See also, *Martin v Zych*, 2009 WL 398166 (E.D. Mich. Feb. 17, 2009) (holding "petition for writ of habeas corpus is not the proper vehicle for a prisoner's claim that prison officials have been deliberately indifferent to his medical needs, because release from custody is not an available remedy for a deliberate indifference claim"); *Davis v Zych,* 2009 WL 1212489 (E.D. Mich. May 4, 2009) ("[C]laims concerning the conditions of confinement are not cognizable in a habeas action brought pursuant to 28 U.S.C. §§ 2241 or 2254"); *Crites v Madison County Jail*, 2018 WL 1832919 at *2 (dismissing habeas petition on preliminary review holding deliberate indifference claim was non-cognizable) and *Peterson v Diaz*, 2020 WL 1640008 (E.D. Cal. April 2, 2020)(holding habeas proceedings not appropriate vehicle to raise Eighth Amendment claims related to COVID-19 pandemic). The same applies for pretrial detainees. *Atkins v State of Michigan*, 644 F2d 543, 546 (6th Cir.1981).

**Most recently, this Court rejected an inmate's claim for habeas relief due to concerns related to COVID-19.** *Chambers v Bouchard*, 20-cv-10916; - - WL - -

- (E.D. Mich. April 20, 2020)(Exhibit Q). As this Court noted, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *Id* at pp. 6-7; citing *United States v Raia*, 20-1033, 2020 WL 1647922 at *2 (3d Cir. April 2, 2020). The Court went on to state:

> These Supreme Court cases clearly direct a federal district court to dismiss a civil rights complaint which raises claims that attack the validity of a conviction; it does not direct a court to construe the civil rights complaint as a habeas petition. See, *Parker v Phillips*, 27 F. App'x 491, 494 (6th Cir.2001); *Murphy v Martin*, 343 F. Supp. 2d 603, 610 (E.D. Mich 2004). The Court has no authority to consider a § 1983 action for injunctive relief where the result may be to shorten the duration of the sentence. *Id* at p. 9.

Here, Plaintiffs have done exactly what has been routinely rejected by numerous federal courts including the Sixth Circuit **and this Court**. *In re Owens*, *Burton, Chambers*, *supra*. Plaintiffs have filed a Petition for Habeas Corpus that alleges Eighth and Fourteenth Amendment violations relating to the conditions and confinement of the Oakland County Jail. Plaintiffs' clearly understand the long and well established constitutional mandate: Plaintiffs' habeas petition is not a lawful mechanism for challenging conditions and confinement of incarceration[2]. As this Court has previously noted, "A petition for writ of habeas corpus is not the proper

---

[2]      In light of the overwhelming authority establishing Plaintiffs' position lacks merit, Plaintiffs' Petition for Habeas Corpus is arguably in violation of FRCP 11.

vehicle for a prisoner's claim that prison officials have been deliberately indifferent to his medical needs, because release from custody is not an available remedy for a deliberate indifference claim." *Burton*, *supra*. Consequently, their habeas petition should be dismissed. *Id.*

## II.    Plaintiff's Are Not Entitled to a Temporary Restraining Order

In order to grant a TRO, the Court must consider (1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent a stay, (3) whether granting the stay would cause substantial harm to others, and (4) whether the public interest would be served by granting the stay. *Ohio Republic Party v Brunner*, 543 F3d 357, 361 (6th Cir.2008).

Where a prison inmate seeks an order enjoining prison officials, this Court is required to proceed with the utmost care and must recognize the unique nature of the prison setting. *Orum v Michigan Dep't of Corrections*, 2018 WL 8369471 *11 (W.D. Mich, December 11, 2018)(citing *Kendrick v. Bland*, 740 F.2d 432 at 438, n.3, (6th Cir. 1984); *Harris v. Wilters*, 596 F.2d 678 (5th Cir. 1979)). In the context of the prison administration, "the interests of identifiable third parties and the public at large weigh against the granting of an injunction. Any interference by the federal courts in the administration of ... prison matters is necessarily disruptive." The Sixth Circuit has noted:

It is fundamental that the federal forum, as the ultimate guardian of constitutional rights, possesses the authority to implement whatever remedy is necessary to rectify constitutionally infirm practices, policies or conduct.... This broad, equitable authority, however, is tempered by precepts of comity and federalism.... The restraints of federalism must be applied not only when an injunction is sought against the judicial branch of state government, but also when an injunction is urged "against those in charge of an executive branch of any agency of state or **local government**.".... Thus the federal equity court in fashioning a remedy must afford relief which is "no broader than necessary to remedy the constitutional violation." *Glover v Johnson*, 855 F2d 277, 286 (6th Cir.1988)(citations and quotations omitted).

