# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DISTRICT

JAMAAL CAMERON; RICHARD
BRIGGS; RAJ LEE; MICHAEL
CAMERON; MATTHEW
SAUNDERS, individually and on
behalf of all others similarly situated,

    Plaintiffs,

Case 2:20-cv-10949-LVP-MJH

v.

MICHAEL BOUCHARD, in his
official capacity as Sheriff of Oakland
County; CURTIS D. CHILDS, in his
official capacity as Commander of
Corrective Services; OAKLAND
COUNTY, MICHIGAN,

    Defendants.

---

## AFFIDAVIT OF CAPTAIN CURTIS CHILDS

Captain Curtis Childs, being first duly sworn, deposes and states:

1. That this Affidavit is made of my own personal knowledge and that if I am sworn to testify, I can give competent testimony of my own personal knowledge in support of each paragraph of this Affidavit regarding conditions at the main jail.

2. That I have been employed by the Oakland County Sheriff's Office ("OCSO") since January 22, 1992. At all times relevant to the instant action I have

1

worked as a Captain at the Oakland County Jail since August 24, 2013. Myself and Captain Molinar are the only direct reports to Major Charles Snarey who has overall responsibility for the jail.

3. With regard to social distancing, the CDC guidelines expressly recognize the impracticality of providing six (6) feet of spacing for *social distancing* in correctional facilities. And, recognizing the guidelines provide that the six (6) foot spacing strategy has to "…be tailored to the individual space in the facility…" the OCSO has implemented several CDC strategies to reduce COVID-19 transmission by;

   a. limiting recreational activities,

   b. contracted for outside catered meals in the housing units or cells,

   c. suspending group programs and

   d. reducing the number of inmates in group cells where room and classification permit.

   e. Continued and increased usage of UVI technology to supplement jail cleaning.

In addition, the OCSO closed one pod to provide for overflow of newly arrested inmates to allow them fourteen (14) days quarantine, together with the separation of these new inmates into pairs of two. Extraordinary efforts have been made to both reduce overall jail occupancy as well as reduce the

2

number of inmates in group cells. Jail occupancy in joint cells has been reduced by 56%. The remaining jail population consists of single and double cell occupancy.

4. With regard to quarantine procedures, if an inmate tests positive, that inmate is transferred into a pod designated for COVID-19 individuals. If an inmate has significant symptoms of COVID-19, that inmate is transferred from their cell and put into an area designated as symptomatic pod. All inmates who had contact with someone who tests positive or has significant symptoms of COVID-19 are then placed into quarantine for 14 days. All quarantined inmates and inmates who have tested positive have access to showers, mental health services, reading materials, phone and video calling, communications with counsel and personal property. All inmates have been provided with a face mask.

5. With regard to the issue of soap, the jail does not have liquid soap. Inmates in the main jail receiving area are allowed to shower three times a week and are given soap when they shower. Additionally, two bars of soap are also provided to inmates in receiving area two times per week. In the main jail, the inmates receive two bars of soap two times per week. In the Annex, inmates are allowed to shower daily and soap is provided when they shower. In addition, inmates in the Annex receive two bars of soap twice per week. Furthermore,

3

the desk deputy in each housing area has extra boxes of soap that is available upon request.

6. With regard to disinfectant, the jail uses a product called DMQ. The jail only dilutes this product pursuant to the manufacturer's instruction. The product is machine mixed at the jail. DMQ is available to all inmates when requested and no less than three times per day. It is provided to the inmates with food delivery. Inmates are provided sponges and rags in order to use the DMQ. When inmates are transferred between cells, the cells are always disinfected before use by the transferring inmates.

7. With regard to food preparation and food delivery, food preparation inmates are provided masks and gloves. Food delivery inmates are also provided masks and gloves. These requirements existed before COVID-19.

8. With regard to laundry exchange, all inmates are provided fresh, clean laundry once per week.

9. With regard to laundry services, inmates performing laundry services are provided with gloves and masks and multiple clothing changes per day if requested. COVID-19 laundry is separated from laundry not suspected of COVID-19 contamination.

10. With regard to inmate grievances, including COVID-19 grievances, all corrections officers are instructed to not retaliate against an inmate who wants

4

to write out a grievance. All correctional staff are instructed to pass out grievance forms multiple times per day.

