UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMAAL CAMERON; RICHARD BRIGGS;
RAJ LEE; MICHAEL CAMERON; MATTHEW
SAUNDERS, individually and on behalf of all
others similarly situated,

     Plaintiffs,

                v.

MICHAEL BOUCHARD, in his official capacity
as Sheriff of Oakland County; CURTIS D.
CHILDS, in his official capacity as Commander of
Corrective Services; OAKLAND COUNTY,
MICHIGAN,

     Defendants.

Case No. 20-cv-10949

Hon. Linda V. Parker

**PLAINTIFFS' COMBINED BRIEF IN RESPONSE TO DEFENDANTS'
MOTION TO DISMISS AND IN REPLY TO DEFENDANTS' RESPONSE
TO PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Index of Authorities .............................................................................iii

Introduction .........................................................................................1

BACKGROUND AND FACTS ............................................................3

I.    The COVID-19 Crisis Is a Health Crisis Unmatched
      in Living Memory.........................................................................3

II.   COVID-19 Presents a Particularly Serious Risk in
      Jail Environments. ......................................................................5

III.  The Dangerous Conditions at the Jail on April 17 .....................6

      A.    Detained People at the Jail Cannot Practice Social Distancing. ........7

      B.    Defendants Do Not Properly Screen or Quarantine
            Suspected Cases. .................................................................8

      C.    Defendants Do Not Provide Adequate or Timely Health Care..........10

      D.    Defendants Maintain Dangerous Conditions and Fail to
            Provide Basic Hygiene Supplies to the People
            Confined at the Jail..............................................................12

      E.    Defendants Fail to Provide Information About COVID-19..............14

      F.    People Are Punished by Being Exposed to COVID-19....................14

STANDARD OF REVIEW ...................................................................15

ARGUMENT .......................................................................................16

I.    THIS COURT HAS JURISDICTION TO REMOVE MEDICALLY
      VULNERABLE SUBCLASS MEMBERS FROM THE JAIL. .................16

      A.    This Court Has Jurisdiction to Entertain a Federal Habeas Petition
            Alleging Eighth and Fourteenth Amendment Violations. .................16

i

1.   Habeas Is Available When the Only Viable Remedy to a
     Constitutional Violation Is Removal from Detention.............16

2.   Habeas Can Be Granted in a Way That Protects the Public....22

3.   Petitioners Are Not Required to Exhaust Their Claims ..........25

     a.  State-Level Habeas Relief Is Unavailable to Plaintiffs ......25

     b.  Even If State Remedies Were Available, the Exhaustion
         Requirement Should Be Waived in Light of the Unique
         Threat Posed by Covid-19. ...........................................28

B.   Alternatively, Removals from Jail Are Authorized Under § 1983. ...30

II.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS
     OF THEIR EIGHTH AND FOURTEENTH AMENDMENT CLAIMS....36

A. Plaintiffs Have Made a Strong Showing of Defendants' Deliberate
   Indifference to the Grave Risk of Harm Posed by COVID-19. .............36

     1.   COVID-19 Presents an Objectively Unreasonable Risk. ........39

     2.   Defendants Are Subjectively Aware of the Risks ..................40

B. Defendants' Deliberate Indifference Is Attributable to Oakland County
   Under Monell.........................................................................46

Conclusion ..............................................................................49

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Adams v. Bradshaw*, 644 F.3d 481, 483 (6th Cir. 2011) ........................17

*Armstrong v. Cardwell*, 457 F.2d 34, 36 (6th Cir. 1972) ......................16

*Avendano Hernandez v. Decker*, 2020 WL 1547459 (S.D.N.Y. Mar. 31, 2020)....19

*Basank v. Decker*, __ F. Supp. 3d __, No. 20-cv-2518, 2020 WL 1481503
    (S.D.N.Y. Mar. 26, 2020)..................................................19

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)....................15

*Braden v. 30th Judicial Circuit Court of Ky.*, 410 U.S. 484, 498 (1973)................17

*Brown v. Plata*, 563 U.S. 493, 510 (2011).................................................30

*Burton v. McGlasson*, No. 14-CV-10693, 2014 WL 700503 (E.D. Mich. Feb. 24,
    2014) ........................................................................20

*Calderon Jimenez v. Wolf*, No. 18-cv-10225 (D. Mass. Mar. 26, 2020)................19

*Chambers v. Bouchard*, No. 20-cv-10949 (E.D. Mich. Apr. 20, 2020) ..................21

*Christian v. Wellington*, 739 F.3d 294, 297 (6th Cir. 2014)....................18

*City of Oklahoma v. Tuttle*, 471 U.S. 808, 823-24 (1985).......................49

*Coronel v. Decker*, __ F. Supp. 3d __, No. 20-cv-2472, 2020 WL 1487274
    (S.D.N.Y. Mar. 27, 2020) ...................................................19

*Davis v. Zych*, No. 9-11459, 2009 WL 1212489 (E.D. Mich. May 4, 2009) ..........20

*DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 199–200
    (1989)........................................................................47

*Dow Corning Corp.*, 199 B.R. 896, 899 (E.D. Mich. 1996 (quoting *Gomez v.
    United States*, 490 U.S. 858, 864 (1989)....................................34

*Duvall v. Dallas Cty., Tex.*, 631 F.3d 203 (5th Cir. 2011)......................47

*Estelle v . Gamble*, 429 U.S. 97, 104 (1976) ..................................37

*Farmer v. Brennan*, 511 U.S. 825, 828 (1994).................................36

*Flanory v. Bonn*, 604 F.3d 249, 255 (6th Cir. 2010) ..........................37

*Fraihat v. Wolf*, No. 20-cv-590 (C.D. Cal. Mar. 31, 2020) .....................19

*Francisco Hernandez v. Wolf*, No. 20-cv-617 (C.D. Cal. Apr. 1, 2020)................19

*Gilmore v. California*, 220 F.3d 987, 998 n.12 (9th Cir. 2000) .................33

*Glaus v. Anderson*, 408 F.3d 382, 384 (7th Cir. 2005).........................20

*Granberry v. Greer*, 481 U.S. 129, 134 (1987) ...............................28

*Gregory v. Shelby Cty.*, 220 F.3d 433, 442 (6th Cir. 2000).....................48

*Hadix v. Johnson*, 367 F.3d 513, 526 (6th Cir. 2004) .........................42

*Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 538 (6th Cir. 2012) ..........15

*Helling v. McKinney*, 509 U.S. 25, 28, 35 (1993) .............................37

*In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)...........16

*Irick v. Bell*, 565 F.3d 315, 323 (6th Cir. 2009) ......................................27

*Jackson v. Johnson*, 475 F.3d 261, 265-66 (5th Cir. 2007)....................35

*Jovel v. Decker*, No. 12-cv-308, 2020 WL 1467397 (S.D.N.Y. Mar. 26, 2020).....19

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015) .....................................38

*Malam v. Adducci*, __ F. Supp. 3d __, 2020 WL 1672662 (E.D. Mich. Apr. 5, 2020) ......................................................................................18

*Martin v. Zych*, No. 09-10423, 2009 WL 398166 (E.D. Mich. Feb. 17, 2009).......20

*Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) ..............46

*Money v. Pritzker*, __ F. Supp. 3d __, 2020 WL 1820660 (Apr. 10, 2020)............27

*Montez v. McKinna*, 208 F.3d 862, 865 (10th Cir. 2000).......................17

*Moses v. Dep't of Corrs.*, 736 N.W.2d 269, 273 (Mich. Ct. App. 2007) ...............26

*Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008)................16

*People v. McSwain*, 676 N.W.2d 236, 248 (Mich. Ct. App. 2003) .........................27

*People v. Stauffer*, 640 N.W.2d 869, 870 n.7 (Mich. 2002).............................36

*Peterson v. Diaz*, No. 19-01480, 2020 WL 1640008 (E.D. Cal. Apr. 2, 2020) ......21

*Phillips v. Warden*, 396 N.W.2d 482, 486 (Mich. Ct. App. 1986)........................26

*Plata v. Brown*, __ F. Supp. 3d __, 2013 WL 12436093, at *8 (N.D. Cal. June 24, 2013) ......................................................................................35

*Preiser v. Rodriguez*, 411 U.S. 475, 498 (1973)........................................18

*Puertas v. Overton*, 272 F. Supp. 2d 621, 626 (E.D. Mich. 2003) .........................28

*Rafael L.O. v. Tsoukaris*, No. 20-cv-3481, 2020 WL 1808843 (D.N.J. Apr. 9, 2020) ......................................................................................19

*Reaves v. Dep't of Corr.*, 404 F. Supp. 3d 520, 523 (D. Mass. 2019)....................33

*Richmond v. Huq*, 885 F.3d 928, 938 n.3 (6th Cir. 2018) ...................................38

*Rockwell v. Yukins*, 217 F.3d 421, 423–24 (6th Cir. 2000) ...............................29

*Sasser v. Hobbs*, 735 F.3d 833, 844 (8th Cir. 2013)........................................34

*Savino v. Souza*, __ F. Supp. 3d __, No. 20-10617-WGY, 2020 WL 1703844, at *8–9 (Apr. 8, 2020) ................................................................24

*Savino v. Souza*, No. 20-10617-WGY, Doc. No. 44, at 3 (Apr. 4, 2020)...............25

*see Fofana v. Albence*, __ F. Supp. 3d __, 2020 WL 1873307 (E.D. Mich. April 15, 2020) ......................................................................................19

*See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) .........................16

*Talal v. White*, 403 F.3d 423, 427 (6th Cir. 2005).........................................37

*Thakker v. Doll*, __ F. Supp. __, 2020 WL 1671563, at *9 (M.D. Pa. Mar. 31, 2020)...............................................................................1, 19

*Triplett v. Deputy Warden*, 371 N.W.2d 862, 780 (Mich. Ct. App. 1985)..............26

*Turner v. Bagley*, 401 F.3d 718, 724 (6th Cir. 2005) ......................................25

*United States v. $11,500 in United States Currency*, 869 F.3d 1062, 1071 (9th Cir. 2017) ......................................................................................34

*United States v. Jalili*, 925 F.2d 889, 893–94 (6th Cir. 1991)................................17

*United States v. Peterman*, 249 F.3d 458, 461 (6th Cir. 2001) ..............................17

*Villegas v. Metro. Govt. of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013) .............38

*Washington v. Elo*, No. 99-CV-71187, 2000 WL 356353, at *4 (E.D. Mich. Feb. 29, 2000) .............................................................................................................26

*Wilson v. Williams*, __ F. Supp. 3d __, 2020 WL 1940882 (N.D. Ohio Apr. 22, 2020) ...................................................................................................................19

*Witzke v. Femal*, 376 F.3d 744, 752 (7th Cir. 2004)..............................................36

**Statutes**

18 U.S.C. § 3626 ............................................................................................ 31, 32

28 U.S.C. § 2241 ...............................................................................................2, 17

28 U.S.C. § 2254(b)(1)(B)(i) ...................................................................................25

28 U.S.C. §§ 2241, 2254 .........................................................................................25

42 U.S.C. § 1983 .................................................................................... 2, 16, 30, 46

**Other Authorities**

Mich. Comp. Laws § 600.4310(3) ..........................................................................26

Mich. Ct. R. 3.303(a) ..............................................................................................25

## INTRODUCTION

As COVID-19 ravages jails and prisons throughout the country where medically vulnerable people are confined to spaces in which social distancing is impossible, Oakland County officials proclaim that they are "entitled to great deference in the operation of prison facilities." Def. Br. at 48. But this Court should follow the lead of so many others that have refused to stand idly by in the face of grave danger to vulnerable populations, as in *Thakker v. Doll*, __ F. Supp. __, 2020 WL 1671563, at *9 (M.D. Pa. Mar. 31, 2020):

> Our world has been altered with lightning speed, and the results are both unprecedented and ghastly. We now face a global pandemic in which the actions of each individual can have a drastic impact on an entire community. The choices we now make must reflect this new reality. . . .

