IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMAAL CAMERON; RICHARD BRIGGS; RAJ LEE; MICHAEL CAMERON; MATTHEW SAUNDERS, individually and on behalf of all others similarly situated,

    Plaintiffs,

v.

MICHAEL BOUCHARD, in his official capacity as Sheriff of Oakland County; CURTIS D. CHILDS, in his official capacity as Commander of Corrective Services; OAKLAND COUNTY, MICHIGAN,

    Defendants.

Case No. 20-cv-10949

## **DECLARATION OF RICHARD WATKINS**

I, Richard Watkins, declare:

I make this declaration based upon my own personal knowledge, and if called to testify, I could and would do so competently.

1. I am currently detained in the Oakland County Jail serving a one-year sentence. My exit date is on August 19.

2. I suffer from black-out tremors, meaning that I sometimes just pass out and cannot remember what has happened. I also have severe dyslexia and have difficulties reading. Being in the jail in the middle of this pandemic is also giving me severe anxiety.

3. When the coronavirus began to hit the jail in March, I was working as a kitchen trustee. I began to feel extremely sick. I was suffering from headaches, loss of sense of small, chills (although I was told I wasn't running a temperature), and I felt like I was coughing my brains out.

4. I told the deputies that I was too sick to work and a nurse came to visit me. He gave me some sort of cold medicine and said I was not really sick. I was given two days off kitchen duty, but then they put me back to work even though I told the deputies I was still sick. They told me that if I stopped working, I would be fired from my trustee job. So I went back to the job even though I was sick because I needed my good time credits so that I can go back to my three kids who are suffering while I'm in jail.

5. But while I was back on kitchen duty, I was trying to do my best not to do things that might infect other inmates. A few days later, there was an Aramark employee who didn't like me, who was following me around and giving me a hard time. I said I should not be working around the food in the kitchen because I could get others sick, and I was fired from my trustee job. This was around March 25.

6. I was then sent to cell R3 in the holding tanks. This was an all concrete cell where I was forced to sleep on the floor. I was told that the cell was under quarantine when I arrived. There were only three of us when I arrived in cell R3, but by the time I left in mid-April there were about 10 people all crowded in with each other.

7. On or around April 16, I was moved out of the holding cell and into a one-man cell on the A-block because I got into a conflict with another inmate and a deputy.

8. On Wednesday, May 6, they came by my cell and tested me for the COVID-19 virus. Later that day—and before my results came back—they moved me into a ten-man cell on the C-block. When I was placed in the ten-man cell, I think that there were 7 other guys in the cell. I was in the cell for two days, until May 8. During that time, I was in regular and constant contact with the guys in my cell because it is not possible to remain 6 feet from other guys in those ten-man cells. I was also in contact with the people in the cell next door to me, as we would sometimes talk and exchange things through the bars.

9. On Friday, May 8, they brought me the results of my COVID-19 test, which indicated that I was negative. A few hours later, they came and pulled me out of the cell and told me I was moving to E block. I knew that was where the COVID-19 patients were located, so I protested because I had just tested negative. The deputies brought me to E block anyhow, where I was able to see the doctor before they put me in my cell. Her name is Joanne, but I can't

remember her last name. She said my negative test results were wrong, and that I was actually positive for COVID-19. I told her there must be some mistake and that they should test me again. She responded, "don't tell me how to do my job. I'm the one making the choices on who gets a test. I'm not going to talk to you any more about this."

10. I was then placed in a cell in the E block with another COVID patient which is where I am now residing. No one has explained to me how my COVID test could have been negative and then positive, and I never had a second COVID test, so none of this makes any sense to me. If I'm not sick, I think it's risking my life to keep me here in the E block. And if I am sick, then by messing up, they just exposed a bunch of guys in the C block to the disease by putting me in there before getting my test results back. That block should probably be on quarantine now, as should the A-block where I was before.

11. I'm not going to lie. I'm angry and want out of the jail so I can be with my family. But even if I'm not released, what happened to me is wrong and endangered others twice—once in March when they made me work in the kitchen while I was sick and now again when they put me in the 10-man cell when I am supposedly sick with the coronavirus. I just want the truth to be told.

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

May 10, 2020                         /s/Richard Watkins_____
                                     Richard Watkins

                                     *consent for signing given telephonically

Due to the COVID-19 crisis, it was not possible to obtain a written signature on the above declaration. I am an attorney admitted to the Eastern District of Michigan. On May 10, 2020, I personally spoke with Richard Watkins and read this declaration to him. Mr. Watkins told me that the information in the above declaration is true, and gave me verbal consent to sign on his behalf.

I declare under penalty of perjury, under 28 U.S.C. § 1746, that the foregoing is true and correct.

                                     /s/Philip Mayor___
                                     Philip Mayor