UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMAAL CAMERON, RICHARD BRIGGS,
RAJ LEE, MICHAEL CAMERON, and
MATTHEW SAUNDERS, individually and
on behalf of all others similarly situated,

                Plaintiffs,                        Civil Case No. 20-10949
                                                      Honorable Linda V. Parker

v.

MICHAEL BOUCHARD, CURTIS D. CHILDS,
and OAKLAND COUNTY,

                Defendants.
_____/

## OPINION

We are in the midst of a global pandemic arising from the novel coronavirus ("COVID-19"). No one could deny that it has produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it. This case addresses whether persons with a limited ability to protect themselves from the threat of this serious and deadly virus due to their incarceration in Michigan's Oakland County Jail ("Jail") are being adequately protected. If they are not, this Court must provide some remedy, as "[p]risoners retain the essence of human dignity inherent in all persons" and failing to protect them from serious harm "is incompatible with the concept of human dignity and has no place in civilized society." *Brown v. Plata*, 563 U.S. 493, 510-11 (2011).

Plaintiffs-Petitioners (hereafter "Plaintiffs"), five Jail inmates, filed this putative class action lawsuit, claiming that Defendants are acting with deliberate indifference in response to the serious risk that COVID-19 poses to incarcerated individuals. And because COVID-19 presents a specifically dire threat to "medically-vulnerable individuals"—a term that has become basic to our lexicon in the last several months, Plaintiffs seek the temporary release of inmates within this category. The matter is before the Court on Plaintiffs' Motion for a Preliminary Injunction (ECF No. 5), Plaintiffs' Motion to Certify Class (ECF No. 6), and Defendants' Motion to Dismiss (ECF No. 30). The Court held a hearing with respect to the motions via videoconference on May 4, 6 and 7, 2020.

## I.    Procedural Background

On April 17, 2020, Plaintiffs filed a combined putative class action complaint pursuant to 42 U.S.C. § 1983 and a representative habeas petition pursuant to 28 U.S.C. § 2241. (ECF No. 1.) Plaintiffs seek to represent a class of all current and future Jail detainees ("Jail Class"), as well as the following subclasses:

- The First Subclass ("Pre-trial Subclass") is defined as "[a]ll current and future persons detained at the Oakland County Jail during the course of the COVID-19 pandemic who have not yet been convicted of the offense for which they are currently held in the Jail."

- The Second Subclass ("Post-conviction Subclass") is defined as "[a]ll current and future persons detained at the

2

Oakland County Jail during the course of the COVID-19 pandemic who have been sentenced to serve time in the Jail or who are otherwise in the Jail as the result of an offense for which they have already been convicted."

- The Third Subclass ("Medically-Vulnerable Subclass") is defined as "[a]ll members of the Jail class who are also over the age of fifty or who, regardless of age, experience an underlying medical condition that places them at particular risk of serious illness or death from COVID-19 …."

(*Id.*)  On April 17, Plaintiffs also filed a Motion to Certify Class.  (ECF No. 6.)

They further filed an Emergency Motion for Temporary Restraining Order

("TRO") and Preliminary Injunction in which they asked the Court to order (i) the

release of members of the Medically-Vulnerable Subclass pending briefing and

argument and (ii) the undertaking of certain measures to improve hygiene and

safety at the Jail.  (ECF No. 5.)

On April 17, the Court issued a TRO directing Defendants to take certain

measures to improve hygiene and safety at the Jail.  (ECF No. 12.)  The Court also

ordered Defendants to promptly produce to Plaintiffs and the Court lists of

information relevant to inmates within the proposed Medically-Vulnerable

Subclass.  (*Id.*)  However, the Court concluded that it was without sufficient

information to then rule on Plaintiffs' request to release all members of the

Medically-Vulnerable Subclass.  (*Id.*)  The Court subsequently entered an amended

opinion and order, which contained no substantive changes.  (ECF No. 21.)

3

Defendants filed a Motion for Reconsideration, which was denied in all respects except the Court modified its order as to the lists relevant to inmates within the proposed Medically-Vulnerable Subclass.  (ECF No. 29.)  The Court instead required Defendants to provide the lists to the Court and/or Plaintiffs' counsel "only once the Court determines that it has the power to release inmates in this litigation or is convinced that there is some other reason why the lists should be produced."  (*Id.* at Pg ID 806.)

Following a telephonic conference with counsel for the parties on April 20, at which time Defendants indicated that they intended to file a motion to dismiss, the Court set a briefing schedule for Defendants to file their motion and respond to Plaintiffs' TRO and preliminary injunction motion.  (ECF No. 22.)  The parties subsequently stipulated to and the Court entered an order allowing for an inspection of the Jail by Dr. Carlos Franco-Paredes on April 23.  (ECF No. 27.)  On April 23, Defendants filed their Motion to Dismiss and response to Plaintiffs' TRO and preliminary injunction motion.  (ECF No. 30.)  Plaintiffs responded to the Motion to Dismiss on April 27.  (ECF No. 33.)

The Court conducted a hearing via videoconference on the parties' pending motions on May 4, 6, and 7.  As consented to during a telephonic status conference prior to the hearing, each side presented two live witnesses but otherwise relied on documentary evidence, affidavits, and declarations to present their evidence.

4

Subsequent to the hearing, both parties supplemented the record with affidavits. (ECF Nos. 64-1, 83-1.)  Defendants filed a response to Plaintiffs' Motion to Certify Class on May 12 (ECF No. 83), and Plaintiffs filed a reply brief on May 18 (ECF No. 90).[1]  Both parties filed trial briefs on May 13.  (ECF Nos. 85, 86.)

## II.  Factual Findings

### A.  The Jail and the Parties

#### 1.  The Parties

The Oakland County Sheriff's Office ("Sheriff's Office") oversees and administers the Jail and is responsible for the custody and care of individuals detained or incarcerated at the Jail.  Michael Bouchard is the Sheriff of Oakland County.  Captain Curtis Childs is the Commander of Corrective Services for the Sheriff's Office.  Plaintiffs are suing Sheriff Bouchard and Captain Childs in their official capacities only.

Plaintiffs are five Jail inmates.  Plaintiff Jamaal Cameron has been incarcerated at the Jail since March 11, 2020 and is expected to be released on July

---

[1] On May 18, Defendants filed a Motion to File a Sur-Reply (ECF No. 91), which Plaintiffs thereafter moved to strike (ECF No. 92).  The Court is denying Defendants' motion, as it contains evidence that they could have presented prior to, at, or immediately following the evidentiary hearing.  Moreover, sur-reply briefs are not permitted by the Local Rules for the Eastern District of Michigan, particularly because they enable parties to introduce new evidence which the opposing party cannot respond to, lest the briefing extend ad nauseam.  In light of this ruling, Plaintiffs' Motion to Strike is denied as moot.

5, 2020.  (J. Cameron Decl., ECF No. 5-3 at Pg ID 370.)  Mr. Cameron's original

release date was in August 2020, but he filed a *pro se* motion in state court seeking

early release on a tether due to his health conditions and was granted a 25-percent

reduction of his sentence.  (5/4/20 Hr'g Tr., ECF No. 56 at Pg ID 1488-89.)  The

judge did not inform Mr. Cameron that he had the right to appeal the denial of his

request for release on a tether.  (*Id.* at Pg ID 1508.)  Mr. Cameron eventually hired

a lawyer to file a second motion to be released, which was filed around April 1,

2020, heard on April 21, and remains pending before the state court.  (*Id.* at Pg ID

1489-91, 1507.)  Mr. Cameron states that he suffers from hypertension, bronchitis,

chronic obstructive pulmonary disease (COPD), gastritis, and sleep apnea.[2]  (*Id.* at

Pg ID 1461.)

Plaintiff Raj Lee has been at the Jail since November 18, 2019 and is serving

a nine-month sentence.  (Lee Decl., ECF No. 5-5 at Pg ID 383.)

Plaintiff Michael Cameron, a 42-year old convicted inmate, suffers from

cardiac disease, hypertension, and obesity.  (M. Cameron Decl., ECF No. 5-6 at Pg

ID 389.)

---

[2] Defendants dispute whether Mr. Cameron in fact suffers from these medical
conditions, as he did not list them upon intake at the Jail.  Mr. Cameron testified at
the hearing, however, that his hypertension was first diagnosed by Jail medical
staff during his incarceration and he has been prescribed medication for this
condition.  (5/4/20 Hr'g Tr., ECF No. 56 at Pg ID 1461-62.)  Mr. Cameron did not
think his other conditions were severe enough to warrant mentioning upon intake.
(*Id*. at Pg ID 1462.)

Plaintiff Richard Briggs is a pretrial detainee who has been unable to afford his $34,000 bond.  (Briggs Decl., ECF No. 5-4 at Pg ID 377.)  Mr. Briggs has been incarcerated at the Jail since approximately November 9, 2019, except for a period of time around March 2020 when he was in the Wayne County Jail.  (*Id.*)

Plaintiff Matthew Saunders is a pretrial detainee who has been incarcerated since October 3, 2019.  (Saunders Decl., ECF No. 5-8 at Pg ID 399.)  His criminal trial was initially scheduled for March 18, 2020, but is now adjourned until June 15.  (*Id.*)

### 2.     The Jail

The Jail has the capacity to house 1,664 inmates.  (5/7/20 Hr'g Tr., ECF No. 61 at Pg ID 1835.)  Pretrial detainees and convicted individuals are housed together.  (*Id.*)  The Jail is comprised of three main housing units:  the Main Jail, the Annex, and the East Annex.  (ECF No. 67.)  The Main Jail and the Annex are in the same building, while the East Annex is in a separate building across a parking lot.  (5/6/20 Hr'g Tr., ECF No. 65 at Pg ID 2020.)  Captain Childs oversees the Main Jail and Annex, while another captain oversees the East Annex. (*Id.* at Pg ID 2125.)

The Annex has eight pods, each of which largely contains two-person cells. (Defs.' Hr'g Ex. G, ECF No. 68 at Pg ID 2288-95.)  The Main Jail has six "holding tanks" and several "blocks."  The smallest holding tank can house 13 inmates and

the largest can house 37 inmates.[3]  (*Id.* at Pg ID 2296.)  Within the blocks, the

smallest cells hold eight inmates but most hold 10 inmates.  The 10-person cells

are approximately 12 by 15 feet.  (Defs.' Hr'g Ex. C, ECF No. 68 at Pg ID 2296-

2301.)  J-Block, which is known as the "clinic," houses inmates with special

medical needs within eight one-person cells.  (5/6/20 Hr'g Tr., ECF No. 65 at Pg

ID 2145.)  K-Block houses inmates diagnosed with mental health issues within

what appear to be one-person cells.  (*Id.* at Pg ID 2138.)

The East Annex houses inmate "trusties"[4] in a dorm-style housing area.  (*Id.*

at Pg ID 2133-34.)  Dorms are open rooms with bunks on each side of the wall,

which accommodate 28 inmates on one side and 32 inmates on the other side.  (*Id.*

at Pg ID 2145.)  There is also a day room area with tables and chairs.  (*Id.* at Pg ID

2133-34.)  It is a "privilege" to be housed in this area as there are no cells and

inmates are allowed increased freedom of movement.  (*Id.*)

The Main Jail has more than 50 cells with a significant number holding more

than two inmates.  (Defs.' Hr'g Ex. C, ECF No. 68.)  Most of these group cells are

10-person cells.  (*Id.*)

---

[3] For context, Mr. Cameron testified that there were 10 inmates at one point in the holding-tank in which he was placed, R-4, which is approximately 9 by 13 feet. (5/4/20 Hr'g Tr., ECF No. 56 at Pg ID 1478-79.)

[4] The parties used "trustee" throughout their briefs but at least one declarant used "trustie," prompting the Court to check the proper spelling in this context.  The Merriam-Webster Dictionary supports using the spelling used by the declarant. *See https://www.merriam-webster.com/dictionary/trusty.*

In some housing areas, inmates sleep a foot apart or less and, in others, inmates may have to sleep side-by-side in the middle of the floor.  (Saunders Decl., ECF No. 5-8 at Pg ID 399; J. Cameron Decl., ECF No. 5-3 at Pg ID 372; 5/4/20 Hr'g Tr., ECF No. 56 at Pg ID 1478-79.)  Inmates pass materials, such as food, hygiene items, and the DMQ used to clean their cells from one cell to the next. (White Decl., ECF No. 55 at Pg ID 1447.)  All inmates, no matter where they are housed, share showers, toilets, sinks, brooms, and cleaning supplies.  (5/7/20 Hr'g Tr., ECF Nos. 62 at Pg ID 1853-54; ECF No. 61 at Pg ID 1837-39.)  Some bunks adjoin toilets.  (Briggs Decl., ECF No. 5-4 at Pg ID 379.)  Toilets have no lids and fecal matter can disperse when toilets are flushed.  (Paredes Report, ECF No. 42 at Pg ID 1373.)  In some cells, the telephone is so close to the toilet or sink that an inmate using the phone may get splashed when the toilet is flushed or the sink is used.  (Chandler Decl., ECF No. 48 at Pg ID 1427-28; 5/4/20 Hr'g Tr., ECF No. 56 at Pg ID 1479-80.)

The Jail has 252 uniformed personnel, 43 medical staff workers, 12 Aramark employees (the Jail's contracted food vendor), approximately six custodial workers, and an undefined number of maintenance workers.  (5/6/20 Hr'g Tr., ECF No. 65 at Pg ID 2111, 2206.)  Approximately 170 individuals who are not inmates enter the Jail facility on a daily basis.  (*Id.* at Pg ID 2207.)

