# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

Deborah S. Hunt
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  July 09, 2020

Ms. Kristen Lara Baiardi
Abbott Nicholson
1900 W. Big Beaver Road
Suite 203
Troy, MI 48084

Ms. Jennifer Bennett
Gupta Wessler
100 Pine Street
Suite 1250
San Francisco, CA 94111

Mr. Robert C. Clark
Potter, DeAgostino, O'Dea & Clark
2701 Cambridge Court
Suite 223
Auburn Hills, MI 48326

Mr. Steven H. Cook
Law Office
3707 Day Road
Rockford, TN 37853-3531

Mr. Thomas M. DeAgostino I
Potter, DeAgostino, O'Dea & Clark
2701 Cambridge Court
Suite 223
Auburn Hills, MI 48326

Mr. Andrew Goetz
United States Attorney's Office
211 W. Fort Street, Suite 2001
Detroit, MI 48226

Mr. Deepak Gupta
Gupta Wessler
1900 L. Street, N.W.
Suite 312
Washington, DC 20036

Mr. Keith Hollingshead-Cook
Law Office
P.O. Box 3432
Peoria, IL 61612

Ms. Jenipher R. Jones
University of Denver
Sturm College of Law
2255 E. Evans Avenue
Suite 335
Denver, CO 80208

Mr. Daniel S. Korobkin
ACLU Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201

Mr. Philip Edwin Mayor
ACLU Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201

Ms. Cary S. McGehee
Pitt, McGehee, Palmer & Rivers
117 W. Fourth Street
Suite 200
Royal Oak, MI 48067

Mr. Peter L. Menna
Oakland County Corporation Counsel
1200 N. Telegraph Road, Department 419
Pontiac, MI 48341

Mr. Andrew A. Nickelhoff
Nickelhoff & Widick
333 W. Fort Street
Suite 1400
Detroit, MI 48226

Mr. Steven M. Potter
Potter, DeAgostino, Campbell & O'Dea
2701 Cambridge Court
Suite 223
Auburn Hills, MI 48326-0000

Ms. Alexandria Twinem
Civil Rights Corps
1600 Connecticut Avenue, N.W.
Eighth Floor
Washington, DC 20009

Samuel Weiss
Rights Behind Bars
416 Florida Aveue, N.W.
Unit 26152
Washington, DC 20001

Re:  Case No. 20-1469, *Jamaal Cameron, et al v. Michael Bouchard, et al*
Originating Case No. : 2:20-cv-10949

Dear Counsel,

The Court issued the enclosed opinion today in this case.

Sincerely yours,

s/Cathryn Lovely
Opinions Deputy

cc:  Mr. David J. Weaver

Enclosure

Mandate to issue

NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0394n.06

No. 20-1469

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jul 09, 2020
DEBORAH S. HUNT, Clerk

JAMAAL CAMERON, et al.,                     )
                                            )
        Plaintiffs-Appellees,               )        ON APPEAL FROM THE
                                            )        UNITED STATES DISTRICT
v.                                          )        COURT FOR THE EASTERN
                                            )        DISTRICT OF MICHIGAN
MICHAEL BOUCHARD, et al.,                    )
                                            )        OPINION
        Defendants-Appellants.              )

BEFORE: COLE, Chief Judge; BUSH and LARSEN, Circuit Judges

JOHN K. BUSH, Circuit Judge. Plaintiffs, five pretrial detainees or convicted prisoners

housed in the Oakland County, Michigan Jail, filed a complaint under 42 U.S.C. § 1983 and

28 U.S.C. § 2241, on behalf of themselves and others housed or to be housed there. They claimed,

among other things, that Defendants' "deliberate indifference" to the substantial risk of harm posed

by COVID-19 at the Jail violated their rights under the Eighth and Fourteenth Amendments. On

May 21, the district court granted a preliminary injunction against Defendants. The preliminary

injunction orders Defendants to:

1.  Provide each incarcerated person, free of charge, on a bi-weekly basis, two bars of
    individual hand soap and a hand towel to allow regular hand washing and drying. Provide
    unrestricted access to additional hand soap upon an inmate's request;

2.  Provide each cell and each dormitory-style housing unit, at no cost, a supply of disinfectant
    hand wipes or disinfectant products effective against the COVID-19 virus for daily
    cleanings. Any disinfectant products shall be provided at the manufacturer's required
    concentration level and in sufficient quantities for inmates to clean and disinfect the floor
    and all surfaces of their housing unit;

No. 20-1469, *Cameron, et al. v. Bouchard, et al.*

3.  Provide daily access to cleaning supplies at no cost for inmates to clean their cells, including showers, toilets, telephones, and sinks. Supplies shall be disinfected before being shared between housing cells;

4.  Require cleaning of any surface or area shared by four (4) or more inmates, for example tabletops, telephones, door handles, television controls, equipment, and restroom fixtures. Surfaces and areas shall be cleaned every hour from 7 a.m. to 10 p.m. with bleach-based cleaning agents;

5.  Establish a protocol for monitoring and supervising the regular sanitization of housing units, common areas, and surfaces. Provide guidance to correctional staff to provide them with the knowledge needed to oversee and assure that cleaning is adequate and effective. Within five (5) business days of this Order, Defendants shall submit a certified report to the Court identifying the procedures implemented to carry out these directives;

6.  Provide access to clean showers and clean laundry, including clean personal towels on a regular basis, but at a minimum on a bi-weekly basis;

7.  Provide masks for all inmates and staff members. If cotton masks are provided, such masks must be laundered regularly. Users must be instructed on how to use the mask and the reasons for its use;

8.  Require all Jail staff to wear personal protective equipment, including masks and gloves, when interacting with any person, distributing items to prisoners (e.g., mail and hygiene supplies), or when touching surfaces in cells or common areas;

9.  Ensure, to the fullest extent possible, that all Jail staff wash their hands with soap and water or use hand sanitizer containing at least 60% alcohol both before and after touching any person or any surface in cells or common areas. Consider allowing staff to carry individual sized bottles of the referenced hand sanitizer while on duty;

