UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMAAL CAMERON; RICHARD BRIGGS;
RAJ LEE; MICHAEL CAMERON; MATTHEW
SAUNDERS, individually and on behalf of all
others similarly situated,

                                        Case 2:20-cv-10949-LVP-PTM

      Plaintiffs,

v.

MICHAEL BOUCHARD, in his official capacity
as Sheriff of Oakland County;
OAKLAND COUNTY, MICHIGAN,

      Defendants.

---

# **DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO ENFORCE STIPULATION**

POTTER, DEAGOSTINO, O'DEA & CLARK

1

# INTRODUCTION

The Sixth Circuit previously reversed this Court's entry of a preliminary injunction determining that "[t]he evidence Plaintiffs presented is insufficient to demonstrate that the jail officials acted with reckless disregard to the serious risk COVID-19 poses. Indeed, the steps that jail officials took to prevent the spread of COVID-19 were reasonable." *Cameron v Bouchard*, 815 Fed Appx 978, 985 (6th Cir. 2020). The same "steps" determined to be "reasonable" by the Sixth Circuit have continued to be in force throughout the COVID-19 pandemic. Despite this, Plaintiffs seek relief from this Court essentially requesting this Court to order Defendants to enforce their own policies under the guise of their current Motion.

It is well known that the pandemic continues to affect significant portions of the population. Indeed, COVID-19 has not spared anyone from its contagiousness. In Michigan alone, COVID-19 has and continues to affect all ranges of the population from elected officials, healthcare workers to restaurant workers. As of this week, over 10,000 people had died from COVID-19 in Michigan alone. Jails and prisons have also suffered the affects of COVID-19. On December 1, 2020, Macomb County Jail reportedly had 143 out of 550 total inmates (26%) positive for COVID-19.  (Freep.com, Quarter of Macomb County Jail Inmates Test Positive For Coronavirus, December 1, 2020). Oakland County

POTTER, DEAGOSTINO, O'DEA & CLARK

has never had anywhere near 26% of its inmates positive for COVID-19. On the contrary, **from May 18-August 12th, there were no positive cases at Oakland County Jail**. (Exhibit Q, Tracker). From August 12th-October 31st there were six (6) total positive cases (including those that arrived at OCJ positive with COVID-19). (Exhibit Q). Despite OCJ's best efforts and consistent practices that were determined to be "reasonable" by the Sixth Circuit, OCJ experienced an increase in positive cases in November. Currently, there are 21 positive cases out of approximately 740 inmates (2.8%). (Exhibit A, Affidavit of Vicki-Lyn Warren, ¶ 10). Following an inspection of OCJ, the State of Michigan Department of Corrections ("MDOC") determined OCJ was in "full compliance with Executive Directive 2020-170 Testing Requirements." (Exhibit B, MDOC Approval Letter). As such, OCJ has and continues to have authority to transfer inmates from OCJ to MDOC. (Exhibit B).

Although OCJ's increase in positive cases is consistent with increases in Michigan and across the United States during the same time period, Plaintiffs' counsel notified the defense counsel of Plaintiffs' belief that Defendants were in violation of the Stipulation entered in April 2020 on November 23rd. In response, defense counsel provided Plaintiff's counsel extensive information and documents confirming that Defendants continued to take its response to the pandemic

seriously and most importantly exercise the same (and additional) measures previously accepted by the Sixth Circuit. **Unfortunately, the 98 pages of documents that were provided to Plaintiffs' counsel prior to the filing of the instant motion were conveniently omitted from Plaintiff's exhibits (despite attaching the email containing the attachment) attached to their instant Motion.** This omission exemplifies Plaintiffs' motive in this case. Defendants have attached this documentation as exhibits throughout this response.

Simply put, Plaintiffs' instant motion is an improper attempt to obtain relief from this Court remarkably similar to the same relief previously sought in their attempt to obtain injunctive relief under the guise that Defendants have breached a stipulation entered approximately eight (8) months ago. Plaintiffs' Motion should be denied.

