# EXHIBIT A

# Proposed Settlement Agreement

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMAAL CAMERON; RICHARD
BRIGGS; RAJ LEE; MICHAEL
CAMERON; MATTHEW
SAUNDERS, individually and on
behalf of all others similarly situated,

    Plaintiffs,

v.

MICHAEL BOUCHARD, in his
official capacity as Sheriff of Oakland
County; OAKLAND
COUNTY, MICHIGAN,

    Defendants.

Case No. 20-cv-10949-LVP-MJH

Hon. Linda V. Parker

## SETTLEMENT AGREEMENT

Plaintiffs and Defendants (collectively, "the Parties") agree as follows:

**I.  INTRODUCTION AND PROCEDURAL PROVISIONS**

1.  Plaintiffs are detainees in the custody of the Oakland County Jail.

2.  Defendants are Michael Bouchard, Oakland County Sheriff, and Oakland County, Michigan.

3.  The Court has provisionally certified this case as a class action. (ECF 94). The class is defined as "all current and future Jail detainees during the course of the COVID-19 pandemic." The pre-trial subclass is defined as all members of the class "who have not yet been convicted of the offense for which they are

1

currently held in the Jail." The post-conviction subclass is defined as class members "who have been sentenced to serve time in the Jail or who are otherwise in the Jail as the result of an offense for which they have already been convicted." The medically-vulnerable subclass is defined as members of the class who "are over the age of sixty (60) or who, regardless of age, experience any of the following underlying medical conditions: (i) chronic lung disease including chronic obstructive pulmonary disease (e.g., bronchitis or emphysema); (ii) moderate to severe asthma; (iii) serious heart conditions; (iv) immunocompromising conditions including cancer treatment, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications; (v) severe obesity (body mass index [BMI] of 40 or higher); (vi) diabetes; (vii) chronic kidney or liver disease; (viii) metabolic disorders; or (ix) current or recent (last two weeks) pregnancy.

4. As a condition of this Agreement, the Parties stipulate that class certification is proper. Defendants shall not oppose final class certification nor appeal any class certification or provisional class certification order.

5. The purpose of this Agreement is to settle the above-captioned case. The parties believe this agreement is fair, reasonable, and adequate to protect the interests of all parties. Defendants agree to support the approval of this Agreement

pursuant to the requirements of Rule 23(e) of the Federal Rules of Civil Procedure and to bear any costs of providing notice to the class,  The Parties stipulate that class notice shall be provided by: (1) providing an agreed-upon summary of this Agreement, along a full copy of this Agreement, to each individual incarcerated at the Jail during the time between when this Agreement is submitted to the federal district court for approval and the time of its actual approval; and (2) posting summaries of the Agreement in prominent locations in every cell row, pod, dorm, or other type of cell block during the same period.

## II.  SUBSTANTIVE PROVISIONS

**Hygiene/Cleaning Supplies**

6. Defendants shall ensure that each detainee receives, free of charge: (a) an individual supply of bar soap and hand towels sufficient to allow regular hand washing and drying each day, (b) an adequate supply of toilet paper; and (c) an adequate supply of disinfectant spray effective against the COVID-19 virus for daily cleanings.  Disinfectant spray shall be left inside all multi-person cells and all shared areas at all times so that it can be used on an as-needed basis for cleaning shared surfaces.[1]  In the event that any detainee runs out of soap, toilet paper, or

---

[1] In "pod" cells consisting of several two-person cells surrounding a common shared space where showers and telephones are located, disinfectant spray may be left in the shared space.  In other cells, disinfectant spray should be left inside each cell.

disinfectant spray and notifies a deputy, additional supplies shall be provided by the end of the shift in which the person notifies the deputy of the need for such products.

7. Defendants shall provide detainees with access to showers daily and clean laundry on a regular basis. Clean laundry includes clean personal towels that shall be provided, at a minimum, on a weekly basis. Detainees shall have access to disinfectant spray at the shower that can be used before and after each shower.