\* \* \*

Federal restraint into intrusion of a state penal institution is counseled for at least two reasons:
[J]udicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the providence of the Legislative and Executive Branches of our Government not the Judicial.

*Kendrick v Bland*, 740 F2d 432, 438 (6th Cir.1984)(quotations and citations omitted).

See also, *Turner v Safley*, 482 US 78, 85 (1987)("Where a... penal system is involved, federal courts have ... additional reason to accord deference to the appropriate prison authorities"); *Meachum v Fano*, 427 US 215, 229 (1976)("Federal courts do not sit to supervise state prisons, the administration of which is of acute interest to the States"). Importantly, a court should assume that, absent an official policy or practice urging unconstitutional behavior, individual government officials will act

constitutionally. *City of Los Angeles v Lyon*, 461 US 95, 102 (1983); *O'Shea v Littleton*, 414 US 488, 495-96 (1974).

> A.   Plaintiffs Are Unable to Show A Strong Likelihood of Success In Regard to Their *Monell* Claims

In order to obtain a TRO, Plaintiffs must first show a strong likelihood of success with regard to a *Monell* claim against Oakland County. As discussed below, the only claims asserted by Plaintiffs are claims against Defendants Bouchard and Childs in their **official capacity**. It is well established that official capacity claims are deemed to be claims made against the governmental entity that employs the individual sued in their official capacity. *Kentucky v Graham*, 473 US 159, 165-68 (1985).

In *Monell v New York City Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that a municipality can be found liable under § 1983 **only** where the municipality itself causes the constitutional violation at issue. "It is only when the execution of a government's policy or custom . . . inflicts the injury that the municipality may be held liable under § 1983." 436 U.S. at 694; *Berry v. City of Detroit*, 25 F.3d 1342, 1345 (6th Cir. 1994). Plaintiff must establish that "through its deliberate conduct, the [County] was the 'moving force' behind" the violation of his constitutional rights. *Gregory v. Shelby County*, 220 F.3d 433, 442 (6th Cir.

2000). In other words, Plaintiff "must show that the [County's] action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the [County's] action and the deprivation of federal rights." *Id*. In addition, **a plaintiff must show an underlying constitutional violation in order to succeed on a municipal liability claim**. *SL v Pierce Twp Bd of Trustees*, 771 F3d 956, 963 (6th Cir.2014).

As discussed below, it is impossible for Plaintiffs to show 1) an underlying constitutional violation and 2) an unconstitutional policy or practice that was the moving force behind the alleged constitutional violation. The situation Oakland County is presently faced with is by all accounts "novel." It is a situation that has never confronted municipalities such as Oakland County and is truly unchartered territory. There is no prior case law or other authority other than recently enacted CDC recommendations which provide guidance to municipalities with respect to the operation of their jails during such a crisis. Because neither Oakland County, nor any other municipality, has ever faced an epidemic such as the current COVID-19 pandemic, Plaintiffs cannot show that Oakland County maintains an unconstitutional policy or practice with respect to same. Instead, as explained below, Plaintiffs seek to impose liability on Oakland County simply through anecdotal "evidence" in the form of affidavits submitted by Plaintiffs regarding **current** conditions of the jail

only. Plaintiffs' sole reliance on the present conditions of the jail are fatal with respect to any Monell claim asserted and thus there is no likelihood of success on the merits.

1. **Plaintiffs' Cannot Establish The Requisite Underlying Constitutional Violation Because Defendants Are Not Recklessly Disregarding The Risk Posed by COVID-19**

Plaintiff must first show an underlying constitutional violation. *SL v Pierce Twp Bd of Trustees, supra*. The United States Supreme Court has held, "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v McKinney*, 509 US 25, 31; 113 S Ct 2475 (1993). In regard to an inmates conditions of confinement, the Supreme Court noted that jail conditions may be "restrictive and even harsh." *Rhodes v Chapman*, 452 US 337, 347; 101 S Ct 2392 (1981). "The Constitution does not mandate comfortable prisons." *Rhodes v Chapman*, 452 US 337, 349 (1981). It is well settled that pursuant to the Eighth Amendment of the United States Constitution, a prison official must "take reasonable measures to guarantee the safety of the inmates." *Hudson v Palmer*, 468 US 517, 526-527; 104 S Ct 3194 (1984). To raise a cognizable constitutional claim for deliberate indifference to an inmate's safety, an inmate must make a two-part showing: (1) the alleged mistreatment was objectively serious; and (2) the defendant subjectively ignored the risk to the inmate's safety.

*Farmer v Brennan*, 511 U.S. 825, 834; 114 S.Ct. 1970 (1994).

With respect to the first element, only extreme deprivations can be characterized as punishment prohibited by the Eighth Amendment. *Hudson v McMillan*, 503 US 1, 8-9 (1992). An extreme deprivation is one "so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling*, 509 US at 36 (emphasis in original).