11. With regard to sinks and toilets contained within cells, cleaning is performed by inmates with DMQ that is provided to them at a minimum of three times per day.

12. With regard to PPE for correctional staff, all correctional staff have been issued masks and gloves. Additionally, N95 masks and face shields have been issued to correctional staff who have contact with inmates who have tested positive for COVID-19.

13. With regard to common areas within the jail, all common areas are disinfected by custodial staff daily.

14. With regard to inmate deaths related to COVID-19, no inmates who have tested positive for COVID-19 have died while at the jail. Additionally, no inmates have had symptoms severe enough to require hospitalization.

15. With regard to allegations that the main jail and/or the holding tanks are used to coerce behavior modification or as punishment, all correctional staff are trained not to threaten any inmate to achieve behavior modification. Additionally, transferring an inmate to the main jail from the Annex or East Annex does not occur for the purpose of punishing the inmate.

16. With regard to trusty job change, if a trusty refuses to do a specific job, that trusty could be given an extra detail or given discipline and removed from the program. Trusty's cannot refuse to work, however, an inmate can request to be removed from the trusty program all together.

17. With regard to COVID-19 information, a COVID-19 information sheet is posted throughout the jail. COVID-19 information was posted throughout the jail as early as March 11, 2020.

18. With regard to hand sanitizer, it is not used in the jail because as recently as October 2019, inmates attempted to mix the hand sanitizer with other substances in an effort to create drinkable alcohol which resulted in several inmates becoming ill.

19. With regard to shower cleanliness, showers in main jail are in cells and are cleaned by the inmates. Showers in the Annex are cleaned by the trusties and are to be cleaned after each use by the inmates. The receiving showers are cleaned by trusties immediately after each use.

20. With regard to the holding cells, inmates in the holding cells are not in the same vicinity as the positive and symptomatic inmates who are housed in separate pods.

21. With regard to pest control, the jail contracts with a third-party vendor for pest control whose services are utilized on an as needed basis.

22. With regard to inmate grievances, no inmate is charged for filing a medical grievance.

23. With regard to medical co-pays, no inmate is charged with a medical co-pay with regard to COVID-19 related symptoms including testing.

24. With regard to jail staff, signs for jail staff are posted throughout the facility requiring the jail staff to wash their hands with soap and water as frequently as possible. The signs also instruct the jail staff on the proper method and manner to wash their hands.

25. The first inmate tested positive for COVID-19 on March 28, 2020.

26. Beginning in March, 2020, the OCSO engaged in an initiative for compassionate release for inmates who were incarcerated due to misdemeanor convictions and/or were potentially medically vulnerable.

27. As a result of the initiative for compassionate release, OCSO advised Oakland County judges of 166 inmates who were in custody as a result of non-violent misdemeanor charges or deemed potentially at risk for COVID-19 by medical personnel.

28. As a result of the initiative for compassionate release, including correspondence with Oakland County judges and/or court administrators, 101 inmates have been released by state court judges who sentenced same.

29. Every inmate is provided a clean towel and a wash cloth weekly.

30. The jail does not provide paper towels to inmates due to concerns with regard to plumbing issues associated with the towels being flushed down the toilet.

31. On March 17, 2020, the total inmate population at Oakland County Jail was 1,223.

32. OCSO has implemented new "pre-take screening" practices which include identifying new inmates with COVID-19 complaints (started on March 18, 2020) and taking all new inmates' temperatures (started on April 1, 2020).

I declare under penalty of perjury, under 28 U.S.C. § 1746, that the foregoing is true and correct.

Further, Affiant sayeth not.

Dated: April 23, 2020

/s/Captain Curtis Childs
CAPTAIN CURTIS CHILDS
*consent for signing given telephonically

Due to the COVID-19 crisis, it was not possible to obtain a written signature on the above Affidavit. I am an attorney admitted to the Eastern District of Michigan. On April 23, 2020, I personally spoke with Captain Curtis Childs and read this Affidavit to him. Captain Childs told me that the information in the above Affidavit is true, and gave me verbal consent to sign on his behalf.

I declare under penalty of perjury, under 28 U.S.C. § 1746, that the foregoing is true and correct.

/s/Steven M. Potter (P33344)
Steven M. Potter (P33344)
Attorney for Defendants