> Our Constitution and laws apply equally to the most vulnerable among us, particularly when matters of public health are at issue. This is true even for those who have lost a measure of their freedom. If we are to remain the civilized society we hold ourselves out to be, it would be heartless and inhumane not to recognize [their] plight. And so we will act.

In Defendants' combined motion to dismiss and response to Plaintiffs' motion for a preliminary injunction,[1] they argue that (a) this Court is literally powerless to

---

[1] Defendants mislabel the "response" portion of their filing as a "response to motion for temporary restraining order." This Court has already granted a TRO and has denied in large part Defendant's motion to reconsider. Thus, the relevant motion before the Court is Plaintiffs' motion for a preliminary injunction, so this Court should construe Defendant's filing as a response to that motion.

order the removal of medically vulnerable individuals from the Oakland County Jail even though they face a high risk of death or serious harm should they contract a deadly virus that is already spreading through the facility, and (b) this Court should deny preliminary injunctive relief despite overwhelming evidence that the Jail environment is perilous for everyone confined there.

The Court should reject both those positions. Plaintiffs can seek habeas relief under 28 U.S.C. § 2241 or removal to another location under 42 U.S.C. § 1983 on behalf of the Medically Vulnerable Subclass because removal from the Jail is the only remedy that would safeguard their constitutional rights—and lives. Therefore, Defendants' motion to dismiss Counts III and IV of Plaintiffs' petition and complaint should be denied. Additionally, Plaintiffs are entitled to both forms of preliminary injunctive relief sought in their motion because they are likely to prevail on their claims and the equities weigh in their favor. On Counts I and II, the Court should convert its TRO into a preliminary injunction and grant further relief requested in Plaintiffs' motion regarding the unsafe policies and practices endangering the health and lives of all people confined in the Jail. And on Counts III and IV, the Court should order the Medically Vulnerable Subclass removed or released from the Jail without delay, as they face a high risk of death or serious harm that cannot be alleviated by the Count I and II relief sought for the class as a whole. Should an

evidentiary hearing be required to resolve any material disputes of fact, Plaintiffs request that one be scheduled at the earliest possible opportunity.

BACKGROUND AND FACTS

## I.     The COVID-19 Crisis Is a Health Crisis Unmatched in Living Memory.

As this Court knows, we are in the midst of an unprecedented public health crisis, *see* Compl. ¶ 19 (citing sources), and southeastern Michigan is an epicenter.[2] Things have only gotten worse in the ten days since Plaintiffs filed this suit: nationally, the number of people diagnosed with COVID-19 has increased by over 50%, and the number of confirmed deaths has more than doubled from 24,000 to over 52,000.[3] In Michigan there are over 37,000 cases and 3,300 deaths confirmed, approximately one-sixth of which are in Oakland County.[4] Plaintiffs' Complaint recounts in detail the scope of the national disaster; the extraordinary governmental emergency responses; and the horrific nature of COVID-19, which has been

---

[2] *See* Melissa Nann Burke, *Michigan COVID-19 Deaths at 2,700 as Cases Rise to Nearly 33,000*, Detroit News (Apr. 21, 2020), https://www.detroitnews.com/story/news/local/michigan/2020/04/21/michigan-deaths-2700-cases-rise-nearly-33000/2997405001/.

[3] *Compare* TRO Br. at 5, *with* Coronavirus 2019, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Apr. 26, 2020).

[4] Coronavirus Michigan Data, Michigan.gov, https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173---,00.html (last visited Apr. 26, 2020).

compared to "drowning in your own blood." They will not belabor these points further here.

What is critical for purposes of the instant motions is the highly contagious nature of COVID-19 and the particularly grim toll it has on medically vulnerable individuals. The coronavirus is highly contagious and "very efficient" at passing from person to person through respiratory droplets that can survive on inanimate surfaces that people touch. Compl. Ex. 14 ¶ 21 ("Lauring Decl."). Although anyone can die or suffer serious organ damage from the virus, among medically vulnerable people the risk of a "poor outcome" such as death or the need for "mechanical intervention" (such as a ventilator) is over 20%. *Id.* ¶ 22. Indeed, 74% of all cases requiring hospitalization involve individuals over the age of 50. *Id.*; *see* Compl. ¶ 23. Between 1% and 4% of all infected people die, a rate about ten times higher than a severe seasonal influenza. *Id.* ¶ 22. Predictably, "serious illness and death are most common among people with underlying chronic health conditions." *Id.*

The only known effective measure to mitigate the risk is to prevent infection in the first instance. Compl. ¶ 29. Accordingly, medical experts, officials, and the CDC urge "social distancing"—isolating oneself from other people at a minimum distance of six feet—as well as frequent hand-washing, use of hand sanitizer, and frequent cleaning *and* disinfecting of high-touch surfaces and objects. *Id.* ¶ 30.

## II.     COVID-19 Presents a Particularly Serious Risk in Jail Environments.

Jails are congregate settings in which "infectious diseases that are transmitted via the air or touch, as does COVID-19[,] are more likely to spread." Compl. Ex. 1 ¶ 7 ("Stern Decl."). As a result, a jail outbreak can rapidly become a "public health disaster unfolding before our eyes." Lauring Decl. ¶ 10. This is due to several factors, including forced proximity of detained individuals/inability to socially distance, lack of medical and hygiene supplies, reliance on hospitals for serious medical care, forced labor of incarcerated people in cleaning their own facilities with insufficient supplies, constant cycling of people through the jails, and inadequate medical care within the jail itself. Compl. ¶ 32; Lauring Decl. ¶¶ 12-16. Indeed, it is "nearly impossible for jails and prisons to provide the atmosphere of 'shelter in place' or 'stay at home' social distancing given the number of individuals that work in and are housed in these facilities in the current system." Lauring Decl. ¶ 24.

The Centers for Disease Control's ("CDC's") guidance for detention facilities recognizes that social distancing is the "cornerstone" of outbreak prevention. Compl. Ex. 6 at 4. Moreover, to the extent the guidance imply that social distancing of less than 6 feet can ever be used, is "incorporate[s] a 'harm reduction' approach" that "recognizes that though there is an appropriate and safe way to address a public health problem, people do not always do things in that way." Stern Decl. ¶ 9. Thus, the guidance "does not mean that it is safe to have less than six feet of social distance

in a jail, and in fact a carceral setting that does not allow for such social distancing is not a safe one and is likely to facilitate the spread of COVID-19." *Id.*

Outbreaks around the country, which predated the current outbreak at the Oakland County Jail, demonstrated as much for the world to see. In New York City's Riker's Island Jail, for example, the first case was detected on March 18 and a week later there were 75 cases, representing an infection rate seven times higher than New York City; the carnage has only increased with a current infection rate of 9.29%, two dead jail officers and more than 800 incarcerated people were in quarantine. Compl. ¶ 40 (and sources cited therein).

Nor can an outbreak be contained inside the Jail. What happens to the people in jails affects others who cycle through, including correctional and medical staff. Stern Decl. ¶ 11. Jail outbreaks spread to staff's families and the community, and can quickly overwhelm regional hospitals, making resources unavailable to treat others suffering from COVID-19 or life-threatening conditions like heart attacks. Compl. ¶ 40; Stern Decl. ¶ 11. That risk is particularly grave in southeastern Michigan where jails and hospitals are already at a breaking point. Lauring Decl. ¶¶ 17, 23, 32; Compl. ¶ 61 (and sources cited therein).

## III.  The Dangerous Conditions at the Jail on April 17

The facts pled and declarations submitted by Plaintiffs paint a mutually corroborating portrait of the Jail when this lawsuit was filed. They "highlight a

number of conditions or practices that are inconsistent with current public health recommendations: crowded conditions which do not allow safe distancing; unsafe practices for isolating residents with suspected COVID-19; inadequate disinfection of frequently touched common surfaces, inadequate provision of supplies for disinfecting surfaces; inadequate provision of hand soap, and inadequate access to episodic care (barriers to requesting care and insufficient evaluation when care is accessed)." Stern Decl. ¶15. Indeed, the conditions show that "[t]he Oakland County Jail is not only obviously under-equipped and ill-prepared to prevent and manage a COVID-19 outbreak . . . but in some cases . . . it is intentionally exposing inmates to COVID-19 as retribution for raising concerns about safety." Lauring Decl. ¶ 27. These conditions are described point by point in the sections that follow.

## A. Detained People at the Jail Cannot Practice Social Distancing.

Social distancing is impossible at the Jail. Some people have to sleep a foot apart. TRO Ex. G ("Saunders Decl.") ¶ 2. In the holding cell, often referred to as "the tank," inmates sleep on the concrete floor, close enough together to be nearly "cuddl[ing]." TRO Ex. B ("J. Cameron Decl.") ¶ 9; TRO Ex. D ("Lee Decl.") ¶19. In many other cells, bunks are separated by about three feet. Ex. E ("M. Cameron Decl.") ¶ 6; Ex. F ("Kucharski Decl.") ¶ 3; Ex. H ("Arsineau Decl.") ¶ 2; Ex. C ("Briggs Decl.") ¶ 2. Inmates share showers, toilets, and sinks either on a section-

wide basis or sometimes with the others in their cell. *E.g.*, J. Cameron Decl. ¶¶ 17–18 (Annex)[5]; Briggs Decl. ¶¶ 3–5. Some bunks adjoin toilets. Briggs Decl. ¶ 9.