### B.    COVID-19 and Michigan

COVID-19 is a serious and new disease, not seen in humans prior to late 2019.  It is a highly infectious respiratory illness that easily spreads from person to person and can cause death.

Two cases of COVID-19 were identified in Michigan as of March 2, 2020.[5] As of May 19, the number of cases in the State had increased to 52,350, with 5,017 confirmed COVID-19 related deaths.[6]  Compared to other states across the nation, Michigan is an "epicenter" for the virus,[7] with Wayne, Macomb, and Oakland counties having the greatest number of cases per population.[8]

### 1.    Populations Most At-Risk from COVID-19

COVID-19 contraction creates a greater risk of severe illness or death for certain persons.  According to the Centers for Disease Control and Prevention

---

[5] Mich. Exec. Order 2020-4 (Mar. 10, 2020).

[6] *Coronavirus*, Michigan.gov, https://www.michigan.gov/coronavirus (last visited May 20, 2020).

[7] *See* Julie Mack, *Michigan Has Become a U.S. Epicenter for Coronavirus. Why?*, MLive (Mar. 27, 2020),  https://www.mlive.com/public-interest/2020/03/michigan-has-become-a-us-epicenter-for-coronavirus-why.html; Pat Byrne et al., *Michigan Coronavirus Cases: Tracking the Pandemic*, Detroit Free Press (May 19, 2020, 2:57 PM), https://www.freep.com/in-depth/news/nation/coronavirus/2020/04/11/michigan-coronavirus-cases-tracking-covid-19-pandemic/5121186002.

[8] *Coronavirus: Michigan Data*, Michigan.gov, https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173---,00.html (last updated May 19, 2020).

("CDC"), individuals with the following underlying conditions are more vulnerable to the virus:

- Over 65 years of age;
- Chronic lung disease or moderate to severe asthma;
- Serious heart conditions;
- Immunocompromised bodies, which could be due to cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications;
- Severe obesity (body mass index of 40 or higher);
- Diabetes;
- Chronic kidney disease undergoing dialysis; or,
- Liver disease.[9]

In addition, as pregnant women are at greater risk of getting sick from respiratory viruses, the CDC instructs them to take extra precautions to avoid exposure to the coronavirus.[10]

Plaintiffs' experts, Dr. Adam Lauring and Dr. Jonathan Louis Golob, testified that the CDC's list of conditions is incomplete. They opine that people over the age of 50, or with high blood pressure, Hepatitis C, less than "severe

---

[9] *Coronavirus Disease 2019 (COVID-19): People Who Are at Higher Risk for Severe Illness*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last updated May 14, 2020).

[10] *See Coronavirus Disease 2019 (COVID-19): If You Are Pregnant, Breastfeeding, or Caring for Young Children*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/pregnancy-breastfeeding.html (last updated May 13, 2020).

obesity," blood disorders (including sickle cell disease), inherited metabolic disorders, a history of stroke, or developmental delay also face a higher risk of experiencing severe COVID-19 outcomes.  (5/4/20 Hr'g Tr., ECF No. 56 at Pg ID 1523-25; Golob Decl., ECF No. 1-5 at Pg ID 148.)  In Dr. Lauring's opinion, medically-vulnerable individuals are probably at double or triple the risk of experiencing severe COVID-19 outcomes as compared to the general population. (5/4/20 Hr'g Tr., ECF No. 56 at Pg ID 1523-25.)

## 2.    Symptoms & Spread of COVID-19

Individuals infected with COVID-19 may experience a variety of symptoms ranging from mild symptoms to severe illness.[11]  These symptoms include a cough, shortness of breath or difficulty breathing, fever, chills, muscle pain, sore throat, and loss of taste or smell.[12]  This list is not all inclusive[13] and some symptoms may appear two to 14 days after exposure to the virus, or may not appear at all.[14]

COVID-19 spreads through respiratory droplets when an infected person coughs, sneezes, or sprays saliva.  (5/4/20 Hr'g Tr., ECF No. 56 at Pg ID 1523.)

---

[11] *Symptoms of Coronavirus*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last updated May 13, 2020).
[12] *Id*.
[13] *Id*.
[14] *See Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last updated May 15, 2020).

Transmission is more likely when people are within six feet of one another.[15]

Individuals also may be infected by touching contaminated surfaces and objects.[16]

The National Institutes of Health reports that the virus is "stable for several hours

to days in aerosols and on surfaces."[17]  Dr. Lauring testified that the virus is not

likely to be transmitted via urine but that there is concern about transmission via

feces.  (5/4/20 Hr'g Tr., ECF No. 56 at Pg ID 1523.)  Dr. Anthony Fauci, Director

of the National Institute of Allergy and Infectious Diseases, has indicated that

asymptomatic individuals can transmit the virus to others.[18]

### 3.    Mitigating the Risk of COVID-19 Infection

Currently, there is no vaccine to protect against COVID-19.  To prevent

infection and mitigate the spread of the virus, the CDC and other public health

agencies universally recommend social distancing (i.e. remaining at least six feet

---

[15] *Frequently Asked Questions: How COVID-19 Spreads*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/faq.html#How-COVID-19-Spreads (last updated May 12, 2020).
[16] *Id.*
[17] *News Release: New Coronavirus Stable for Hours on Surface*, Nat'l Insts. of Health (Mar. 17, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces.
[18] *See* Roni C. Rabin, *They Were Infected with the Coronavirus. They Never Showed Signs.*, N.Y. Times (Feb. 26, 2020), https://www.nytimes.com/2020/02/26/health/coronavirus-asymptomatic.html; *see also* Aria Bendix, *A Person Can Carry and Transmit COVID-19 Without Showing Symptoms, Scientists Confirm,* Sci. Alert (Feb. 24, 2020), https://www.sciencealert.com/researchers-confirmed-patients-can-transmit-the-coronavirus-without-showing-symptoms.

from every other person), not gathering in groups, staying out of crowded places and avoiding mass gatherings, wearing a face cover, and rigorous hygiene—including regular and thorough hand washing with soap and water, the use of alcohol-based hand sanitizer, proper sneeze and cough etiquette, and frequent cleaning of all surfaces.[19]

COVID-19 is more easily transmitted within communal living and densely packed environments, such as jail facilities and nursing homes.[20]  (*See* Meyer Decl., ECF No. 1-3 at Pg ID 95; Lauring Decl., ECF No. 1-15 at Pg ID 270-72.) This is a significant reason why individuals within these environments are at a particularly high risk of contracting COVID-19.  Shared dining halls, bathrooms, showers, and other common areas, as well as a lack of necessary medical and hygiene supplies, catalyzes the rapid spread of infectious diseases among jail inmates.  (*See, e.g.*, Meyer Decl., ECF No. 1-3 at Pg ID 95.)  And spaces within jails are often poorly ventilated, fueling more of the same.  (*Id.*)  Incarcerated

---

[19] *Coronavirus Disease 2019: How to Protect Yourself & Others*, Ctrs. for Disease Control & Prevention (last updated Apr. 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.
[20] *See Coronavirus Disease 2019: Guidance for Shared or Congregate Housing*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/shared-congregate-house/guidance-shared-congregate-housing.html (last updated Apr. 25, 2020); *Coronavirus Disease 2019: Nursing Homes & Long-Term Care Facilities*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/hcp/long-term-care.html (last updated May 19, 2020).

14

individuals also are more likely than members of the general public to have the chronic underlying health problems that cause greater risk of infection. (Meyer Decl., ECF No. 1-3 at Pg ID 96; Lauring Decl., ECF No. 1-15 at Pg ID 271.) Staff, visitors, contractors, vendors, and rapid turnover of the prison population means that people often cycle between facilities and communities. (Lauring Decl., ECF No. 1-15 at Pg ID 268-69.)

Recognizing these risks, the CDC published guidance for correctional and detention facilities on March 30, 2020.[21] The recommended CDC protocols include screening for individuals entering the facility, restricting visitors, establishing protocols for detecting and treating individuals exhibiting COVID-19 symptoms and testing positive for the virus, providing personal protective equipment, conducting stringent cleaning, providing access to personal hygiene products, restricting transfers to those that are "absolutely necessary," and practicing social distancing.[22] Dr. Lauring and Dr. Franco-Paredes both opine that social distancing is the single most important strategy for preventing coronavirus. (5/4/20 Hr'g Tr., ECF No. 56 at Pg ID 1526; Franco-Paredes Report, ECF No. 42 at Pg ID 1381.) Recognizing such need, Michigan's Governor Gretchen Whitmer

---

[21] *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Ctrs. for Disease Control & Prevention (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.
[22] *Id.*

issued an Executive Order encouraging the Michigan Department of Corrections

("MDOC") and county jails to consider actions to reduce their inmate

populations.[23]  The Governor also ordered MDOC to implement risk reduction

protocols reflective of those recommended by the CDC.[24]

### C.     COVID-19 and the Jail

### 1.     Defendants' Testimony

Captain Childs and the Jail's Health Services Administrator, Registered

Nurse Vicky Lynn Warren, are responsible for coordinating the Jail's response to

the COVID-19 pandemic.  (5/6/20 Hr'g Tr., ECF No. 65 at Pg ID 2163; 5/4/20

Hr'g Tr., ECF No. 56 at Pg ID 1557.)  Their first relevant conversation was in late

February 2020.  (*Id.*)

---

[23] Mich. Exec. Order 2020-29 (Mar. 29, 2020).  Despite these precautions, as of May 11, 2020, MDOC had more coronavirus-related deaths than any other state prison system and the federal prison system.  *See* Angie Jackson & Kristi Turner, *Michigan Ranks Highest in Nation for Prisoner Deaths from Coronavirus*, Detroit Free Press (May 9, 2020, 12:18 PM), https://www.freep.com/story/news/local/michigan/2020/05/09/prisoner-coronavirus-covid-19-deaths/3090182001/; *A State-by-State Look at Coronavirus in Prisons,* The Marshall Project (May 15, 2020 3:45 PM), https://www.themarshallproject.org/ (follow "Topics" hyperlink; then follow "Coronavirus" hyperlink; then follow "A State-by-State Look at Coronavirus in Prisons" hyperlink).  As of May 15, 2020, MDOC reports that 2,173 inmates have contracted the virus, placing it only below Ohio, Tennessee, and the Federal prison system in the number of cases.  *See A State-by-State Look at Coronavirus in Prisons, supra.*  Among all prisoners in Michigan, there have been 2,173 known cases of the virus and 55 deaths.  *Id.*  There have been 313 cases of the virus among prison staff throughout Michigan and two deaths.  *Id.*

[24] Mich. Exec. Order 2020-29 (Mar. 29, 2020).

As of May 6, 2020, it had been a couple of weeks since Captain Childs visited the housing units of the Jail.  (5/6/20 Hr'g Tr., ECF No. 65 at Pg ID 2142.) And though Nurse Warren is responsible for the Jail's entire medical and dental program, she does not provide direct care to inmates.  (5/4/20 Hr'g Tr., ECF No. 56 at Pg ID 1557.)  Nurse Warren's staff must obtain her permission for what they say to inmates but Nurse Warren concedes that she has not personally observed her staff interacting with inmates on a daily basis.  (5/6/20 Hr'g Tr., ECF No. 65 at Pg ID 2023.)  When asked when she last personally accompanied her staff on their visits around the housing facility, Nurse Warren indicated that she "do[es] not accompany them."  (*Id.* at Pg ID 2040-41.)  In fact, Nurse Warren testified that in her capacity as Health Services Administrator—a position she has held since 2014—it is "very seldom" that she is inside the Jail's housing areas.  (*Id.* at Pg ID 2110.)

Nonetheless, Captain Childs and Nurse Warren have described the following steps that Defendants have taken to respond to the COVID-19 pandemic:

- As early as March 11—before the first confirmed case of coronavirus at the Jail on March 28—signs were posted advising inmates to wash their hands regularly, that extra cleaning was being done to attempt to prevent the virus from entering the facility, and that "[c]leaning supplies are readily available."[25]

---

[25] Captain Childs testified that he reviewed video of the Jail from March 19, 2020, in which the signs described above were visibly posted.  (5/6/20 Hr'g Tr., ECF No. 65 at Pg ID 2184.)  Notably, the video clip provided to the Court captures a staff area of the jail, not a housing area.

(Childs Aff., ECF No. 30-2 at Pg ID 884; *see also* 5/6/20 Hr'g Tr., ECF No. 65 at Pg ID 2184; Defs.' Hr'g Ex. J, ECF No. 30-3.)

- Inmates are provided two bars of soap twice a week and can request more bars from corrections staff when needed. (Childs Aff., ECF No. 30-2 at Pg ID 881-82.)

- Inmates are responsible for cleaning the Jail's showers, sinks, toilets, and cells, as has been the case historically. (*Id*. at Pg ID 882.) To clean, inmates are provided sponges, rags, and spray bottles containing DMQ. (*Id*.)

- On April 9, the Sheriff's Office acquired a few thousand level one masks and distributed them to the inmates. (5/6/20 Hr'g Tr., ECF No. 65 at Pg ID 2182.) The Jail also ordered five thousand cloth masks around April 7. (*Id*. at Pg ID 2183; Defs.' Hr'g Ex. I, ECF No. 74.)