10. Maintain a protocol through which an incarcerated person may self-report symptoms of COVID-19 infection and to evaluate those symptoms, including temperature monitoring;

11. Within three (3) business days, provide the Court and Plaintiffs with a detailed plan to continue testing all inmates for COVID-19, prioritizing members of the Medically-Vulnerable Subclass, as well as a plan to test all individuals who (i) have access to the housing units or (ii) interact with inmates or with individuals who have access to the housing units;

12. Conduct immediate testing for anyone displaying known symptoms of COVID-19 and submit a weekly list to the Court and Plaintiffs' counsel indicating (i) the number of tests performed that week and (ii) whether any inmates or Jail staff have tested positive for coronavirus;

13. Provide adequate spacing of six feet or more between people incarcerated, to the maximum extent possible, so that social distancing can be accomplished;

14. Ensure that individuals identified as having COVID-19, with symptoms of COVID-19, or having been exposed to COVID-19 receive adequate medical care and are properly quarantined in a non-punitive setting, with continued access to showers, mental health services, reading materials, phone and video calling with loved ones, communications with counsel, and personal property (to the extent reasonable and necessary to the inmate's

No. 20-1469, *Cameron, et al. v. Bouchard, et al.*

physical and mental well-being). Such individuals shall remain in quarantine and wear face masks and gloves when interacting with other individuals until they are no longer at risk of infecting other people. Facemasks must be replaced at medically appropriate intervals;

15. Respond to all COVID-19 related emergencies (as defined by the medical community) within an hour;

16. Post signage and information in common areas that provide: (i) general updates and information about the COVID-19 pandemic; (ii) information on how inmates can protect themselves from contracting COVID-19; and (iii) instructions on how to properly wash hands. Among other locations, all signage must be posted in every housing area and above every sink. Require staff to provide this information orally to low literacy and non-English speaking people;

17. Train all staff regarding measures to identify inmates with COVID-19, measures to reduce transmission, and the Jail's policies and procedures during this crisis (including those measures contained in this Order);

18. Suspend co-pays for medical treatment for the duration of the pandemic and encourage all inmates to seek treatment if they are feeling ill;

19. Waive all charges for medical grievances during the pandemic until further order of the Court;

20. Within five (5) business days of this Order, establish and put into effect a policy suspending, to the extent possible, the use of multi-person cells (i.e., with more than two individuals), except where: (i) the person is currently under quarantine, or (ii) a person for whom a medical or mental health professional has documented that particular housing is needed. All housing units utilized shall be configured to permit social distancing, to the maximum extent possible. If dormitory-style housing must be utilized, those areas shall be reconfigured to allow six-feet between inmate beds to the maximum extent possible. Defendants shall submit a report to the Court and Plaintiffs' counsel within seven (7) business days detailing (i) the policy put into effect, (ii) the housing cells occupied, and (iii) the number of inmates in each cell, similar to the Housing Occupancy List introduced at the evidentiary hearing. Defendants shall submit updated reports as to (i) and (ii) on a weekly basis;

21. Ensure that Plaintiffs' counsel have the ability to promptly communicate with detainees;

22. Within three (3) business days, provide the Court and Plaintiffs' counsel with a list of the members of the Medically-Vulnerable Subclass, which includes inmate identification numbers, ages, any health vulnerabilities, as well as records detailing the instant charges or convictions and any criminal history of the Subclass member. The purpose of this order is to enable the Court to implement a system for considering the release on bond or other alternatives to detention in the Jail for each subclass member. After reviewing the list, the Court will issue a schedule for Defendants to submit the following additional information for each Subclass member: (i) their position on whether the individual should be released on bond; (ii) the reasons why they maintain the individual should not be released; and (iii) what conditions should be put into place if bond is granted.

No. 20-1469, *Cameron, et al. v. Bouchard, et al.*

On May 26, we denied Defendants' motion to stay the preliminary injunction pending appeal. *Cameron, et al. v. Bouchard, et al.*, No. 20-1469 (6th Cir. May 26, 2020) (order denying motion to stay). On May 31, the district court entered an order that began the process for granting bail for members of the medically vulnerable subclass. This order was consistent with the preliminary injunction, the purpose of which was to "enable the Court to implement a system for considering the release on bond or other alternatives to detention in the Jail for each subclass member." (R. 94 at PageID 3063). On June 1, the district court identified fifty inmates under consideration for release and instructed Plaintiffs to submit bail applications on behalf of any of the fifty inmates.

On June 5, Defendants filed a renewed emergency motion to stay the district court's preliminary injunction, arguing that intervening changes in the law warranted a reconsideration of our initial denial of their motion. We agreed with Defendants and granted their renewed emergency motion to stay in light of our recent decision to vacate a district court's preliminary injunction in very similar circumstances in *Wilson, et al. v. Williams, et al.*, --- F.3d ---, ---, 2020 WL 3056217, at *12 (6th Cir. June 9, 2020). *See Cameron, et al. v. Bouchard, et al.*, --- F. App'x ---, 2020 WL 3100187 (6th Cir. May 11, 2020) (granting stay pending appeal).

We now review the appeal of the preliminary junction on the merits. For the reasons discussed below, we **VACATE** the district court's May 21, 2020 preliminary injunction.

## I.

"A district court must balance four factors in determining whether to grant a preliminary injunction: '(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction.'" *Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012)).

No. 20-1469, *Cameron, et al. v. Bouchard, et al.*

These factors "are to be balanced against each other." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). However, "the likelihood of success on the merits often will be the determinative factor." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 689 (6th Cir. 2014) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)).

"[T]he party seeking a preliminary injunction bears the burden of justifying such relief." *Livingston Cty.*, 796 F.3d at 642 (quoting *McNeilly v. Land*, 683 F.3d 611, 615 (6th Cir. 2012)). "A movant's likelihood of success on the merits is a question of law reviewed de novo, but we review for abuse of discretion the district court's ultimate conclusion as to whether the preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief." *Wilson*, No. 20-3447, 2020 WL 3056217, at *4 (citing *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011)).