## **ARGUMENT**

## I.  **The Stipulation Should Be Vacated**

As discussed extensively in Defendants' Motion to Vacate the Stipulation, the stipulation should be vacated in light of the Sixth Circuit's determination. A stipulation may be set aside when it would result in "manifest injustice." *Waldorf v. Shuta*, 142 F.3d 601, 614 (3d Cir. 1998); *Fairway Const. Co. v. Allstate Modernization, Inc.*, 495 F.2d 1077, 1079 (6th Cir. 1974). "In interpreting

a stipulation, courts should consider its plain language and the circumstances surrounding the formation of the [s]tipulation which may explain its meaning." *Washington Hosp. v. White,* 889 F.2d 1294, 1299 (3d Cir.1989).

Here, "manifest injustice" would occur if the stipulation continues to be in place. The stipulation was agreed to by Defendants in response to the Court's Temporary Restraining Order ("TRO"). Indeed, the Stipulation was entered April 22nd following entry of the TRO on April 18th. The Stipulation set forth the existing policies of OCJ and largely followed the TRO and it was Defendants' belief that the identical portions between the two documents would render same contained in the TRO moot. Indeed, the Preamble to the parties' Stipulation specifically indicates, "Defendants position is that Defendants were in full compliance with all subparagraphs of this Stipulation prior to the filing of Plaintiffs' lawsuit." (R.28, Stipulation, PageID# 798). Defendants' belief is supported by well established authority which establishes a court may not order a municipality such as Oakland County to follow its own laws and procedures. *Pennhurst State School & Hospital v Halderman*, 465 US 89 (1984). This notion has been upheld by the Fifth Circuit in the COVID-19 context. *Valentine v Collier*, 956 F3d 797, 802 (5th Cir.2020).

Additionally, Plaintiff's claims for injunctive relief no longer exist in light of the Sixth Circuit's decision. See, *Cameron*, 815 Fed Appx at 988(holding "[o]ur conclusion that Plaintiffs are unlikely to succeed on the merits challenge is

POTTER, DeAGOSTINO, O'DEA & CLARK

dispositive, because our cases warn that a court must not issue a preliminary injunction where the movant presents **no likelihood of merits success**.")(quotations and citations omitted, emphasis supplied). Thus, all that remains are Plaintiff's claims for declaratory relief. Plaintiffs' claims for declaratory relief simply seek an order that their constitution rights were violated. The declaratory relief claims cannot obtain injunctive relief that is being requested by Plaintiffs in their instant motion. To the extent Plaintiffs' request the status quo to be altered or rely upon any provision of the Stipulation wherein they claim provides support for same, such provision is unenforceable in light of the Sixth Circuit's determination that 1) Plaintiffs' injunctive relief claims lack merit and 2) Defendant's response (i.e. policies) are reasonable and do not amount to deliberate indifference. Consequently, when the circumstances are considered, there is no basis for enforcement of the Stipulation and it should be vacated. Therefore, Plaintiff's Motion should be denied.

## II.    Defendants Are Not In Breach of The Stipulation

Even if the stipulation is in effect, Defendants have not breached the stipulation. Each of Plaintiffs' allegations will be addressed separately below.

### A.    Cleaning (Paragraphs 1 and 10)

First, it should be noted that Plaintiff's request this Court to order that "rags and washcloths must be distributed as needed..." (Plaintiff's Motion, pp. 5-6).

Plaintiff's request exceeds the parameters of the Stipulation as the Stipulation does not require same. This is true because the cleaning agent currently being utilized "HALT," is not designed to be dried with a rag or washcloth and instead is designed to air dry. (Exhibit C, Photographs of HALT). Similarly, Plaintiffs request this Court to order Defendants to provide "toilet paper…provided promptly upon request." (Plaintiffs' Motion, pp. 14). Plaintiffs even acknowledge that toilet paper is not required to be provided in the Stipulation in a footnote to their Motion. (Plaintiffs' Motion, p. 6 n. 4). Consequently, there is no basis for any order regarding these requests.

The remainder of Plaintiffs' allegations are without merit. The following cleaning supplies are distributed three (3) times per day and upon request: 1) swifter pads, 2) toilet brushes, 3) shower brushes (except to single man cells), 4) sponges, 5) spray bottles containing disinfectant HALT. (Exhibit D, Affidavit of Lt. Thomas Vida, ¶ 3).