8. Defendants shall provide all cells and shared spaces with cleaning supplies such as sponges, disinfecting wipes, or rags, without cost, that are sufficient to allow detainees to scrub and clean common areas or items (including, but not limited to high touch items like phones and tables) between each use. Such items shall be left in each cell and shared space so they can be used as-needed, and the supply in each cell shall be sufficient to prevent cross-contamination. Such cleaning supplies shall be of sufficient quantity such that detainees can clean large surface areas such as tables with different items than they use to clean phones. Defendants must replace these cleaning items daily.

9. Defendants will provide all detainees with clean and usable masks and will replace ruined or soiled masks upon such detainees' reasonable request.

**Jail Staff**

10. "Jail staff" as used in this agreement, means all Oakland County Jail employees, as well as employees of third-party contractors including (but not limited to) Aramark and Wellpath, vendors, law enforcement officials visiting the Jail, volunteers, and medical personnel.

11. Defendants shall ensure that, to the fullest extent possible, all Jail staff wear personal protective equipment, including masks.

12. Defendants shall ensure that, to the fullest extent possible, all Jail staff wash their hands with soap and water or use hand sanitizer containing at least 60% alcohol both before and after touching any person or any surface in cells or common areas.

**Medical Care and Treatment**

13. Defendants shall establish a protocol through which an incarcerated person may self-report symptoms of COVID-19 infection and to evaluate those symptoms, including temperature monitoring. This may be satisfied either by (1) offering a sick call slip to an inmate upon request or (2) having an inmate report symptoms by using the jail provided tablet and addressing a message to the jail clinic.

14.  Defendants shall conduct testing for anyone displaying known symptoms of COVID-19 within 12 hours of Jail staff becoming aware of the symptoms or upon request of a COVID-19 test within 12 hours of the request.

15.  Defendants shall conduct testing of anyone in a cell or cell block in which another incarcerated person has tested positive for COVID-19 within 12 hours of learning of the positive test result unless all individuals in the cell were tested for COVID-19 simultaneously with the individual who tested positive.

16.  Defendants shall respond to all COVID-19 related emergencies (as defined by the medical community) within an hour.

17.  Medical co-pays shall not be charged before treatment (including testing) is provided to those experiencing COVID-19-related symptoms.

18.  Charges for medical grievances shall be waived during the pandemic.

**Housing**

19.  Defendants shall provide adequate spacing between detainees to the maximum extent possible, with a goal of six feet of separation, so that social distancing can be accomplished. Unless necessary, ten-man cells will not exceed 8-person occupancy.

20.  Individuals identified as having COVID-19, having symptoms of COVID-19, or having been exposed to COVID-19 shall receive adequate medical care and be properly quarantined in a non-punitive setting, with continued access

to showers, mental health services, reading materials, phone and video calling with loved ones, communications with counsel, and personal property (to the extent reasonable and necessary to the inmate's physical and mental well-being). Such individuals shall remain in quarantine and be strongly encouraged to wear face masks when interacting with other individuals until they are no longer at risk of infecting other people.  Quarantine practices shall be consistent with CDC and/or MDHHS recommendations for congregate facilities absent compelling necessity.

**Communication**

21.     Defendants shall effectively communicate to all detainees, including low-literacy and non-English speaking detainees, sufficient information about COVID-19, measures taken to reduce the risk of transmission, and any changes in policies or practices to reasonably ensure that detainees are able to take precautions to prevent infection.

22.     Defendants shall train all Jail staff regarding measures to identify symptoms of COVID-19 in detainees, measures to reduce transmission, and the Jail's policies and procedures during the pandemic.

**Transfers**

23.     Defendants shall refrain from the use of punitive transfers or threats of transfers to areas of the Jail that have higher infection rates (or any other form of

threat involving increased exposure to infection) for any infraction whatsoever. Defendants dispute that this practice ever occurred.

24. Under no circumstances shall Jail staff effect (or threaten to effect) a transfer, for disciplinary reasons, of any detainee into a quarantined area. Defendants dispute that this practice ever occurred.