In regard to the second element discussed above, the United States Supreme Court has held that in order for a plaintiff to be successful in his deliberate indifference claim, he must show the prison official possessed a state of mind "more blameworthy than negligence." *Id.* The *Farmer* Court also noted that "acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding the risk." *Id.* Importantly, the reckless standard is not one of objectivity. *Id* at 837-838. Instead, a plaintiff must show the prison officer "consciously disregarded," a substantial risk of harm. *Id* at 839. The Sixth Circuit has likewise acknowledged that a plaintiff must show defendant subjectively ignored a risk that was objectively serious. *Leary v Livingston County*, 528 F3d 438, 442 (6th Cir.2008). The prison official's state of mind must

evince "deliberateness tantamount to intent to punish." *Miller v. Calhoun Cty*., 408 F.3d 803, 812–13 (6th Cir. 2005) (citing *Horn v. Madison County Fiscal Court,* 22 F.3d 653, 660 (6th Cir.1994))."[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer,* 511 U.S. at 838, 114 S.Ct. 1970. Deliberate indifference is more than "mere negligence or malpractice." *Bowman v Corrections Corp of Am*, 350 F3d 537, 544 (6th Cir.2003). It is tantamount to a finding of criminal recklessness. *Farmer*, 511 US at 837. In the prison setting, it requires a showing "approaching total unconcern for the prisoner's welfare." *Rosario v Brown*, 670 F3d 816, 821 (7th Cir. 2012).

Deliberate indifference claims are the **same** under the Eighth and Fourteenth Amendments. *Ford v Cnty of Grand Traverse*, 535 F3d 483, 494-95 (6th Cir.2008); *Hanner v City of Dearborn Heights*, 450 Fed Appx 440, 447 (6th Cir.2011) ("Similar rights are guaranteed to pretrial detainees by the Due Process Clause of the Fourteenth Amendment, which provides the same deliberate indifference standard of care as the Eighth Amendment"), *Goebert v Lee County*, 510 F3d 1312, 1326 (11th Cir.2007) ("the standards under the Fourteenth Amendment are identical to those under the Eighth.").

In the COVID-19 context, the *Money* court denied plaintiffs' request for a TRO

when plaintiffs made nearly identical allegations and requests to Plaintiffs in the instant case. *Money*, at *2-3. In determining plaintiffs had "no chance of success" on the merits of their claim, the court held:

> Clearly Defendants are trying, very hard, to protect inmates against the virus and to treat those who have contracted it. The record simply does not support any suggestion that Defendants have turned the kind of blind eye and deaf ear to a known problem that would indicate "total unconcern" for the inmates' welfare. *Rosario*, 670 F3d at 821. Nor would the record support any claim that Defendants lack a plan for implementing exactly what Plaintiffs have requested - individualized decisions on release through a panoply of vehicles guided by administrative discretion. It may not be the plan that the Court would choose, if it were sufficiently informed to offer an opinion on the subject. But the Eighth Amendment does not afford litigants and courts an avenue for de novo review of the decisions of prison officials, and the actions of Defendants here in the face of the COVID-19 easily pass constitutional muster. *Id* at *18.

Plaintiffs cannot show that Defendants have been deliberately indifferent to their needs and thus are unable to show a strong likelihood of success on the merits of their Eighth and Fourteenth Amendment claims because the overwhelming evidence establishes Defendants previously put into place nearly all of Plaintiffs' requests and the subsequent requirements of the Court's TRO at the jail. This is in addition to the efforts to proactively reduce the inmate population that occurred in March before any inmate had tested positive for COVID-19. Specifically,101 inmates were released by state judges after being identified by OCSO in correspondence to

the respective judges. (Exhibit B, ¶ 28). Moreover, jail inmate population has been reduced by 481 inmates (1332 - 742) from March 17 through April 17. (Exhibit I; Exhibit O).As of April 17, OCJ was at 44% of its total capacity. Although each individual reacts differently to the virus, fortunately no inmate has been admitted to a hospital due to COVID-19 related symptoms and no inmate has died as a result of COVID-19. Most importantly, the measures taken by OCSO long before the first confirmed COVID-19 case in the jail and long before Plaintiffs' filed the instant action, establish they have not "turned the kind of blind eye and deaf ear to a known problem that would indicate total unconcern for the inmates' welfare." *Id.*

Again, Defendants emphasize the parties have agreed to a stipulation that addresses the vast majority of Plaintiffs' requested TRO. Defendants contend the TRO should be rescinded in light of this stipulation. Defendants will address each aspect of Plaintiff's TRO for purposes of completeness below.