When people are allowed to leave their cells or are in common space, they are often within one or two feet of other detainees and staff. Arsineau Decl. ¶ 3; Briggs Decl. ¶ 2; Bates Decl. ¶ 9; J. Cameron Decl. ¶ 16; Lee Decl. ¶ 2; Kucharski Decl. ¶ 13. People detained in the tanks can reach through the bars in front of their cell and into the next cell, where quarantined people are housed in similarly dungeon-like circumstances. Lee Decl. ¶ 21; J. Cameron Decl. ¶ 9.

Because of this "layout and crowded environment," the Jail "is not following basic CDC protection and prevention" measures, making it "impossible to prevent the risk or spread of infection." Lauring Decl. ¶ 28.

### B. Defendants Do Not Properly Screen or Quarantine Suspected Cases.

Incarcerated people are moved between cells with disregard for the health consequences. In the tanks, a cell under quarantine was emptied, and healthy people were moved into it without it having been cleaned. Lee Decl. ¶ 23. Hair was still on the floor, and the toilet had not been cleaned. Lee Decl. ¶ 23. And an individual who was moved out his cell because he had a high temperature was sent back into his cell

---

[5] The Jail is composed of three sections, the main jail building, where the COVID-19 outbreak has been concentrated, and two annex buildings which have not yet experienced a (known) widespread outbreak. *See* J. Cameron Decl. ¶ 3.

to retrieve his own belongings, further exposing his cellmates. M. Cameron Decl. ¶ 12. On April 11, 2020, someone in a quarantine cell died. Lee Decl. ¶ 24. Two of his cellmates were then moved to a cell with healthy prisoners. *Id*. Matthew Saunders contracted the virus after being forced to clean a van, which transported a suspected COVID-19 patient, without proper protective equipment. Saunders Decl. ¶¶ 3-6.

Two Plaintiffs were moved from the Annex (where there is not a known outbreak) to the tanks in the main jail (where there is) as punishment for not doing trustee tasks would have put them at risk of infection. J. Cameron Decl. ¶¶ 8–10; Lee ¶¶ 9–17. Their experiences are not anomalies; signs posted in the Jail warn of such consequences for others. Bates Decl. ¶ 12; *see* M. Cameron Decl. ¶ 12.

Defendants are not properly monitoring for COVID-19. Jason Arsineau, who is a paramedic, watched officers incorrectly taking people's temperatures by testing right after meals and by contaminating the thermometer without cleaning it. Arsineau Decl. ¶ 6; *see* Lee Decl. ¶ 5 (guards don't look at thermometer reading). Michael Bates was in direct contact with a COVID-19 patient; his area was locked down but no one explained why or the risks. Bates Decl. ¶¶ 4–6.

Symptomatic people often are not tested or properly isolated. Inmates who work as kitchen trustees[6] have been required to prepare and serve communal food,

---

[6] Trustees are detained people who are tasked with responsibilities like food service, laundry, and cleaning.  Saunders Decl. ¶ 6; Arsineau Decl. ¶ 5.

despite exhibiting symptoms of COVID-19, risking spread to everyone who received food from them. Arsineau Decl. ¶ 5. When Arsineau had most of the symptoms of COVID-19 and told a deputy he was feeling sick and asked to be assigned a new trustee duty, the deputy responded, "motherfucker, you do what I tell you to do, and you are going to serve food." *Id*. Arsineau continued to serve food to others while sick for four days until he could not get out of bed, leading a deputy to physically assault him. *Id*. Richard Briggs was also not tested despite having numerous symptoms of COVID-19; when he reported shortness of breath to a nurse the nurse said "if you are short of breath, how can you be here talking to me?" Briggs. Decl. ¶ 8. He never received treatment and spread his illness to bunkmates. *Id.* ¶¶ 8–9. David Kucharski had a similar experience. Kucharski Decl. ¶ 10. People are sniffling and coughing in the same cells as asymptomatic people, and the Jail has not tested them. Lee Decl. ¶ 20; M. Cameron Decl. ¶ 6.

This "[f]ailure to adequately test for infection results in dramatic undercounting of persons infected, and, in turn, makes it impossible to protect against an outbreak." Lauring Decl. ¶ 33; *see also id.* ¶ 34.

### C. Defendants Do Not Provide Adequate or Timely Health Care.

In addition to the failures to diagnose and quarantine COVID-19 cases, medical care is not provided in a timely manner. One of Kucharski's cellmates requested medical treatment for COVID-like symptoms on March 31. A nurse did

not come until April 3. Kucharski Decl. ¶ 5. The day after that, a nurse gave everyone in his cell some Tamiflu, with instructions to take it if they had COVID-19 symptoms. *Id*. ¶ 8. The nurses had not been back as of April 10. *Id.*. A guard told Kucharski he could not help get a nurse to the cell. *Id.* ¶ 10. This experience is widespread. Saunders Decl. ¶¶ 8–10 (same). And in the Annex, people who take prescription drugs were dispensed a thirty-day supply and told that nurses and doctors would not be coming back. J. Cameron Decl. ¶ 16; Lee Decl. ¶ 4.

Nor is medical care sufficient when COVID-19 patients *are* identified. Saunders was quarantined for suspected COVID-19 with a temperature of 103. Saunders Dec. ¶ 3. He was placed in a single cell where no one checked on him for hours at a time. *Id.* ¶ 4. His food was left outside, and when he was too weak to retrieve it, it was simply taken away. *Id.* Four days later, he was returned to his cell with other incarcerated people. *Id.* ¶ 5. And in Arsineau's cell, where several people were sick, nighttime temperatures dropped into the 50s, threatening already depleted immune systems. Arsineau Decl. ¶ 8; *see* Kucharski Decl. ¶ 20.

Based on these conditions, "it is apparent that the Jail is not providing adequate medical treatment to infected inmates. This is also worrisome because it will surely cause unnecessary risk of severe illness or death." Lauring Decl. ¶ 32.

**D. Defendants Maintain Dangerous Conditions and Fail to Provide Basic Hygiene Supplies to the People Confined at the Jail.**

Many people in the Jail do not have enough soap or, in the Annex, have to rely on a shared soap supply. Briggs Decl. ¶ 6; Saunders Decl. ¶ 11; Kucharski Decl. ¶ 15; J. Cameron Decl. ¶ 19; M. Cameron Decl. ¶ 4; Lee Decl. ¶ 19. The high lye content of the soap that is provided irritates the skin, forcing people "to choose between staying clean or suffering serious skin reactions." Briggs Decl. ¶ 6. Several have not received soap in over a week. Kucharski Decl. ¶15; Saunders Decl. ¶11.

The commissary, which is the only source of most hygiene products like deodorant, non-abrasive soap, and shampoo, has been closed for at least three weeks, so there is no way to purchase basic supplies. M. Cameron Decl. ¶ 4; Arsineau Decl. ¶ 11 (unable to get any toothpaste for days as a result). No one in the Jail has access to hand sanitizer or tissues. Arsineau Decl. ¶ 13–14. Toilet paper supplies are inadequate and sometimes shared, Lee Decl. ¶ 19; J. Cameron Decl. ¶ 18, which risks spreading fecal matter germs to each person who touches the roll. There are no paper towels, and no sanitary way for people to dry their hands after they have been washed. J. Cameron Decl. ¶ 20.

Most people get a change of uniform and linens once a week. Kucharski Decl. ¶ 19. Some cells have a dirty communal bucket that is never replaced in which to wash their clothes and underwear during the week. Briggs Decl. ¶ 3. Recently, laundry service stopped entirely for over two weeks. Briggs Decl. ¶ 15.

Although there is access to showers, they are filthy with scum, mold, clumps of hair, and insects. J. Cameron Decl. ¶ 17; Briggs Decl. ¶ 5; Arsineau Decl. ¶ 4. There is no adequate way to clean showers, toilets, and shared spaces. Kucharski Decl. ¶ 17. In some areas of the Jail, bottles of diluted DMQ (a floor cleaner) is available, but people are not given sufficient clean sponges or rags to clean and disinfect their cell. *Id.*; Arsineau Decl. ¶¶ 4, 9; M. Cameron ¶ 7.

Common surfaces and items that are touched frequently are not cleaned regularly. M. Cameron Decl. ¶ 8. There are no rags or cleaning supplies to clean shared surfaces. Briggs Decl. ¶ 4. The rails on the staircase are cleaned every other day and a shared water cooler is not sanitized between uses. M. Cameron Decl. ¶ 8.

Trustees tasked with cleaning receive one pair of gloves that they must reuse. M. Cameron Decl. ¶ 7. As noted above, Saunders was made to clean a van that transported an inmate with suspected COVID-19 with only a cloth face mask as protection. Saunders Decl. ¶ 6. Kitchen trustees must handle carts and plastic trays that ungloved jail workers touch. J. Cameron Decl. ¶ 4. And some food trustees have only been given a pair of gloves and no mask when distributing food. J. Cameron Decl. ¶¶ 4–7. Laundry trustees are afraid to work with some of the laundry, which comes in biohazard bags. Bates Decl. ¶¶ 11–12; M. Cameron Decl. ¶ 12. Several laundry trustees quit because they felt the job was unsafe. J. Cameron Decl. ¶ 25.

Taken as a whole, these hygienic practices "deprive[] individuals of the most important CDC-recommended measures to protect themselves from infection," Lauring Decl. ¶29, and "demonstrate[] the Jail's failure to take the most fundamental precautions for preventing the spread of the disease[.]" *Id.* ¶ 30.

**E.  Defendants Fail to Provide Information About COVID-19.**

Jail guards studiously refuse to provide information about the outbreak to incarcerated people, leaving them to guess what is happening and rely on relatives or news broadcasts to learn about the outbreak. Bates Decl. ¶¶ 5–6, 8, 10; M. Cameron Decl. ¶ 4; Briggs Decl. ¶ 7; M. Cameron Decl. ¶¶ 4–5. And there has been a lack of signage about coronavirus. J. Cameron Decl. ¶ 10; Bates Decl. ¶ 10. However, the guards are aware of its spread and use it as a threat to terrorize inmates.