- On March 13, the Jail stopped all in-person visitation. (5/6/20 Hr'g Tr., ECF No. 65 at Pg ID 2166.) Inmate visits with attorneys, family, and friends must be through video. (*Id*.)

- To facilitate social distancing, the Jail canceled various programs (e.g., Alcohol Anonymous, Narcotics Anonymous, church, and recreational activities) and began using prepackaged meals. (5/6/20 Hr'g Tr., ECF No. 65 at Pg ID 2125-27.)

- Inmates have been moved around based on their classification levels to reduce the number of people housed in a cell. (*Id.* at Pg ID 2127, 2180.)

- Daily from Monday through Friday, a doctor or nurse practitioner from Nurse Warren's staff canvasses every housing unit, cell, and pod, at which time they interact with the inmate population and explain the importance of self-reporting COVID-19 symptoms. (5/4/20 Hr'g Tr., ECF No. 56 at Pg ID 1570; Warren Aff., ECF No. 30-6 at Pg ID 934.) Nurse Warren's staff also distributes sick call slips to inmates daily and picks up those slips every morning. (5/4/20 Hr'g Tr., ECF No. 56 at Pg ID 1570; Warren Aff., ECF

18

No. 30-6 at Pg ID 934.)  She explains that this is the protocol for inmates to self-report coronavirus symptoms.  (*Id*.)

- Inmates displaying symptoms are assessed.  (*Id*.)  Beginning on or around March 28, if an inmate tested positive for coronavirus, Jail staff moved him or her to a quarantine cell in the Jail's Annex reserved for such inmates.  (5/4/20 Hr'g Tr., ECF No. 56 at Pg ID 1572; 5/6/20 Hr'g Tr., ECF No. 65 at Pg ID 2000.)  The cell from which an infected inmate is removed is then placed under quarantine for 14 days, along with the inmates remaining in those cells and the entire adjoining row of cells.  (*Id*. at Pg ID 1575-76, 1579.)[26]

- Defendants began testing inmates on March 26.  (Defs.' Hr'g Ex. B, ECF No. 67.)  Prior to May 1, the Jail's testing focused on symptomatic inmates.  (5/6/20 Hr'g Tr., ECF No. 65 at Pg ID 2009.)  On May 1, Nurse Warren received 1,000 test kits.  (5/4/20 Hr'g Tr., ECF No. 60 at Pg ID 116.)  On that date, Defendants focused on testing medically-vulnerable individuals.  (5/6/20 Hr'g Tr., ECF No. 65 at Pg ID 2051.)  Medical staff tested 356 inmates from May 1 through May 7.  (*Id*. at Pg ID 2002; 5/7/20 Hr'g Tr., ECF No. 61 at Pg ID 1817.)

- Nurse Warren testified that she was not consulted when Defendants crafted and implemented the COVID-related training of corrections staff.  (5/6/20 Hr'g Tr., ECF No. 65 at Pg ID 2085-86, 2116.)  She also was not consulted about whether the same corrections officers should be interfacing with both symptomatic and non-symptomatic inmates.  (*Id*. at Pg ID 2102.)

- According to Captain Childs, corrections officers were instructed to pass out grievance forms multiple times each day and to not retaliate against an inmate for filing one, even those related to

---

[26] At the evidentiary hearing, Defendants introduced a diagram of the Jail reflecting the quarantined cells housing inmates who have tested positive for the coronavirus and those housing inmates exposed to COVID-19 or who are exhibiting COVID-19 symptoms.  (Defs.' Hr'g Ex. G, ECF No. 72.)

COVID-19.[27]  (Childs Aff., ECF No. 30-2 at Pg ID 882-83.)
Corrections officers were also trained to not threaten any inmate to
achieve behavior modification, (*id*. at Pg ID 883), and therefore
inmates are not transferred to the Main Jail from the Annex or East
Annex for the purpose of punishment.  (*Id*.)

- No policy currently in effect prohibits the transfer of inmates from
  one housing unit to another, unless the inmate is under quarantine.
  (5/7/20 Hr'g Tr., ECF No. 61 at Pg ID 1755-56.)  At one point,
  signs in the East Annex informed trusties that they will be sent to
  the Main Jail if they refuse to do their assigned work.  (*Id*. at
  1758.)  Captain Childs confirmed that East Annex inmates are
  moved for this reason, even during the pandemic and even if they
  are medically vulnerable.  (*Id*.)  On re-direct, Captain Childs
  indicated that, since the Court issued its TRO, inmates in the East
  Annex are moved only if they assault or threaten to assault
  someone.  (5/7/20 Hr'g Tr., ECF No. 61 at Pg ID 1787.)

- In mid- to late March, the Jail initiated a protocol to screen new
  arrestees by taking their temperatures and asking a series of
  questions to assess their exposure to or contraction of coronavirus.
  (5/6/20 Hr'g Tr., ECF No. 65 at Pg ID 2167-68; 5/4/20 Hr'g Tr.,
  ECF No. 56 at Pg ID 1568-69.)  Depending on the result of this
  screening, new inmates are placed with inmates with COVID-19,
  symptomatic inmates, or in quarantined housing for new arrestees
  where they remain for 14 days.  (5/4/20 Hr'g Tr., ECF No. 56 at Pg
  ID 1569.)  Before they are moved into the general population, new
  inmates are swab-tested for the virus.  (5/6/20 Hr'g Tr., ECF No.
  65 at Pg ID 1989-90.)  Starting on March 26, the same screening
  protocol was adopted for corrections officers, medical staff, and
  other workers when they arrive at work each day.  (5/4/20 Hr'g
  Tr., ECF No. 56 at Pg ID 1581-82; Defs.' Hr'g Ex. Ex. N, ECF
  No. 77.)

---

[27] According to Captain Childs, a search of the Jail's grievance system reflected no
grievance filed by any Plaintiff from January 1, 2020 through May 6, 2020.
(5/6/20 Hr'g Tr., ECF No. 56 at Pg ID 2189.)  Of the 276 grievances filed during
that period, only eight possibly related to COVID-19 and complained of unsanitary
conditions.  (*Id*.)  Defendants did not offer any of the filed grievances as evidence
prior to, during, or immediately following the evidentiary hearing.

- Around the third week in March, the Sheriff's Office sent letters to Oakland County Circuit Court judges seeking alternatives to imprisonment for 166 Jail inmates who were incarcerated due to non-violent misdemeanor convictions and/or were potentially medically vulnerable (based on the conditions for vulnerability outlined by the CDC). (Childs Aff., ECF No. 30-2 at Pg ID 885; 5/6/20 Hr'g Tr., ECF No. 65 at Pg ID 2168.) Forty-two of the 166 inmates were medically vulnerable. (5/6/20 Hr'g Tr., ECF No. 65 at Pg ID 2171.) The Sheriff's Office petitioned for the release of only those medically-vulnerable inmates who did not have a history of a violent misdemeanor or felony.[28] (5/7/20 Hr'g Tr., ECF No. 61 at Pg ID 1841.) As a result of this process, 110 inmates were released. (5/6/20 Hr'g Tr., ECF No. 65 at Pg ID 2171; *see also* Defs.' Hr'g Ex. D, ECF No. 69 at Pg ID 2342-44). Twenty-seven of those inmates were medically vulnerable. (*Id.*)

- Between May 11 and May 13, at which time the Jail housed 248 medically-vulnerable individuals (127 of whom have no history of a violent misdemeanor or felony), Defendants forwarded 17 additional letters to the Oakland County Circuit Court.[29, 30]

- Defendants do not have a protocol for segregating medically-vulnerable inmates from the rest of the Jail population. (5/7/20 Hr'g Tr., ECF No. 61 at Pg ID 1749.)[31] Medically-vulnerable

---

[28] To be clear, based on Defendants' list of medically-vulnerable inmates as of May 14 (*see infra* note 29), it is likely that the 42 medically-vulnerable inmates for whom the Sheriff's Office submitted petitions constitute only a fraction of the medically-vulnerable inmates with no history of a violent misdemeanor or felony.

[29] Four of the 17 inmates had the following original release dates: May 13, May 16, May 21, and May 28.

[30] This information was obtained from Defendants' list of medically-vulnerable inmates, which—at the Court's request—was submitted for *in camera* review on May 14.

[31] An inmate's housing is based upon his or her classification, which is based on the inmate's current and past charges and institutional behaviors. (5/7/20 Hr'g Tr.,

inmates could be housed in double cells, 10-person cells, or housing tanks,[32] (*id*. at Pg ID 1749-50), and no report detailing where the medically-vulnerable inmates are housed exists, (*id.* at Pg ID 1750).

- Defendants did not present any expert evidence on the adequacy of their current policies or the implementation of these policies.

## 2.    Plaintiffs' Testimony

Notwithstanding Defendants' claims of proactive implementation of protective measures, Plaintiffs and other Jail inmates present a dramatically different picture of what is occurring at the Jail:

- Inmates are not six feet apart from each other within their respective cells. (*See, e.g.*, J. Cameron Decl., ECF No. 5-3 at Pg ID 372-73; Briggs Decl., ECF No. 5-4 at Pg ID 377-78; Lee Decl., ECF No. 5-5 at Pg ID 384.)

- The Jail posted signs providing methods to prevent the spread of COVID-19 only after this lawsuit was filed, and when a sign fell, it was destroyed and not replaced. (Sheppard Decl., ECF No. 49 at Pg ID 1432; Hutson Decl., ECF No. 46 at Pg ID 1422.)  Mr. Cameron testified that the signs were posted the day before Dr. Franco-Paredes' inspection. (5/4/20 Hr'g Tr., ECF No. 56 at Pg ID 1482-83.)  In addition, the signs warning trusties that they would be sent to the Main Jail if they denied their work detail were

---

ECF No. 61 at Pg ID 1748.)  While an inmate's "medical needs" are considered (*id*.), those needs do not refer to their vulnerabilities to coronavirus. (*Id*., Pg ID 1749.)

[32] For example, Inmate Antione Hutson suffers from multiple myeloma cancer and stage three kidney failure. (Hutson Decl., ECF No. 46 at Pg ID 1421.)  Mr. Hutson is housed in a 10-person cell. (*Id*. at Pg ID 1422.)  He reports that some of his cellmates are coughing and sniffling, but no one is monitoring their symptoms. (*Id*.)

removed the day before Dr. Franco-Paredes' inspection and replaced with signs about COVID-19.  (M. Cameron Decl., ECF No. 31-2 at Pg ID 1025-26.)

- Inmates do not get sufficient soap to regularly wash their hands. (Briggs Decl., ECF No. 5-4 at Pg ID 378; Kucharski Decl., ECF No. 5-7 at Pg ID 396; Lewis Decl., ECF No. 51 at Pg ID 1437.) The bars of soap are small hospital-like bars.  (5/4/6 Hr'g Tr., ECF No. 56 at Pg ID 1480.)  In the Main Jail, inmates shared bars of soap up until the day of Dr. Franco-Paredes' inspection; and then individual supplies were distributed.  (*Id.* at Pg ID 1483-84.)  In addition, there is an insufficient amount of toilet paper and, therefore, inmates share rolls between cells.  (J. Cameron Decl., ECF No. 5-3 at Pg ID 374; *see also* Lewis Decl., ECF No. 51 at Pg ID 1437.)

- Mr. Chandler indicates that, recently, inmates received a bottle of DMQ for cleaning three times a day.  (Chandler Decl., ECF No. 48 at Pg ID 1428.)  Inmates cannot get DMQ at any other time of day, even if they ask.  (*Id.*; 5/4/20 Hr'g Tr., ECF No. 56 at Pg ID 1480.) In the East Annex, inmates are allowed to use DMQ in the bathrooms, but they are prohibited from bringing it into the bunk or common area.  (5/4/20 Hr'g Tr., ECF No. 56 at Pg ID 1509.) And while bottles of DMQ are available, inmates have no other cleaning equipment or supplies, such as rags (Williams Decl., ECF No. 50 at Pg ID 1434; Chandler Decl., ECF No. 48 at Pg ID 1428), or the supplies they receive are passed from cell to cell without being disinfected between use, (Chandler Decl., ECF No. 38 at Pg ID 1428; Sheppard Decl., ECF No. 49 at Pg ID 1431).

- Common surfaces and items that are touched frequently are not cleaned regularly and, in some cases, at all.  (M. Cameron Decl., ECF No. 5-6 at Pg ID 390; Briggs Decl., ECF No. 5-4 at Pg ID 378.)  The showers are filthy with scum, mold, clumps of hair, and insects.  (J. Cameron Decl., ECF No. 5-3 at Pg ID 374; Briggs Decl., ECF No. 5-4 at Pg ID 378; Kucharski Decl., ECF No. 5-7 at Pg ID 396; Lewis Decl., ECF No. 51 at Pg ID 1437.)  According to Inmate Karla Lewis, the common shower in her housing area is cleaned by trusties once every three days, at most.  (Lewis Decl., ECF No. 51 at Pg ID 1437.)  Inmate Jacqueline Williams indicates

that she is only allowed to clean the cell (including the toilet) she shares with another inmate every five days.  (Williams Decl., ECF No. 50 at Pg ID 1434.)