## II.

Central to this appeal is the inmates' likelihood of success on their Eighth and Fourteenth Amendment claims.[1] The Supreme Court has long recognized that the government has a constitutional obligation to "provide humane conditions of confinement." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citations omitted). As part of this duty, officials must "take reasonable measures to guarantee the safety of the inmates." *Id.* (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–527 (1984)). For prisoners incarcerated following a conviction, the government's obligation arises out of the Eighth Amendment's prohibition on cruel and unusual punishment. *See Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013). For pretrial detainees, the obligation arises out of the Due Process Clause of the Fifth or Fourteenth Amendment. *See id.*

---

[1] Defendants make several threshold arguments. They assert that Plaintiffs' claims are barred because they failed to exhaust them and they have not satisfied the requirements of the PLRA. They also argue that Plaintiffs have not presented a cognizable habeas claim. This latter argument is inconsistent with our recent decision in *Wilson*. *See Wilson*, 2020 WL 3056217, at *5–6. And because we conclude that Plaintiffs' claims fail on the merits, we decline to address the non-jurisdictional procedural questions. *See Hanna v. Ishee*, 694 F.3d 596, 610 (6th Cir. 2012); *see also Kramer v. Wilkinson*, 302 F. App'x 396, 398 (6th Cir. 2008).

No. 20-1469, *Cameron, et al. v. Bouchard, et al.*

Conditions-of-confinement claims are assessed under the "deliberate indifference" framework. *See id.* This framework requires plaintiffs to meet two requirements. The first is "objective[]," and it requires the inmate to "show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 833 (citing *Helling v. McKinney*, 509 U.S. 25, 35 (1993)). The second is "subjective," and it requires the inmate to "show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837). The official must have a subjective "state of mind more blameworthy than negligence," akin to criminal recklessness. *Farmer*, 511 U.S. at 835, 839–40.

Plaintiffs and their amici argue that we should adopt a new standard for pretrial detainees in light of *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015). In that case, the Supreme Court held that in the excessive force context, it is inappropriate to apply the same mental culpability requirement to pretrial detainees as to convicted prisoners. *Id.* at 2473. Instead, an officer's state of mind in an excessive force claim brought under the Fourteenth Amendment must be assessed using an objective standard, unlike the analysis for an excessive force claim brought under the Eighth Amendment. The touchstone of the *Kingsley* test is whether the official's actions were "objectively unreasonable." *Id.*

Since *Kingsley*, the circuits have split on whether deliberate indifference claims arising under the Fourteenth Amendment are still governed by *Farmer* (requiring a subjective inquiry for an officer's state of mind), or instead are governed by *Kingsley* (requiring an objective inquiry for an officer's state of mind). *Compare Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc) (adopting a new objective standard for deliberate indifference claims brought by pretrial detainees); *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017) (same); *Miranda v. Cty. of Lake*, 900 F.3d 335, 351–52 (7th Cir. 2018) (same) *with Alderson v. Concordia Parish Corr.*

6

No. 20-1469, *Cameron, et al. v. Bouchard, et al.*

*Facility*, 848 F.3d 415, 419 n. 4 (5th Cir. 2017) (declining to reconsider its earlier precedent treating Eighth and Fourteenth Amendment claims alike); *Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018) (same); *Nam Dang by and through Vina Dang v. Sheriff, Seminole Cty. Florida*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (same). We have not ruled on the issue. *See Richardson v. Huq*, 885 F.3d 928, 938 n.3 (6th Cir. 2018) (declining to address the issue because it was not raised by either party).

We need not resolve the issue today, because no matter the approach we adopt, the outcome is the same. Even if the pretrial detainees do not need to introduce evidence of subjective recklessness in light of *Kingsley*, they acknowledge that they still must prove something more than that the Defendants acted unreasonably. A "claim for a violation of due process requires proof of a *mens rea* greater than mere negligence." *Darnell v. Pineiro*, 849 F.3d 17, 36 (2d Cir. 2017) (citing *Kingsley*, 135 S. Ct. at 2472). The test they propose would still require either "something akin to reckless disregard," *see Castro*, 833 F.3d at 1071, or that they "knew or should have known" of the risk and nonetheless "recklessly failed to act", *see Darnell*, 849 F.3d at 35. *See also Miranda*, 900 F.3d at 533 (requiring proof that officials acted "purposefully, knowingly, or perhaps even recklessly"). The evidence Plaintiffs presented is insufficient to demonstrate that the jail officials acted with reckless disregard to the serious risk COVID-19 poses. Indeed, the steps that jail officials took to prevent the spread of COVID-19 were reasonable. Such steps include: distributing a memo to the Jail staff about proper cleaning procedures intended to limit the spread within the Jail; stopping all visitation; initiating new arrest screenings for COVID-19; initiating a prison release program, in which 110 inmates were released by Michigan state courts; quarantining new arrestees for 14 days; quarantining any inmate experiencing symptoms of COVID-19 and any inmate who had contact with a symptomatic inmate; checking inmates who were in symptomatic quarantine three times a day with a full set of vitals including a temperature check; placing inmates

7

No. 20-1469, *Cameron, et al. v. Bouchard, et al.*

that tested positive in the positive COVID-19 cells; offering level-one masks and medical treatment to all inmates; cancelling group activities; using prepackaged meals for food service; using a UVI disinfecting machine and sanitizing cells more frequently; giving all inmates access to a disinfectant called DMQ, which is effective against COVID-19; promoting social distancing by reducing cell numbers depending upon inmate classification; and providing access to COVID-19 testing to the entire inmate population.