This is confirmed by officers in OCJ who are responsible for providing and ensuring same. (See Exhibits V-CC, EE-FF, Affidavits of Bastianelli, Root, Richardson, Wargel, DeMulder, Carnes, Tuttle, Hein, Beane and McKinney). Specifically, main jail supervisors Deputies Heather Bastianelli, Emily Root, James Richardson, Brian Wargel, Terence DeMulder, William Beane and Kahilla McKinney all confirm that after each meal, disinfectant, swifter pads, toilet

POTTER, DEAGOSTINO, O'DEA & CLARK

brushes and sponges are distributed to all inmates at the main jail. (Exhibits, V-Z, EE-FF, ¶ 5). Deputies Basitanelli, Root and Richardson all work the afternoon shift. (Exhibits V-X, ¶ 3). Deputies Wargel and DeMulder work the midnight shifts. (Exhibits Y-Z, ¶ 3). Deputies McKinney and Beane work the day shift. (Exhibits EE-FF, ¶ 3). These deputies have personally observed the distribution by other deputies in addition to personally distributing these items. (Exhibits V-Z, EE-FF, ¶ 6). The supervisors confirm that soap is distributed three (3) times per week and is available to inmates upon request. (Exhibits V-Z, EE-FF ¶ 7). Once again, these individuals have personally observed this distribution by others in addition to distributing the soap themselves. (Exhibits V-Z, EE-FF ¶ 8). With respect to toilet paper, it is distributed to inmates at the main jail twice per week and upon request. (Exhibits V-Z, EE-FF, ¶ 9).

Defendants' personnel assigned to the Annex similarly confirm cleaning supplies are available to inmates in this facility. Deputy David Carnes supervises deputies assigned to the Annex. (Exhibit AA, ¶ 2). These deputies confirm that in the annex (currently being used for new inmate quarantine), cleaning supplies including disinfectant, sponges, swifter pads, toilet brushes, toilet paper, hand soap, toothbrushes and toothpaste are available on a daily basis on a table in the day room. (Exhibit AA, ¶¶ 8, 9). Inmates in the Annex are allowed out of their cell for thirty to forty-five minutes per day. (Exhibit AA, ¶ 7).

POTTER, DeAGOSTINO, O'DEA & CLARK

The same applies for the east annex ("ENEX"). Deputies Dana Tuttle and Ronald Hein supervise deputies assigned to the East Annex. (Exhibit BB-CC, ¶ 2). Deputies Tuttle and Hein confirm that cleaning supplies including disinfectant, sponges, swifter pads, toilet brushes, toilet paper, hand soap, toothbrushes and toothpaste are available on tables in the dorm. (Exhibits BB-CC, ¶ 6). Inmates have freedom of movement throughout the day in the east annex. (Exhibits BB-CC, ¶ 5). The inmates in the ENEX have access to these supplies throughout everyday. (Exhibits BB-CC, ¶ 7).

With regard to the disinfectant agent currently being utilized, HALT is not to be wiped. (Exhibit C). It is to air dry pursuant to the manufacture label. (Exhibit C; Exhibit D, ¶ 3(g)). Garbage cans are provided for each 10-man cell and are emptied three (3) times per day. (Exhibit D, ¶ 3(h)). Grocery bags are provided as garbage for inmates in single cells. (Exhibit D, ¶ 3(i)). These are also emptied three (3) times per day. (Exhibit ¶ 3(i)). Bars of soap are resupplied to inmates in the main jail three (3) times weekly and upon request. (Exhibit D, ¶ 4(c)).

In the annex and east annex, again, soap and cleaning supplies are readily available for all inmates as the annex is a dormitory set up. (Exhibit D, ¶ 4(b); Exhibit E, Photographs; Exhibits AA-CC. Inmate workers (i.e. trustees) are responsible for "thoroughly cleaning bathrooms...three times a day outside of individual cleaning by incarcerated individuals." (Exhibit K, p. 9).

POTTER, DeAGOSTINO, O'DEA & CLARK

9

In addition to cleaning supplies being supplied to all inmates, OCJ has and continues to take efforts to sanitize the entire jail. Deputy Treavor Phillips testified that he is a corrections officer that is exclusively tasked with sanitizing the jail on a daily basis during the pandemic. (Exhibit DD, Affidavit of Treavor Phillips, ¶ 5). When staffing permits, a second deputy is also assigned to assist in the sanitation process. (Exhibit DD, ¶ 9). Deputy Phillips testified that all common areas of the jail are sanitized with ultraviolet light and electro-static sprayers (including receiving and attorney booths that are utilized for arraignments). (Exhibit DD, ¶ ¶ 6, 8). The same methods are used to clean the housing units when access is available.  (Exhibit DD, ¶ 6). These methods are also used to clean any area of the jail in which positive COVID cases have been identified. (Exhibit DD, ¶ 7).