25. Any disciplinary movement of a non-quarantined incarcerated person shall be to a "non-quarantined area." A non-quarantined area is an area, defined as any of the following areas, in which no cell or individual is under quarantine at the time of transfer: (1) in the ten-man cells, a row of cells in a cell block that contains its own separate locked entrance from the hallway; (2) an entire pod of one-or-two man cells that contains a separate locked entrance from other areas of the jail; (3) any dorm rooms that are not separated from each other by separate locked entrances; or (4) any cell block not otherwise described above. Additionally, any quarantine in the receiving holding tanks shall be grouped as follows: R1 and R2 will be quarantined together, R3 through R5 will be quarantined together, and R9 will be quarantined separately by itself. Therefore, the quarantine of one of these receiving holding tank groups will not affect the quarantine/non-quarantine status of the other receiving holding tank groups. The division of the holding tanks into separate quarantine areas is contingent upon the Jail maintaining air seals between the areas by keeping doors between the areas closed and locked (for R3 through

R5) and by maintaining a plexiglass barrier dividing the hallway that separates R-1/R-2 from R9. This process shall also be applicable to transfers for documented medical necessity.

**Retaliation**

26. Defendants shall refrain from retaliating in any form, against class members who raise concerns either formally or informally about the health and safety conditions in the Jail. Defendants dispute this practice ever occurred.

**Vaccine Program**

27. Defendants represent that, as of the time this Agreement is entered, they have offered vaccines to everyone currently incarcerated in the Jail. Anyone who has previously declined to receive a vaccine will still be eligible to receive one within one week of making a request to Jail staff.

28. Until the expiration of this Agreement, Defendants shall offer a COVID-19 vaccine of their choice that has been approved for emergency or permanent use by the FDA to any newly arriving detainee at the Jail within eight days of that individual's arrival at the Jail, assuming that the Oakland County Health Department has received a supply of vaccines that may lawfully be used at the Jail, and assuming that there are groups of five or more individuals who agree to be vaccinated. All detainees shall be placed in new-arrival quarantine upon first arriving at the Jail for a period of at least fourteen days, and shall not be transferred

into general population until they have tested negative for COVID-19 following their fourteen-day quarantine. Any detainee who has requested a vaccine during their new-arrival quarantine shall receive the vaccine by the end of their fourteen-day quarantine period, regardless of whether five other individuals have requested a vaccine, and no detainee shall be held in quarantine for a lengthened period of time as the result of having requested a vaccine.

29. The Parties will cooperate to develop a program to encourage detainees to accept vaccines. Plaintiffs' counsel will draft a letter to all class members encouraging them to accept the vaccine which will be displayed on the Jail tablets and television. Plaintiffs' counsel will produce a short (~15 minutes) video that features a medical expert, Plaintiffs' counsel, and/or a formerly incarcerated person, to promote vaccine uptake. Any detainee who indicates that they do not wish to receive the vaccine will be shown the video produced by Plaintiffs' counsel and will receive one-on-one counseling from a case worker employed by the Jail to answer questions or concerns about the vaccine. A one-on-one code entry will be documented in the inmate file to document that this counseling has occurred. Case workers will receive training on frequently asked questions and medical concerns and will be trained to encourage taking the vaccine as recommended by the Center for Disease Control (CDC) and Advisory Committee on Immunization Practices (ACIP). Detainees will also be provided an

electronic or physical copy of a flier to be produced by Plaintiffs' counsel as well as an electronic or physical copy of the Johnson & Johnson fact sheet produced by AMEND, available at the following url: https://amend.us/wp-content/uploads/2021/04/COVID-Vax-info-for-residents-JJ-FAQ.pdf. If these measures are not successful in achieving high levels of vaccine acceptance, the Parties agree to work together to develop additional strategies, including the option of a signed, sealed letter from counsel being delivered to all unvaccinated detainees.