A.    Liquid Hand Soap/Disinfectant Products

Prior to the Court's Order, OCJ practices included providing hand soap in all cells. (Exhibit B, ¶ 5). Two bars of soap are provided to inmates two times per week. (Exhibit B, ¶ 5). Additionally, jail personnel provide disinfectant products ("DMQ") when requested and no less than three times per day to each cell in the jail. (Exhibit B, ¶ 6). The jail provides a clean towel and wash cloth to each inmate weekly.

(Exhibit B, ¶ 29). The jail does not provide paper towels to inmates due to concerns with regard to plumbing issues associated with the towels being flushed down the toilet. (Exhibit B, ¶ 30).

Plaintiffs take issue with OCJ's practices of providing hand soap, a wash cloth and a towel for purposes of hygiene. According to Plaintiffs, liquid soap and paper towels should be provided. Plaintiffs have not and cannot provide any authority to establish that OCJ's policies referenced above amount to deliberate indifference or are likely to amount to deliberate indifference. Courts have previously held inmates are not entitled to a specific type of soap. *Burke v Dep't of Correction*, 2016 WL 4120063 at *4 (M.D. Tenn August 3, 2016) report and recommendation adopted, 2016 WL 4527274 (M.D. Tenn. August 30, 2016) (holding allegations related to hygienic products including chosen type of soap do not satisfy objective prong of Eighth Amendment claim). Plaintiffs need to show that by only providing bar soap multiple times per week (and by request), Defendants have subjected Plaintiffs to "deliberateness tantamount to intent to punish." *Miller, supra*. This is impossible considering the above referenced authority and current CDC recommendations which state that correction facilities should "provide a no-cost supply of soap to incarcerated/detained person, sufficient to allow frequent hand washing." (Exhibit N, Excerpt of CDC Recommendations). This is done by OCSO. While the

recommendations state liquid soap should be provided "where possible," the guidelines also allow for bar soap to be used. (Exhibit N). The fact that Plaintiffs cannot meet this threshold is highlighted further considering the additional deference the United States Supreme Court has held is owed to prison officials. *Turner, supra*. Therefore, any request for a TRO in regard to liquid bar soap and paper towels should be denied.

### B.    Hand Sanitizer

This issue was previously addressed by the Court and removed from the stipulation per the Court's instruction. **Defendants do not allow for inmates to possess hand sanitizer and vehemently object to same**. The OCJ previously provided inmates with access to sanitizer. (Exhibit B, ¶ 18). Unfortunately, on October 23, 2019, a serious incident occurred involving inmates making alcoholic drinks from hand sanitizer. (Exhibit B, ¶ 18; Exhibit D Incident Report). As a result, several inmates became ill including one inmate who became unresponsive and required hospitalization. (Exhibit D, p. 28). Consequently, any future release of hand sanitizer potentially places inmates at a serious risk to their own health and safety. In addition, because Defendants are on notice of same, they potentially face exposure and liability in the form of a substantive due process claim to the extent an inmate becomes ill due to Defendants providing hand sanitizer to them.

### C. Access to Showers/Clean Laundry

Inmates in the main jail receiving area are given showers three times per week. (Exhibit B, ¶ 5). Inmates in the annex have daily access to showers. (Exhibit B, ¶ 5). Inmates are given clean laundry once per week. (Exhibit B, ¶ 8). Plaintiffs cannot demonstrate criminal recklessness or an intent to punish. *Miller, Farmer, supra.*

### D. PPE for Jail Staff

All jail personnel have been issued masks and gloves. (Exhibit B, ¶ 12). Additionally, N95 masks and face shields have been issued to correctional staff who have contact with inmates who have testified positive for COVID-19. (Exhibit B, ¶ 12). Plaintiffs cannot demonstrate criminal recklessness or an intent to punish. *Miller, Farmer, supra.*

### E. Jail Staff Hygiene Efforts

Defendants have taken steps to ensure jail personnel wash their hands with soap and water both before and after touching any person or surface in cells or common areas. (Exhibit B, ¶ 24). This includes signs posted throughout the Jail for all personnel to observe. (Exhibit B, ¶ 24). Jail personnel have access to both soap and water to be used at their disposal. (Exhibit B, ¶ 24). Plaintiffs cannot demonstrate criminal recklessness or an intent to punish. *Miller, Farmer, supra.*

### F. Protocol to Report Symptoms

With regard to inmates' communication with medical staff, sick call slips are distributed to the inmates daily and picked up every morning by medical staff. (Exhibit F, ¶ 3). Sick call slips are the protocol for inmates to self-report COVID-19 symptoms. (Exhibit F, ¶ 3). Individuals who are displaying COVID-19 symptoms are seen daily by the medical staff and assessed accordingly. (Exhibit F, ¶ 3). A full set of vitals is taken once per day. (Exhibit F, ¶ 3). Temperature is taken by the day, afternoon and midnight medical shifts and therapeutics are administered as needed. (Exhibit F, ¶ 3). Plaintiffs cannot demonstrate criminal recklessness or an intent to punish. *Miller, Farmer, supra.*