**F.  People Are Punished by Being Exposed to COVID-19.**

The Jail has a policy of punishing incarcerated people, including the medically vulnerable, for health and safety advocacy and for other infractions by exposing them to a heightened risk of COVID-19. It is well known in the Jail that the COVID-19 outbreak is in the main building, and Jail officials routinely transfer or threaten to transfer people in the Annex to the main building as a punishment for perceived or actual infractions. As noted earlier, two named Plaintiffs were shipped off to the tanks and placed in a crowded cell directly adjoining a quarantine cell after declining to do trustee tasks that they considered a threat to their health. J. Cameron Decl. ¶¶

8–9; Lee Decl. ¶¶ 9–17. Briggs was threatened with being moved to the tank for requesting a grievance to protest the lack of medical care he was receiving while suffering COVID-like symptoms. Briggs Decl. ¶ 8. And the laundry room in the Annex has a sign telling people they will be relocated to the main building if they refuse to work processing dirty linens from the contaminated main building. Bates Decl. ¶ 12. These threats are widespread. *See* M. Cameron ¶ 12; J. Cameron ¶ 10.

## STANDARD OF REVIEW

In ruling on a motion to dismiss, a court "construe[s] the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 538 (6th Cir. 2012) (citation omitted). A motion to dismiss must be denied if plaintiffs allege "facts that 'state a claim to relief that is plausible on its face' and that, if accepted as true, are sufficient to 'raise a right to relief above the speculative level.'" *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).

The legal requirements for the Court to grant a temporary restraining order and preliminary injunction are different. To determine whether to grant a preliminary injunction or temporary restraining order, a district court must consider: (i) whether the movant has a strong likelihood of success on the merits; (ii) whether the movant would suffer irreparable injury without the injunction; (iii) whether the balance of equities weighs in the movant's favor; and (iv) whether an injunction is in the public

interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008). Where, as here, plaintiffs demonstrate "irreparable harm which decidedly outweighs any potential harm to the defendant," the "degree of likelihood of success required" is less, and a plaintiff need only show "serious questions going to the merits." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985) (citation omitted).

## ARGUMENT

### III. THIS COURT HAS JURISDICTION TO REMOVE MEDICALLY VULNERABLE SUBCLASS MEMBERS FROM THE JAIL.

For the Medically Vulnerable Subclass, every day in the Jail poses an grave—and unmitigable—risk of contracting COVID-19 and suffering illness, organ damage, or death. Because social distancing is impossible in the Jail, removal from the facility is the only cure for the constitutional violations to which subclass members are being subjected. This Court has authority to order their removal from the Jail both under habeas jurisdiction and under 42 U.S.C. § 1983.

#### C. This Court Has Jurisdiction to Entertain a Federal Habeas Petition Alleging Eighth and Fourteenth Amendment Violations.

##### 1. Habeas Is Available When the Only Viable Remedy to a Constitutional Violation Is Removal from Detention.

It has long been true that federal "habeas lies in 'exceptional circumstances'—*as when the petitioner's claims suggest that he has been victim of cruel and unusual punishment.*" *Armstrong v. Cardwell*, 457 F.2d 34, 36 (6th Cir. 1972) (emphasis

added). And it remains the law today that "an attack upon *the execution* of a sentence," which is to say "the manner in which the sentence [i]s being executed"—as opposed to an attack on the validity of the sentence itself—"is properly cognizable in a 28 U.S.C. § 2241(a) habeas petition."[7] *United States v. Jalili*, 925 F.2d 889, 893–94 (6th Cir. 1991); *see United States v. Peterman*, 249 F.3d 458, 461 (6th Cir. 2001) (same). Indeed, the Sixth Circuit has specifically held that courts have jurisdiction to consider some habeas petitions that allege Eighth Amendment claims. *See Adams v. Bradshaw*, 644 F.3d 481, 483 (6th Cir. 2011) (recognizing that habeas was the proper mechanism to bring an Eighth Amendment challenge that would render petitioner's death sentence "effectively invalid"). Similarly, an individual in pretrial detention who challenges their confinement does so under 28 U.S.C. § 2241,

---

[7] Because Petitioners do not challenge the validity of their underlying conviction or sentence but instead seek relief on the grounds that their confinement has become unconstitutional due to the Jail's inability to protect them from the risk of a fatal pandemic, § 2241 is the proper vehicle for their habeas petition. The Supreme Court has already held that habeas petitions filed by state prisoners are sometimes properly categorized as § 2241 petitions. *See Braden v. 30th Judicial Circuit Court of Ky.*, 410 U.S. 484, 498 (1973) (holding that § 2241 permits state prisoners who are "in custody under one sentence to attack a sentence which they had not yet begun to serve"). As the Tenth Circuit has noted, a "challenge to the validity of [petitioner's] conviction and sentence" should "properly be brought under § 2254" but "an attack on the execution of his sentence" should be "pursuant to § 2241." *Montez v. McKinna*, 208 F.3d 862, 865 (10th Cir. 2000) (holding that a state prisoner's challenge to his interstate prison transfers arose under § 2241). In any event, even if Petitioners' claim is characterized as a claim under § 2254, this Court would still have jurisdiction for the reasons explained in this section.

regardless of the legal basis for their claim. *See Christian v. Wellington*, 739 F.3d 294, 297 (6th Cir. 2014).

That is so because the "heart of habeas corpus" is a claim "challenging the fact or duration of [a petitioner's] physical confinement." *Preiser v. Rodriguez*, 411 U.S. 475, 498 (1973). Thus, when a petitioner alleges an Eighth or Fourteenth Amendment claim for which the *only* adequate remedy is immediate removal from detention, habeas jurisdiction lies. Plaintiffs in the Medically Vulnerable Subclass do exactly that: they challenge the "very fact" of their detention during the pandemic because Defendants cannot make the Jail safe enough to avoid exposing them to an unreasonable risk to their lives and bodily integrity. Thus, immediate release is the appropriate remedy, and habeas is the appropriate vehicle.

Federal courts in this district that have considered this issue in the context of COVID-19 agree. In *Malam v. Adducci*, __ F. Supp. 3d __, 2020 WL 1672662 (E.D. Mich. Apr. 5, 2020), Judge Levy held that habeas jurisdiction is proper and released medically vulnerable ICE detainees held in a Michigan jail. As *Malam* explained, "Supreme Court and Sixth Circuit precedent support the conclusion that where a petitioner claims no set of [achievable] conditions would be sufficient to protect her constitutional rights, her claim should be construed as challenging the fact, not conditions, of her confinement and is therefore cognizable in habeas." *Id.* at *3; *see*

*Fofana v. Albence*, __ F. Supp. 3d __, 2020 WL 1873307 (E.D. Mich. April 15, 2020) (Drain, J.) (granting habeas to medically vulnerable detainees).

Another district court in the Sixth Circuit reached the same conclusion just last week. *See Wilson v. Williams*, __ F. Supp. 3d __, 2020 WL 1940882 (N.D. Ohio Apr. 22, 2020). *Wilson* held that although the "general r[ule]" is that conditions of confinement claims sound in § 1983, "claims concerning COVID-19 are not so easily classified" because "the only truly effective remedy to stop the spread is to separate individuals—a measure that in our nation's densely populated [carceral facilities] is typically impossible without the release of a portion of the population." *Id.* at *5. Such claims sound in habeas because they "ultimately seek to challenge the fact or duration of confinement." *Id.* A cavalcade of other federal courts around the country have agreed, granting habeas relief on the same basis.[8]

Defendants nonetheless argue that there is a categorical prohibition on the use of federal habeas for any claim that could be construed as arising from the conditions

---

[8] *See, e.g.*, *Rafael L.O. v. Tsoukaris*, No. 20-cv-3481, 2020 WL 1808843 (D.N.J. Apr. 9, 2020); *Francisco Hernandez v. Wolf*, No. 20-cv-617 (C.D. Cal. Apr. 1, 2020) (TRO Ex. I, pp. 20–34); *Thakker v. Doll*, __ F. Supp. 3d __, No. 20-cv-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020); *Avendano Hernandez v. Decker*, 2020 WL 1547459 (S.D.N.Y. Mar. 31, 2020); *Fraihat v. Wolf*, No. 20-cv-590 (C.D. Cal. Mar. 31, 2020) (Appendix A); *Coronel v. Decker*, __ F. Supp. 3d __, No. 20-cv-2472, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020); *Basank v. Decker*, __ F. Supp. 3d __, No. 20-cv-2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020); *Calderon Jimenez v. Wolf*, No. 18-cv-10225 (D. Mass. Mar. 26, 2020) (Appendix A); *Jovel v. Decker*, No. 12-cv-308, 2020 WL 1467397 (S.D.N.Y. Mar. 26, 2020).

of anyone's confinement, relying on a Seventh Circuit case, an unpublished Sixth Circuit case, and unpublished district court opinions. Def. MTD at 19–23. As a threshold matter, none of Defendants' cases are binding on this court. In any event, Defendants' cases are distinguishable. Unlike the present situation, most involve denial of medical treatment for which the proper remedy is treatment rather than, as here, a *complete inability* to protect the petitioners from an imminent but foreseeable and potentially fatal threat, rendering release the *only* adequate remedy. *See Glaus v. Anderson*, 408 F.3d 382, 384 (7th Cir. 2005) (resumption of medical treatment was one remedy available to petitioner);[9] *In re Owens*, 525 F. App'x 287, 290 (6th Cir. 2013) (alleging overcrowding, poor medical care, and inadequate nutrition); *Burton v. McGlasson*, No. 14-CV-10693, 2014 WL 700503 (E.D. Mich. Feb. 24, 2014) (denial of "medication for an unspecified medical condition"); *Martin v. Zych*, No. 09-10423, 2009 WL 398166 (E.D. Mich. Feb. 17, 2009) ("[P]etitioner claims that he is being denied medical treatment."); *Davis v. Zych*, No. 9-11459, 2009 WL 1212489 (E.D. Mich. May 4, 2009) (petitioner "request[ed] a change in his custody level so that he can obtain proper medical care"). Defendants rely on one out-of-circuit case that involves COVID-19, *Peterson v. Diaz*, No. 19-01480, 2020 WL

---

[9] The court in *Glaus* was also bound by prior in-circuit precedent, but recognized that the "the Supreme Court has left the door open a crack for habeas corpus claims challenging prison conditions." *Id.* at 387.

1640008 (E.D. Cal. Apr. 2, 2020). But the *pro se* petitioner there raised the COVID-19 issue through a motion in the midst of an unrelated habeas proceeding, so the court treated the motion as a request for bail and denied it on the grounds that the underlying petition lacked merit. *Id.* at *2. More importantly, unlike in this case, the petitioner had not shown that social distancing was impossible. *See id.*

Finally, and bizarrely, Defendants also rely heavily upon *Chambers v. Bouchard*, No. 20-cv-10949 (E.D. Mich. Apr. 20, 2020), a case involving a member of the putative class here. Yet *Chambers* actually states that habeas relief *is* available (and the preferred remedy)[10] in cases such as this. Slip op. at 9. *Chambers* in no way supports Defendants' habeas argument.