- Inmate Elizah Sheppard indicates that deputies, nurses, and trusties only started wearing gloves and masks after this lawsuit was filed. (Sheppard Decl., ECF No. 49 at Pg ID 1431.)  And while corrections officers wore masks on the day of the Jail inspection, in the days that followed, some either do not wear masks, others wear them sometimes, and others wear them under their chins. (Chandler Decl., ECF No. 48 at Pg ID 1428.)  And though corrections officers typically wear masks and/or gloves when serving food or taking an inmate's temperature, they usually do not do so when handing mail and hygiene supplies to inmates or when checking inmates' lockers.  (*Id*. at Pg ID 1428; 5/6/20 Hr'g Tr., ECF No. 56 at Pg ID 1472-73.)  Mr. Cameron further testified that Aramark employees, who touch the food containers, wore neither gloves nor face masks.  (5/4/20 Hr'g Tr., ECF No. 56 at Pg ID 1469.)  In addition, an Aramark employee who worked in the Jail's kitchen (who happened to be Mr. Jamaal Cameron's cousin) contracted the virus two weeks after she started working at the Jail. (*Id*. at Pg ID 1470.)

- Inmates are moved from cell to cell without consideration of who is symptomatic and who is not, and symptomatic inmates are housed in cells directly adjacent to presumptively healthy inmates. (Lee Decl., ECF No. 5-5 at Pg ID 386.)  In one instance, after quarantined inmates were moved from their cell, healthy inmates from the next cell were moved into the cell without it being cleaned.  (*Id*.)  There was hair still on the floor and the toilet had not been cleaned.  (*Id*.)  In another instance, on April 11, when an inmate in a quarantined cell died from suspected COVID-19, two of his cellmates were then moved to a cell with presumptively healthy prisoners.  (*Id*.)  And on a different occasion, Inmate Matthew Saunders became sick with suspected COVID-19 and had a fever of 103 degrees.  (Saunders Decl., ECF No. 5-8 at Pg ID 399.)  He was quarantined in the medical ward for four days and then returned to his dorm without being tested for the virus.  (*Id*. at Pg ID 400.)

- Mr. Cameron and Mr. Lee claim that Jail medical staff do not make rounds at all in certain parts of the Jail. (J. Cameron Decl., ECF No. 5-3 at Pg ID 374; Lee Decl., ECF No. 5-5 at Pg ID 383.) Mr. Cameron testified that around March 18, nurses visited the East Annex day room and provided inmates with a 30-day supply of their medications. (5/4/20 Hr'g Tr., ECF No. 56 at Pg ID 1473.) The nurses instructed the inmates that they were responsible enough to administer their medications themselves and that the nurses were not going to be back. (*Id.*) Mr. Cameron did not see a nurse in the East Annex at any point between that day and April 9 (a span of some 27 days).[33] (*Id.* at Pg ID 1474, 1476.)

- Jail medical staff are not responding appropriately to inmates who report symptoms of COVID-19. After Inmate David Kucharski, who suffers from asthma, reported that he was experiencing coronavirus symptoms, the nurse told him to let her know if his symptoms worsened and she gave everyone in the cell Tamiflu, with instructions to take it if they had COVID-19 symptoms. (Kucharski Decl., ECF No. 5-7 at Pg ID 395; Saunders Decl., ECF No. 5-8 at Pg ID 400.) When Mr. Briggs experienced shortness of breath and a loss of smell and taste, two nurses told him he did not have coronavirus and would not be tested. (Briggs Decl., ECF No. 5-4 at Pg ID 400.) One of the nurses told him that he could not be experiencing shortness of breath, as he was able to speak to her. (*Id.*) Mr. Briggs reports that others in his cell subsequently experienced the same symptoms. (*Id.*) About a month later, Mr. Briggs in fact tested positive for COVID-19. (5/6/20 Hr'g Tr., ECF No. 65 at Pg ID 2036.)

---

[33] Nurse Warren testified that they went to a "keep-on-person med path" at the East Annex because her staff was going there every day from the Main Jail and they wanted to decrease the interaction between her staff and the inmates. (5/6/20 Hr'g Tr., ECF No. 65 at Pg ID 2037.) Nurse Warren further testified that there was only one day, April 6, when medical staff did not visit the East Annex and that was because a contingent nurse contracted coronavirus. (5/4/20 Hr'g Tr., ECF No. 56 at Pg ID 1580.) According to Nurse Warren, the nurse contracted coronavirus while performing her job as an EMT, rather than while working at the Jail. (5/6/20 Hr'g Tr., ECF No. 65 at Pg ID 2044.)

- Kitchen trusties (i.e., inmates assigned to work in the kitchen) have been required to serve meals despite exhibiting COVID-19 symptoms.[34] (Kucharski Decl., ECF No. 5-7 at Pg ID 395.) Trusties who refuse to work because they believe they are being exposed to dangerous conditions are threatened by and sometimes suffer retaliation from corrections officers.[35] (5/4/20 Hr'g Tr., ECF No. 56 at Pg ID 1471-76.)

- Mr. Jamaal Cameron testified that he requested a grievance form but never received one. (5/4/20 Hr'g Tr., ECF No. 56 at Pg ID 1504.) Other inmates in Mr. Cameron's cell also could not get grievance forms when they requested them. (*Id.*)

On March 17, there were 1,223 inmates housed at the Jail. (Childs Aff., ECF No 30-2 at Pg ID 886; Defs.' Mot. Ex. O, ECF No. 78.) The Jail has

---

[34] For example, around the end of March 2020, Inmate Jason Arsineau, was experiencing COVID-19 symptoms and was feeling sick, so he informed a Jail deputy that he should not be serving food. (Arsineau Decl., ECF No. 5-9 at Pg ID 404-05.) The deputy called Mr. Arsineau a "motherf---er" and told Mr. Arsineau: "you do what I tell you to do, and you are going to serve food." (*Id.*) Mr. Arsineau continued to serve food for four days until he was unable to get out of bed, leading a deputy to physically assault him. (*Id.*)

[35] For example, on April 9, Jail Supervisor Kettlewell told Mr. Lee that he would be relocated from the Annex to the Main Jail if he refused to prepare food, pointing out that there was a COVID-19 outbreak in the Main Jail. (Lee Decl., ECF No. 5-5 at Pg ID 384.) Mr. Lee prepared a grievance form describing Supervisor Kettlewell's threat and was subsequently moved to a cell in the Main Jail that contained nine other inmates. (*Id.* at Pg ID 384-85.) Inmates in the adjoining cell were under quarantine. (*Id.* at Pg ID 385; J. Cameron Decl., ECF No. 5-3 at Pg ID 371-72.) In addition, after learning that his cousin contracted the virus while working in the Jail kitchen, Mr. Jamaal Cameron requested a change in his duties from serving food to cleaning the bathrooms or the dorm room. (5/4/20 Hr'g Tr., ECF No. 56 at Pg ID 1474-75.) As he expected, Mr. Cameron was transferred to the Main Jail on April 9. (*Id.* at Pg ID 1476.)

26

experienced an active outbreak of coronavirus, with 47 inmates testing positive

between March 27 (when coronavirus testing began at the Jail) and May 1.  (Defs.'

Hr'g Ex. B, ECF No. 67 at Pg ID 2245.)  As of May 1, the Jail population had been

reduced to 664 inmates.  (Defs.' Hr'g Ex. B, ECF No. 67.)  As of May 4, there

were 85 inmates at the Jail under quarantine.  (5/4/20 Hr'g Tr., ECF No. 56 at Pg

ID 1576.)

Prior to May 1, the Jail had tested 275 inmates for COVID-19.  (Defs.' Hr'g

Ex. B, ECF No. 67.)  From May 1 to 7, 356 inmates were tested, and 171 inmates

refused testing.[36]  (5/7/20 Hr'g Tr., ECF No. 61 at Pg ID 1814.)  As of May 6,

there were 10 COVID-positive inmates in the Jail.[37]  (Defs.' Hr'g Ex. B, ECF No.

---

[36] The Jail has not made clear why inmates have refused testing.  (*See* 5/7/20 Hr'g
Tr., ECF No. 61 at Pg ID 1821, 1826.)  The CDC Fact Sheet for Patients indicates
that the tests cause discomfort and that complications can occur during sample
collection.  *Coronavirus Disease 2019 (COVID-19): Fact Sheet for Patients*, Ctrs.
for Disease Control & Prevention (Mar. 15, 2019),
https://www.cdc.gov/coronavirus/2019-ncov/downloads/Factsheet-for-Patients-
2019-nCoV.pdf.  It also has been reported that some prisoners refuse to test and
conceal their COVID-19 symptoms to avoid being quarantined.  *See* Gus Burns,
*Michigan Inmates Hide Coronavirus Symptoms to Avoid Prison Quarantine*,
MLive (Apr. 15, 2020), https://www.mlive.com/public-interest/2020/04/michigan-
inmates-hide-coronavirus-symptoms-to-avoid-prison-quarantine.html.
[37] These test results are not a definitive sign that a large percentage of the Jail
population is free of the virus.  As the CDC has recognized, the current tests for
coronavirus—which have not gone through the FDA's approval process—may
provide false negative results.  *See, e.g.*, *Coronavirus Disease 2019 (COVID-19):
Fact Sheet for Patients*, *supra* note 36.  According to one news article,
approximately 15 percent of all tests conducted in the United States return false
negatives, meaning that of every 100 individuals infected with COVID-19, 15 are
told they do not have it.  *See This is How 'False Positives' and 'False Negatives'*

67; 5/7/20 Hr'g Tr., ECF No. 61 at Pg ID 2003; Defs.' Brief, ECF No. 85 at Pg ID 2904.)

### III. Plaintiffs' § 2241 Petition on Behalf of the Medically-Vulnerable Subclass

#### A. Whether Relief is Available Under § 2241 or More Appropriately Under § 1983

Defendants argue that § 2241 is not the proper avenue for Plaintiffs to pursue their claims because release is not an available remedy for the violation of their Eighth or Fourteenth Amendment rights. Defendants cite to Sixth Circuit decisions holding that an inmate may not challenge the conditions of confinement in a habeas petition. *See, e.g.*, *In re Owens*, 525 F. App'x 287, 290 (6th Cir. 2013). As the Sixth Circuit recently acknowledged, however, "[t]he Supreme Court has neither foreclosed a prisoner from using, nor authorized a prisoner to use, habeas relief to challenge his conditions of confinement." *Wilson v. Williams*, No. 20-3447, 2020 U.S. App. LEXIS 14049, at *4 (6th Cir. May 4, 2020); *see also Boumediene v. Bush*, 553 U.S. 723, 792 (2008) (declining to "discuss the reach of the writ with respect to claims of unlawful conditions of treatment or

---

*Can Bias COVID-19 Testing*, Forbes (May 7, 2020), https://www.forbes.com/sites/startswithabang/2020/05/07/this-is-how-false-positives-and-false-negatives-can-bias-covid-19-testing/#4f6cfae21743. Therefore, 70 of the 465 Jail inmates who tested negative since May 1, may in fact be COVID-19 positive.

confinement"); *Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979) (deferring "to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement"); *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973) (stating "we need not in this case explore the appropriate limits of habeas corpus as an alternative remedy to a proper action under § 1983").

Like the Sixth Circuit in *Wilson*, this Court need not resolve the question here. This is because Plaintiffs seek release for medically-vulnerable inmates not because the conditions of their confinement fail to prevent irreparable constitutional injury, but based on the fact of their confinement. "Where a petition claims no set of conditions would be constitutionally sufficient, [the Sixth Circuit] construes the petitioner's claim as challenging the fact of the confinement." *Wilson*, 2020 U.S. App. LEXIS 14291, at *4 (citing *Adams v. Bradshaw*, 644 F.3d 481, 483 (6th Cir. 2011); *see also Malam v. Adducci*, No. 20-10829, 2020 WL 1672662, at *3 (E.D. Mich. Apr. 5, 2020) (finding § 2241 to be a proper avenue for the plaintiff to seek "immediate release from confinement as a result of there being no conditions of confinement sufficient to prevent irreparable constitutional injury under the facts of her case"); *Refunjol v. Adducci*, No. 2:20-cv-2099, 2020 WL 2487119, at *17 (S.D. Ohio May 14, 2020) (citing cases to conclude that the petitioners could bring their claims under § 2241).

Defendants also briefly cite the *Rooker-Feldman* doctrine and the Full-Faith and Credit Act, 28 U.S.C. § 1783, as precluding the Court from adjudicating Plaintiffs' § 2241 petition.  (*See* ECF No. 30 at Pg ID 826.)  "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation," however, "are deemed waived."  *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (citation and quotation marks omitted).  In any event, the Court finds neither the doctrine nor statute applicable here where Plaintiffs are not seeking review of a state court decision.

For these reasons, the Court concludes that § 2241 is the proper vehicle for Plaintiffs to challenge the continued confinement of medically-vulnerable Jail inmates during the COVID-19 pandemic.  Notably, federal judges have the authority to release detainees on bail while their habeas petitions are pending.  *See Lee v. Jabe*, 989 F.2d 869, 871 (6th Cir. 1993) (citing *Dotson v. Clark*, 900 F.2d 77, 79 (6th Cir. 1990)); *see also Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001); *Savino v. Souza*, No. 20-10617, 2020 WL 1703844, at *8-9 (D. Mass. Apr. 8, 2020); *Clark v. Hoffner*, No. 16-cv-11959, 2020 WL 1703870 (E.D. Mich. Apr. 8, 2020).  "In order to receive bail pending a decision on the merits, prisoners must be able to show not only a substantial claim of law based on the facts surrounding the petition but also the existence of some circumstance making the motion for bail exceptional and deserving of special treatment in the interests of justice."  *Lee*, 989

F.2d at 871 (quoting *Dotson*, 900 F.2d at 79) (internal quotations marks and citations omitted).