These steps are very similar to the steps taken by the officials in *Wilson*. There, federal prisoners housed in the Elkton Federal Correctional Institution in Ohio filed a petition under 28 U.S.C. § 2241 to obtain release from custody to limit their exposure to the COVID-19 virus. *Wilson*, 2020 WL 3056217, at *1. They sought to represent all current and future inmates, including a subclass of inmates who—because of age and/or certain medical conditions—were particularly vulnerable to complications, including death, if they contracted COVID-19. *Id.* On April 22, the district court entered a preliminary injunction much like the one entered here, requiring the Federal Bureau of Prisons ("BOP") to, among other things, identify members of the medically vulnerable subclass and evaluate their eligibility for transfer out of confinement at Elkton. *Id.*

Justice Sotomayor granted a stay of the preliminary injunction pending appeal to our court. *See Williams, et al. v. Wilson, et al.*, No. 19A1047, 2020 WL 2988458 (Mem) (June 4, 2020). On appeal, we vacated the preliminary injunction, holding that petitioners had not shown a likelihood of success on the merits of their Eighth Amendment claim, because they had not satisfied the subjective component of the deliberate indifference inquiry. *Wilson*, --- F.3d ---, ---, 2020 WL 3056217, at *12. Fatal to Plaintiffs' claim was the fact that the BOP "responded reasonably" to the risks presented by COVID-19. *Id.* at *7. The BOP's actions to control the virus included:

> [I]mplement[ing] measures to screen inmates for the virus; isolat[ing] and quarantin[ing] inmates who may have contracted the virus; limit[ing] inmates' movement from their residential areas and otherwise limit[ing] group gatherings;

No. 20-1469, *Cameron, et al. v. Bouchard, et al.*

> conduct[ing] testing in accordance with CDC guidance; limit[ing] staff and visitors and subject[ing] them to enhanced screening; clean[ing] common areas and giv[ing] inmates disinfectant to clean their cells; provid[ing] inmates continuous access to sinks, water, and soap; educat[ing] staff and inmates about ways to avoid contracting and transmitting the virus; and provid[ing] masks to inmates and various other personal protective equipment to staff.

*Id.* at *8. Given the similarity of the BOP's response in *Wilson* and Defendants' response here, *Wilson* controls the outcome of this case, even if *Farmer*'s subjective component does not apply to Plaintiffs' Fourteenth Amendment claims.

### III.

Plaintiffs identify several factors that they believe distinguish this case from *Wilson*. Plaintiffs claim that the jail officials adopted preventative measures only as a response to this lawsuit and later, after the court-ordered inspection, discontinued them. Plaintiffs claim, for instance, that (1) the jail continues to fail to disinfect common spaces between each use, (2) after the inspection, inmates continued to receive insufficient soap, and (3) officers do not ordinarily wear masks, even though they did so during the inspection. To the extent plaintiffs ask us to consider conduct occurring after entry of the preliminary injunction, we cannot. *See Wilson*, 2020 WL 3056217, at *1 ("Our task . . . is to review the record that was before the district court at the time the preliminary injunction was entered." (quoting *Johnson v. City of Memphis*, 444 F. App'x 856, 860 n.2 (6th Cir. 2011))). In addition, plaintiffs' argument at most shows that defendants' response was imperfect. That is not enough to establish deliberate indifference. *See id.* at *10 ("Here, even if the BOP's response has been inadequate, it has not disregarded a known risk or failed to take any steps to address the risk, . . . such that its response falls below the constitutional minimum set by the Eighth Amendment.").

Next, Plaintiffs claim that Defendants acted with deliberate indifference in continuing to house nearly half of the jail's population in multi-person cells after Defendants were aware of the

No. 20-1469, *Cameron, et al. v. Bouchard, et al.*

risk of COVID-19, even though many of the jail's cells remain empty. Defendants attribute the empty cells to "security, classification and mental health concerns." Appellants' Br. at 56. The district court made no factual finding, and Plaintiffs have produced no evidence, as to whether it would be feasible to occupy those empty cells with inmates, given the jail's security and mental health concerns. Given the lack of evidence as to whether the empty cells could be safely occupied, Plaintiffs have not satisfied their burden of showing that officials have left these cells empty out of an objectively (or subjectively) reckless disregard of the risks of COVID-19. *See Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 420–21 (6th Cir. 2014) (affirming the denial of a preliminary injunction because the plaintiffs produced "scant evidence" for their claim). Even if those empty cells could be occupied, that Defendants quarantine any inmate exposed to COVID-19 is strong evidence that they are responding reasonably to the risk posed by the virus.

Plaintiffs also claim that the jail intentionally transferred inmates from the east annex, where there were "no COVID-19 cases," to the main jail, where there were "multiple cases of the virus." Appellants' Br. at 35. For example, the district court found that Plaintiffs Cameron and Lee were relocated from the east annex to the main jail after they refused to prepare and/or serve food in the kitchen. However, as the district court noted, housing at the east annex is a "privilege," and pursuant to jail policy, violation of the rules results in transfer to other portions of the jail. The jail made this policy clear to inmates—signs were posted in the east annex informing inmates that they would be sent to the main jail if they refused to do their assigned work. It thus appears that Plaintiffs Cameron and Lee were transferred because they refused to perform their kitchen duties.[2]

---

[2] Plaintiffs claim that inmate Jason Arsineau was required to continue serving food despite showing symptoms of COVID-19. Mr. Arsineau, however, admits that his "temperature was not particularly high," so the prison officials may have reasonably believed that he did not have COVID-19. And Mr. Arsineau did stop serving food after a few days, and he was consequently removed from his kitchen duties. (*Id.* at PageID 405). Plaintiffs also claim that inmate Richard Briggs was threatened with transfer to a crowded cell with a concrete floor and no beds, because he requested a grievance to complain about not being tested for COVID-19. But the record does not convince us that Defendants' treatment towards Mr. Briggs constituted deliberate indifference. Mr. Briggs' own declaration

No. 20-1469, *Cameron, et al. v. Bouchard, et al.*

Plaintiffs produced no evidence even tending to show that this adherence to the jail's ordinary policy caused any inmate to be put at risk. For example, Plaintiffs produced no evidence that any inmate who had not tested positive for COVID-19 was transferred to a cell containing inmates who had tested positive for COVID-19. Nor do Plaintiffs allege that the transfers resulted in any inmate testing positive for COVID-19. Thus, the jail's inmate transfer system also does not distinguish this case from *Wilson* or otherwise demonstrate that the prison officials acted with deliberate indifference.