Finally, Plaintiffs reference a flooding toilet they claim "took over a month to fix." Plaintiffs' allegation is easily refuted by work orders demonstrating that all issues were repaired within 24 hours. (Exhibit F, Work Orders).

### B.	Masks, Training and Prevention (Paragraphs 3 and 12)

Without identifying a single deputy by name, Plaintiffs contend deputies' mask wearing is "sporadic at best." (Plaintiff's Motion, p. 6). Obviously, such a vague allegation is impossible to specifically address. Moreover, Plaintiffs hypocritically request an order requiring deputies to wear masks when inmates refuse to wear masks provided to them. (Exhibit D, ¶ 5; Exhibit E).

POTTER, DEAGOSTINO, O'DEA & CLARK

Regardless, documents demonstrate that prior to Plaintiffs' filing their Motion or providing notice of the alleged breach (November 23rd), an email from Capt. Douglas Molinar was sent to all commanders at the jail on November 4th indicating "please make certain that assigned personnel are practicing social distancing and mask wearing as required at all times while on duty as required and directed by Sheriff Bouchard. Violators are subject to disciplinary actions." (Exhibit G, E-mail dated November 4, 2020). On November 6th, an email was sent from Lt. Thomas Vida to all sergeants assigned to the jail advising that boxes of N95 masks were to be distributed to deputies working the COVID positive and symptomatic housing units. (Exhibit H, E-mail dated November 6, 2020). On November 10th, an email was sent by Lt. Vida instructing Sergeants Ashley and Sexton to "conduct a walk around and ensure that signs are posted EVERYWHERE including all housing units that are READABLE about handwashing, wearing masks and social distancing." (Exhibit I, E-mail dated November 10, 2020; emphasis in original). On November 11th an email was sent by Lt. Vida to all sergeants that once again addressed mask wearing. In this email, Lt. Vida stated, "it is imperative that we enforce...wearing masks at all times" and "that PPE must be used at all times. Make sure that the deputies under your command are familiar with the attached protocols and are following them."

POTTER, DEAGOSTINO, O'DEA & CLARK

11

(Exhibit J, E-mail dated November 11, 2020). The protocols referenced in Lt.

Vida's email are attached as Exhibit K. These protocols indicate in relevant part:

### Personal Protection Equipment

All Deputies, staff and support staff are issued and have access to
sufficient cotton, surgical and N95 masks, gloves and eye protection
(face shields). Sworn and civilian staff are trained on proper usage
and sterilization techniques. All are advised to wear appropriate PPE
to the fullest extent possible and at all times when in close contact
with inmates or bodily fluids. (Exhibit K, p. 8).

On November 16th, Major Curtis Childs sent an email to Capt. Molinar and all

lieutenants instructing them to advise deputies that cloth, surgical or N95 masks

were to be worn and not neck gaiters. (Exhibit L, E-mail dated November 16,

2020). On November 20th (three days before Plaintiffs notified Defense counsel of

the alleged breach), Major Childs once again sent an email to all commanders at

the jail. In this email, Major Childs instructed, "During your rounds throughout the

facilities, you **MUST** ensure that ALL personnel are wearing their masks.

Discipline WILL occur if they are found not wearing it appropriately. (Exhibit M,

E-mail dated November 20, 2020; emphasis in original).

The warnings that masks must be worn or discipline would ensue are not

empty threats. On November 20th **(three days before Plaintiffs' notified defense**

**counsel of the alleged breach**), an investigation was authorized by Captain

Molinar as a result of a statement made by a deputy that he did not wear a mask on

November 18th. (Exhibit N). The investigation confirmed the deputy was "not wearing his mask in violation of the protocols..." (Exhibit N). Discipline was recommended. (Exhibit N).