30. Jail staff shall not discourage detainees from taking the vaccine, nor will they provide inaccurate anecdotes or information that might discourage vaccine uptake. Unless medically contraindicated for a particular individual, anyone receiving the vaccine shall receive, at the time of vaccination, a 12-pack of acetaminophen pills. Individuals receiving the vaccine will be monitored for the first fifteen-minutes after vaccination. Additionally, deputies will be notified on a shift-to-shift basis of all detainees who have received the vaccine within the past 48 hours. While making regular rounds every hour, deputies will monitor detainees who have received the vaccine within the past 48 hours. Any detainee experiencing an unusual adverse reaction (e.g., stroke, blood clot, etc.) will be hospitalized. The hospital will notify the Oakland County Health Department and/or the Centers for Disease Control of unusual adverse reactions to the vaccine.

31. The monthly testing report described in paragraph 34 shall include the number of vaccines administered during the month and the number of detainees who have refused the receive the vaccine.

32. The Parties agree to cooperate to take any additional reasonable steps to promote vaccine uptake by detainees.

### III. MONITORING AND ENFORCEMENT

33. Defendants shall continue the practice the Parties have developed during litigation of providing Plaintiffs' counsel with weekly transfer reports as provided by ECF 110, as amended by ECF 177. These reports will be consistent in content and format with the reports Defendants have provided during litigation, and shall therefore be submitted via e-mail, at the beginning of each week and shall detail each transfer within every Jail building including the following: 1) the name of each transferred detainee; 2) their assigned inmate ID number; 3) their pre-transfer housing assignment; 4) their post-transfer housing assignment; and 5) the reason for the transfer. The weekly list shall also state what areas of the Jail have been under quarantine each week and the dates that they were quarantined.

34. Defendants shall provide Plaintiffs' counsel with monthly reports detailing how many COVID-19 tests have been administered and the results of the tests. These reports will be consistent in content and format with the reports

Defendants have provided during litigation, and will be provided within three business days of the first day of each month.

35. The parties shall meet and confer in a good faith effort to resolve their disputes informally. Plaintiffs' counsel agrees to contact defense counsel and give notice of a suspected breach of this Agreement. Defendants will continue the practice the Parties have developed during litigation of providing reasonable information to Plaintiffs' counsel in response to allegations of a potential breach of this Agreement. If the matter cannot be satisfactorily resolved within 72 hours of notice to defense counsel, Plaintiffs' counsel shall contact the court, and within 72 hours of notice from Plaintiffs' counsel that there has been a breach or suspected breach of this Agreement, the Court will schedule a conference call with the parties to discuss the matter and how to best remediate the issue. Both Parties recognize that one purpose of undertaking such consultation prior to resorting to judicial intervention is for class counsel to obtain necessary information to assess whether information they have received actually represents a breach of this Agreement. Accordingly, as part of the consultation process, Defendants will promptly provide reasonably available evidence requested by Plaintiffs' Counsel that bears on the accuracy of any alleged breach.

## IV. DISMISSAL AND RETENTION OF JURISDICTION

36. The parties stipulate that, as a condition of this Agreement, the United States District Court shall retain jurisdiction over all disputes arising out of this Agreement and to enforce this Agreement according to its terms during the pendency of this Agreement.

37. Based upon the entire record, the parties stipulate that this Agreement satisfies the requirements of 18 U.S.C § 3626(a)(1)(A) in that it is narrowly drawn, extends no further than necessary to correct the alleged violation of Federal rights, and is the least intrusive means necessary to correct the alleged violation of the Federal rights of Plaintiffs. In the event that the Court finds that Defendants have not complied with the Agreement, it will require Defendants to submit a plan to be approved by the Court to remedy the deficiencies. If Defendants do not remedy the deficiencies, the Court will retain power to enforce this Agreement through all remedies provided by law. The Parties further stipulate that neither this Agreement nor the Court's approval of this Agreement shall constitute a previous court order within the meaning of 18 U.S.C § 3626(a)(3).