## G.  Testing of COVID-19

Defendants have and continue to test all inmates who display known symptoms of COVID-19. (Exhibit F, ¶ 15). As of April 18, 2020, 242 COVID-19 tests have been administered to inmates through swab testing. (Exhibit F, ¶ 15). Of the 242 tests performed, only 36 inmates have tested positive for COVID-19. (Exhibit F, ¶ 15). Five (5) of the positive inmates have been released from custody, seven (7) recovered and returned to general population and 24 remain quarantined in the pod designated for COVID-19 positive inmates. (Exhibit F, ¶ 15).  Plaintiffs cannot demonstrate criminal recklessness or an intent to punish. *Miller, Farmer, supra.*

<span style="text-decoration: underline">H.</span>    <span style="text-decoration: underline">Adequate Spacing</span>

This component of the requested TRO was also previously addressed and resolved by the Court. With regard to social distancing, the CDC guidelines expressly recognize the impracticality of providing six (6) feet of spacing for *social distancing* in correctional facilities. (Exhibit B, ¶ 3) And, recognizing the guidelines provide that the six (6) foot spacing strategy has to "…be tailored to the individual space in the facility…" (Exhibit B, ¶ 3) The OCSO has implemented several CDC strategies to reduce COVID-19 transmission by, 1) limiting recreational activities, 2) providing outside catered meals in the housing units or cells, 3) suspending group programs and 4) reducing the number of inmates in group cells where room and classification permit. (Exhibit B, ¶ 3). In addition, the OCSO closed one pod to provide for overflow of newly arrested inmates to allow them fourteen (14) days quarantine, together with the separation of these new inmates into pairs of two. (Exhibit B, ¶ 3) Extraordinary efforts have been made to both reduce overall jail occupancy as well as reduce the number of inmates in group cells. (Exhibit B, ¶ 3) Jail occupancy in joint cells has been reduced by 56%. The remaining jail population consists of single and double cell occupancy. (Exhibit B, ¶ 3). Plaintiffs cannot demonstrate criminal recklessness or an intent to punish. *Miller, Farmer, supra.*

## I.     Quarantine of Positive Cases

Inmates who test positive are immediately quarantined from other inmates. (Exhibit B, ¶ 4). There is one specific pod in the jail that has been designated for COVID-19 positive inmates only. (Exhibit B, ¶ 4). These inmates have access to showers, mental health services, reading materials, phone and video calling, communications with counsel and personal property. (Exhibit B, ¶ 4). Inmates who are positive for COVID-19 remain in quarantine for 14 days. (Exhibit B, ¶ 4). Plaintiffs cannot demonstrate criminal recklessness or an intent to punish. *Miller, Farmer, supra.*

## J.     Response To Emergencies within an Hour

All medical emergencies receive immediate response from jail personnel. (Exhibit F, ¶ 6). Plaintiffs cannot demonstrate criminal recklessness or an intent to punish. *Miller, Farmer, supra.*

## K.     Disinfecting Supplies

See subparagraph (A) above.

## L.     Communication Regarding COVID-19

Communication including written postings consistent with CDC recommendations have been posted and/or distributed throughout the Jail. (Exhibit B, ¶ 17; Exhibit C). The communications advise inmates of the steps taken by jail

personnel as it pertains to COVID-19. (Exhibit B, ¶ 17). The posting was posted throughout the jail as early as March 11, 2020 and prior to any confirmed cases inside the jail. (Exhibit B, ¶ 17). Medical staff, including a doctor or nurse practioner, are visiting each housing area Monday-Friday at which time they are constantly interacting with the inmate population and providing lengthy verbal education regarding the importance of self-reporting COVID-19 symptoms. (Exhibit F, ¶ 4). Plaintiffs cannot demonstrate criminal recklessness or an intent to punish. *Miller, Farmer, supra*.

## M.  Training of Staff

Consistent with CDC recommendations, signs are posted throughout the facility reminding jail personnel they are required to wash their hands with soap and water as frequently as possible. (Exhibit B, ¶ 24). The signs also instruct the staff on the proper method and manner to wash their hands. (Exhibit B, ¶ 24). Additionally, as noted above, each housing area is visited by a doctor or nurse practioner Monday-Friday. (Exhibit F, ¶ 4). Plaintiffs cannot demonstrate criminal recklessness or an intent to punish. *Miller, Farmer, supra*.

## N.  Medical Co-Pays

Defendants have waived all charges related to medical co-pays related to COVID-19 related symptoms and/or treatment which includes testing of same.