As *Malam* held, "[r]elease from custody represents the only adequate remedy in this case, and it is within this Court's broad equitable power to grant it." *Malam*, 2020 WL 1672662, at *13. The Medically Vulnerable Subclass faces the same situation as the *Malam* petitioners. Defendants have "conceded that social distancing between prisoners of at least six feet would be impossible." *Id.* at *4.[11] In other

---

[10] *Chambers* also concluded that it lacked § 1983 jurisdiction. For the reasons described below, *see infra*, Section I.B, that analysis of the § 1983 issue is incorrect. In any event, nothing in *Chambers* supports Defendants' *habeas* arguments.

[11] *See* Mot. to Reconsider, ECF No. 17 at 23 (describing social distancing of six feet as "impractical"); Aileen Wingblad, *Lawsuit Claims Oakland County Jail Conditions Put Inmates at Risk for COVID-19, Demands 'Vulnerable' Be Released*, The Oakland Press (Apr. 17, 2020) ("As for social distancing, [Undersheriff Mike]

words, they have conceded that there is no way to accomplish what the CDC describes as the "cornerstone of reducing respiratory diseases such as COVID-19" in the Oakland County Jail in the middle of an unprecedented pandemic. Compl. Ex. 6 at 4. As such, and as Plaintiffs' medical experts have concluded, Lauring Decl. ¶¶ 36–37; Stern Decl. ¶¶ 12–13, the *only* way to protect the subclass from the imminent threat of death or life-threatening illness is to order them removed from the jail. *See Malam*, 2020 WL 1672662, at *4 ("[T]he public health recommendation is to release high-risk people from detention, given the heightened risks to their health and safety" (citing declaration by infectious disease epidemiologist Joseph Amon)); *see also Thakker*, 2020 WL 1671563, at *9. That is what this Court can, and should, do.

As an alternative to complete release from Defendants' custody, this Court could transfer Petitioners to home confinement. As *Wilson* explained, federal courts' habeas authority includes the power to "enlarge" custody by ordering that the physical location of confinement be altered. *Wilson*, 2020 WL 1940882, at *4.

## 2. Habeas Can Be Granted in a Way That Protects the Public.

Given the severe and unavoidable risks to the Medically Vulnerable Subclass, this Court can and should act quickly to implement a system for ordering the release of subclass members. In deciding whether to grant this emergency release, the Court

---

McCabe said 'that's impossible at any jail. You just can't give six feet between everybody.'").

follows the well-known balancing test that governs preliminary relief, which includes weighing "the public interest." *Winter*, 555 U.S. at 20; *Malam*, 2020 WL 1672662, at **6–7. Thus, this Court can weigh the public interest when granting temporary release to the members of the Medically Vulnerable Subclass. For most members of the subclass, such a balance will inevitably lead to the conclusion that they should be released given the risks to their health of remaining incarcerated and given that every release also reduces the risk to the public, of the Jail becoming a transmission vector and a drain on public health resources. But if the Court concludes that it would be a significant risk to public safety to grant temporary release to certain particular members of the subclass, and that such risk outweighs the other factors, the Court could deny emergency relief to such individuals.

The Court therefore has options to deciding how to exercise its discretion in ordering preliminary relief. Plaintiffs submit that the most sensible approach would be to immediately order the release of members of the subclass who fall into the following categories: (1) subclass members being held on bail who are charged with an offense that does not have as an element the use or threatened use of violence or unwanted sexual touching of another person; (2) subclass members serving sentences for offenses that do not have as an element the use or threatened use of violence or unwanted sexual touching of another person; (3) subclass members whose sentences, regardless of the charged offense, expire by July 1, a period

throughout which the COVID-19 epidemic is likely to remain a major risk in the Jail and the community. For each of these categories of the subclass, it makes sense to determine as a categorical matter that the public interest in reducing the Jail population exceeds any danger in releasing the individuals. And by quickly taking this step, the remainder of the class—and Defendants' staff for that matter—would be made better off by making the Jail a somewhat safer place. Remaining members of the subclass could be promptly evaluated on a case-by-case basis by the Court or by an appointed magistrate or special master. That evaluation could weigh any risk to the public of releasing the individual against the risk to public health of failing to further reduce the jail population.

Several such systems already exist. For example, a federal court in the District of Massachusetts has released (and continues to release) numerous immigration detainees on non-monetary bond conditions while their class action habeas petition is pending. *See Savino v. Souza*, __ F. Supp. 3d __, No. 20-10617-WGY, 2020 WL 1703844, at *8–9 (Apr. 8, 2020) (explaining its decision to grant bail pending habeas). In that case, named petitioners and class members include all immigration detainees held at two facilities in Massachusetts. *Id.* at *1.[12] Finding "exceptional circumstances" in "this nightmarish pandemic," the court opted to "diligently

_____

[12] Unlike in this case, the *Savino* class is not limited to detainees who are medically vulnerable. *Savino*, 2020 WL 1703844, at *1.

entertain[] bail applications while the petitions for habeas corpus are pending." *Id.* at \*9. The district court requested and rapidly considered an initial list of 50 detainees for bail, and has since considered class members' bail applications in groups of ten. Order, *Savino v. Souza*, No. 20-10617-WGY, Doc. No. 44, at 3 (Apr. 4, 2020); *see id.*, Doc. No. 45 at 1-3 (listing class members in groups of ten for bail consideration) (Appendix B). Similar solutions could be implemented here.

### 3. Petitioners are Not Required to Exhaust their Claims

### a. State-Level Habeas Relief Is Unavailable to Plaintiffs.

Federal habeas corpus exhaustion requirements are waived when "there is an absence of available State corrective process." 28 U.S.C. § 2254(b)(1)(B)(i); *see Turner v. Bagley*, 401 F.3d 718, 724 (6th Cir. 2005) (exhaustion excused where "there is an absence of state corrective process, or circumstances exist that render such process ineffective to protect the petitioner's rights" or where "further action in state court 'would be an exercise in futility'" (citation omitted)). Defendants' exhaustion argument assumes that such a remedy is in fact *available* to Plaintiffs.

Defendants are wrong. Federal habeas statutes allow a court to review whether a habeas petitioner "is in custody in violation of the Constitution." 28 U.S.C. §§ 2241, 2254. In sharp contrast, the plain language of Michigan's state habeas provision permits a state court only "to inquire into the *cause* of detention." Mich. Ct. R. 3.303(a) (emphasis added); *see also* Mich. Comp. Laws § 600.4307

(authorizing habeas to "inquire into the cause of detention"). Caselaw is in accord. *See Phillips v. Warden*, 396 N.W.2d 482, 486 (Mich. Ct. App. 1986) (stating that under Michigan's habeas provision "a distinction must be made between a challenge to the fact or duration of confinement . . . and an attack on the conditions of confinement. Habeas corpus is proper in the former instance; in the latter it is not." (citation omitted)).

In fact, as interpreted, the writ in Michigan is even narrower than the text, and may only be used to challenge "radical defects rendering a judgment or proceeding absolutely void." *Triplett v. Deputy Warden*, 371 N.W.2d 862, 780 (Mich. Ct. App. 1985); Mich. Comp. Laws § 600.4310(3). And "MCL 600.4310(3) prohibits habeas corpus relief to '[p]ersons convicted, or in execution, upon legal process, civil or criminal" except in one narrow instance, "'where the convicting court was without jurisdiction to try the defendant for the crime in question.'" *Moses v. Dep't of Corrs.*, 736 N.W.2d 269, 273 (Mich. Ct. App. 2007).

Similarly, state-level relief is also unavailable under Mich. Ct. R. 6.501 *et seq.*, which is available only to prisoners who seek to challenge the validity of their underlying conviction or sentence. *See* Mich. Ct. R. 6.501(A); *Washington v. Elo*, No. 99-CV-71187, 2000 WL 356353, at *4 (E.D. Mich. Feb. 29, 2000) ("a motion for relief from judgment pursuant to M.C.R. 6.500, et seq. is the proper and exclusive means *to challenge convictions* in Michigan courts" (citation omitted) (emphasis

added)); *People v. McSwain*, 676 N.W.2d 236, 248 (Mich. Ct. App. 2003) ("It is well settled that [s]ubchapter 6.500 of the Michigan Court Rules establishes the procedures for pursuing postappeal relief from a criminal conviction."). Plaintiffs are not challenging their underlying conviction and sentence—rather, they challenge the execution of their punishment under constitutionally impermissible conditions. This they cannot do via state collateral review.

In sum, Plaintiffs seek removal from the Jail for a subclass of medically vulnerable people on the basis that are no detention conditions at the Jail that can adequately or constitutionally protect them from the fatal risk of COVID-19. Pursuing a state-level habeas remedy, under the narrow confines of Michigan's habeas and postconviction provisions, is thus squarely unavailable to Plaintiffs.

Defendants' reliance on *Irick v. Bell*, 565 F.3d 315, 323 (6th Cir. 2009), to support their exhaustion argument is misplaced. *Irick* is inapposite for two critical reasons: (1) the petitioner in *Irick* was challenging the *validity* of his conviction through habeas, based on alleged constitutional violations in his underlying state criminal proceeding; and (2) the petitioner presented novel claims in his federal habeas petition that were not previously presented to the state court, *but which could have been*. *Id.* at 323–24. Thus, *Irick* is inapplicable here.

Defendants also rely on *Money v. Pritzker*, __ F. Supp. 3d __, 2020 WL 1820660 (Apr. 10, 2020). But there too the Illinois-based petitioners had an available

state habeas remedy that they could have pursued. The Illinois statute governing habeas corpus is expansive: it authorizes a writ of habeas "[w]here, though the original imprisonment was lawful, nevertheless, by some act, omission or event which has subsequently taken place, the party has become entitled to be discharged." 735 Ill. Comp. Stat. Ann. 5/10-124. The *Money* plaintiffs therefore had the ability to pursue state-level habeas relief on the theory they were unlawfully detained due to an "event which has subsequently taken place." Here, by contrast, the "absence of state corrective process" excuses Plaintiffs from resorting to state habeas because "further action in state court 'would be an exercise in futility.'" *Bagley*, 401 F.3d at 724.