The likelihood of the Medically-Vulnerable Subclass prevailing on their habeas petition requires application of the same deliberate indifference analysis as the § 1983 claim of the Jail Class.  The Court therefore addresses both together, in Section VI(A) below.

### B.    Exhaustion under § 2241

The requirement of the Prison Litigation Reform Act ("PLRA"), that administrative remedies must be exhausted before bringing suit challenging prison conditions, does not apply to habeas petitions.  28 U.S.C. § 3626(g)(2); *McIntosh v. United States Parole Comm'n*, 115 F.3d 809, 811-12 (10th Cir. 1997).  "Nor does the exhaustion requirement of 28 U.S.C. § 2254, which applies to petitions filed to challenge state court convictions, expressly apply to petitions filed under § 2241."  *Graham v. Snyder*, 68 F. App'x 589, 590 (6th Cir. 2003).  Nevertheless, the Sixth Circuit has held that the exhaustion doctrine applies to § 2241 petitions. *See Little v. Hopkins*, 638 F.2d 953, 954 (6th Cir. 1981).  Prisoners must exhaust their available remedies prior to filing a habeas petition except in unusual circumstances.  *Id.*; *Rose v. Lundy*, 455 U.S. 509, 516 (1982).  The Supreme Court has provided that the exhaustion requirement will be waived "'in rare case where

exceptional circumstances of peculiar urgency are shown to exist.'" *Rose*, 455 U.S. at 515-16 (quoting *Ex parte Hawk*, 321 U.S. 114, 117 (1944)).

Only *available* state remedies must be exhausted before seeking federal habeas relief. Exhaustion is not required where a remedy in state court is "unavailable," *O'Sullivan v. Boerckel*, 526 U.S. 838, 847-848 (1999), or where the remedy is "inadequate or cannot provide the relief requested," *Goar v. Civiletti*, 688 F.2d 27, 28-29 (6th Cir. 1982) (citations omitted). The Supreme Court has "held that state prisoners do not have to invoke extraordinary remedies when those remedies are alternatives to the standard review process and where the state courts have not provided relief through those remedies in the past." *O'Sullivan*, 526 U.S. at 844 (citation omitted).

Defendants identify four instances where Oakland County Circuit Court judges released Jail inmates due to the coronavirus. In two cases, the state court did not identify the court rule or state statute on which it was relying to grant relief. In the remaining two cases, the court cited Michigan Compiled Laws Section 801.59b, which is part of Michigan's County Jail Overcrowding Act. The statute does not set forth a remedy for *inmates* to pursue. Instead, it grants judicial officers the authority to suspend or reduce a jail sentence or modify bond in response to "a county jail overcrowding state of emergency." *See id.*; Mich. Exec Order 2020-29 (Mar. 29, 2020). To the extent prisoners have obtained relief

32

through this mechanism during the coronavirus pandemic, it is not part of the "standard review process" and is not a remedy through which state courts have "provided relief … in the past."

Defendants also argue that pretrial detainees may seek relief by filing a motion for modification of their prior release decisions. A district judge in the District Court for the Western District has found such an available remedy in Michigan Court Rule 6.106H, concluding that it "contemplates circumstances that warrant emergency release and provides an avenue to appeal a custody decision. *Evil v. Whitmer*, No. 1:20-cv-343, 2020 WL 1933685, at *3 (W.D. Mich. April 22, 2020). The rule only provides for emergency release, however, "as a result of a court order or law requiring the release of prisoners to relieve jail conditions[.]" Mich. Ct. R. 6.106(H)(3). Additionally, the rule states that a reviewing court may "stay, vacate, modify, or reverse [a] release decision" only based on "an abuse of discretion." *Id.* at R. 6.106(H)(1).

But even if these state remedies were available to Plaintiffs to seek the relief sought here, the failure to exhaust does not divest this Court of jurisdiction over their petition. *Rockwell v. Yukins*, 217 F.3d 421, 423 (6th Cir. 2000). A federal habeas court may consider unexhausted claims where "'unusual'" or 'exceptional' circumstances" exist. *Id.* (quoting *O'Guinn v. Dutton*, 88 F.3d 1409, 1412 (6th Cir. 1996) (citing *Granberry v. Greer*, 481 U.S. 129 (1987))).

33

The Court can conceive of few more unusual or exceptional circumstances than the current pandemic.  In fact the Court imagines that judges in the future will use this pandemic as the quintessential example of when unusual and exceptional circumstances exist.

## IV.   Plaintiffs' § 1983 Claim on Behalf of the Jail Class - Exhaustion

The PLRA requires prisoners to exhaust all administrative remedies before filing suit under federal law.  42 U.S.C. § 1997e(a).  The exhaustion requirement is "mandatory," *Woodford v. Ngo*, 549 U.S. 199, 219 (2007), and courts may not excuse an inmate's failure to exhaust because of "special circumstances," *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016).  Nevertheless, in *Ross*, the Supreme Court "underscore[d]" the PLRA's "built-in exception to the exhaustion requirement:  A prisoner need not exhaust remedies if they are not 'available.'"  136 S. Ct. at 1855.  The exhaustion requirement must be applied "to the real-world workings of prison grievance systems."  *Id.* at 1859.

The *Ross* Court identified three circumstances in which an administrative remedy, although officially on the books, may be deemed "unavailable":  (i) when an administrative procedure "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (ii) when an administrative scheme is "so opaque that it becomes, practically speaking, incapable of use[]"; and (iii) where "prison administrators thwart inmates from

taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60. Determining whether any of these circumstances exist may require factual development. *See id.* at 1862.

Addressing the exhaustion requirement in the context of the COVID-19 pandemic, Supreme Court Justice Sonia Sotomayor, joined by Justice Ruth Bader Ginsburg, recently indicated that an exception to the PLRA's exhaustion requirement may also arise where "a prison grievance system cannot or will not respond to an inmate's complaint." *Valentine v. Collier*, -- U.S. --, 2020 WL 2497541, *1 (May 14, 2020). Justice Sotomayor suggested that when faced with "a rapidly spreading pandemic[,]" administrative remedies may be "unavailable":

> I caution that in these unprecedented circumstances, where an inmate faces an imminent risk of harm that the grievance process cannot or does not answer, the PLRA's textual exception could open the courthouse doors where they would otherwise stay closed.

*Id.*; *see also Fletcher v. Menard Corr. Ctr.*, 623 F.3d 1171, 1173 (7th Cir. 2010) ("[W]e think it's also true that there is no duty to exhaust, in a situation of imminent danger, if there are no administrative remedies for warding off such a danger."). At this stage of the proceedings, there is sufficient evidence on this record to conclude that the Jail's grievance procedures are "unavailable" to Plaintiffs. Corrections officers refuse to provide grievance forms to some inmates who request them. Corrections officers threaten to transfer inmates to COVID-19

infested areas if they complain.  When Mr. Lee submitted a grievance, the form was simply handed to the corrections officer being grieved and Mr. Lee was transferred from the East Annex where there were no COVID-19 positive inmates to the Main Jail, where there were many.

This record evidence reflects that Plaintiffs' affirmative efforts to exhaust have been thwarted by machination and intimidation.  *See Risher v. Lappin*, 639 F.3d 236, 240-41 (6th Cir. 2011) (requiring "affirmative efforts," but concluding that an inmate "was not required to make additional efforts beyond the scope of the Bureau's regulations simply because the Regional Director failed to supply him with a document, something it was obligated to do"); *Himmelreich v. Fed. Bureau of Prisons*, 766 F.3d 575, 577-78 (6th Cir. 2014), *aff'd sub nom. Simmons v. Himmelreich*, -- U.S. --, 136 S. Ct. 1843 (2016); *Rancher v. Franklin Cty.*, 122 F. App'x 240, 241-42 (6th Cir. 2005) (excusing exhaustion when an inmate made numerous requests for medical treatment but received no response and presented evidence that, in practice, the prison refused to accept medical grievances).  In *Himmelreich*, the Sixth Circuit vacated the district court's grant of summary judgment on exhaustion grounds because the alleged retaliation, if true, "would render the grievance process functionally unavailable for a person of ordinary firmness."  766 F.3d at 578.  In that case, the plaintiff alleged that a prison official threatened to transfer him to a higher-security prison or penitentiary where he

would more likely be attacked and placed the plaintiff in a Special Housing Unit

for filing a lawsuit. *Id*. at 577-78. More alarming, here, corrections officers have

threatened—and in Mr. Lee's case, carried out the threat—to transfer inmates who

dare to complain to areas infested with a deadly and highly contagious virus.

Moreover, the Jail's grievance procedures do not appear to provide an

avenue for medically-vulnerable inmates to seek release on the basis of the serious

and deadly risk COVID-19 poses. Rather, the Jail's Inmate Guide states that

grievances are available for prisoners who "wish[] to complain regarding the living

conditions, procedures, facilities or treatment in the Oakland County Jail[.]"

(Defs.' Resp. Ex. B, ECF No. 82-2 at Pg ID 2875.) Defendants lack the authority

to release prisoners on their own.

For these reasons, at this preliminary stage, the Court concludes that the

PLRA's exhaustion requirement does not preclude Plaintiffs from pursuing their

claims in this lawsuit.

**V.      Whether Plaintiffs' § 1983 Claims Should Proceed as a Class Action and
          Whether Their Request for Habeas Relief Under § 2241 is Appropriate
          as a Representative Petition**

Rule 23 of the Federal Rules of Civil Procedure governs class certification.

Numerous courts have concluded that a petition for writ of habeas may be brought

as a class action. *See, e.g., Wilson v. Williams*, -- F. Supp. 3d --, 2020 WL

1940882, at *6 (N.D. Ohio Apr. 22, 2020); *Mays v. Dart*, No. 20 C 2134, 2020 WL

1987007, at *16 (N.D. Ill. Apr. 27, 2020) (citing cases).  Those courts generally

apply the provisions of Rule 23 to determine whether a representative action is

appropriate.  *Id.*  However, several circuit courts have "clearly pointed out that a

representative prisoners proceeding is merely analogous to a Rule 23 class action,

and that the provisions of Rule 23 need not be complied with precisely."  *United*

*States ex rel. Morgan v. Sielaff*, 546 F.2d 218, 221 n.5 (7th Cir. 1976) (citing *Bijeol*

*v. Benson*, 513 F.2d 965, 968 (7th Cir. 1975) and *United States ex rel. Sero v.*

*Preiser*, 506 F.2d 1115, 1125 (2d Cir. 1974)); *Napier v. Gertrude*, 542 F.2d 825,

827 n.2 (10th Cir. 1976).

Pursuant to Rule 23, a class must meet the requirements of numerosity,

commonality, typicality, and adequate representation.  Fed. R. Civ. P. 23(a).

Additionally, one of the requirements of Rule 23(b) must be satisfied.  Plaintiffs

seek certification under Rule 23(b)(2), which permits certification where the

defendant "has acted or refused to act on grounds that apply generally to the class,

so that final injunctive relief or corresponding declaratory relief is appropriate

respecting the class as a whole[.]"  Fed. R. Civ. P. 23(b)(2).  Plaintiffs bear the

burden of showing that class certification is proper.  *Wal-Mart Stores, Inc. v.*

*Dukes*, 564 U.S. 338 (2011).

As a preliminary matter, at this time the Court is modifying the Medically-

Vulnerable Subclass to include individuals 60 years of age and older or who,

38

regardless of age, experience any of the following underlying medical conditions: (i) chronic lung disease including chronic obstructive pulmonary disease (e.g., bronchitis or emphysema); (ii) moderate to severe asthma; (iii) serious heart conditions; (iv) immunocompromising conditions including cancer treatment, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications: (v) severe obesity (body mass index of 40 or higher); (vi) diabetes; (vii) chronic kidney or liver disease; (viii) metabolic disorders; or (ix) current or recent (last two weeks) pregnancy.

Defendants contend that the Medically-Vulnerable Subclass is not sufficiently defined so as to be capable of certification.  According to Defendants, because some factual inquiry is needed to determine whether individuals fall within the subclass and subclass membership is not based on objective criteria, the subclass is not appropriate for class certification.  As Defendants' brief acknowledges, however, "[t]he purpose of this requirement is to ensure administrative feasibility, including the ability to notify absent class members in order to provide them an opportunity to opt out and avoid the potential collateral estoppel effects of a final judgment."  (ECF No. 82 at Pg ID 2869 (quoting *Kensu v. Mich. Dep't of Corr.*, 18-cv-10175, 2020 WL 1698662, at *7 (E.D. Mich. Apr. 8, 2002) (citing *Cole v. City of Memphis*, 893 F.3d 530, 541 (6th Cir. 2016)).)

*Kensu*, however, involved certification under Rule 23(b)(3).  Plaintiffs seek

certification under Rule 23(b)(2).  In *Cole*, the Sixth Circuit held that this need for

"'ascertainability' is inapplicable to Rule 23(b)(2)."[38]  839 F.3d at 541-42 (joining

three other Circuits in reaching this conclusion).

### A.    Numerosity

When Plaintiffs filed their motion for class certification a month ago, the Jail

housed 863 inmates.  (*See* Defs.' Hr'g Ex. B, ECF No. 67 at Pg ID 2245.)  Based

on a report of the Michigan Joint Task Force and Pretrial Incarceration, Plaintiffs

estimate that this population is evenly divided between pretrial and convicted

individuals.  At the time of the evidentiary hearing, there were 220 individuals on

Defendants' list of medically-vulnerable inmates.  These numbers are substantial

enough to satisfy the numerosity requirement.  *See Peters v. Cars to Go, Inc.*, 184

F.R.D. 270, 276 (W.D. Mich. 1998) (citation omitted) ("[A] class numbering more

than 40 members usually satisfies the impracticability requirement, and classes

containing 100 or more members routinely satisfy the numerosity requirement.").