Finally, Plaintiffs claim that Defendants' quarantine procedure was insufficient, and they raise Mr. Watkins' story as evidence. Mr. Watkins was housed in a one-person cell (A-4) from April 16 to May 6. On May 6, he was tested for COVID-19, and later that day, he was reassigned to a different cell (C-Block) with seven other inmates. Two days later, he was informed that he was COVID-19 positive. As a result of Mr. Watkins' positive status, the entire row of cells associated with his A-4 cell was quarantined. However, we do not know whether Mr. Watkins' C-Block cell was quarantined. Plaintiffs and the district court treat Defendants' failure to produce evidence showing that the C-Block cell was quarantined as itself evidence of deliberate indifference. But Plaintiffs and the district court incorrectly put the burden on *Defendants* to produce evidence that they were *not* deliberately indifferent. The burden is instead on *Plaintiffs* to produce evidence that Defendants were deliberately indifferent and that Plaintiffs are entitled to a preliminary injunction. *Livingston Cty.*, 796 F.3d at 642. Plaintiffs have produced no evidence

---

states that when he "began to feel extremely ill," he "asked a guard to send a nurse." (R. 5-4 at PageID 379). He stated that "the nurse came [and] she took my temperature . . . [and] [b]ecause my temperature was below 100 degrees, she put me back in the cell and told me I was not suffering from COVID-19 and would not be tested." (*Id.*). Yet again, Mr. Briggs asked the guard to send a nurse. Consistent with Mr. Briggs' request, "[a]nother nurse came and told me the same thing." (*Id.*). And Mr. Briggs was eventually tested for COVID-19, about a month after he requested a test. We cannot say that Defendants' response to Mr. Briggs constituted deliberate indifference, when jail officials sent nurses to Mr. Briggs to check his condition both times he requested, and when Plaintiffs presented no evidence as to whether it would have been feasible, given the shortage of testing kits, to test Mr. Briggs for COVID-19 earlier.

No. 20-1469, *Cameron, et al. v. Bouchard, et al.*

showing that the C-Block cell was not quarantined after Mr. Watkins tested positive.  Further, the affirmative steps prison officials did take in response to Mr. Watkins' positive test results strongly rebut Plaintiffs' contention that Defendants acted with reckless disregard to the risk of the virus's spread.  Their argument that Defendants' quarantine procedure was insufficient is thus meritless.[3]

## IV.

Given our decision in *Wilson*, a case that is binding on us, we agree with Defendants that Plaintiffs are unlikely to succeed on the merits of their Eighth and Fourteenth Amendment claims. "[W]hile the harm imposed by COVID-19 on inmates at [the Jail] 'ultimately [may] not [be] averted,' [Defendants have] 'responded reasonably to the risk' and therefore ha[ve] [likely] not been deliberately indifferent to the inmates' Eighth Amendment rights."  *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 844 (1994)).  The same can be said under the Due Process Clause of the Fourteenth Amendment.  Our conclusion that Plaintiffs are unlikely to succeed on the merits challenge is dispositive, because "[o]ur cases warn that a court must not issue a preliminary injunction where the movant presents no likelihood of merits success."  *Id.* at *11 (quoting *Daunt v. Benson*, 956 F.3d 396, 421–22 (6th Cir. 2020)).  We thus **VACATE** the district court's May 21, 2020 preliminary injunction.

---

[3] The dissent points to other alleged circumstances as evidence of the jail's insufficient quarantine procedure: (1) Defendant Lee stated he and others were moved into a vacated cell that had been recently quarantined and had not been cleaned; (2) inmate Saunders claims he was quarantined for only four days with suspected COVID-19 symptoms; (3) inmate Hutson complains of being housed in a cell where he cannot adequately socially distance; and (4) inmate Kucharski says he had to wait four days after first reporting his COVID-19 symptoms to receive medical attention, he continued to work in the jail's kitchen as he waited, and he was not quarantined when he began experiencing COVID-19 symptoms.  The district court made no determination as to accuracy of these allegations, so they are not before us as part of the district court's factual findings in support of the preliminary injunction.  But, even assuming their truth, while these allegations may tend to show that the jail's response has been imperfect, we are not convinced that they are enough to establish deliberate indifference.  *See Wilson*, 2020 WL 3056217, at *10.

No. 20-1469, *Cameron, et al. v. Bouchard, et al.*

COLE, Chief Judge, dissenting.  The plaintiffs and defendants paint vastly different pictures of the adequacy of the defendants' response to the COVID-19 pandemic at the Oakland County Jail.  In making their respective cases before the district court, the parties developed an extensive factual record.  The court then fulfilled its responsibility to consider carefully the evidence to make factual determinations when it held a three-day hearing, considered numerous declarations and exhibits submitted by the parties, and made credibility determinations to weigh the evidence before it.

Relying on its factual findings, the district court issued the preliminary injunction we review today.  It is not generally the role of an appellate court to resolve the discrepancies in the parties' factual accounts; that is the district court's job.  We also do not re-weigh the evidence.  To me, the district court's findings, which we adopt absent clear error, show serious deficiencies on the part of the defendants in responding to the COVD-19 pandemic.  I therefore depart from the majority and would find that the plaintiffs have demonstrated a likelihood of success on the merits of their claims.  As such, I respectfully dissent.

I.

A.