All of the foregoing (with the exception of the disciplinary documents which are confidential) was provided to Plaintiffs' counsel prior to Plaintiffs filing their Motion. Despite being provided these documents, Plaintiffs request this Court to enter an Order requiring those who do not wear masks to be "immediately reprimanded/disciplined." There is no need for a court order requiring "discipline" when such measures were being taken prior to Plaintiffs filing their motion AND continue to be taken. Such a request demonstrates Plaintiffs' desire and ill conceived notion that somehow they or this Court can control the discipline and order of the jail. Unfortunately for Plaintiffs, there is no such authority for same. **Lastly, it is interesting that Plaintiffs request such an order when photographic evidence demonstrates that inmates themselves refuse to wear masks even when not social distancing**. (See, Exhibit E). Simply put, there is no legal or factual basis for any of the relief requested by Plaintiffs regarding masks.

C.    Testing (Paragraphs 6 and 8)

Defendants expressly deny the allegations contained in Plaintiffs' Motion regarding their testing procedures. In reality, the testing protocols have and continue to remain the same. They are:

1. All inmates are placed in quarantine (2 people per cell) upon entry into OCJ.
2. On approximately day 10 of quarantine, new inmates are tested. If they refuse testing, the inmate remains in quarantine. If the inmate tests negative, they are moved to general population.
3. The entire jail (aside from intake quarantine) is tested monthly pursuant to schedule.
4. Any inmate can request and receive a test at any time.
5. If an inmate tests positive, they are moved to the Covid+ pod.
6. If an inmate tests positive and has one cell mate, the cell mate is moved to a "symptomatic" area and tested seven (7) days later.
7. If an inmate tests positive in a multiperson cell, the remainder of the cell is quarantined in place. The remainder of the cell is tested seven (7) days later.
8. An inmate who complains of symptoms is removed from their cell, placed in symptomatic housing and tested. The disposition of the remaining cell mates is dependent on the inmate's swab results. The entire cell is "held" (no one in no one out) until the results are known.
9. If an inmate in symptomatic housing tests positive, all others in that cell (even if they test negative) remain in the cell and are swabbed again in seven (7) days.

(Exhibit A, ¶¶ 3-9; Exhibit O, Calendar; Exhibit P, Example of Quarantine Signs).

The allegations set forth in the inmate affidavits attached to Plaintiffs' Motion regarding testing are replete with misrepresentations (and consequently perjured testimony). Inmate Antonio Fenn testified (under the penalty of perjury) that he was tested "after 13 or 14 days of quarantine." (ECF No. 162-3, Page ID#3878). In reality, Mr. Fenn was attempted to be tested on October 30th (day he arrived at OCJ) and refused to be tested. (Exhibit A, ¶ 11). Mr. Fenn was subsequently tested while in quarantine on November 3rd and November 9th.

POTTER, DEAGOSTINO, O'DEA & CLARK

(Exhibit A, ¶ 11). He tested negative both times. (Exhibit A, ¶ 11). Mr. Fenn also testified that a "jail dentist" was positive for COVID-19. (ECF No. 162-3, Page ID#3878). Once again, this testimony is false as no jail dentist has tested positive for COVID-19. (Exhibit A, ¶ 13).  Mr. Fenn also testified that an inmate named "Daniel" in the cell next to his tested positive for COVID. (ECF No. 162-3, Page ID#3878). However, no one with the first or last name of "Daniel" has tested positive for COVID-19.  (Exhibit A, ¶ 13). Mr. Fenn later testified he "developed a really sore throat" and his "asthma has started acting up." (ECF No. 162-3, Page ID#3879).  Mr. Fenn has never requested to see a nurse because of a sore throat, asthma or a headache. (Exhibit A, ¶ 14). In fact, on December 1st, Mr. Fenn refused to see a nurse regarding his asthma. (Exhibit A, ¶ 14).

The same perjured testimony is demonstrated in the inmate affidavits of Steven Johnson, Dennis Carter and David Kucharski. Mr. Johnson testified under oath that he was not tested following a vague incident described with an inmate named "Treale". (ECF No. 162-6, Page ID#3890). However, Mr. Johnson was tested on November 9th and again on November 17th. (Exhibit A, ¶ 15). Both tests were negative. (Exhibit A, ¶ 15). Mr. Carter testified that an inmate tested positive in his cell. However, what Mr. Carter omitted from his self-serving affidavit was that he was subsequently tested on November 9th and November 17th and both tests were negative.  (Exhibit A, ¶ 16). Mr. Kucharski testified under oath that he

POTTER, DeAGOSTINO, O'DEA & CLARK

15

reported symptoms to an anonymous "nurse." (ECF No. 162-6, Page ID#3869). In reality, Mr. Kucharski never reported symptoms to any staff and similarly never submitted a sick call slip advising medical personnel of any symptoms he was experiencing. (Exhibit A, ¶ 17).