38. Subject to the terms of this Agreement, and upon the Court's approval of this Agreement pursuant to the requirements of Rule 23(e) of the Federal Rules of Civil Procedure, the parties stipulate that the Court may enter an order dismissing this case with prejudice and without costs, fees, or attorney's fees to

any party, except as otherwise specifically authorized by paragraphs 42 and 43 of this Agreement, provided that the Court expressly include in its dismissal order that it retains jurisdiction to enforce this Agreement. If this Agreement is not approved or the Court does not agree to retain jurisdiction, this Agreement shall be null and void.

**MISCELLANEOUS PROVISIONS**

39. This Agreement constitutes the entire agreement among the parties as to all claims raised by Plaintiffs in this action. It supersedes all prior agreements, representations, statements, promises, and understandings. Each party represents, warranties, and covenants that it has full legal authority necessary to enter into this Agreement and to perform the duties and obligations arising under it, and that the court's entry of this Agreement is proper and will not be challenged by the Parties. This agreement is effective upon being executed by all parties through counsel whose signatures appear below.

40. This Agreement may not be modified except by a writing signed by all representatives of all parties at the time of modification.

41. This Agreement is binding on all successors, assignees, employees, agents, and all others working for or on behalf of Defendants and Plaintiffs.

42. In the event that (1) Plaintiffs move to enforce any aspect of this Agreement, and (2) Plaintiffs are the prevailing party, and (3) Plaintiffs prove that

the breach of the Agreement that they alleged constituted a custom or policy by the Jail (as defined by *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) and its progeny), then Defendants agree that they shall pay reasonable attorneys' fees (for a maximum of two attorneys) and costs, including expert costs, which shall be determined using an hourly rate that shall not exceed 150 percent of the hourly rate established in the Eastern District of Michigan under 18 U.S.C. § 3006A for payment of court-appointed counsel. Plaintiffs may also recover for the time of one paralegal at half of the rate stated above. Moreover, any recovery of fees by Plaintiffs pursuant to this provision shall be limited to time and expenses spent relating to the specific issue upon which they prevailed and upon which they demonstrated a breach that constituted Jail custom or policy. Any attorneys' fees payable under this paragraph shall not be due until after the Sixth Circuit has reviewed the federal district court's underlying determination of a breach (or after the time to appeal the federal district court's decision has expired).

43. In the event that (a) any attorneys' fees are awarded to Plaintiffs pursuant to paragraph 42, and (b) Plaintiffs have litigated multiple alleged breaches of this Agreement at the same hearing before the federal district court, and (c) Defendants prevailed on one or more of the alleged breaches by demonstrating that no such breach(es) occurred, then Defendants shall be entitled to an offset against the attorneys' fees owed for their attorneys' time and expenses spent relating to the

16

specific issue upon which Defendants prevailed. Any offsets under this paragraph shall be subject to the same limitation on hourly rates to which Plaintiffs are subject under paragraph 42, the same limitation that only two attorneys and one paralegal are eligible for consideration, and the same limitation to time and expenses spent relating to the specific issue upon which Defendants prevailed. Under no circumstances shall any offset provided under this paragraph result in any attorneys' fees ever being owed by Plaintiffs to Defendants. Rather, the offset is available only to reduce any fees owed by Defendants to Plaintiffs pursuant to paragraph 42.

44. The District Court shall have jurisdiction to enforce this Agreement until the earlier of (a) October 31, 2021; or (b) when the Centers for Disease Control have declared that the COVID-19 pandemic has terminated and that heightened precautions are no longer necessary for both the general public and carceral facilities specifically.

Signed and agreed to by counsel on behalf of the Plaintiff Class by:

 /s/*Philip Mayor*                                    5/18/21
Philip Mayor (P81691)                                 Date
American Civil Liberties Union Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6803
pmayor@aclumich.org

17

Signed and agreed to by counsel on behalf of the Defendants by:

| | |
|---|---|
| /s/*Steven M. Potter* | 05/18/21 |
| Steven M. Potter (P33344) | Date |
| POTTER, DeAGOSTINO, O'DEA & CLARK | |
| 2701 Cambridge Court, Suite 223 | |
| Auburn Hills, Michigan 48326 | |
| (248) 377-1700 | |
| spotter@potterlaw.com | |