(Exhibit B, ¶ 23). Plaintiffs cannot demonstrate criminal recklessness or an intent to punish. *Miller, Farmer, supra*.

### O.     Waiver of charges for Medical Grievances

There are no charges for grievances during the pandemic. (Exhibit B, ¶ 22). Plaintiffs cannot demonstrate criminal recklessness or an intent to punish. *Miller, Farmer, supra*.

### P.     Punitive Transfers/Retaliation

Defendants have never engaged in punitive transfers or threats of transfers to areas of the jail that have higher infection rates for any infraction. (Exhibit B, ¶ 10, 15). As indicated above, inmates who have tested positive are quarantined in a pod that is separate from all those who are not positive for COVID-19. (Exhibit B, ¶ 4). Plaintiffs cannot demonstrate criminal recklessness or an intent to punish. *Miller, Farmer, supra*.

### Q.     CDC Recommendations

On March 23, 2020, the Center for Disease Control ("CDC") issued "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correction and Detention Centers. (ECF 17 Pg. ID 166, Pgs. 1- 27) Recognizing it is neither feasible nor practical to implement all recommendations, the CDC expressly authorizes Correction and Detention Centers to implement the recommendations

according to the "specific needs of…" their facility. *Id pg. 4 of 27.* This guidance encompasses, among other things, "Prevention" and "Management" of the Covid-19 virus in the inmate population.

CDC "Prevention" guidelines are intended to assist facilities in preventing the spread of the virus from outside the facility to inside the facility.

CDC "Management" guidelines are intended to assist facilities in clinically managing confirmed and suspected COVID-19 cases inside the facility. *Id pg. 6 of 27.*

The OCSO had already implemented all feasible CDC recommendations relating to inmate safety long before the subject suit.

**<u>PREVENTION</u>**

Among the recommendations for prevention, the CDC suggest "Cleaning and Disinfecting Practices" be intensified. These recommendations include cleaning and disinfecting surfaces several times a day. *Id pg. 10 of 27.* Long before this suit was filed, the OCSO implemented new procedures requiring cleaning and disinfecting all surfaces identified in the CDC recommendation three (3) times a day. In accord with this new policy, all inmate Trusties and custodial staff clean common areas three (3) times a day with approved disinfectant products. Inmates are given all necessary cleaning supplies to clean their respective cells after each of their three (3) meal. In

addition, they are advised that cleaning supplies are readily available and are encouraged to "use them as often as possible". (Exhibit B, ¶ 5, 6, 19; Exhibit C).

In accord with the CDC recommendations to use "household cleaners and EPA-registered disinfectants effective against the virus that causes COVID-19" [*Id pg. 10 of 27*] the OCSO uses DMQ® a United States Environmental Protection Agency ("EPA") EPA registered disinfectant. *Id.* (Exhibit G, EPA registration documentation).

In addition to the use of EPA registered cleaning agents, OCSO has also implemented  Ultraviolet Germicidal Irradiation (UVGI) technology to supplement cleaning in the jail environment.  (Exhibit C). This technology has become routinely used in a variety of industries to combat COVID-19[3].

The OCSO has implemented the CDC recommendation for posting signage throughout the facility. (Exhibit C). In addition, Monday through Friday, each housing area in the facility is visited by a doctor or nurse practioner at which time they are constantly interacting with the inmate population and providing lengthy verbal education regarding the importance of self-reporting COVID-19 symptoms. *Id pgs. 11& 12 of 27;* (Exhibit F, ¶ 4).

---

[3] For example, see; Effects of Ultraviolet Germicidal Irradiation (UVGI) on N95 Respirator Filtration Performance and Structural Integrity, J Occup. Environ Hyg. 2015; 12(8): 509–517; N95 Filtering Facemask Respirator Ultraviolet Germicidal Irradiation (UVGI) Process for Decontamination and Reuse; Nebraska Medicine, *John J Lowe, Katie D Paladino, et al.*

Inmates are given, free of charge, individual bar soap, running water and towels to wash frequently consistent with CDC recommendations. (Exhibit B, ¶ 5). While Plaintiffs would have the OCSO provide hand sanitizer to inmates, the CDC recognizes the inherent danger of inmate intoxication posed by giving inmates a product containing 60% or more alcohol by volume. This is why the CDC only recommends hand sanitizer if there is no "soap and water" available to the inmates and only if security concerns allow. *Id pg. 8 of 27.* The principal security concern for dispensing hand sanitizer to inmates is "inmate intoxication." Mixing salt with hand sanitizer is known to convert the semi liquid sanitizer to a liquid form for ease of consumption. In October of 2019, inmates were found to have consumed hand sanitizer mixed with rock salt, antifreeze and Kool Aid®. One of the seven (7) was found breathing but unresponsive, even to painful stimuli. (Exhibit D). He was lifted from his top bunk and immediately transported by ALS to the McLaren Oakland Emergency Department. (Exhibit D). Poison control advised the remaining six (6) were to be monitored over the next several hours. (Exhibit D).