> **b.** **Even If State Remedies Were Available, the Exhaustion Requirement Should Be Waived in Light of the Unique Threat Posed by Covid-19.**

Even if the Court somehow finds that Plaintiffs could have attempted the futile act of exhausting state-level remedies, Defendants are mistaken in concluding that this requires the dismissal of Plaintiffs' federal habeas claim. "A [plaintiff's] failure to exhaust his remedies in state court . . . does not divest a federal court of jurisdiction over the petition." *Puertas v. Overton*, 272 F. Supp. 2d 621, 626 (E.D. Mich. 2003). Rather, a court should assess whether "unusual or exceptional circumstances" exist such that "'the interests of comity and federalism will be better served by addressing the merits.'" *Id.* (quoting *Granberry v. Greer*, 481 U.S. 129, 134 (1987), *superseded*

*by statute on other grounds as stated in Rockwell v. Yukins*, 217 F.3d 421, 423–24 (6th Cir. 2000)).

Significantly, this Court has applied this exception when pursuit of state court procedure would amount to a death sentence. *Puertas* waived the exhaustion requirement for a 76-year-old prisoner with coronary disease and bladder cancer who had recently gone into remission, releasing him on bond pending a decision on his petition for a writ of habeas corpus. *Id.* at 628. In doing so, the court found that the petitioner's "age, ill health, and dire need for continued medical treatment" warranted special consideration. *Id.* Considering the situation, "the interests of comity and federalism" were better served by addressing the merits of the petition rather than allowing the petitioner to risk death in prison while awaiting adjudication in state court. *Id.* at 629 (quoting *Granberry*, 481 U.S. at 131).

So too here. Any delay in providing relief could be the difference between life and death for the Medically Vulnerable Subclass. The outbreak of COVID-19 at Michigan's Lakeland Correctional Facility is illustrative. On April 1, 2020, it had 14 confirmed COVID-19 cases;[13] by April 25, 2020, there are over 600,[14] and the

---

[13] Jim Measel, *MDOC Reports Lakeland COVID-19 Cases Up to 14*, WTVB (Apr. 1, 2020), https://wtvbam.com/news/articles/2020/apr/01/mdoc-reports-lakeland-covid-19-cases-increase-14/1001801/

[14] Angie Jackon, Kristi Tanner, *Coronavirus Cases at Michigan Prison Surge as Widespread Testing Begins*, Detroit Free Press (Apr. 25, 2020),

facility leads the state's COVID-19 death count. Defendants have admitted that they cannot provide the necessary six feet of social distancing in the Jail that experts say is necessary to prevent a fatal risk of exposure.

Given this reality and the rapid pace at which COVID-19 spreads, it is "in the interests of comity and federalism," *Granberry*, 481 U.S. at 131, and well within this Court's power, to waive any applicable exhaustion requirements for the Medically Vulnerable Subclass members before it is too late to protect them.

### D. Alternatively, Removals from Jail Are Authorized Under § 1983.

Even if this Court lacked habeas jurisdiction, it could still grant immediate relief to the Medically Vulnerable Subclass pursuant to 42 U.S.C. § 1983.

"Prisoners retain the essence of human dignity . . . [that] animates the Eighth Amendment." *See Brown v. Plata*, 563 U.S. 493, 510 (2011). By incarcerating people, "society takes from prisoners the means to provide for their own needs." *Id.* Thus, "[a] prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." *Id.* And "[i]f the government fails to fulfill this obligation, *the courts have a responsibility to remedy the resulting Eighth Amendment violation*." *Id.* (emphasis added).

---

https://www.freep.com/story/news/local/michigan/2020/04/25/coronavirus-cases-michigan-prison-surge-widespread-testing-prisoners/3002811001/.

The Prison Litigation Reform Act ("PLRA") prescribes a number of rules and procedures for cases involving some § 1983 claims involving prison conditions. *See Plata*, 563 U.S. at 511–12; 18 U.S.C. § 3626. Defendants point to the provision that a court may enter a "prisoner release order" only after it first enters an order for less intrusive relief that has "failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order" and after the prison has had a reasonable time to comply under the circumstances. 18 U.S.C. § 3626(a)(3)(A). In turn, a "prisoner release order" can be entered only by a three-judge court, and only upon finding that overcrowding is the primary cause of the violation. 18 U.S.C. § 3626(a)(3)(B)–(E); *Plata*, 563 U.S. at 512. A "prisoner release order" is defined as an order "that has the purpose or effect of reducing or limiting the prison population"—in other words, an order that addresses systemic overcrowding. 18 U.S.C. § 3626(g)(4). For example, the order at issue in *Plata* was a "prisoner release order" because it sought to impose a population cap on the overcrowded California state prison system. *Plata*, 563 U.S. at 511.

Here, the PLRA does not present an obstacle to this Court ordering Defendants to remove or transfer members of the Medically Vulnerable Subclass out of the Jail, for two reasons. First, the PLRA provides the procedures for judicial response to Eighth Amendment violations that result from systemic overcrowding; it does *not* limit a federal court's ability to respond to individualized threats to the

lives and health of incarcerated people. As explained above, the PLRA requires the convening of a three-judge panel to issue "prisoner release orders," but makes clear that the only basis for a three-judge "prisoner release order" is a finding of overcrowding that cannot be ameliorated adequately through other means. Thus, a three-judge panel can order releases from jail *only* on systemic overcrowding grounds. *See* 18 U.S.C. § 3626(a)(3)(E) (prisoner release order be entered "only if the court finds by clear and convincing evidence that . . . crowding is the primary cause of the violation of a Federal right"); *see Plata*, 563 U.S. at 502 (finding that "overcrowding [wa]s the 'primary cause of the violation of a Federal right'").

The PLRA does not, by contrast, constrain a federal district court's authority to order the release of individuals who face a potentially fatal hazard behind bars that is *not* the result of systemic overcrowding. If the PLRA were construed to prohibit a federal district court from ordering *anyone* who raises *any* Eighth Amendment claim to be removed from a prison, it would risk leaving incarcerated people who face imminent risks that derive from causes *other* than systemic overcrowding without any remedy whatsoever to prevent a threat to the lives.[15] For example, if people in the Jail were "in the direct path a hurricane and . . . the facility

---

[15] To be clear, Plaintiffs' position is that what they seek here is not a "prisoner release order" within the meaning of the PLRA. As such, Defendants' arguments about whether there is a pre-existing order that would permit a three-judge panel to issue a prisoner release order, Def. Br. at 15–16, are a red herring.

was unlikely to withstand the storm," the Defendants' interpretation of the PLRA would prohibit this court—or *any* federal court—from acting immediately to address the risk. *L.O. v. Tsoukaris*, No. 20-3481, 2020 WL 1808843, at *7 (D.N.J. Apr. 9, 2020).[16] As another court has put the point, "[a]ccepting [such an] argument would mean that the only way a district court can order the release of a prisoner is for a violation of his constitutional rights where overcrowding caused the violation, but not if any other reason caused the violation." *Reaves v. Dep't of Corr.*, 404 F. Supp. 3d 520, 523 (D. Mass. 2019). Congress did not intend such a result; rather, "the legislative history suggests that the sponsors of the PLRA were primarily 'concerned with courts setting 'population caps' and ordering the release of inmates as a sanction for prison administrators' failure to comply with the terms of consent decrees designed to eliminate overcrowding.'" *Id.* (quoting *Gilmore v. California*, 220 F.3d 987, 998 n.12 (9th Cir. 2000)); *see* Margo Schlanger, *Anti-Incarcerative Remedies for Illegal Conditions of Confinement*, 6 U. Miami Race & Soc. Just. L. Rev. 1, 27–28 (2016) (collecting congressional testimony and reports).

---

[16] *Tsouarkaris* involved the court's habeas jurisdiction. Of course, if this Court holds that relief is available via habeas, it need not reach the PLRA issue. But if this Court concludes that habeas relief is not available, that leaves § 1983 as the only remaining avenue for relief. And if the Court were to accept Defendants' position with respect to § 1983 as well, it would mean that no avenue would exist to remedy the hurricane hypothetical—a situation that is analogous to the harm cause by a pandemic sweeping towards and through the Jail.

To interpret the PLRA in the manner proposed by Defendants risks rendering the PLRA unconstitutional because it would leave prisoners who face imminent lethal threats without a remedy in contravention of *Plata*'s core insight that "courts have a responsibility to remedy. . . Eighth Amendment violation[s]." *Plata*, 563 U.S. at 511; *see Reaves*, 404 F. Supp. 3d at 523. A "court is obligated 'to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question.'" *In re Dow Corning Corp.*, 199 B.R. 896, 899 (E.D. Mich. 1996 (quoting *Gomez v. United States*, 490 U.S. 858, 864 (1989))); *see Sasser v. Hobbs*, 735 F.3d 833, 844 (8th Cir. 2013) (applying constitutional avoidance canon to avoid an Eighth Amendment issue); *United States v. $11,500 in United States Currency*, 869 F.3d 1062, 1071 (9th Cir. 2017) (same). In short, under Defendants' interpretation of the PLRA, detainees in the gravest and most immediate danger can be left with no practical recourse to federal court. That cannot be, and is not, the law.

Defendants' principal PLRA case, the unpublished decision in *Money v. Pritzker*, is admittedly in tension with Plaintiffs' position on this issue. But it is wrongly decided. It errs by treating a request for short-term releases due to the inability to control an infectious disease as tantamount to the orders that the PLRA is intended to govern, i.e., orders whose purpose is to systemically reduce or cap an overcrowded prison population. And it fails to even mention the potential

unconstitutionality of interpreting the PLRA in the manner urged by Defendants, and thus does not apply the constitutional avoidance canon.

Second, even if this Court concludes that the PLRA prohibits an order *releasing* members of the Medically Vulnerable Subclass from the Sheriff's legal custody, the PLRA presents no barrier to this Court ordering that members of subclass be transferred to an alternate form of custody, including home confinement, for the duration of the COVID-19 crisis.[17] Multiple federal courts have held that an order that prisoners be moved into alternative custody is not a "prisoner release order" within the meaning of the PLRA and, therefore, may be issued by a single-judge court. *See Plata v. Brown*, __ F. Supp. 3d __, 2013 WL 12436093, at *8 (N.D. Cal. June 24, 2013) (holding that transferring a group of inmates at high risk of contracting a fatal disease out of a prison was not a "prisoner release order" under the PLRA); *Reaves*, 404 F. Supp. 3d at 523 (similar).

It is also clear, under the PLRA, that home confinement is not "release." Federal law defines "home confinement" as a form of (prerelease) custody. 18 U.S.C. § 3624(g)(2)(A). Caselaw is in accord. *See Jackson v. Johnson*, 475 F.3d 261, 265-66 (5th Cir. 2007) (holding that a person confined in a halfway house is still a

---

[17] Thus, the court's suggestion to the contrary in *Chambers* was mistaken, because if this Court were to transfer Plaintiffs to home confinement, it would not result in shortening the duration or altering the validity of their sentences. Rather, the Court would merely be altering the physical location in which those sentences are served.