Defendants do not argue that these numbers are insufficient to satisfy the

numerosity requirement of Rule 23.  Instead, they argue that Plaintiffs cannot show

numerosity because none of them exhausted their administrative remedies and they

---

[38] Thus, while the *Cole* court explained the purpose of the ascertainability
requirement, it expressly declined to require it in the Rule 23(b)(2) class action
before it.  839 F.3d at 542.

fail to identify any potential class member who has.  Defendants' argument does not prevail in light of the Court's ruling on exhaustion.

### B.    Commonality

The commonality requirement of Rule 23(a)(2) "simply requires a common question of law or fact."  *Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 884 (6th Cir. 1997); *see also Dukes*, 564 U.S. at 350.  The Sixth Circuit has explained that "'[t]he interests and claims of the various plaintiffs need not be identical.  Rather, the commonality test is met when there is at least one issue whose resolution will affect all or a significant number of the putative class members.'"  *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 424 (6th Cir. 1998) (quoting *Forbush v. J.C. Penney Co., Inc.*, 994 F.2d 1101, 1106 (5th Cir. 1993)).

All of the Jail's inmates are allegedly suffering the same injury due to Defendants' alleged failure to adequately respond to COVID-19.  Regardless of their housing locations, security class, date of incarceration, or cell assignments, Plaintiffs allege that Defendants have not instituted sufficient measures throughout the Jail to protect them from the serious risk of harm posed by the virus.  There are common questions of law and fact for the proposed class and subclasses, such as: what are the conditions within the Jail, what has been Defendants' response to COVID-19, and are Defendants' actions and/or inactions reflective of their deliberate indifference to the serious risk of harm the virus poses to all inmates.

41

There is at least one common question that must be resolved to adjudicate the habeas petition brought by the Medically-Vulnerable Subclass: whether COVID-19 presents such a severe risk of harm that it is unconstitutional to continue confining such individuals in the Jail. This issue is at the core of Plaintiffs' § 2241 petition. "The commonality test is qualitative rather than quantitative, that is, there need be only a single issue common to all members of the class." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1080 (6th Cir. 1996) (quotation marks and citation omitted). Even if individualized determinations as to placement suitability are necessary, the "mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1998); *see also Hill v. Snyder*, 308 F. Supp. 3d 893, 914 (E.D. Mich. 2018) (finding commonality among class members challenging state's statutory scheme barring them from parole eligibility "[r]egardless of individual factors regarding a prisoner's likelihood of parole"); *Wilson*, 2020 WL 1940882, at *7 (finding that medically-vulnerable inmates seeking release from prison due to the coronavirus satisfied the commonality requirement); *Mays*, 2020 WL 1987007, at *17 (same).

42

## C.    Typicality

"A claim is typical if 'it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if [the named plaintiff's] claims are based on the same legal theory.'" *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007) (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d at 1082).  Typicality is satisfied for the Jail Class, as well as the Pre-Trial and Post-Conviction Subclasses at large because Plaintiffs allege the same injurious conduct stemming from Defendants' response to the coronavirus pandemic.  This is because they advance the same legal theory.  In other words, Plaintiffs assert that they are exposed to a serious risk of contracting the deadly coronavirus because Defendants have acted deliberately indifferent in violation of their Eighth or Fourteenth Amendment rights by failing to institute safety measures throughout the Jail to prevent the virus from quickly spreading from inmate to inmate (and failing to release the medically vulnerable based on the fact of their confinement).

## D.    Adequacy of Representation

The Sixth Circuit has identified two criteria relevant to deciding whether the named plaintiff "will fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4):  "(1) the representative must have common interests with unnamed members of the class and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *In re*

*Am. Med. Sys., Inc.*, 75 F.3d at 1083 (internal quotations and citations omitted).

Defendants raise two arguments challenging Plaintiffs' adequacy:  (i) no Plaintiff

has exhausted his administrative remedies and (ii) no Plaintiff is a pretrial detainee.

Defendants' first argument lacks merit in light of the Court's exhaustion

analysis.  As to the second, Plaintiffs' Complaint and Mr. Briggs' declaration

reflect that he was a pretrial detainee on the date this lawsuit was filed.  (Compl.,

ECF No. 1 at Pg ID 8; Briggs Decl., ECF No. 5-4 at Pg ID 277.)  The Oakland

County Circuit Court's public website reflects that Mr. Briggs in fact remains a

pretrial detainee in Case Number 2019-272964-FH and that he was arraigned on

December 3, 2019, and is still awaiting trial, with his pretrial date repeatedly

continued due to COVID-19.[39]

### E.    Rule 23(b)(2)

Again, certification under Rule 23(b)(2) is appropriate where the party

seeking class certification shows that "the party opposing the class has acted or

refused to act on grounds that apply generally to the class, so that final injunctive

relief or corresponding declaratory relief is appropriate respecting the class as a

whole."  Fed. R. Civ. P. 23(b)(2).  "Rule 23(b)(2) applies only when a single

---

[39] *See Court Explorer*, Oakland County,
https://courtexplorer.oakgov.com/oaklandcounty/ (last visited May 20, 2020)
(insert "Last Name" "Briggs"; then insert "First Name" "Richard"; then follow
"Briggs, Richard, Mareno" hyperlink associated with "2019-272964-FH").

injunction or declaratory judgment would provide relief to each member of the class." *Dukes*, 564 U.S. at 360.  Courts have found that the requirements of Rule 23(b)(2) are "almost automatically satisfied in actions primarily seeking injunctive relief." *Williams v. City of Philadelphia*, 270 F.R.D. 208, 222 (E.D. Pa. 2010) (citing *Baby Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1995)) (additional citation omitted).  "Numerous courts have held that Rule 23(b)(2) is an appropriate vehicle in actions challenging prison conditions." *Id.* at 222 (citing cases).

The Jail Class, Pre-trial Subclass, and Post-Conviction Subclass seek an injunction requiring Defendants to take appropriate action to improve the conditions in the Jail, which Plaintiffs claim render the Jail a ticking timebomb for widespread contagion of COVID-19.  The Medically-Vulnerable Subclass challenges the policies and practices through which Defendants have acted or refused to act on grounds that apply generally to all inmates at heightened risk of contracting the coronavirus due to their age and/or underlying medical conditions. This subclass is seeking an injunction that will protect them from the unique risk of harm they face from coronavirus.  The Court can fashion injunctive relief that requires Defendants to take specific actions to address this risk.  The § 2241 petition brought on behalf of the Medically-Vulnerable Subclass may not fit perfectly within Rule 23(b)(2) because the Court's injunction may not result in the same relief for every member of the subclass.  Nonetheless, this Court need only

look to the provisions of Rule 23 in determining whether a representative action is appropriate and need not find precise compliance with the rule.  *See supra*.

The Court concludes that the Jail Class and Subclasses as defined in this Opinion meet the requirements for class certification and should be provisionally certified.  This provisional determination is made with the understanding that it "may be altered or amended before final judgment."  Fed. R. Civ. P. 23(c)(1)(C).

## VI.   Whether Plaintiffs are Entitled to a Preliminary Injunction for the Jail Class and/or Medically-Vulnerable Subclass

The relevant factors for deciding whether to issue a preliminary injunction are well-established:

> (1) whether the movant has a "strong" likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction.

*McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc) (quoting *Sandison v. Mich. High Sch. Athletic Ass'n*, 64 F.3d 1026, 1030 (6th Cir. 1995)).  These factors are balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction.  *McPherson*, 119 F.3d at 459.

### A.    Whether Plaintiffs are Likely to Succeed in Establishing a Violation of Their Constitutional Rights

### 1.    *Monell* Liability

Plaintiffs are essentially suing Oakland County alone, as they name Sheriff Bouchard and Captain Childs solely in their official capacities.  "Official capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'"[40]  *Kentucky v. Graham*, 473 U.S. 159, 165-68 (1985) (quoting *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 690 n.5 (1978)).  "[A] governmental entity is liable under § 1983 only when the entity itself is a moving force behind the [constitutional] deprivation."  *Id.* (internal quotation marks and citations omitted).  "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Monell*, 436 U.S. at 694.

Defendants argue that Plaintiffs cannot show that Oakland County maintains an unconstitutional policy or practice.  Defendants seem to be contending that because the current pandemic presents a "novel" situation—one "that has never confronted municipalities" (ECF No. 30 at Pg ID 833)—there can be no municipal

---

[40] For this reason, Defendants argue that Sheriff Bouchard and Captain Childs should be dismissed from this lawsuit.  (ECF No. 30 (citing *Barber v. City of Salem*, 953 F.2d 232, 237 (6th Cir. 1992).)  The Court agrees and is dismissing them as parties to this lawsuit.

policy or custom responsible for the constitutional violation of Plaintiffs' rights.
This argument conflates the concept of municipal liability with qualified immunity.
Regardless of the exceptional nature of the circumstances presented,[41] liability can
attach if Defendants are aware of the serious threat to Jail inmates posed by
COVID-19 and respond to it with a policy that is deliberately indifferent to
Plaintiffs' constitutional rights.  "[O]fficial municipal policy extends to 'the acts of
its policymaking officials[,]'" such as Sheriff Bouchard and Captain Childs.
*Richmond*, 885 F.3d at 948.

### 2.      Deliberate Indifference

Prison officials must guarantee the safety of and provide adequate medical
care to both convicted inmates and pretrial detainees.  The Eighth Amendment's
prohibition against cruel and unusual punishment establishes this obligation as it
relates to convicted inmates.  *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018)
(quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).  Pretrial detainees are
similarly protected under the Fourteenth Amendment's Due Process Clause.
*Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004) (citing *Bell*, 441
U.S. at 545).

---

[41] While COVID-19 is a new virus not previously diagnosed in people prior to late
2019, highly contagious viruses are not unique.  Unfortunately, nor is the risk of
highly contagious viruses or infections spreading throughout a prison facility.  *See,
e.g.*, *Duvall v. Dallas Cty.*, 631 F.3d 203, 207 (5th Cir. 2011) (MRSA).

In the context of the medical needs of convicted inmates or pretrial

detainees, a plaintiff must show that the defendant "acted with deliberate

indifference to [the plaintiff's] medical needs." *Blackmore*, 390 F.3d at 895 (citing

*Estelle*, 429 U.S. at 104). To show "deliberate indifference," a plaintiff must

satisfy two components: one objective and the other subjective.[42] *Comstock v.*

*McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

### a)    Objective Component

To satisfy the objective component, inmates must demonstrate that they are

"incarcerated under conditions posing a substantial risk of serious harm." *Farmer*

*v. Brennan*, 511 U.S. 825, 834 (1994); *see also Richko v. Wayne Cty.*, 819 F.3d

907, 915 (6th Cir. 2016) (quoting *Amick v. Ohio Dep't of Rehab. & Corr.*, 521 F.

App'x 354, 361 (6th Cir. 2013)) (explaining that a plaintiff satisfies "the objective

component by showing that, 'absent reasonable precautions, an inmate is exposed

to a substantial risk of serious harm'").

Though Defendants cite case law discussing the objective component, (*see*

ECF No. 30 at Pg ID 834-35), they have not disputed that the objective component

---

[42] The Sixth Circuit has not decided whether the Supreme Court's decision in
*Kingsley v. Hendrickson*, 576 U.S. 389 (2015), abrogated the subjective component
when evaluating the deliberate indifference claims of pretrial detainees. *See*
*Richmond v. Huq*, 885 F.3d 923, 938 n.3 (6th Cir. 2018). The Court will proceed
as if pretrial detainees must still satisfy both components, even though the Sixth
Circuit has recognized that decisions of other circuit courts "call[] into serious
doubt" whether a pretrial detainee must satisfy the subjective component. *Id.*

is satisfied here.  *Mekani v. Homecomings Fin., LLC*, 752 F. Supp. 2d 785, 790 n.2 (E.D. Mich. 2010) (stating that where a plaintiff fails to dispute the arguments a defendant makes for dismissal of a claim, "the Court assumes he concedes this point").

Moreover, the above record shows that the congregate nature of the Jail— housing hundreds of inmates who share sinks, toilets, and showers, as well as eating, sleeping, and living spaces—makes it an ideal environment for the spread of COVID-19.  This, along with the fact that there is an active outbreak of COVID-19 at the Jail and the fact that COVID-19 is a highly infectious virus that poses a significant risk of severe illness and death, particularly for the medically vulnerable, renders the objective component easily satisfied in this case.  *Wilson*, 2020 WL 1940882, at *8 (finding objective component satisfied where jail housed medically-vulnerable population and experienced COVID-19 outbreak); *Valentine*, -- U.S. --, 2020 WL 2497541, at *2 (Sotomayor, J.) (noting the district court's "detailed, careful findings," which included "the 'obvious' risk of [COVID-19] to the older men in the [Jail] Unit").

### b)    Subjective Component

"To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference,

50

and then disregarded that risk." *Comstock*, 273 F.3d at 703 (citing *Farmer*, 511 U.S. at 834).