Our review here is complicated by the fact that the plaintiff class includes both those incarcerated pursuant to convictions and pretrial detainees who await trial on charges that the government has not yet proven.  As the majority acknowledges, the question of how to analyze the pretrial detainees' Fourteenth Amendment claims—specifically whether they include a deliberate indifference element—is an open one after the Supreme Court's decision in *Kingsley v. Hendrickson*, where the Supreme Court held that it was inappropriate to apply the same mental culpability requirement to excessive force claims brought by pretrial detainees as the one applied

13

No. 20-1469, *Cameron, et al. v. Bouchard, et al.*

in those brought by convicted inmates. *See* 135 S. Ct. 2466, 2473 (2015). The majority assumes, for purposes of this case, that pretrial detainees do not need to prove a subjective component and says that it is proceeding under the Ninth Circuit's approach of requiring such plaintiffs to prove only "objective recklessness" on the part of jail officials. *See Castro v. Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc).

The Ninth Circuit explained that the "objective recklessness" standard requires plaintiffs to prove that "[t]he defendant did not take reasonable available measures to abate [a substantial risk of harm facing the plaintiff], even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious." *Id*. By contrast, plaintiffs seeking vindication of their Eighth Amendment right against cruel and unusual punishment face a steeper climb and must prove that a defendant "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Despite the majority's representation that it is applying the *Castro* Fourteenth Amendment standard for purposes of this case, however, it in effect still holds all plaintiffs to the Eighth Amendment's deliberate indifference standard. We know this to be true because the majority cites a single case to support its analysis of the plaintiffs' constitutional claims: our recent decision in *Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020). That case was brought by prisoners at a federal prison, none of whom were pretrial detainees. *Id.* at 832–33. As their claims all arose under the Eighth Amendment, we applied the Eighth Amendment test, and, indeed, our decision turned on the prisoners' ability to prove deliberate indifference under the subjective prong. *Id.* at 840–44. Our consideration of this Fourteenth Amendment claim should not be bound by a case where we used an Eighth Amendment analysis.

14

No. 20-1469, *Cameron, et al. v. Bouchard, et al.*

For today's purposes, though, I will not further explore the issue of the proper standard for reviewing Fourteenth Amendment claims of pretrial detainees, as I conclude that the plaintiffs are likely to succeed on the merits even under the more-stringent Eighth Amendment review that all parties agree applies to the claims of the convicted inmates at the jail.

B.

The preliminary injunction before us today requires the defendants to take basic steps to ensure the safety of those housed at the jail.[4]  Our review of preliminary injunctions like the one before us today is "highly deferential."  *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011) (internal citation omitted).  We do not vacate a preliminary injunction unless the district court abused its discretion in granting the injunction.  *Id.*  Courts consider four factors in weighing the propriety of a preliminary injunction:

(1) whether the movant has a strong likelihood of success on the merits;

(2) whether the movant would suffer irreparable injury without the injunction;

(3) whether issuance of the injunction would cause substantial harm to others; and

(4) whether the public interest would be served by the issuance of an injunction.

*Pontiac Ret. Emp's Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam). The majority correctly observes that the plaintiffs' likelihood of success on the merits is the most important of these four factors.  *See Obama for America v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Jones v. Caruso*, 569 F.3d 258, 267 (6th Cir. 2009)).

---

[4] Despite the defendants' repeated assertions in their brief and at oral argument, we are not considering a "prisoner release order." *See, e.g.,* Defendant Br. at 37. These statements by the defendants flatly misrepresent the district court's order, which does not order the release of a single inmate or pretrial detainee. I am likewise unpersuaded by the defendants' hyperbolic assertion that, by entering a preliminary injunction in a case where the plaintiffs raised federal constitutional claims, the district court turned "decades or [sic] precedent regarding federalism and comity on its head." Defendant Br. 20. The majority wisely declines to credit these defendants' attempts to recast the district court's order on appeal.

15

No. 20-1469, *Cameron, et al. v. Bouchard, et al.*

To determine the likelihood of success on the merits, we apply this factual record to the standards governing the plaintiffs' claims. In doing so, we credit the district court's factual findings unless we find that the district court clearly erred in making them. *See Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 625 (6th Cir. 2016). This means that we "abide by the court's findings of fact unless the record leaves us with the definite and firm conviction that a mistake has been committed." *Id.* (internal citation and quotation marks omitted). The majority does not undertake an analysis of whether the district court erred in its weighing of the record, but nonetheless declines to fully credit the factual findings adopted by the district court. I see this as a departure from our role as an appellate court, and I cannot join the majority in adopting the defendants' interpretation of the record in lieu of the district court's, as I do not independently conclude that the district court clearly erred in making its factual findings.

C.

The Eighth Amendment prohibits the incarceration of a prisoner "under conditions posing a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citing *Helling v. McKinney*, 509 U.S. 25, 35 (1993)). By incarcerating prisoners against their will, the government "assume[s] some responsibility for [their] safety and general well-being." *Helling*, 509 U.S. at 32 (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989)). This is so because the government restrains prisoners' liberties such that they cannot care for themselves, and the government must therefore be responsible for providing for basic human needs such as a reasonable degree of safety. *Id.*

An Eighth Amendment claim consists of two elements, an objective and a subjective component. The objective component requires that the deprivation at issue must be "objectively, sufficiently serious." *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298)

No. 20-1469, *Cameron, et al. v. Bouchard, et al.*

(internal quotation marks omitted).  The subjective component demands proof that the prison official has a "sufficiently culpable state of mind," meaning that the official is deliberately indifferent to the prisoner's health or safety.  *Id.* (internal citations and quotation marks omitted).

## II.

The majority finds that the plaintiffs cannot demonstrate a likelihood of success on the merits largely based on our decision in *Wilson*.  I remain unconvinced that *Wilson* properly adjudicated the claims before it.  *See Wilson*, 961 F.3d at 845–50 (Cole, C.J., dissenting in part).  But I do not dissent from today's decision because I think *Wilson* was wrongly decided; I recognize that it carries the same precedential value of any published decision of our court.  Rather, I conclude that the decision does not stretch so far as to foreclose a constitutional claim based on the record before us today, both because the record contains evidence adverse to the defendants that was not present in *Wilson* and because the evidence in favor of the defendants that appears at first glance to be similar to that which we credited in *Wilson* suffers from serious reliability issues.