Plaintiffs request this Court to enforce Defendants' ongoing policies and procedures. As indicated above, such relief is improper. *Pennhurst State School & Hospital, Valentine, supra.* Moreover, entire inmate testing is not only unnecessary considering entire jail testing is done on a monthly basis, but a waste of valuable resources which is reflected by the positivity rate of total tests completed at OCJ. From March 27th thru December 1st, 5281 tests have been performed. (Exhibit Q, OCJ Daily Tracker). Of these tests, there have been 109 positive tests (which includes inmates who arrived at OCJ positive for COVID-19). (Exhibit Q). Thus, the total positivity rate for COVID-19 is approximately 2%.

D.    Social Distancing (Paragraph 7)

Paragraph 7 of the Stipulation sets forth that Defendants will "provide adequate spacing between people incarcerated, **to the maximum extent possible** with a **goal** of six feet of separation..." (Emphasis supplied).

Throughout this litigation, Plaintiffs have exposed their ignorance of correction procedure including security and classification regarding same. Moreover, Plaintiffs have routinely disregarded the law with respect to these

POTTER, DEAGOSTINO, O'DEA & CLARK

16

issues. Indeed, an inmate does not have a protected right to be assigned to a particular prison, security classification, or housing assignment. *Olim v. Wakinekona*, 461 U.S. 238 (1983); *Meachum v. Fano*, 427 U.S. 215 (1976); *Montanye v. Haymes*, 427 U.S. 236 (1976); *Sandin*, 515 U.S. at 484-87. Because "maintaining security, order, and discipline are essential goals of a corrections system," prison officials are given wide latitude in the adoption and application of prison policies, and courts have deferred to judgments of prison officials in upholding these regulations." *Hayes v. Tennessee*, 424 F. App'x 546, 549 (6th Cir. 2011).

Further, Plaintiffs' Motion is factually flawed. At no point have any cells been "overcrowded" as Plaintiffs contend. This is conclusively established by the Daily Inmate Population Report which shows every portion of the jail (including individual cells) well below capacity. (Exhibit R, Daily Population Report). OCJ continues to house by validated, objective and tested Northpointe classification system which helps to keep incidents in the housing areas at a minimum. (Exhibit S, Affidavit of Major Curtis Childs, ¶ 3).

OCJ continues its efforts to maintain social distancing to the fullest extent possible and where practicable. For example, in the main jail, there are 36 cells on the second floor which are approved by the MDOC to house 10 inmates. (Exhibit S, ¶ 5). Each 10 person cell is approximately 19' by 19' for a total of approximately

17

361 square feet. (Exhibit S, ¶ 6). As of December 10th, the cells in the main jail are

occupied as follows:

1. One (1) 10-person cell housing 10 inmates;
2. Two (2) 10-person cells housing 9 inmates;
3. Five (5) 10-person cells housing 8 inmates;
4. Twelve (12) 10-person cells housing 7 inmates;
5. Eleven (11) 10-person cells housing 6 inmates;
6. Two (2) 10-person cells housing 5 inmates;
7. Two (2) 10-person cells housing 4 inmates;
8. One (1) 10-person cells housing 3 inmates.

(Exhibit S, ¶¶ 7(a)-(h)). 13 of these cells are housing maximum security inmates.

(Exhibit S, ¶ 8). Another 13 cells are housing high medium security inmates.

(Exhibit ¶ 8). In addition to security levels, housing and movements are restricted

based on areas that are under quarantine. (Exhibit S, ¶ 9). This is demonstrated by

the fact that the lone 10-person cell currently housing 10 inmates recently came off

quarantine and is in the process of being reduced when practicable and when

classification allows. (Exhibit S,  ¶ 9).

　　With respect to N dorm, 60 inmates are able to be housed in this dormitory

style unit. (Exhibit S, ¶ 12). As of the present date, only 36 inmates are assigned

to this unit. (Exhibit S ¶ 12). The other inmate worker dorm (trusty dorm) has six

(6) cells and each cell allows for 12 inmates. (Exhibit S, ¶ 12). Two (2) of those

cells are empty and the others contain no more than three (3) inmates. (Exhibit S,

¶ 12).