In accord with CDC guidelines, the OCSO has implemented a new "pre-intake screening" practice which includes identifying new inmates with COVID-19 complaints and taking all new inmates' temperature. *Id pg. 11 of 27*. Consistent with the guidelines, OCSO further segregates all new inmates for fourteen (14) days to

determine if they develop COVID-19 symptoms or later test positive. *Id pg. 15 of 27*; (Exhibit B ¶ 3). The OCSO also provides all inmates as well as new arrestees with a letter explaining the concerns and policies governing COVID-19 protections in the jail. (Exhibit H).

The CDC guidelines expressly recognize the impracticality of providing six (6) feet of spacing for *social distancing* in correctional facilities. The guidelines provide that this strategy [six (6) foot spacing] will have to "…be tailored to the individual space in the facility…" and "[n]ot all strategies will be feasible in all facilities…" Consequently, the six (6) foot spacing is only one of several strategies that may be considered for implementation. *Id pg. 12 of 27*. The OCSO has implemented several CDC strategies to reduce transmission by; limiting recreational activities, suspending group programs and reducing the number of inmates in group cells where room and classification permit. *Id;* (Exhibit B, ¶ 3).

Long before the subject litigation, the OCSO closed one pod to provide for overflow of newly arrested inmates to allow them fourteen (14) days quarantine, together with the separation of these new inmates into pairs of two. (Exhibit B, ¶ 3). Extraordinary efforts have been made to both reduce overall jail occupancy as well as reduce the number of inmates in group cells. Jail occupancy in joint cells has been

reduced by 56%. The remaining jail population consists of single and double cell occupancy. (Exhibit I).

The OCSO began its efforts to prevent and managed against the spread of COVID-19 in compliance with CDC recommendations and as a part of its own independent policies long before this litigation[4].

## MANAGEMENT

Consistent with CDC guidelines, the OCSO has been "medically isolate[ing]" all inmates diagnosed with COVID-19 [*Id pgs. 16 of 27*]*,* and "quarantine[ing]" all inmates with any symptoms of COVID-19 [*Id pgs. 20 of 27*] regardless of their status in the jail[5]. All medically isolated or quarantined inmates remain in their cohort until CDC related criteria have been met or they are eligible for release[6]. *Id pgs. 18 & of 27.* Simply put, OCSO has taken extraordinary efforts to comply with the available CDC guidelines at a time of national pandemic. As such, the Court's determination

---

[4]

In addition to the affidavits of Childs and Warren, attached as Exhibit M is the Affidavit of Sgt. Ryan Terry which sets forth the efforts to prevent COVID-19 transmission in the East Annex. The Court should be aware that the East Annex has not experienced a single positive case of COVID-19.

[5] The CDC recognizes that Correctional and Detention facilities often lack the physical ability to provide single cell locations for medical isolation and/or quarantine. Consequently, the CDC provides that confirmed COVID cases can be "medically isolated" as a "…cohort, in a large, well ventilated cell with solid walls but without a solid door. *Id pgs. 16 of 27.* Quarantined inmates can be maintained in as a "...cohort in a multi person cell without a solid wall or solid door…" *Id pgs. 21 of 27*

[6]

However, it is not feasible to obtain two (2) negative tests in 24 hours pursuant to guidelines because of the unavailability of test kits.

that Plaintiffs' have shown a strong likelihood of success contained a palpable defect and should be reversed.

> 2.    Plaintiff is Unable to Show an Unconstitutional Policy or Practice That Caused an Alleged Violation of Their Constitutional Rights

The Sixth Circuit set forth the elements of a claim for municipal liability under *Monell* in *Alkire v. Irving*, 330 F.3d 802 (6th Cir. 2003). To demonstrate municipal liability, Plaintiffs must (1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that their particular injury was incurred due to the execution of that policy. *Id.* at 815. The *Monell* standard is recognized as a "high standard." *Ruiz-Cortez v City of Chicago,* 931 F3d 592, 595 (7th Cir. 2019); *Snyder v Trepagnier*, 142 F3d 791, 796 (5th Cir.1998); *Knowlton v Richland County, Ohio*, 2017 WL 5649597 (N.D. Ohio, 2017). Plaintiffs have not identified any policy or custom of Oakland County that **caused** a violation of their constitutional rights and have not made any showing they are unable to satisfy the "high standard" of *Monell* claims.