"prisoner" under the PLRA ); *Witzke v. Femal*, 376 F.3d 744, 752 (7th Cir. 2004) (similar). So is Michigan law, which allows for "house arrest" as a form of sentence that is on par with jail time as a criminal sanction available for individuals who do not receive a prison sentence. Mich. Comp. Laws § 769.31(b)(ii), (viii), (xiv); *see People v. Stauffer*, 640 N.W.2d 869, 870 n.7 (Mich. 2002).[18]

In sum, the PLRA should not be construed to prevent a federal court ordering that individuals be released from jail in response to an imminent and fatal threat that is not the result of systemic overcrowding. But even if this Court were to disagree, it still has the power under § 1983 to transfer the Medically Vulnerable Subclass into home confinement without running afoul of the PLRA. If this Court concludes that it cannot order releases or enlargement under its habeas jurisdiction, *see* Section I.A, *supra*, then it can and should instead act pursuant to § 1983.

## IV.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR EIGHTH AND FOURTEENTH AMENDMENT CLAIMS.

### A.  Plaintiffs Have Made a Strong Showing of Defendants' Deliberate Indifference to the Grave Risk of Harm Posed by COVID-19.

Corrections officials have a constitutional obligation to protect incarcerated people from a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). Under the Eighth Amendment, prison officials "must provide humane

---

[18]  *See also* https://www.oakgov.com/sheriff/Corrections-Courts/Satellites-and-Court-Services/Pages/Work-Release-Tether.aspx (making clear that a sentence to work release is a sentence served under the sheriff's extensive supervision).

conditions of confinement; . . . must ensure that inmates receive adequate . . . medical care, and must take reasonable measures to guarantee the safety of the inmates[.]" *Id.* at 832 (internal quotation marks omitted). The obligation requires corrections officials to address prisoners' serious medical needs—including needs far less dire than those at stake here. *See Plata*, 563 U.S. at 531–32; *Helling v. McKinney*, 509 U.S. 25, 28, 35 (1993); *Estelle v . Gamble*, 429 U.S. 97, 104 (1976); *Flanory v. Bonn*, 604 F.3d 249, 255 (6th Cir. 2010) (extended failure to provide toothpaste); *Talal v. White*, 403 F.3d 423, 427 (6th Cir. 2005) (exposure to tobacco smoke). This obligation requires corrections officials to protect incarcerated people from the risk of "infectious maladies" and "serious contagious diseases" rather than waiting until someone tests positive and providing treatment. *McKinney*, 509 U.S. at 33–34 ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."); *see Farmer*, 511 U.S. at 833 ("[H]aving stripped [prisoners] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course.").

Eighth Amendment claims require a showing of "deliberate indifference" to a substantial risk of serious harm. *Farmer*, 511 U.S. at 828. "Deliberate indifference has two components to it: objective and subjective." *Villegas v. Metro. Govt. of*

*Nashville*, 709 F.3d 563, 568 (6th Cir. 2013).[19] It may be "infer[red] from circumstantial evidence," including "the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. In the midst of the COVID-19 pandemic, the deliberate indifference test has been easily satisfied in this District and elsewhere that medically vulnerable inmates are detained in unsafe conditions. *See, e.g.*, *Wilson*, 2020 WL 1940882, at *8; *Fofana*, 2020 WL 1873307, at *8; *Malam*, 2020 WL 1672662, at *12; *Thakker*, 2020 WL 1671563, at *8 n.15.

As explained below, the record in this case demonstrates that Defendants are deliberately indifferent to the serious risks posed by COVID-19, requiring immediate action by this Court. With respect to conditions for the Medically Vulnerable Subclass, there is no dispute that remaining in the Jail places them at a risk of death or serious harm that is both objectively intolerable and obvious to Defendants. For that subclass, as in *Wilson*, *Fofana*, *Malam*, *Thakker*, and other

---

[19] Defendants' assertion that "[d]eliberate indifference claims are the same under the Eighth and Fourteenth Amendments," Def. Br. at 29, relies entirely on outdated case law preceding *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). Since *Kingsley*, the Sixth Circuit has recognized that pre-trial detainees, whose terms of confinement are governed by the Fourteenth Amendment, may no longer need to demonstrate the subjective component of the deliberate indifference standard in order to show that their conditions of confinement are unconstitutional. *See Richmond v. Huq*, 885 F.3d 928, 938 n.3 (6th Cir. 2018); *see* Pl. TRO Br. at 15 & n.6. In any event, Plaintiffs meet both standards as explained herein.

cases ordering release from detention, preliminary injunctive relief immediately removing them from the Jail environment is urgently needed.

As for the highly generalized evidence submitted by Defendants regarding purported efforts to marginally improve some conditions within the Jail, the mutually corroborating declarations of eight individuals overwhelmingly refute Defendants' assertions and conclusively demonstrate that the Jail is not doing what it claims. *See* Facts, *supra*. But to the extent there are genuine factual disputes about Defendants' conduct, which go only to Counts I and II and not the urgent need to remove the Medically Vulnerable Subclass pursuant to Counts III and IV, they should be resolved at an evidentiary hearing on Plaintiffs' motion for a preliminary injunction, not by dissolving the TRO as Defendants seem to request.

### 1. COVID-19 Presents an Objectively Unreasonable Risk.

As Plaintiffs have already established, the risk of infection from COVID-19 is plainly a serious one, and Plaintiffs are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Pl. TRO Br. at 15–17; *see* Facts, Sections I–II, *supra*. The only way to alleviate the risk is to reduce the jail population. Stern Decl. ¶¶ 10–13; Lauring Decl. ¶¶ 36–37.

Defendants do not contend that the Jail can be made safe without further population reductions, and submit no evidence to the contrary. Thus, they have essentially conceded that the conditions in the Jail present an objective risk of grave

harm to Plaintiffs. *Accord Malam*, 2020 WL 1672662, at **4, 12; *Wilson*, 2020 WL 1940882, at *8; *Thakker*, 2020 WL 1671563, at *8 n.15. As such, they concede that the conditions in the Jail are unconstitutional with respect to the Pre-Trial Subclass, which need only show that they are exposed to an objectively unreasonable risk of harm in order to establish a violation of their Fourteenth Amendment rights. *See Richmond*, 885 F.3d at 938 n.3; Pl. TRO Br. at 15 & n.6.

## 2. Defendants Are Subjectively Aware of the Risks.

Plaintiffs also satisfy the "subjective" component of the Eighth Amendment test because Defendants acknowledge their awareness of the risks of the COVID-19 pandemic to the incarcerated population. Indeed, based on the publicity, warnings, letters, and CDC guidance surrounding the COVID-19 pandemic, it can hardly be doubted that "risk of harm is obvious." *Farmer*, 511 U.S. at 842.

Defendants offer two responses, neither persuasive. First, they contend essentially that they are not "deliberately indifferent" because they are making efforts to keep the Jail safe and are not exhibiting "total unconcern" for inmates' welfare. But that is not the law. Plaintiffs are not required to demonstrate that Defendants are bad people, harbor malicious intent, or are personally responsible for having created conditions that are now intolerable. Even if Defendants *were* trying their best to achieve social distancing (contrary to the record in this case), their conceded and knowing inability to accomplish it establishes their subjective

awareness of the unconstitutional conditions in the Jail. In *Plata*, for example, the Supreme Court confirmed that where a reduction in prison population is the only way to cure a constitutional violation, an injunction may issue even if the defendants did not intend to create the overcrowding. *Plata*, 563 U.S. at 521, 526–29.

Thus, when "the risk of harm is obvious," *Farmer*, 511 U.S. at 842, Defendants' conduct is unconstitutional because they have the information they need to know that whatever attempts they are making are not enough to keep Plaintiffs safe. *See Malam*, 2020 WL 1672662, at **11–12 (finding deliberate indifference even though jail "t[ook] a range of precautionary measures" because "even with these precautionary measures, in light of Petitioner's underlying health conditions, she is not ensured anything close to 'reasonable safety'"); *see also Wilson*, 2020 WL 1940882, at *8; *Fofana*, 2020 WL 1873307, at *8.

This principle is illustrated by binding precedent in injunctive relief cases. The Supreme Court has held that if "the evidence before a district court establishes that an inmate faces an objectively intolerable risk of serious injury, the defendants could not plausibly persist in claiming lack of awareness." *Farmer*, 511 U.S. at 846 n.9. Similarly, in cases involving "future conduct to correct prison conditions," the Sixth Circuit has said that "[i]f those conditions are found to be objectively unconstitutional, then that finding would also satisfy the subjective prong because the same information that would lead to the court's conclusion was available to the

prison officials." *Hadix v. Johnson*, 367 F.3d 513, 526 (6th Cir. 2004).

Consequently, it is Defendants' *knowledge* of the conditions that threaten Plaintiffs' health and safety that is the critical factor in analyzing Plaintiffs' claims. And that analysis demands the conclusion that the Medically Vulnerable Subclass is entitled to immediate relief. For, despite any efforts Defendants are making,[20] they admit that six-feet social distancing is currently impossible in the Jail. That impossibility does not make the jailer immune; it requires the removal of individuals whose confinement in the Jail cannot be made safe.

Continuing to expose medically vulnerable individuals to deadly contagion so clearly meets the deliberate indifference standard that immediate relief removing them from the Jail environment is the only way to address the constitutional violation. *See Malam*, 2020 WL 1672662, at *8 ("[E]ven the most stringent precautionary measures—short of limiting the detained population itself—simply cannot protect [vulnerable] detainees from the extremely high risk of contracting this unique and deadly disease."); *Fofana*, 2020 WL 1873307, at *8 (releasing medically vulnerable detainees despite jail taking "some steps to address the COVID-19

---

[20] Defendants told this Court last Thursday that they have no obligation to provide additional care to medically vulnerable Plaintiffs and will not do so. *See* Appendix C at 11 (transcript of Apr. 23, 2020 hearing). Thus, even accepting that Defendants are not responsible for the difficulties of achieving social distancing in the Jail, they clearly have not tried to reduce the risks to medically vulnerable individuals.

pandemic"); *Thakker*, 2020 WL 1671563, at *9 (ordering release where facilities were "plainly not equipped to protect Petitioners" even though the "deficiency is neither intentional nor malicious"); *Wilson*, 2020 WL 1940882, at *8 (ordering release despite defendants "offer[ing] certain prison-practice changes to show they know COVID-19 risks and have sought to reduce those risks").