Here, it is undisputed that Defendants perceived facts from which to infer substantial risk: the danger COVID-19 poses to the Jail Class and in particular to the Medically-Vulnerable Subclass is practically common knowledge. Indeed, the CDC's guidance on how to curb the spread of coronavirus, as well as their warnings about the increased threat the virus poses to the medically vulnerable and people living in congregate environments such as prison and detention facilities, has been the topic of extensive national and local media coverage. It also is undisputed that Defendants did in fact draw the inference that COVID-19 poses a risk to the members of the Jail Class and the Medically-Vulnerable Subclass particularly. *Cf. Farmer*, 511 U.S. at 842 ("[A] fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."). Defendants concede as much in their brief: "[p]rior to the first confirmed COVID-19 case in the jail, Defendants took an immediate and proactive response to the COVID-19 pandemic to curb an outbreak or spread at the Oakland County Jail." (ECF No. 30 at Pg ID 810.) Moreover, Nurse Warren testified that she, Captain Childs, and Lieutenant McLellan met and decided that the medically vulnerable would be tested before the general population because the former group was in "greater need." (5/6/20 Hr'g Tr., ECF No. 65 at Pg ID 2051-52.)

51

The remaining issue, therefore, is whether Defendants have disregarded the risk that COVID-19 could imperil the health and lives of Jail inmates. Before getting there, the Court pauses to discuss credibility.

One of Defendants' primary arguments in response to Plaintiffs' claims is that Plaintiffs and the putative Jail Class members who have provided declarations in support of their claims lack credibility. Defendants maintain that "the affiants' criminal histories are replete with convictions related to crimes involving theft or dishonesty." (ECF No. 30 at Pg ID 815 (citing ECF No. 30-5).) Nothing about the summary of purported convictions provided by Defendants suggests that it comes from an official or reliable source. (*See* Defs.' Mot. Ex. E, ECF No. 30-5.) It is not a print-out of the declarants' criminal histories, but a rough list that an unidentified individual has prepared from an unknown source. Nevertheless, the Court takes into consideration that some of the declarants may have previous and recent convictions which could be considered when assessing their credibility under the Federal Rules of Evidence. *See* Fed. R. Evid. 609. The Court also takes into consideration that, while Plaintiffs and other inmate declarants detail events and interactions with specifically identified Jail staff members, Defendants have not rebutted many of the inmates' accounts with testimony from any of the identified or named staff members.

What the Court finds more significant when assessing credibility is that the bulk of Defendants' evidence concerning the conditions in the Jail and what is being done to prevent the spread of coronavirus comes primarily from two individuals—one who admittedly spends "seldom" time in its housing areas and the other who had not been inside the housing areas for weeks before the evidentiary hearing. Nurse Warren and Captain Childs have painted a picture of those areas which is not based on their own knowledge and may not even be based on reality. Finally, the Courts finds it noteworthy that Defendants presented no expert testimony on the adequacy of their COVID-related policies or their implementation of those policies.

### Pre-Trial & Post-Conviction Subclasses

According to Defendants: "Plaintiffs cannot show that Defendants have been deliberately indifferent . . . because the overwhelming evidence establishes Defendants previously put into place nearly all of Plaintiffs' requests and the subsequent requirements of the Court's TRO at the jail." (ECF No. 30 at Pg ID 837.) Undoubtedly, Defendants have taken steps to curb the spread of COVID-19, but the overall record reflects a willingness to continue housing Jail Class members in a manner that increases their risk of infection.

First, though the Jail outlined enhanced cleaning and sanitation policies and procedures, members of the Jail Class continue to share toilets, sinks, showers,

phones, brooms and other communal spaces and items, sometimes without disinfection between each use.  The declarations of several inmates reflect that Jail Class members still have insufficient access to soap and cleaning supplies.  And while corrections officers were wearing masks on the day of the Jail inspection, in the days that have followed, some either do not wear masks or wear masks under their chins.  Plaintiffs further note that, though corrections officers typically wear gloves when serving food, they usually do not do so when distributing inmate mail and hygiene supplies.

Further, regarding social distancing, Defendants posted signs on or around May 1, telling inmates to sleep "head to toe," (ECF No. 47 at Pg ID 1425)— presumably to create distance from other inmates while they sleep.  Captain Childs suggests that social distancing *is* possible in multi-person cells if inmates remain in the same positions on opposite corners of the cells for the 23 hours a day they must remain there.  (5/7/20 Hr'g Tr., ECF No. 62 at Pg ID 1858-59.)  This suggestion is disingenuous at best.  And despite their understanding of the risk associated with the close quarters in which inmates reside, as of May 1, almost half of the Jail's population was housed in multi-person cells, with a significant number in housing units with more than 10 individuals.  At the same time, many of the Jail's housing cells remain empty.  (*See* Defs.' Hr'g Ex. C, ECF No. 68.)  The fact that Defendants offer no explanation regarding why individuals have not been moved

54

to these available cells in order to maximize the distance between inmates suggests a disregard of the substantial risk of contracting a virus that already has been demonstrated to be lethal.

Second, despite Defendants' contention that they have instituted a strict quarantine procedure, the evidence reflects that this policy is insufficient, resulting in Jail Class members being placed at greater risk of contracting COVID-19. For example, Mr. Watkins was housed in A-4 (a one-person cell) from April 16 to May 6. (*See* Watkins Decl., ECF No. 64-1 at Pg ID 1972.) On May 6, he was reassigned to a 10-person cell on C-Block in which there were seven other inmates and, later that day, was tested for coronavirus. (*Id*. at Pg ID 1972; Warren Decl., ECF No. 83-1 at Pg ID 2888.) Two days later, Defendants learned that Mr. Watkins was COVID-negative. (Warren Decl., ECF No. 83-1 at Pg ID 2888.) Mr. Watkins was informed of this test result but, approximately two hours later, was informed that he in fact was COVID-positive—a fact that, according to Nurse Warren, the rectification of "human error" revealed. (*Id*. at Pg ID 2888) Nurse Warren declared that, as a result of Mr. Watkins' positive status, the entire row of cells associated with A-4 was quarantined. (Warren Decl., ECF No. 83-1 at Pg ID 2888.)

Critically, however, Nurse Warren does not contend that the 10-person cell on C-Block—where Mr. Watkins ate, slept, and socialized during the two days

immediately preceding his COVID-19 diagnosis—was quarantined.  (*See id.*)

Perhaps more critically, there is no evidence that Nurse Warren or her staff—who

are responsible for deciding which inmates and cells to quarantine—or other Jail

staff have instituted a policy for contact tracing.  This is so despite knowledge that

COVID-positive individuals can remain asymptomatic and contagious, thereby

exposing members of the Jail Class to COVID-19.  (*See, e.g.*, 5/6/20 Hr'g Tr., ECF

No. 65 at Pg ID 2069-70.)

Third, Plaintiffs' evidence suggests that Defendants transferred inmates from

the East Annex, where there are currently no cases of COVID-19, to the Main Jail,

where there are multiple cases of the virus.  These allegations, if true, suggest that

Defendants are deliberately indifferent to the risk of accelerating an outbreak that

already exists in the Jail.  It also reflects deliberate indifference to the individuals

being moved by placing them at greater risk of contracting the virus.

### Medically-Vulnerable Subclass

Members of the Medically-Vulnerable Subclass face a greater risk of serious

outcomes from COVID-19 than the general inmate population.  Indeed,

Defendants concede that the medically vulnerable are in "greater need" because of

the heightened risk of serious complication from the virus.  (5/6/20 Hr'g Tr., ECF

No. 65 at Pg ID 2051-52.)  And public health experts agree that people over the

age of 60 or with underlying conditions face a higher risk of experiencing severe COVID-19 outcomes, including death.

Defendants argue that, because they have taken reasonable steps to address the impact of COVID-19 within the Jail, Plaintiffs' allegation that Defendants have been deliberately indifferent to the needs of the Medically-Vulnerable Subclass fails.  Plaintiffs, however, challenge their continued confinement on the grounds that no condition of confinement can ensure their reasonable safety from coronavirus.

The record shows that the congregate nature of a jail facility makes it impossible to put in place and enforce precautionary measures and, thereby, ensure the reasonable safety of medically-vulnerable inmates.  Indeed, in the midst of a pandemic for which there is no vaccine, limited effective treatment, no contact tracing, and rapid spread via asymptomatic individuals, to place especially susceptive individuals into a highly confined communal space—with limited access to clean facilities, limited ability to socially distance from others, and increased exposure via potentially infected Jail staff and inmates cycling in and out of the Jail—and then, to ask them to tolerate the risk of whatever catastrophic result that may befall them, is to demean "the essence of human dignity inherent in all persons."  *Brown*, 563 U.S. at 510-11.  Such a suggestion "has no place in civilized society."  *Id.*

Considering the weight of the public health evidence demonstrating the medically-vulnerable population's unique, specific, and life-threatening susceptibility to COVID-19—paired with the communal nature of jail facilities, the Court finds that home confinement or early release is the only reasonable response to this unprecedented and deadly pandemic.[43, 44]  In other words, the inherent characteristics of the Jail cannot be altered to any extent that would make it safe enough to protect the members of the Medically-Vulnerable Subclass from the potentially lethal combination of their unique vulnerabilities and COVID-19's

---

[43] As discussed *infra*, an individualized consideration of the suitability for release of a subclass member, based on factors such as public safety, is required.

[44] The Court finds it troubling that, despite understanding that medically-vulnerable individuals are uniquely susceptive to the harms of COVID-19 and that the CDC and medical experts have emphasized the need to implement specific measures to protect them, Defendants have evidenced little care in their attempts to implement even the most basic elements of the precautions necessary to curb the risk that COVID-19 could kill members of the Medically-Vulnerable Subclass.

This conclusion is based on all of the reasons discussed above as to the Pre-Trial and Post-Conviction Subclasses.  The Court further notes that Defendants adhere to special housing protocols for inmates with special medical needs and diagnosed mental health issues, but admit that they have crafted no such plan for a group of inmates especially susceptive to the often deadly health complications caused by the present pandemic.  Not only have Defendants failed to do so, this lack of planning persists as many cells remain empty.  Moreover, considering that Defendants currently house inmates throughout the Jail without regard to their medical vulnerabilities and their specific failure to quarantine the 10-person cell in C-Block in which Mr. Watkins resided prior to his positive test result, Defendants likely exposed and continue to expose members of the Medically-Vulnerable Subclass to COVID-19.

health-shattering consequences.  Any response other than release or home confinement placement constitutes deliberate indifference.

Yet, despite the authority to take action to release medically-vulnerable inmates and the exhortations of the same by Governor Whitmer and experts, the record suggests that Defendants are exercising their authority at a pace that disregards the seriousness of the risk faced by medically-vulnerable inmates.  On March 29, Governor Whitmer issued an Executive Order encouraging county jails to consider actions to reduce their inmate populations.  On or around March 20, Defendants forwarded to Oakland County Court Administrators an Excel spreadsheet containing the names and information relevant to 42 inmates whose conditions ranged from "a [very] high medical risk" to "a medical risk if they become infected" along with an expression of gratitude to the "courts for working with [them] to help reduce the jail population during [the] pandemic."  (ECF No. 30-1 at Pg ID 862; ECF No. 85 at Pg ID 2900.)  The release of 27 medically-vulnerable inmates followed this effort.

Critically, however, the record is lacking in support that, during the almost eight weeks that passed between March 20 and May 13, Defendants expended even a basic level of effort to continue the release initiative.  By Defendants' own account, on May 13, they forwarded the names of 17 medically-vulnerable inmates

to the Oakland County courts.[45]  Notably, however, as of the same day, Defendants report that 248 medically-vulnerable inmates remain in the Jail.  This means that, at this moment, Defendants are actively seeking the release of only 7 percent of the medically-vulnerable population.  Even if the Court were to exclude the 121 inmates Defendants contend should not be released due to their assaultive charge or history, Defendants are actively seeking the release of only 13 percent of the total number of medically-vulnerable inmates without assaultive histories, while the rest remain in harm's way.

Defendants contend that they are reviewing the files of the remaining inmates.  But some of these inmates have been incarcerated or detained well before Michigan's first diagnosed coronavirus case, and well before Defendants submitted their first list of names in March.  This has allowed Defendants at least two months to review and make decisions as to these inmates, yet they have not.

Ultimately, in light of Defendants' awareness of the deathly risk that COVID-19 poses to the medically-vulnerable population, Defendants' failure to make prompter, broader, and more meaningful use of their authority to implement

---

[45] Notably, four of 17 inmates had the following original release dates:  May 13, May 16, May 21, and May 28.  The Court is skeptical that the submission of the names of these inmates—who very likely will be released sometime before the state court can make a decision as to home confinement or early release—was for the legitimate purpose of seeking relief as opposed to bolstering the number of inmates for whom Defendants may now claim they have sought alternative custody.

what appears to be the only solution capable of adequately protecting medically-vulnerable inmates may constitute deliberate indifference under the Eighth Amendment.

### B.   Whether Plaintiffs Will Suffer Irreparable Harm Absent an Injunction

Plaintiffs must "demonstrate that irreparable injury is likely in the absence of an injunction," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), and that the injury is "both certain and immediate, rather than speculative or theoretical," *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991).  Notably, "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed."  *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *see also Overstreet v. Lexington-Fayette Urban Cty. Gov.*, 305 F.3d 566, 578 (6th Cir. 2002) (noting that "a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights"); *Rhinehart*, 509 F. App'x at 514 (suggesting that an allegation of "continuing violation of . . . Eighth Amendment rights" gives rise to a finding of irreparable harm).