## A.

To confirm that the defendants knew of the risk posed by the pandemic, we need only look to its actions leading up to the court-ordered April 23 inspection of the jail by Dr. Carlos Franco-Paredes.  The defendants posted signs with methods to prevent the spread of COVID-19 the day before Dr. Franco-Paredes arrived for his inspection, while at the same time removing other signs threatening to transfer inmates who declined work detail to the main jail, where COVID-19 was spreading.  (R. 93, PageID 3008–09; R. 56, PageID 1482–83.)  It was similarly on the eve of that inspection that the jail finally distributed individual cleaning supplies to the inmates.  (R. 93,

No. 20-1469, *Cameron, et al. v. Bouchard, et al.*

PageID 3009.)  During the inspection, jail officials wore masks.  (R. 93, PageID 3010; R. 48, PageID 1428.)

Donald Wallace Chandler, a jail inmate, testified, however, that some jail officials do not continue to wear masks on a day-to-day basis.  (R. 48, PageID 1428.)  Elizah Sheppard, another inmate, explained that since signs about COVID-19 practices were posted, a sign fell off the wall, and was destroyed and not replaced by jail officials.  (R. 49, PageID 1432.)  She further testified that "the deputies continue to tell us that nothing is wrong."  (*Id.*)

Considering that the jail appeared to change its operations after this case was filed and just before the district court's inspector arrived, only to revert back to a more indifferent approach to the virus after the inspector left, I am left with a difficult question:  are the defendants more interested in keeping the inmates in their care safe or in convincing courts that they are doing so? When I consider other factual findings regarding the punishment of inmates, I fear that it is the latter.

By far the most troubling of the district court's findings are the ones concerning the transfer of inmates to areas of the jail where the virus was more prevalent.  Raj Lee was housed in the annex to the jail where he worked as a trustee tasked with cleaning the jail.  (R. 5-5, PageID 383.) He explained that, on April 9, 2020, his supervisor told him that he would have to begin serving food to the entire jail population or else be transferred to the main jail building.  (*Id.*, PageID 384.) The supervisor advised Lee that Lee would not want to go to the main building "because of the COVID-19 outbreak there."  (*Id.*)  When Lee attempted to file a grievance about this interaction, he was transferred to the main jail, where he was then held in "the tanks." (*Id.*, PageID 385.)  These tanks are small holding cells infested with bugs and rats where everyone sleeps on a concrete floor.

18

No. 20-1469, *Cameron, et al. v. Bouchard, et al.*

(*Id.*)  Lee's cell was 12 feet by 15 feet, and he shared it with nine others, rendering any sort of social distancing impossible.  (*Id.*)

Even more concerning is that Lee's case does not appear to be an isolated incident.  Jamaal Cameron similarly testified that when he raised safety concerns about his food-service job, his request to change to a different job was denied.  (R. 56, PageID 1475.)  But Cameron remained concerned about his safety, so he decided to stop serving food.  As punishment, he was transferred to the main jail.  (*Id.*, PageID 1475–76.)

Another inmate, Richard Briggs, began to feel ill and reported his symptoms to jail nurses.  Those nurses dismissed his concerns and doubted his symptoms instead of addressing them.  (R. 5-4, PageID 379.)  When he then asked a guard for a grievance form to complain about the lack of medical care he received, the guard "refused and asked [Briggs] if [he] wanted to be sent down to 'the Tank.'"  (*Id.*)  After that threat, Briggs decided not to file a grievance but continued to suffer night chills, diarrhea, and loss of appetite.  (*Id.*)  He was never treated.

The district court found that the defendants had not rebutted any of these accounts, and that the plaintiffs' witnesses were more credible than the defendants' witnesses who defended the jail's approach to the pandemic at the hearing.  (R. 93, PageID 3038–39.)  Nonetheless, the majority attempts to explain these transfers and threatened transfers as the mere mechanical application of the jail's transfer policy, which considers being housed in an annex to be a privilege.  Maj. Op. at 10.  But issue is not the transfer inmates to a different part of the jail; it is the transfer of inmates to a part of the jail that not only already had a COVID-19 outbreak, but also has a near-perfect environment for the transmission of respiratory disease.  The application of the policy here undoubtedly put inmates at risk.  Again, Lee was transferred to a holding cell where he was held

No. 20-1469, *Cameron, et al. v. Bouchard, et al.*

with nine other inmates in the area where infections from the virus had spread and where he had to sleep on the concrete floor which was crawling with bugs and rats.

The Eighth Amendment forbids punishment that is "barbarous" or does not accord with "evolving standards of decency that mark the progress of a maturing society." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The Supreme Court has held that jail officials violate the Constitution when they "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). It is difficult to imagine conduct that would better fit this description than that of the defendants here. In the middle of a deadly, once-in-a-century pandemic where social distancing is recognized as the best method to prevent transmission of the virus, inmates should not be forced to sleep on a concrete floor with rats and bugs where they cannot practice even a modicum of social distancing. And given that the record suggests that Lee's treatment is not an isolated event but rather constitutes a repeated practice, a preliminary injunction is warranted to prevent the jail from similarly placing other members of the plaintiff class at risk.