In regard to the east annex, inmates are housed in bunks in a checkerboard pattern. (Exhibit S, ¶ 14). The facility is approved for 398 inmates and there are currently 55 inmates housed in this facility. As discussed previously, inmates are assigned to this facility based on classification in addition to passing a medical review. (Exhibit S, ¶ 14).

The factual flaws (and likely misrepresentation made by Mr. Kucharski to his attorneys) is best illustrated by the affidavit of Mr. Kucharski. According to Mr. Kucharski, he was housed in a 31 bunk dorm with 37 inmates. What Mr. Kucharski fails to indicate in his affidavit is that each bunk is a double bunk and thus the dorm is not overcrowded.

Finally, OCJ continues to attempt to control inmate population levels by reviewing inmates who may be eligible for release. Beginning on November 11th, letters were sent to state district courts/judges advising them of inmates who were potentially medically vulnerable. (Exhibit T, Letters). The letters advised the courts and/or judges of the inmate, inmate's number and medical condition. (Exhibit T). The Oakland County Sheriff's Office continues to work in conjunction with the Oakland County Prosecutor's Office and its medical contractor, Wellpath, to determine those that are potentially eligible for early release at the discretion of the Prosecutor's Office and state court judge. Indeed, Paul Walton, the Chief Assistant

19

Prosecutor of the Oakland County Prosecutor's Office, has advised assistant prosecuting attorneys of the OCSO initiative.  (Exhibit U, E-mail).

Since November 11th, 87 total letters have been sent. The letters are attached as Exhibit T. While Defendant is under no obligation nor requirement to participate in such an early release initiative, the initiative is further evidence that there is no basis for any Court Order regarding the stipulation. Plaintiffs implicitly acknowledge this as they fail to advise the Court of such an initiative or of their knowledge regarding same at the time they filed their motion. Not surprisingly, Plaintiffs also fail to acknowledge Plaintiffs' counsel requested OCSO to expand their release initiative to include those with violent criminal histories and thus jeopardizing public safety.  One certainly has to wonder where the line is for these Plaintiffs and their counsel.

## CONCLUSION

This case is only a claim against Oakland County and thus Plaintiffs must establish liability under *Monell*. The law-of-the-case doctrine establishes that the policies and procedures of OCJ that were implemented prior to Plaintiffs filing their Complaint, prior to this Court issuing a TRO and Preliminary Injunction and that have continued to be in effect through the present date are reasonable and do not support a cause of action against Oakland County. See, *Keahey v Marquis*, 978 F3d 474, 481 (6th Cir. 2020).

20

Plaintiffs' repeated (and similar) baseless allegations and anecdotes from a handful of inmates that have been made throughout this litigation, do not and cannot establish the requisite unconstitutional policy or custom that is required pursuant to *Monell*. Indeed, in addressing the affidavits relied upon by Plaintiffs and this Court in ordering a preliminary injunction, the Sixth Circuit rejected such reliance and held "even assuming their truth, while these allegations may tend to show that the jail's response has been imperfect, we are not convinced that they are enough to establish deliberate indifference." *Cameron*, 815 Fed Appx at 988, n. 3. Without a valid cause of action (and without equitable claims), there is no basis for any further order from this Court regarding affirmative measures taken by the jail. Similarly, even if there was a legal basis (which there is not), in light of the extensive evidence provided in the instant Response, there is no factual basis for the relief requested by Plaintiffs.

WHEREFORE, Defendants, OAKLAND COUNTY and MICHAEL J. BOUCHARD, respectfully request this Honorable Court to deny Plaintiffs' Motion based on the foregoing.

POTTER, DEAGOSTINO, O'DEA & CLARK

21

Respectfully submitted,

POTTER DeAGOSTINO O'DEA & CLARK

/s/ ROBERT C. CLARK (P76359)
Attorneys for Defendants
2701 Cambridge Court, Suite 223
Auburn Hills, Michigan 48326
(248) 377-1700
Dated: December 11, 2020          rclark@potterlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on December 11, 2020, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all attorneys of record.

/s/ Robert C. Clark

POTTER, DeAGOSTINO, O'DEA & CLARK

22