As stated in *Thomas v. City of Chattanooga*, 398 F.3d 426, 432-433 (6th Cir. 2005):

> **The danger in appellants' argument is that they are attempting to infer a municipal-wide policy based solely on one instance of potential misconduct.** This argument, taken to its logical end, would result in the collapsing of the municipal liability standard into a simple

45

*respondeat superior* standard. This path to municipal liability has been forbidden by the Supreme Court. *Monell,* 436 U.S. at 694. (emphasis supplied).

Most recently, the Sixth Circuit has confirmed *Monell* claims require more than allegations regarding plaintiffs' specific incident. In *Stewart v City of Memphis*, 788 Fed Appx 341, 347-48 (6th Cir. 2019) the court held, "Arguing that one instance of potential misconduct is evidence of a clear and persistent pattern is a path to municipal liability [that] has been forbidden by the Supreme Court." *Id.* Courts have noted sole reliance on plaintiffs' own incident is improper as it does not provide the municipality with "notice" of the "alleged illegal activity." *Butts v City of Bowling Green*, 374 F Supp 2d 532, 539 (W.D. Kentucky 2005).

Plaintiffs' claim here is attempting to do exactly what well established precedent forbids. *Thomas, Stewart, supra*. Plaintiffs fail to identify any other circumstances to support the claim that there is a policy that results in a constitutional violation. Indeed, the only claim referenced in Plaintiffs' Complaint references the instant pandemic and the associated jail conditions related to the pandemic. There are no references nor allegations regarding past conditions of the jail. There are no references nor allegations regarding past unconstitutional conduct. As discussed above, it is not surprising Plaintiffs are unable to show a likelihood of success considering the novelty of the epidemic and similarly the epidemic as it applies to the

carceral setting. Regardless, Plaintiffs have not made a showing they are likely to succeed on the merits of their *Monell* claim and consequently there is no basis for a TRO. *Thomas, supra*.

## III. Claims against Bouchard and Childs Should Be Dismissed

The United States Supreme Court has noted an individual sued in his official capacity has no stake, as an individual, in the outcome of the litigation. *Bender v Williamsport Area Sch Dist*, 475 US 534, 543-544 (1986). Official capacity suits are deemed to be claims made against the governmental entity that employs the individual sued in his or her official capacity. *Kentucky v Graham,* 473 US 159, 165-68 (1985); *Barber v. City of Salem, Ohio*, 953 F.2d 232, 237 (6th Cir. 1992).

Plaintiffs' Petition/Complaint contains claims against Bouchard and Childs in their official capacity only. (R.1, ¶¶ 17, 18). Plaintiffs' Petition/Complaint also contains the same substantive claims against Oakland County. Because the official capacity claims are deemed to be claims against the governmental entity that employs Bouchard and Child (i.e. Oakland County), the official capacity claims are superfluous, duplicative and redundant of their claims against Oakland County. *Barber, supra.* Thus, the claims against Bouchard and Childs should be dismissed. *Id.*

## CONCLUSION

Defendants, prison officials, are entitled to great deference in the operation of prison facilities. Federal courts are instructed not to involve themselves with the administration of state prison facilities. Plaintiffs' habeas petition fails because Plaintiffs have failed to exhaust the required state remedies, satisfy the conditions of the PLRA and because habeas petitions are not available for Eighth and Fourteenth Amendment claims. Plaintiffs are not entitled to a TRO because there is no likelihood of success in regard to their substantive claim(s) against Oakland County. Numerous proactive measures were taken prior to an inmate testing positive for COVID-19 and well before the commencement of this action. These measures preclude any showing of deliberate indifference. Moreover, Plaintiffs are unable to show an unconstitutional policy caused or likely caused a constitutional violation due to the uniqueness of the COVID-19 epidemic combined with Plaintiffs' sole reliance on their own situation.

## RELIEF REQUESTED

WHEREFORE, Defendants respectfully request that this Honorable Court dismiss Plaintiffs' Habeas Petition, claims asserted against Bouchard and Childs, rescind its April 17, 2020, Opinion and Order granting Plaintiffs' Motion for Temporary Restraining Order and deny Plaintiffs' Motion for Temporary Restraining Order for the reasons set forth above.

Respectfully submitted,

POTTER DeAGOSTINO O'DEA & CLARK

s/ STEVEN M. POTTER (P33344)
s/ ROBERT C. CLARK (P76359)
Attorney for Defendants
2701 Cambridge Court, Suite 223
Auburn Hills, Michigan 48326
(248) 377-1700
Dated: April 23, 2020        spotter@potterlaw.com

### CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2020, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the attorneys of record, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: N/A.

/s/ STEVEN M. POTTER (P33344)
Attorney for Defendants
2701 Cambridge Court, Suite 223
Auburn Hills, Michigan 48326
(248) 377-1700
spotter@potterlaw.com