Defendants cannot hide behind the fact that the CDC says that social distancing measures will need to "be tailored to the individual space in the facility." Def. Br. at 36. The CDC guidance does not state what is *medically required* to protect people's lives—which is the analysis the Eighth and Fourteenth Amendments require. Nor are these specific statements a repudiation of the CDC's *scientific* guidance that social distancing is required to stop the transmission of the virus and why, in other settings, the CDC recommends wholesale cancellation of schools, closures of nursing facilities and business offices, cancellation of "faith-based gatherings of any size," and emphasizes that social distancing is "especially important" for vulnerable individuals.[21] Indeed, in its correctional guidance, the CDC describes social distancing as "a cornerstone of reducing transmission of respiratory diseases such as COVID-19." Compl., Ex. 6 at 4.

In any event, it is ultimately for this Court to determine whether the risk to

---

[21] *See* Appendix D (compiling CDC guidance documents).

Plaintiffs' lives is an unconstitutional one. And Plaintiffs' experts expressly confirm that proper social distancing is medically necessary to protect people from the risk of serious harm posed by COVID-19, especially the medically vulnerable, and they explain that the CDC's correctional guidance reflects harm reduction principles recognizing that some Jails will not do what is actually safe. Stern Decl. ¶ 9; Lauring Decl. ¶ 24. These scientific facts, of which Defendants are aware, render them deliberately indifferent to the objective risks to the lives and health of the Medically Vulnerable Subclass.

Defendants' second major argument against a finding of deliberate indifference is to assert that they are taking responsive protective measures. *See* Def. Exs. B, F, M (jail manager declarations). But their generalized claims are not credible when compared with the detailed declarations provided Plaintiffs. For example, Curtis Childs claims that no one has been transferred to the main jail as punishment, Ex. B ¶ 15, but does not address the specific claims by two Plaintiffs who were the victims of such transfers or the fact that a sign was posted in the laundry room making such a threats as a matter of policy. Facts, Section III.F, *supra*. Childs also states that inmates are given adequate soap and cleaning supplies, Childs Decl. ¶ 6, but does not explain how almost every declarant reports otherwise, *see* Facts, Section III.D, *supra*. Similarly, Defendants rely on a declaration from Vicki-Lyn Warren, who claims that sick slips are distributed daily, inmates are properly

assessed for COVID-19, and named Plaintiffs in the medically vulnerable subclass lack a medical vulnerability. Def. Ex. F. Yet Ms. Warren does not explain how it is that multiple inmate declarants were unable to obtain medical attention, Facts Section III.C, *supra*, resulting in three declarants (one a paramedic) having to sweat it out while infecting cellmates, Arsineau Decl. ¶¶ 5–8; Briggs Decl. ¶¶ 8–9; Kucharski Decl. ¶¶ 8–10. Nor does she explain the withdrawal of nurses from the Annex, or the fact that two medically vulnerable plaintiffs are receiving their hypertension medication from the Jail itself.

Defendants' only real response is to call the declarants liars and "wonder if these career criminals are not simply looking for a 'get-out-of-jail-free' card." Def. Br. at 10. Defendants' sweeping suggestion that anyone convicted of a crime is a liar ignores: (1) the interlocking and mutually corroborating nature of declarants' testimony; (2) five of eight declarants are not medically vulnerable and thus have *not* sought to "get out of jail free"; and (3) two declarants (Arsineau and Kucharski) were scheduled to get out of jail anyhow within a few days of filing. Rather, one might wonder, based on the generalized and easily refuted nature of Defendants' declarations, whether they have an incentive to be fully forthcoming about the brutal and embarrassing conditions they have overseen in the Jail.

Defendants again rely on *Money v. Pritzker*, but *Money* does not support their position. The court there concluded that plaintiffs had not shown "deliberate

indifference" to an unconstitutional risk of serious harm because numerous measures were being implemented such that there was no factual showing of an immediate intolerable risk to the plaintiffs' health and lives. *Money*, 2020 WL 1820660, at *17–18. Most importantly, however, *Money* did not have the benefit of an evidentiary record that establishes that the only way to mitigate medically intolerable serious risk of infection was social distancing, nor did it have the rich record presented here of a systemic failure to take other measures.

For these reasons, Plaintiffs have shown that their Eighth Amendment rights are being violated, a preliminary injunction should issue, and an unacceptable risk to the Medically Vulnerable Subclass will persist no matter what Defendants do. Their immediate release is warranted pursuant to Counts III and IV. To the extent factual disputes as potentially dispositive of Plaintiffs' request for preliminary injunctive relief regarding Counts I and II, an evidentiary hearing should be held.

### B. Defendants' Deliberate Indifference Is Attributable to Oakland County Under *Monell*.

"A municipality or other local government may be liable under [42 U.S.C. § 1983] if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation." *Richmond,* 885 F.3d at 948 (quotation and citation omitted). "To make such a claim, plaintiffs must prove that 'action pursuant to official municipal policy caused their injury." *Id.* (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). "[O]fficial

municipal policy extends to "the acts of its policymaking officials[] and practices so persistent and widespread as to practically have the force of law." *Id.*.

Here, Plaintiffs are incarcerated in the Oakland County Jail, so Oakland County and the official-capacity defendants are responsible for ensuring that Plaintiffs are protected from and not exposed to the jail-wide substantial risks posed by COVID-19. *See McKinney*, 509 U.S. at 32 (quoting *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 199–200 (1989)). Defendants acknowledge that they have been aware of the jail-wide risk for some time, so there can be little doubt that they are responsible for the policy response.

In similar cases, courts have held that municipal policies, practices, and customs violate the Constitution. For example, in *Duvall v. Dallas Cty., Tex.*, 631 F.3d 203 (5th Cir. 2011), there was a "legally sufficient evidentiary basis for a reasonable jury to find a custom or practice" of deliberate indifference to a jail outbreak of an infectious disease in the Dallas County Jail.

Here, as in *Duvall*, there is overwhelming evidence of policies, practices, and customs exhibiting deliberate indifference. Based on Plaintiffs' extensive factual record, Dr. Lauring concluded that the Jail "is not only obviously under-equipped and ill-prepared to prevent and manage a COVID-19 outbreak . . . but in some cases . . . it is intentionally exposing inmates to COVID-19 as retribution for raising concerns about safety." Lauring Decl. ¶ 27. Defendants are either unwilling or

unable, as a matter of policy to take steps needed to control the infection. Stern Decl. ¶ 15; Lauring Decl. ¶¶ 26–34. *See generally* Facts, *supra*.

Taken together, Defendants' action and inaction plainly reflects municipal policy. *See Duvall*, 631 F.3d at 208–09. The inability to provide social distancing alone, which Defendants have acknowledged, suffices to show a "direct causal link between [the County's] action and the deprivation of federal rights." *Gregory v. Shelby Cty.*, 220 F.3d 433, 442 (6th Cir. 2000). And the larger policy failure to take adequate and known measures to alleviate the threat makes the link yet more clear.

Defendants' arguments against *Monell* liability are unpersuasive. First, Defendants say that because COVID-19 is novel, they cannot be responsible for failing to take proper precautions to protect inmates. Def. Br. at 26. The Supreme Court has expressly rejected the notion that a jail can avoid liability in the face of a known "unsafe, life-threatening condition in their prison" simply because nothing "yet had happened to [the inmates]." *McKinney*, 509 U.S. at 33. "[A] remedy for unsafe conditions need not await a tragic event." *Id.*

Second, Defendants take issue with Plaintiffs' "anecdotal" evidence of unconstitutional conditions, citing cases that suggest that a municipal policy cannot be established based on "one instance of potential misconduct." Def. Br. at 45 (citation omitted). But this argument, if accepted by the Court, would construct an impossible burden of proof. Who but the people detained inside the jail could offer

testimony regarding the conditions inside? Moreover, Plaintiffs are not relying on allegations of "one instance of potential misconduct," but rather on eight interlocking and mutually corroborative declarations that demonstrate a clear and systemic policy failure to protect the Jail population from the pandemic.

Defendants' position is also foreclosed by controlling case law. The Sixth Circuit has held that plaintiffs may prove a policy, custom, or practice by pointing to "a single incident of arguably unconstitutional activity," combined with "proof that the activity 'was [arguably] caused by an existing, unconstitutional municipal policy.'" *Richmond*, 885 F.3d at 948 (quoting *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823-24 (1985)). The County and official defendants are solely responsible for maintaining practices that will protect those it detains from "a substantial risk of serious harm." Indeed, this is their constitutional duty. *Farmer*, 511 U.S. at 834. There is no serious dispute that the official policies, practices, and customs of the Defendants are at issue. The *Monell* standard is satisfied here.

## CONCLUSION

Defendants contend that this Court is powerless to protect inmates, even if floodwaters are rising at the Jail's doorstep. Defendants are wrong. Their motion to dismiss should be denied and a preliminary injunction should issue. This Court has jurisdiction to remove medically vulnerable people from the Jail, and it should so immediately. The floodwaters are rising.

Respectfully submitted,

/s/ Krithika Santhanam
Krithika Santhanam (DC Bar No. 1632807)
Thomas B. Harvey (MBE #61734MO)*
Advancement Project National Office
1220 L Street, N.W., Suite 850
Washington, DC 20005
Tel: (202) 728-9557
Ksanthanam@advancementproject.org
Tharvey@advancementproject.org

/s/ Philip Mayor
Philip Mayor (P81691)
Daniel S. Korobkin (P72842)
American Civil Liberties Union
Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6803
pmayor@aclumich.org
dkorobkin@aclumich.org

/s/ Alexandria Twinem
Alexandria Twinem (D.C. Bar No. 1644851)
Civil Rights Corps
1601 Connecticut Ave NW, Suite 800
Washington, DC 20009
Tel: 202-894-6126  Fax: 202-609-8030
alexandria@civilrightscorps.org

/s/ Cary S. McGehee
Cary S. McGehee (P42318)
Kevin M. Carlson (P67704)
Pitt, McGehee, Palmer,
Bonanni & Rivers, PC
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067
248-398-9800
cmcgehee@pittlawpc.com
kcarlson@pittlawpc.com

/s/ Allison L. Kriger
Allison L. Kriger (P76364)
LaRene & Kriger, PLC
645 Griswold, Suite 1717
Detroit, MI 48226
(313) 967-0100
Allison.kriger@gmail.com

Attorneys for Plaintiffs/Petitioners

*Applications for admission forthcoming

Dated: April 27, 2020

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was filed with the U.S. District Court through the ECF filing system and that all parties to the above cause was served via the ECF filing system on April 27, 2020.

Signature: ___/s/ Carrie Bechill_____
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067
(248) 398-9800
cbechill@pittlawpc.com