Here, Plaintiffs contend that "Defendants violate Plaintiffs' Eighth and Fourteenth Amendment rights by incarcerating them in conditions that fail to adequately mitigate against the spread of a potentially fatal virus in the midst of a growing pandemic and in spite of their knowledge and ability to do so."  (ECF No.

1 at Pg ID 56.)  Plaintiffs further contend that the Eighth and Fourteenth

Amendments "forbid exposing []Plaintiffs to a severe risk of death, pain, or

permanent severe injury, and at this time, with respect to the Medically-Vulnerable

Subclass, no options available to Respondents/Defendants will adequately mitigate

that risk other than release from custody."  (*Id.* at Pg ID 64-65.)

Because Plaintiffs allege a deprivation of their constitutional right to be free

from cruel and unusual punishment and the Court finds that Plaintiffs will likely

succeed on the merits of this claim, the Court finds that Plaintiffs satisfy the

irreparable harm requirement for issuing a preliminary injunction.

### C.      Whether Defendants or the Public Interest will be Harmed by the Injunction

The remaining factors, "harm to the opposing party and weighing the public

interest[,] . . .  merge when the Government is the opposing party," *Nken v. Holder*,

556 U.S. 418, 435 (2009), because "the government's interest is the public

interest," *Malam*, 2020 WL 1672662, at *5 (quoting *Pursuing America's*

*Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 512 (D.C. Cir. 2016) (citing

*Nken*, 556 U.S. at 435)).  This factor weighs in Plaintiffs' favor for two reasons.

First, as discussed above, Plaintiffs face irreparable injury to their

constitutional rights absent an injunction and "it is always in the public interest to

prevent the violation of a party's constitutional rights."  *G & V Lounge Inc. v.*

*Mich. Liquor Control Comm*., 23 F.3d 1071, 1079 (6th Cir. 1994).

Second, the public has a significant interest in avoiding serious illness or death.  Indeed, efforts to curb the spread of COVID-19—including implementing procedures to curb the spread of COVID-19 within the Jail, as well as placing on home confinement populations who cannot be protected from the virus while housed in the Jail—helps "flatten the curve," limit potential strain on healthcare systems, and reduce the likelihood of death and long-term health complications. *See Perez-Perez v. Adducci*, No. 20-10833, 2020 WL 2305276, at *9 (E.D. Mich. May 9, 2020) ("Society benefits by stemming the proliferation of COVID-19, thereby 'flattening the curve,' preventing strain on medical centers and hospitals, and ultimately reducing death or long-term injury from COVID-19-related lung damage."); *Cristian A.R. v. Decker*, No. CV 20-3600, 2020 WL 2092616, at *13 (D.N.J. Apr. 12, 2020) ("[T]he public interest also supports the release of Petitioners before they contract COVID-19 to preserve critical medical resources and prevent further stress on . . . overburdened healthcare systems."); *Perez v. Wolf*, No. 5:19-CV-05191, 2020 WL 1865303, at *13 (N.D. Cal. Apr. 14, 2020) (holding that the petitioner shall be released because "the public interest in promoting public health is served by efforts to contain the further spread of COVID-19, particularly in detention centers, which are typically staffed by persons who reside in the local communities"); *see also Neinast v. Bd. Of Trustees*, 346

F.3d 585, 592 (6th Cir. 2003) (recognizing public health and safety as legitimate government interests).

Regarding the injunctive relief as to the Jail Class, Defendants contend that they have an interest in operating the correctional facility as they deem fit, noting that "[a]ny interference by the federal courts in the administration of . . . prison matters is necessarily disruptive."  (ECF No. 30 at Pg ID 830.)  But this argument ignores the evidence Plaintiffs have presented suggesting that Defendants' purported sanitation and quarantining procedures are not actually being carried out within the Jail.

As Defendants acknowledge in their brief, federal courts—"as the ultimate guardian of constitutional rights"— "possess the authority to implement whatever remedy is necessary to rectify constitutionally infirm practices, policies or conduct," such as failing to implement policies that will effectively protect inmates from a potentially lethal virus.  (*See* ECF No. 30 at Pg ID 831 (quoting *Kendrick v. Bland*, 740 F2d 432, 438 (6th Cir. 1984)).  The Court acknowledges that running a Jail is challenging even in the best of times.  The Court further acknowledges the unprecedented challenges Defendants face as they try to address the impact of COVID-19 on Jail operations.  However, Defendants' interest in operating a correctional facility as they see fit must be balanced with the interest of the Jail Class in avoiding serious illness and/or death.  Because it is likely that

constitutional violations are occurring in this case, the Court will fashion the relief in the least intrusive way to remedy the constitutional violation. *Kendrick*, 740 F.2d at 437 (quoting *Newman v. State of Alabama*, 683 F.2d 1312, 1319 (11th Cir. 1982) ("[T]he federal equity court in fashioning a remedy must afford relief which is 'no broader than necessary to remedy the constitutional violation.'").

Moreover, while Defendants may be concerned that releasing members of the Medically-Vulnerable Subclass may pose a danger to the community, this concern can be addressed by requiring individualized consideration of the subclass member's suitability for release, taking into account criminal history and other relevant factors.  The Supreme Court has held that "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take *reasonable measures* to abate it."  *Farmer*, 511 U.S. at 847 (emphasis added).  Whether the release of a Medically-Vulnerable Subclass member is a "reasonable measure" will turn on a variety of factors, such as the severity of the risk faced by the inmate from COVID-19 in light of his or her age and medical history, the danger the inmate presents to the residents of the home environment under consideration, and the danger to the public at large.  Such determinations may be difficult, but in the midst of the COVID-19 pandemic, both

justice and the need to honor the human dignity in every person demand that they must be made and made at an accelerated pace.

## VII.  Prison Release Orders

While the Court has concluded that § 2241 is a proper avenue to pursue Plaintiffs' request for release of the Medically-Vulnerable Subclass, it acknowledges that the Sixth Circuit might conclude that theirs is instead a "conditions of confinement" rather than "fact of confinement" claim given that the Supreme Court has not definitively ruled on the availability of § 1983 to seek release for unconstitutional conditions of confinement.  Thus, the Court will touch briefly on Defendants' argument that the PLRA's requirements, 18 U.S.C. § 3626(a)(3), apply to such a claim.[46]

Pursuant to the PLRA, a three-judge panel is required to enter a prison release order[47] and release is permitted only if "clear and convincing evidence" shows that: "(i) crowding is the primary cause of the violation of a Federal right; and (ii) no other relief will remedy the violation of the Federal right."  *Id.*

---

[46] These requirements include a prior order for intrusive relief, reasonable time for the defendant to comply, and a three-judge court to decide whether release is appropriate.  18 U.S.C. § 3626(a)(3).

[47] A "prison release order" is "any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison."  18 U.S.C. § 3626(g)(4).

§ 3626(a)(3)(B), (E).  The Court concludes that these requirements do not apply to an order releasing medically-vulnerable inmates in this case.

This Court cannot construe § 3626 as applying to an order to transfer inmates out of a prison to correct the violation of a constitutional right where overcrowding is not the primary cause of the violation.  Other district judges agree. *See Plata v. Brown*, 427 F. Supp. 3d 1211, 2013 WL 12436093, *9-10 (N.D. Cal. 2013); *Reaves v. Dep't of Corr.*, 404 F. Supp. 3d 520, 522-24 (D. Mass. 2019); *see also Mays*, 2020 WL 1987007, at *31 (indicating that the "conclusion seems correct" in *Plata* and *Reaves*, but finding that overcrowding was the primary basis for the plaintiffs' request); *Money v. Pritzker*, -- F. Supp. 3d --, 2020 WL 1820660, at *12 n.11 (N.D. Ill. Apr. 10, 2020) (suggesting that single-judge courts can order prisoner transfers for reasons other than crowding).  To interpret § 3626 as Defendants urge would mean that a court could never order an inmate released unless a three-judge panel found by clear and convincing evidence that overcrowding was the cause of the violation.  In other words, if any other reason caused the violation of an inmate's constitutional rights, judges could not provide relief by releasing the inmate.  There is no evidence to support that this was Congress' intent when crafting this section of the statute.

Instead, as the Ninth Circuit Court of Appeals has observed, "[s]ponsors of the PLRA were especially concerned with courts setting 'population caps' and

ordering the release of inmates as a sanction for prison administrators' failure to

comply with the terms of consent decrees designed to eliminate overcrowding."

*Gilmore v. California*, 220 F.3d 987, 998 n.14 (9th Cir. 2000).  Moreover, as the

district court observed in *Plata* 2013 WL 12436093:  "Although 'Congress is free

to alter the standard that determines the scope of prospective relief for

unconstitutional prison conditions,' it can do so only 'so long as the restrictions on

the remedy do not prevent vindication of the right.'"  *Id*. at *10.  As Judge

Henderson described in *Plata*, there are obvious scenarios, unrelated to crowding,

where the transfer of prisoners would be necessary to protect their constitutional

rights, such as "a prison … so dilapidated that no one could predict when the walls

would crumble down, thus putting inmates' lives at serious risk, but that

Defendants refused to transfer those inmates despite being aware of that risk, in

clear violation of the Eighth Amendment."  *Id*.  And if a prison were in the path of

rising flood waters, a tornado, or a highly contagious and deadly viral pandemic,

which threatened cruel and unusual punishment to inmates if not released, and their

jailers were not responding adequately to protect them from serious harm, surely a

single judge should possess the authority to quickly remedy the situation rather

than proceeding through the procedural requirements of § 3626(a)(3).

Defendants assume that overcrowding is the primary cause of Plaintiffs'

alleged constitutional violation, without explaining why.  The district courts in

*Mays* and *Money* reached this conclusion, reasoning that "[s]ocial distancing"—
which is regarded as one of the best defenses to the spread of COVID-19—"is
essentially the converse of overcrowding[.]"  *Mays*, 2020 WL 1987007, at *31;
*Money*, 2020 WL 1820660, at *13.  This Court respectfully disagrees.

    The PLRA does not define "overcrowding."  As one district court described,
"'crowding' refers to the presence in a facility or prison system of a prisoner
population exceeding that facility or system's capacity."  *Coleman v.
Schwarzenegger*, 922 F. Supp. 2d 882, 920 (N.D. Cal. 2009) (citing cases where
overcrowding was found because a jail's population exceeded its design capacity);
*cf*. Random House Webster's Unabridged Dictionary 482 (2d ed. 1998) (defining
"crowded" as "filled to excess").  An overcrowding case, as another district judge
described, is one where the "plaintiffs are asserting that the penitentiary houses
more inmates then it can adequately manage or provide human services for."
*Jensen v. Gunter*, 807 F. Supp. 1463, 1469 (D. Neb. 1992).  The Supreme Court's
decision in *Brown*, reflects that these understandings are correct, as the Court there
focused on the design capacity of California's prisons in comparison to the actual
inmate population.  *Id*. at 502-06.

    The inability to socially distance in the jail setting has nothing to do with the
capacity of the facility.  In fact in this case, the Jail has never exceeded its capacity
during the relevant period.  During the evidentiary hearings, Defendants repeatedly

compared the Jail's overall capacity and the capacity of its cells to the number of inmates actually being housed.  Currently, as again the Jail repeatedly has noted, its population of 664 inmates as of May 1, 2020, represents less than forty-percent (40%) of its total capacity.  *There has been no suggestion that the size of the Jail's population is the cause of its inability to implement social distancing measures*.

For these reasons, the Court concludes that any decision in this case to release particular inmates in response to COVID-19 under § 1983 would not be a prison release order to which the requirements of § 3626 apply.

## VII.  Conclusion

As Justice Sotomayor recently stated in relation to COVID-19 and prisons:

> It has long been said that a society's worth can be judged by taking stock of its prisons.  That is all the truer in this pandemic, where inmates everywhere have been rendered vulnerable and often powerless to protect themselves from harm.  May we hope that our country's facilities serve as models rather than cautionary tales.

*Valentine*, 2020 WL 2497541, at 3.  Yet, where the country's detention facilities fail to fulfill their obligations, "courts have a responsibility to remedy the resulting [constitutional] violation."  *Brown*, 563 U.S. at 511 (citing *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978)).  Undoubtedly courts must consider the State's interest in punishment and prison officials' authority to run their prisons as they see most fit to maintain security and order, but "[c]ourts … must not shrink from their

obligation to enforce the constitutional rights of all persons, including prisoners."
*Id.* (internal quotation marks and citation omitted).

In this case, Plaintiffs have shown a substantial likelihood that Defendants are being deliberately indifferent to the risk that COVID-19 poses to Jail inmates, particularly medically-vulnerable inmates.  Without injunctive relief, Plaintiffs will suffer immediate irreparable injury for which there is no adequate remedy at law, in that they will face a high risk of serious illness or death from exposure to coronavirus.  The issuance of a preliminary injunction will not inflict greater or undue injury upon those restrained or third parties and the issuance of a preliminary injunction order will serve the public interest.

The Court finds that the relief it is ordering is narrowly drawn, is the least intrusive means, and extends no further than necessary to correct the harm that the Court finds requires preliminary relief.  The Court has given substantial weight to any adverse impact on public safety and the operation of the criminal justice system caused by the preliminary relief and shall respect the principles of comity in tailoring this preliminary relief.  *See* 18 U.S.C. § 3626(a)(2).

An Order will issue.

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: May 21, 2020