## B.

*Wilson* does not authorize any of the defendants' conduct that I have discussed so far. That case was, after all, silent on whether controlling or punishing detainees by threatening them with exposure to the virus accords with the Eighth and Fourteenth Amendments. It similarly does not speak to the legal impact of jail officials' deception of a court-ordered investigator. But even if I were to ignore those findings, it would be difficult to conclude that the measures that the majority cites as similar to those that were deemed constitutionally adequate in *Wilson* are actually occurring at the jail. Before going into those measures, recall the district court's credibility assessment of the defendants' witnesses who explained these purported measures at hearing:

No. 20-1469, *Cameron, et al. v. Bouchard, et al.*

> What the Court finds more significant when assessing credibility is that the bulk of Defendants' evidence concerning the conditions in the Jail and what is being done to prevent the spread of coronavirus comes primarily from two individuals—one who admittedly spends "seldom" time in its housing areas and the other who had not been inside the housing areas for weeks before the evidentiary hearing. Nurse Warren and Captain Childs have painted a picture of those areas which is not based on their own knowledge and may not even be based on reality. Finally, the Courts finds it noteworthy that Defendants presented no expert testimony on the adequacy of their COVID-related policies or their implementation of those policies.

(R. 93, PageID 3039.) I share the district court's concern that the defendants' assertions as to the measures that they are purportedly taking may not be based in reality.

The majority notes that the defendants claim to have promoted social distancing by reducing cell numbers depending on inmate classification. Maj. Op. at 8. But, as it later concedes, the jail has kept some cells empty while leaving other inmates in multi-person cells where they cannot practice social distancing. Maj. Op. at 9.

What is the reason for this seemingly irrational allocation of resources? The majority credits the assertion in the defendants' appellate brief that these cells remain empty due to "security, classification, and mental health concerns." Appellant Br. 56. The problem with accepting this explanation is that the defendants never persuaded the district court that it was plausible. In fact, the district court found that the defendants "offer[ed] no explanation regarding why individuals have not been moved to these available cells in order to maximize the distance between inmates." (R. 93, PageID 3040–41.) As there are no grounds to conclude that the district court clearly erred in its finding that the defendants have provided no basis as to why they cannot increase social distancing by making use of the empty cells, I would consider that finding instead of substituting the defendants' appellate explanation (offered without record support) for those failures. And at the very least, the defendants should not receive credit for emphasizing social distancing by reducing the inmate population when they have left the cells vacated by those

No. 20-1469, *Cameron, et al. v. Bouchard, et al.*

departing the jail vacant even as the remaining inmates continue to be housed in multi-person cells or on concrete floors.

Furthermore, the majority discusses the district court's finding that the jail's quarantining process was incomplete following Richard Watkins's positive test result. But even if we accept the majority's dismissal of this evidence, it was far from the only evidence considered by the district court that supports the conclusion that the quarantining process was inadequate. For example, Lee stated that when one group of inmates was moved from a cell to be quarantined due to COVID-19 symptoms, he and others were moved into the vacated cell, which had not been cleaned following the departure of the quarantined inmates. (R. 5-5, PageID 385–86.) Another inmate, Matthew Saunders, was quarantined for four days in the medical unit with suspected COVID-19 symptoms, including a 103-degree fever, only to be returned to his assigned cell in the general population without being tested for the virus. (R. 5-8, PageID 399–400.) Finally, Antione Hutson's declaration demonstrates that inmates are often housed in multi-person cells without regard for medical vulnerabilities that may place them at a greater risk should they contract the virus, resulting in him being housed in a cell where he cannot socially distance despite his Stage-III cancer. (R. 46, PageID 1421–22.) In light of these examples, there is ample justification to conclude that the defendants' quarantining procedures have been incomplete at best.

The district court also found that the medical care provided to inmates showing symptoms of the virus was not as thorough as the defendants suggest. Briggs's account of nurses doubting his account of his condition shows that the defendants do not consistently take the threat of COVID-19 seriously, even when confronted with an inmate who is clearly displaying its symptoms. David Kucharski explained that a cellmate of his waited four days after first reporting his COVID symptoms to a nurse to actually receive medical attention, continuing to work in the

No. 20-1469, *Cameron, et al. v. Bouchard, et al.*

jail's kitchen even as he waited for assistance. (R. 5-7, PageID 395.) When Kucharski, who

suffers from asthma, began experiencing symptoms himself, he was not quarantined, but instead

given a seven-day supply of Tamiflu, an influenza medication, and told to take it if symptoms

continued. (*Id.*)

In sum, the record reveals differences in degree and in kind between this case and *Wilson*.

I find that by demonstrating that the defendants deployed transfers to COVID-infected areas

punitively, temporarily adopted better practices only for purposes of passing inspection, repeatedly

provided inadequate medical care, failed to consistently quarantine symptomatic inmates, and did

not take advantage of opportunities for increased social distancing, the plaintiffs have shown that

they are likely to succeed on the merits of their claims.

III.

The majority, finding that the plaintiffs are not likely to succeed on the merits, does not

address the remaining preliminary injunction factors. As I reach a different conclusion on the first

factor, I proceed to the remaining ones. Each of these factors supports upholding the preliminary

injunction. On the second and third factors, the plaintiffs show that they could suffer irreparable

harm absent an injunction, while the defendants do not show that they will be harmed should the

injunction remain in place. The plaintiffs, especially the medically vulnerable ones, could suffer

grave illness or death if the defendants do not abide by the terms of the preliminary injunction.

Meanwhile, the preliminary injunction only imposes upon the defendants a burden to take

measures necessary to ensure the safety of the inmates housed at the jail. This may cost the

defendants in terms of time and resources, but it does not irreparably harm them. *See Sampson v.*

*Murray*, 415 U.S. 61, 90 (1974). As for the fourth factor, there is not a discernable public harm,

as no inmates are being released pursuant to the preliminary injunction and the public interest is

23

No. 20-1469, *Cameron, et al. v. Bouchard, et al.*

served by caring for the health and safety of detainees and the community in which they live. Further, "it is always in the public interest to prevent the violation of a party's constitutional rights." *See G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994).

## IV.

The record does not reflect that the district court clearly erred in making its factual findings. As such, the merits of this appeal should rise or fall on the application of the law to those findings, especially given our deferential abuse-of-discretion review of preliminary injunctions. I respectfully dissent because the record and factual findings before us should be fatal to the defendants' challenge to the district court's preliminary injunction.